**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

ERIN BAUER in her individual capacity and as administratrix of the ESTATE OF PAUL BAUER

Plaintiff,

Case No.

v.

ARMSLIST, LLC,
BRIAN MANCINI,
JONATHAN GIBBON
and
BROC ELMORE,

Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Erin Bauer, by and through her attorneys, states and alleges as follows:

### Introduction

1. This lawsuit concerns the irresponsible, negligent, reckless, and intentional actions of Defendants who chose to place profits over people by creating and maintaining an Internet gun marketplace that routinely armed the criminal gun market, and a Chicago police commander who died as a result.

2. Armslist, LLC ("Armslist"), Brian Mancini, Jonathan Gibbon and Broc Elmore (collectively "the Armslist Defendants") intentionally designed and maintained www.Armslist.com to actively encourage, assist and profit from the illegal sale and purchase of firearms.

3. The Armslist Defendants knew or should have known that their design, policy and content choices implemented on Armslist.com would arm dangerous individuals – including individuals barred from possessing firearms under state or federal law ("Prohibited Purchasers")--either directly or through gun traffickers purchasing from sellers on Armslist.com.

4. The Armslist Defendants knew or should have known that these Prohibited Purchasers would use weapons sold through Armslist.com to harm – and in some cases kill – innocent people. Indeed, the Prohibited Purchasers who the Armslist Defendants knew or should have known they would arm are barred from possessing firearms precisely because they pose an unreasonable risk to the safety of innocent people – including law enforcement officers.

5. The Armslist Defendants deliberately created and implemented a variety of policies, features and content on Armslist.com which encouraged and assisted individuals in illegally "engag[ing] in the business" of selling firearms without a license in violation of 18 U.S.C. § 923(a) by creating and operating what were, in essence, unlicensed virtual firearms "stores."

6. The virtual, illicit, unlicensed "stores" encouraged and assisted by Armslist.com's policies, features and content pose a grave risk of harm to the public and law enforcement because they facilitate countless illegal firearms sales and purchases which allow guns to fall into the hands of Prohibited Purchasers directly and/or through gun traffickers.

7. Prohibited Purchasers and gun traffickers disproportionately utilize such unlicensed "stores" because such illicit enterprises enable them to buy and sell guns without a National Instant Criminal Background Check System ("NICS") check, without any firearms transaction records, and without complying with relevant state and/or federal laws which are intended to prevent Prohibited Purchasers from obtaining firearms. All firearms purchases at a Federal Firearms Licensee ("FFL") are subject to all of the above requirements.

8. Upon information and belief, individuals seeking to establish illicit, unlicensed virtual firearms "stores" or to purchase weapons from such "stores" to avoid these requirements disproportionately choose to utilize Armslist.com rather than competitor websites. This is a foreseeable result of the design, policy and content choices made by the Armslist Defendants and the fact that Armslist.com chooses not to use features, policies and content designed to minimize the risk of illegal transactions which supply the criminal market.

9. The Armslist Defendants knew or should have known that their irresponsible design policy, and content choices would create and supply a criminal market in firearms and, thereby, cause death and injury to innocent third-parties. In the years since they created Armslist.com, the Armslist Defendants have come to know with certainty that their site repeatedly and continuously arms criminals and causes deaths and injuries to members of the public.

10. Their response to this fact has been ignore this unconscionable cost and to double down on their callously irresponsible conduct in creating a haven for illegal firearms transactions

that foreseeably put guns in the hands of criminals including Prohibited Purchasers and/or gun traffickers.

11. This is because the Armslist Defendants are focused on driving up revenue they receive from advertisers buying space on Armslist.com by maximizing the volume of firearms sales on the website – both legal and illegal – regardless of any foreseeable collateral damage.

12. Police Commander Paul Bauer was murdered on February 13, 2018 as a proximate result of the Armslist Defendants' knowing, reckless and/or negligent actions and decisions.

13. Upon information and belief, the Armslist Defendants' design, policy and content choices actively encouraged and assisted Wisconsin resident Thomas Caldwell in creating and operating an illicit, virtual gun "store" on the site.

14. Caldwell has since been convicted of illegally engaging in the business of selling firearms without a legally-required license.

15. Predictably, the Armslist Defendants' design, policy and content choices also, upon information and belief, motivated and assisted a gun trafficker from the Milwaukee area¸ Ron Jones, in locating Caldwell's virtual gun "store" and using it to acquire weapons without a background check or any record of his transactions.

16. Jones, in 2017, purchased a Glock 26 9mm handgun ("the Handgun") from Caldwell through his Armslist.com "store." Jones foreseeably resold the Handgun into the broader criminal market, where it ultimately was obtained by Shomari Legghette, a Prohibited Purchaser unable to buy guns in the legal firearms market due to past felony convictions. Legghette foreseeably used the Handgun to murder Commander Bauer on February 13, 2018.

Had the Armslist Defendants not designed their website to actively motivate, assist and profit from transactions by unlicensed, illicit virtual firearms "stores" like Caldwell's, the Handgun would not

have been in Legghette's possession in 2018. The Armslist Defendants knew or should have known their actions would foreseeably supply Prohibited Purchasers like Legghette, directly and/or through gun traffickers like Jones. If the Armslist Defendants had acted with reasonable care – instead of callous and willful disregard of human life – Commander Bauer would still be alive.

17. The Armslist Defendants were also negligent per se because they are, at minimum, responsible as knowing accomplices or co-conspirators for Caldwell's violations of § 923(a). The Armslist Defendants may also potentially be responsible, either directly or indirectly, for the violations of other state and/or federal firearms laws.

18. The Armslist Defendants are also responsible for aiding and abetting Caldwell's tortious behavior by negligently entrusting lethal firearms to a dangerous buyer like Jones who showed a propensity to misuse these weapons in a manner that would foreseeably harm innocent third-parties.

19. This suit does not challenge the right of responsible and law-abiding parties to broker firearms sales utilizing reasonable screening procedures, effective safeguards and common sense to minimize the risk that lethal weapons fall into the wrong hands. It seeks to hold the Armslist Defendants responsible for the foreseeable consequences of intentionally, recklessly and/or negligently designing and administering Armslist.com as a platform that does not merely enable but actively encourages and assists in the completion of illegal transactions supplying the criminal firearms market.

20. This suit does not seek to treat the Armslist Defendants as publishers or speakers of third-party content, or to impose liability on the Armslist Defendants for simply publishing content solely produced by third-party users. The Armslist Defendants are liable because they

acted negligently and intentionally, and took an active role in the production and proliferation of the content on Armslist.com.

21. In particular, the Armslist Defendants produced content such as computer code, website features and statements of policy which assisted and encouraged illegal firearms transactions. They also materially contributed to the illegal firearms transactions rampant on their website, and acted collaboratively with their unlawful users to make them co-authors of the various advertisements for these illegal transactions.

**Jurisdiction and Venue**

22. Jurisdiction is properly conferred by 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy, upon information and belief, is well in excess of $75,000.

23. Venue is proper under § 1391(b)(2) because, upon information and belief, a "substantial part of the events or omissions giving rise to the claim" occurred in this district. For example, upon information and belief, Jones was motivated and assisted by the Armslist Defendants' design, policy and content choices on Armslist.com in using the site to locate Caldwell's illicit, unlicensed "store" while operating in the Milwaukee area, first acquired the Handgun from Caldwell in the Milwaukee area, and possessed the Handgun for some period of time in the Milwaukee area.

**Parties**

24. Plaintiff Erin Bauer is the surviving wife of decedent Commander Bauer and is suing in her individual capacity and in a representative capacity as the administratrix of Commander Bauer's estate. She, in all capacities, is a resident of the state of Illinois. § 1332(c)(2).

25. On information and belief, defendant Armslist is an Oklahoma limited liability company with its principal place of business at 616 Magee Avenue, Jeanette, Pennsylvania, 15644.

Armslist owns and operates Armslist.com and derives its primary revenue from selling advertising space on its website.

26. On information and belief, Defendant Brian Mancini is an individual residing at 300 Heinz St., Pittsburgh, Pennsylvania 15212 who was, at all relevant times, a member of Armslist and an individual who played a role in the design, architecture, and administration of Armslist.com.

27. On information and belief, Defendant Jonathan Gibbon is an individual residing at 616 Magee Ave., Jeanette, Pennsylvania 15644 who was, at all relevant times, a member of Armslist and an individual who played a role in the design, architecture, and administration of Armslist.com.

28. On information and belief, Defendant Broc Elmore is an individual residing at 4212 Middlefield Court, Norman, Oklahoma 73072 who was, at all relevant times, a member of Armslist and an individual who played a role in the design, architecture, and administration of Armslist.com.

## Factual Allegations

A. Internet Firearms Transactions by "Private Sellers."

29. FFLs are required to conduct background checks on gun buyers to prevent sales to felons, the mentally ill, domestic abusers and other Prohibited Purchasers. They are also required to keep detailed records of all firearms transactions so that law enforcement can more easily trace the chain of custody of a firearm ultimately linked to a crime. These records assist law enforcement in identifying any parties who may have been responsible for diverting the firearm into the hands of dangerous individuals including Prohibited Purchasers. State and/or federal laws also impose other restrictions and requirements on licensed firearms dealers. As part of their legal

responsibility, firearms dealers are supposed to screen for, and not supply, illegal straw purchasers and gun traffickers.

30. These laws prevent criminals and other dangerous persons from obtaining guns and using them in crime. Prohibited Persons are generally unable to buy guns from licensed gun dealers due to an inability to pass a Brady background check. Individuals are also less likely to use weapons purchased from FFLs in a crime or to resell firearms purchased from FFLs to dangerous third-parties such as Prohibited Purchasers because they know that law enforcement can quickly consult transaction records to link their names to these weapons.

31. In enacting the background check and record-keeping requirements, Congress recognized and sought to address the inherent danger to the public posed by unregulated gun sales and Prohibited Purchasers possessing firearms.

32. Unlicensed "private sellers" who are not "engage[d] in the business" of selling firearms (*see* 18 U.S.C. § 923(a)) are not subject to the same regulations as FFLs.

33. Many illegal gun sellers unlawfully engage in the business of selling a large volume of firearms as a commercial enterprise without a license while falsely pretending to be "private sellers" — often without detection or prosecution.

34. Private sales from such illegal gun dealers are attractive to buyers wishing to avoid a record of their purchases and buyers who fear they will or may possibly fail a background check because they are or may be Prohibited Purchasers. Such sales, which take place on the internet at an ever-increasing rate, account for around one-fifth of all United States sales, and are key source for the black market in firearms.

35. As the Armslist Defendants knew or should have known, firearms sold online in private sales – including on their site – often cost more money than the same firearms purchased

from a licensed dealer because Prohibited Purchasers and/or gun traffickers are willing to pay a premium to avoid background checks, transaction records and other restrictions applicable at an FFL.

36. Private sales conducted over the internet have repeatedly been linked to illegal gun trafficking and direct or indirect sales to Prohibited Purchasers – including minors, domestic abusers, and felons. Internet sales have also been connected to several well-documented mass shootings – including the 2007 shooting at Virginia Tech (which killed 32 people and left over a dozen wounded) and the 2008 shooting at Northern Illinois University (where 5 were killed and 17 more were wounded).

37. Nineteen states and Washington, D.C. require background checks on at least some private sales. However, in most jurisdictions, no such background checks are required.

38. Upon information and belief, the Armslist Defendants were well aware of these facts when they created and/or were maintaining and operating Armslist.com prior to and during 2017.

B. Armslist.com.

39. Armslist.com is a for-profit online firearms marketplace.

40. Armslist.com assists and encourages individuals in purchasing and selling firearms and firearm-related items without regulation, detection or compliance with firearms laws.

41. Armslist, which owns and operates Armslist.com, is not licensed as a FFL.

42. The Armslist Defendants chose to create Armslist.com after several prominent online marketplaces chose to stop facilitating online private sales of firearms due to a recognition that it was too likely that such transactions would contribute to America’s gun violence epidemic by channeling weapons to the criminal market.

43. For example, in 2002, eBay, the multibillion-dollar online auction and trading community, announced that it was prohibiting gun sales on its website. The company's decision to end the user listings of firearms was rooted in the belief that the internet "was not an appropriate venue for that kind of merchandise" because "the process of buying and selling firearms online is sufficiently different from the offline world." eBay's then-vice president of marketing and business development cited the fact that "online sellers cannot readily guarantee that buyers meet all the qualifications and comply with the laws governing firearm sales."

44. In or around 2007, Craigslist, the ubiquitous classified advertisements website, also banned firearm sales from its site.

45. Other web services, including Amazon.com's third-party seller program and Google's "AdWords" ad-serving platform, similarly prohibit the listing of firearms for sale because of the high likelihood that such online sales will funnel guns to the criminal market.

46. The decisions of these online providers sent an unequivocal message to other businesses that online gun marketplaces should either be avoided entirely or should only be operated with the greatest care and strong precautions designed to prevent dangerous people from using such sites to illegally acquire weapons.

47. The Armslist Defendants, however, saw an opportunity to design and operate website that flouted reasonable care and the law in order to dominate the online firearms marketplace business and profit off the criminal gun market.

48. Armslist.com's co-founder, Defendant Jonathan Gibbon, admitted that the decisions of other service providers to discontinue online firearms marketplaces motivated the creation of Armslist.com while paying lip-service to the idea of compliance with the law, stating: "Sometime during the Summer of 2007, I saw an interview about Craigslist.com on TV. When I

heard them say that they decided to ban all gun related ads because a few users cried out for it, it inspired me to create a place for law abiding gun owners to buy and sell online without all of the hassles of auctions and shipping."

49. As intended, Armslist.com now primarily serves so-called "private sellers." A 2013 examination of Armslist.com postings by the *New York Times* revealed that 94% of the advertisements on the site were posted by self-identified "private sellers."

50. Since revenue from advertising on Armslist.com is correlated with the number of transactions and users Armslist.com supports, the Armslist Defendants' revenue is almost entirely dependent on the sales traffic of these "private sellers."

51. In 2018 alone, Armslist.com had almost 1.2 million advertisements for firearms transactions from "private sellers" where no background check was required. Many or all of these transactions were also exempt from any record keeping requirements.

52. Contrary to its talk about catering to "law abiding" citizens, the Armslist Defendants knew or should have known that, by launching the Armslist.com platform, they would be encouraging and assisting in the completion of precisely the illegal firearm sales supplying the criminal market that eBay, Craigslist and other prominent e-commerce marketplaces had sought to avoid.

C. The Armslist Defendants Intentionally Created and Adopted Design Features, Policies and Content to Encourage and Assist Illegal Firearms Sales and Purchases.

53. Not only did the Armslist Defendants choose to enter a business that demanded the utmost care to minimize the virtually-certain harm that it would cause, but they chose not to institute any of the numerous reasonable and feasible measures that could minimize the risk of harm.

54. Instead, the Armslist Defendants chose to create their website's features, policies and content to exacerbate that risk in order to maximize sales and profit.

55. The Armslist Defendants implemented policies, features and content on Armslist.com that were designed to motivate and assist in the creation and operation of illicit, unlicensed virtual firearms "stores" as well as the completion of the illicit gun sales and purchases these "stores" enable.

56. The Armslist Defendants made these choices despite the fact that they knew or should have known that such "stores" disproportionately cater to gun traffickers and/or Prohibited Purchasers and violate, at minimum, 18 U.S.C. § 923(a).

57. In particular, the Armslist Defendants encouraged and assisted unlawful firearms buyers and sellers by providing tailored tools to enable unlicensed sellers operating "stores" like Caldwell's and their gun trafficker and/or Prohibited Purchaser clients to easily identify, attract, interact with and transact with one another as opposed to responsible, law-abiding sellers or buyers.

58. The Armslist Defendants also encouraged and assisted unlawful conduct by providing explicit or implicit assurances and functionalities to these classes of individuals so that they could confidently operate with impunity and anonymity when conducting illegal firearms transactions.

59. The below is a non-exhaustive list of some of Armslist's policies, features and content that encourages and assists unlawful buyers and sellers to identify, attract, interact with and transact with one another, and assures and empowers such users so that they could confidently operate with impunity and anonymity:

(a) Armslist.com enables any party to identify him or herself as a "Private Party" and enables any party to search for only "Private Party" in his or her state via filtering functions. This enables unlicensed dealers like Caldwell, who are selling large quantities of firearms in violation of § 923(a), to effectively market the fact that they will be selling firearms without background checks, transaction records or compliance with other legal restrictions. It also enables Prohibited Purchasers and/or gun traffickers like Jones to easily locate unlawful sellers like Caldwell while seeking to avoid such restrictions.

(b) For example, see this screen shot of the Armslist.com website: *See, e.g.*, https://www.armslist.com/classifieds/search?location=wisconsin&category=all&search=glock+26&posttype=7&sellertype=1 (boxes added for emphasis):

The above search for a "Glock 26" in Wisconsin, for example, located a gun identical or nearly identical to the Handgun sold in this case and offered by another "private seller" in the same city where Jones was based within a matter of minutes.

(c) Armslist.com, upon information and belief, pre-labels both "For Sale" and "Want to Buy" postings as being posted by or being directed to "Private Part[ies]" if the user does not have an established account when using the "Create a Listing" function, as evidenced in the following interface page that occurs during the process of developing an advertisement.

(d) For example, see this screen shot from the Armslist.com website. *See* https://www.armslist.com/posts/01b2c9b570db4653bc42b65fd2515464/edit?stage=Info (box added for emphasis) (changing post type to "Want to Buy" does not alter the "Private Party" language displayed in the box):

(e) Because of this feature of the website design and content created by Armslist, when any user who does not have an account attempts to create a post on Armslist.com using the "Create a Listing" function, the user must select various pieces of information – such as the location of the desired transaction and the category or firearm being offered for sale/sought to be purchased (*e.g.* "Handguns") -- from a series of introductory menus; these initial selections are then reflected on the interface page above. *See id*. Upon information and belief, the information on the interface page (contained in the box on the image above) is ultimately translated into tags displayed on the advertisements produced when the user completes the process of developing the advertisement. *See id.*; https://www.armslist.com/posts/11171037/milwaukee-wisconsin-handguns-for-sale-trade--glock-26-gen-4 (boxes added for emphasis) (advertisement for sale):



(f) The "Private Party" tag that later appears on advertisements like the above is, thus, not produced as a result of the user selecting an option on any menus. Rather, the words "Private Party" occurring on the interface page and later reflected on advertisements are authored entirely by Armslist.com and exist as a pre-populated, default option.

(g) By automatically applying the words "Private Party" to all advertisements created by users without an account, the Armslist Defendants have chosen to make functioning as or seeking out a "private seller" the default for most of its users.

(h) As a result, the Armslist Defendants encourage and assist Armslist.com users in engaging in sales/purchases without background checks, transaction records and other restrictions.

(i) Further, because the words "Private Party" that Caldwell and other unlicensed dealers use to market their willingness to sell guns without background checks, transaction records and other restrictions are generated entirely by Armslist.com without any interaction from users, the Armslist Defendants are acting as co-authors of advertisements for

illegal sales by unlicensed dealers like Caldwell by contributing a critical piece of content to these advertisements.

(j) Armslist.com places no limitation on the number of firearms advertisements a so-called "private seller" may post.

(k) Armslist.com takes no steps to identify, remove or report unlicensed dealers like Caldwell who are clearly "engag[ing] in the business" of selling firearms in violation of § 923(a) by placing hundreds of firearms advertisements while posing as "private sellers."

(l) The Armslist Defendants, despite choosing to allow Armslist.com users to flag posts for removal, correction and/or reporting for various reasons, have chosen not to allow users to flag posts as specifically reflecting, encouraging or soliciting unlawful conduct. *See* FAQ Page, https://www.armslist.com/info/faqs (arrow and box in original):

(m) This telegraphs to Armslist.com users that the Armslist Defendants will take no steps to find out if any of the self-identified "private sellers" on their website, in reality, unlicensed firearms dealers like Caldwell who are violating § 923(a) or if any of their other users are acting unlawfully in violation of other state and/or federal firearms statutes.

(n) The Armslist Defendants chose, through their stated polices, to explicitly and repeatedly assure their unlawful users that they will exercise no oversight regarding illegal conduct on Armslist.com.

(o)     For     example,     on     Armslist.com's     Terms     of     Use     Page (https://www.armslist.com/info/terms) the Armslist Defendants have emphasized that ". . . ARMSLIST DOES NOT become involved in transactions between parties and does not certify, investigate, or in any way guarantee the legal capacity of any party to transact."

(p)     Similarly, on the FAQ Page, the Armslist Defendants have chosen to emphasize that ". . . ARMSLIST *can not* and *will not* be a party in transactions. It is the sole responsibility of the buyer and seller to conduct safe and legal transactions." (emphasis in original).

(q)      The Armslist Defendants chose to provide these assurances to give unlawful users even more confidence that they will face a minimal risk of identification, removal from the site or apprehension by law enforcement when engaging in unlawful firearms transactions through Armslist.com.

(r)     These explicit assurances of impunity for illegal conduct are particularly egregious given that Armslist.com's Terms of Use recognize the risk that some users will exploit the design, policy and content choices implemented on the site to conduct illegal firearms transactions.  *See* Terms of Use Page (demanding that users indemnify the Armslist Defendants for damages including those related to the "direct or indirect results of violations of any and all applicable laws").

(s)     On the FAQ Page, Armslist.com informs its users that, unlike on some of Armslist.com's competitor sites, "You can perform all of the major functions without creating an account."

(t)     The absence of a required account where the account user's identity has been verified means that Armslist.com allows prospective purchasers or sellers to browse or create advertisements without accurately identifying themselves.

(u) The absence of an account also means that even responsible sellers have effectively no means of checking a buyer's transaction history should they have concerns that the purchaser is a gun trafficker buying an excessive number of firearms.

(v) The Armslist Defendants have expressly stated that they will not provide information to sellers – such as the actual name of the buyer – that the sellers might need to verify that a sale is lawful. *See* FAQ Page ("Q: Can ARMSLIST contact a seller for me or provide me with information about a user? Due to our privacy policy, ARMSLIST can only provide information to law enforcement during due process of law.").

(w) Armslist.com provides an internal messaging system whereby users do not have to divulge personally identifying contact information – such as their names, phone numbers or mailing addresses – when contacting prospective buyers or sellers.

(x) Armslist.com does not require that a purchaser take delivery of a gun through a FFL who, by law, would have to verify the prospective purchaser's identity, maintain a record of the transaction and conduct a background check.

(y) The Armslist Defendants take no measures to prevent persons who cannot legally buy or possess firearms from using the website to illegally buy and possess firearms.

(z) The Armslist Defendants take no measures to prevent persons who cannot legally engage in the firearms business from using the website to illegally engage in the firearms business.

60. The Armslist Defendants, through these and/or other policy, feature, and content choices they implemented on Armslist.com, effectively encouraged and assisted individuals like Caldwell to create and operate unlicensed virtual firearms "stores" catering to Prohibited Purchasers/gun traffickers on the site in violation of § 923(a).

61.     The Armslist Defendants encouraged and assisted gun traffickers like Jones and/or Prohibited Purchasers in finding and utilizing such unlawful "stores."

62.     The Armslist Defendants also, by materially contributing to illegal firearms transactions, became responsible, as co-authors, of the advertisements for illegal transactions posted by unlicensed dealers like Caldwell.

63.     The Armslist Defendants knew or should have known that a large number of unlicensed dealers like Caldwell were regularly using Armslist.com to illegally "engage in the business" of selling firearms as a commercial enterprise prior to 2017.

64.     The Armslist Defendants knew or should have known that such unlicensed dealers foreseeably and disproportionately arm Prohibited Purchasers like Legghette either directly or through traffickers like Jones.

65.     The Armslist Defendants knew or should have known that by assisting and encouraging unlicensed, illicit firearms "stores" on their site and taking an active and significant role in the production and proliferation of advertisements for illicit transactions involving such "stores" they would foreseeably be arming Prohibited Purchasers like Legghette with deadly firearms.

66.     The Armslist Defendants knew or should have known that such individuals would use these weapons to cause death and injury to innocent people – including, in particular, law enforcement officers.

67.     The Armslist Defendants' policy, design and content choices have been enormously successful in assisting and encouraging unlicensed virtual "stores" like Caldwell's and generating more and more advertisements for illegal firearms transactions on Armslist.com.

68. *The Verge* and *The Trace* analyzed over 2 million posts on Armslist.com between December 2016 and March 2019 in an effort to identify unlicensed dealers like Caldwell. They focused on the frequency of occurrence of specific cell phone numbers linked to sellers and found over 700 unique phone numbers were listed by sellers in 10 or more posts – including one phone number listed in more than 300 posts. Only 14 of these numbers belonged to legitimate FFLs according to a database maintained by Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Each one of the other phone numbers is highly likely to belong to seller who, like Caldwell, has violated and/or is continuing to violate § 923(a) by "engag[ing] in the business" of selling firearms as a commercial enterprise without a license.

69. Multiple unlicensed sellers contacted as part of the above investigation freely admitted that they were unlawfully utilizing Armslist.com to turn a profit on the sale of firearms as opposed to simply offloading private collections.

70. The approximately 700 unique phone numbers listed by sellers in 10 or more posts above are likely dramatically underinclusive of the real number of unlicensed sellers "engag[ing] in the business" of selling firearms on Armslist.com.

71. The Armslist Defendants knew or should have known that if they had chosen to provide mechanisms by which lawful transactions are promoted and unlawful conduct is deterred, they could have prevented many or all of unlawful shootings involving weapons sold on Armslist.com.

72. The Armslist Defendants chose not to implement such safeguards.

73. Instead, the Armslist Defendants chose to implement design, policy and content choices which made the transfer of firearms to the criminal market an inevitable and major part of the commerce on Armslist.com.

74. Even some of Armslist.com's current users recognize and are uncomfortable with Armslist.com's failure to provide safeguards to prevent weapons from falling into the wrong hands.

75. One seller contacted by *The Trace* and *The Verge* lamented the inability to conduct background checks in connection with sales brokered on Armslist.com, stating that "If someone calls you up and says, 'Hey, I'd like to buy a gun,' you should be able to check if the person can have a gun . . . . I want to be a responsible gun owner."

D. Despite Having Notice That Armslist.com Was Supplying a Dangerous Criminal Firearms Market, the Armslist Defendants Chose Not to Use Feasible Safeguards to Decrease the Number of Illegal and/or Dangerous Sales Channeling Weapons to Criminals

76. The Armslist Defendants had been presented with compelling information prior to 2017 demonstrating that their design, policy and content choices on Armslist.com were encouraging and assisting individuals who, like Caldwell, wanted to unlawfully "engage in the business" of selling firearms as a commercial enterprise without a license by operating virtual weapons "stores" on their site.

77. For example, a 2013 Mayors Against Illegal Guns ("MAIG") report observed that an "investigation of high-volume online sellers [on Armslist.com] show[ed] that hundreds of gun sellers were using the internet to transfer tens of thousands of firearms each year, blurring the line between private sellers and licensed dealers, undermining the background check system, and putting guns in the hands of killers."

78. During the approximately two months analyzed in the MAIG investigation, 29% of all advertisements for sales on Armslist.com were posted by high-volume "private sellers" – a large amount of whom are likely in violation of § 923(a).

79. In follow-up investigations of a subset of these unlicensed dealers, a majority of the sellers gave at least one additional indicator beyond the high volume of sales indicating that they were probably illegally "engag[ing] in the business" of selling firearms as a commercial enterprise without a license.

80. At least one seller contacted by MAIG directly confirmed that the design features, policies and content on Armslist.com encouraged and assisted him in operating an illicit online "store" without a license.

81. This seller, who posted 17 firearms advertisements on Armslist.com during the approximately two-month time period, admitted that "[Selling guns] is a hobby . . . more like an obsession. It started like a hobby, *and then places like Armslist made it so easy. So I get on Armslist like every day."* (emphasis added).

82. The MAIG report received media coverage and the Armslist Defendants were, upon information and belief, aware of the facts identified therein.

83. Upon information and belief, the Armslist Defendants were also aware, prior to 2017, that Armslist.com was serving as one of the best possible sources for dangerous buyers who wished to acquire weapons they intended to utilize in crimes while minimizing their likelihood of punishment by evading background checks and record keeping requirements.

84. A 2011 undercover investigation of online gun sales conducted by the City of New York found, *inter alia,* that: (1) 62% of "private sellers" agreed to sell a gun to a buyer who stated that he or she probably could not pass a background check; (2) 54% of Armslist.com "private sellers" were willing to make a sale to a person they believed could not pass a background check; and (3) 67% of "private sellers" in Wisconsin were willing to make a sale to a person they believed could not pass a background check.

85. The results of this investigation were widely reported in the mainstream press and, upon information and belief, the Armslist Defendants were aware of the facts therein.

86. The MAIG report released in 2013 also referenced that one in thirty "Want to Buy" ads on Armslist.com were posted by someone with a criminal record that barred them from owning a gun.

87. A 2013 study by Third Way and Americans for Responsible Solutions revealed that Wisconsin had the fifth-highest number of "Want to Buy" ads seeking out "private sellers."

88. The Armslist Defendants, upon information and belief, were also aware of the prevalence of "Want to Buy" ads seeking "private sellers" – including in Wisconsin – on their site.

89. The Armslist Defendants thus had notice, prior to 2017, that Prohibited Purchasers, including in Wisconsin, were seeking to use Armslist.com to acquire firearms at more than quadruple the rate at which they were trying to buy guns at FFLs.

90. The Armslist Defendants also knew or should have known that Prohibited Purchasers would be attracted to Armslist.com because they seek to avoid FFLs due to the fact that background checks might bar their acquisition of desired weapons and records might link them to the weapons they were trying to acquire.

91. A survey conducted by Everytown for Gun Safety in February of 2019 reinforced the above findings that Armslist.com is a haven for illegal firearms transactions.

92. This investigation found that one in nine would-be buyers on Armslsist.com across several states were prohibited under federal or state law — a frequency over seven times higher than the frequency with which prohibited buyers fail background checks at licensed dealers or in other contexts where background checks are required.

93.    The same study also confirmed, consistent with previous findings, that over 65% of Armslist.com sellers contacted by undercover Everytown operatives would be willing to complete a sale without a background check.

94.    The Armslist Defendants also were aware, prior to 2017, that weapons acquired through transactions brokered on Armslist.com were being utilized by Prohibited Purchasers to commit horrific murders – including in both Wisconsin and Illinois.

95.    For example, a FNP-40 semiautomatic handgun and ammunition purchased through Armslist.com were used in a 2012 mass casualty shooting at a spa and salon in Brookfield, Wisconsin.

96.    The shooter, Radcliffe Haughton, could not have accessed the legal firearms market by buying from an FFL because he was unable to pass a background check; he had a restraining order against him for a history of domestic violence that rendered him a Prohibited Purchaser. § 922(g)(8).

97.    Upon information and belief, the design, policy and content choices implemented on Armslist.com encouraged and assisted Haughton in violating this prohibition and acquiring the weapon he used to kill or injure his wife and multiple others.

98.    The Brookfield shooting was widely reported in the press.

99.    The Armslist Defendants were sued for their role in supplying the gun to the killer.

100.    Similarly, the 40-caliber handgun used in the 2011 murder of Jitka Vesel in Oak Brook, Illinois was initially advertised on Armslist.com –where it caught the eye of her ultimate murderer, Demetry Smirnov.

101. Smirnov was an immigrant from Russia living in Canada when he made the purchase – meaning that he was a Prohibited Purchaser because "private sellers" are restricted to selling firearms to residents of the same state. 18 U.S.C. § 922(a)(5).

102. The seller who sold to Smirnov via Armslist.com had, despite listing himself as a "private seller," conducted over 20 firearms sales through the site and appears, like Caldwell, to have violated § 923(a) by "engag[ing] in the business" of selling firearms as a commercial enterprise without a license.

103. Upon information and belief, the design, policy and content choices implemented on Armslist.com encouraged and assisted the seller in violating § 923(a) and Smirnov in unlawfully acquiring a firearm

104. The Vesel shooting was widely reported in the press.

105. The Armslist Defendants were sued for their role in supplying the gun to the killer.

106. There are well-known and common-sense safeguards that the Armslist Defendants could have and should have implemented so as to stop encouraging and assisting in illegal firearms transactions.

107. The 2013 MAIG report listed several steps that Armslist could have taken to decrease the number of transfers of guns to dangerous criminals through its website, including, without limitation:

(a) monitoring high-volume sellers and issuing direct warnings to sellers apparently "engag[ing] in the business" of selling weapons as a commercial enterprise, providing users with a tool to report repeat offenders, and reporting repeat offenders identified by users or site administrators to law enforcement;

(b) requiring greater transparency from users – such as by requiring both buyers and sellers to create accounts and provide credit-card verified evidence of their identities before posting on or purchasing through the website;

(c) requiring sellers to conduct background checks on would-be gun buyers or, at a minimum, recommending that users conduct background checks and providing tools to facilitate such background checks.

108. The Armslist Defendants also knew or should have known that they could have required that any purchasers of guns from "private sellers" take delivery of their guns through a FFL who would conduct a background check and keep a record of the transactions.

109. Some or all of these procedural safeguards, which reduce the opportunity for unlawful sellers to provide guns to anonymous and unchecked buyers, have been adopted, in whole or in part, by other online gun marketplaces such as ShootersXchange.com, GunAuction.com, GunBroker.com and GunRunnerAuctions.com.

110. Such safeguards are not only well-known but are also economically and technologically feasible.

111. A reasonable person or company who wished to create a website to encourage and assist lawful firearms sales would have implemented these and other policy, design and content choices to prevent illegal firearms sales that foreseeably lead to people being shot with guns obtained through such transactions.

112. The Armslist Defendants did the opposite of what a reasonable person or company would do in order to encourage, assist and profit from unlawful firearms sales.

113. Despite all of the above specific notice prior to 2017 that they were encouraging and assisting in illegal gun sales and purchases and causing injuries and deaths involving those

guns, the Armslist Defendants continued to design and administer Armslist.com to fuel an online black market in firearms.

E. The Armslist Defendants Assisted and Encouraged the Illicit Virtual "Store" and the Gun-Running Operation that Enabled Legghette to Illegally Acquire the Handgun and Proximately Caused Commander Bauer's Death.

114. Caldwell, in 2017, was illicitly "engag[ing] in the business" of selling firearms via a virtual online "store" on Armslist.com.

115. Caldwell could have tried to use sites such as ShootersXchange.com, GunAuction.com, GunBroker.com and GunRunnerAuctions.com to engage in his illicit, unlicensed virtual firearms dealership. Instead, he chose to use Armslist.com.

116. Upon information and belief, design, policy and content choices implemented by the Armslist Defendants on Armslist.com encouraged Caldwell to use Armslist.com for his illicit purposes and assisted in the success of his scheme.

117. Upon information and belief, safeguards and precautions on Armslist.com's competitor websites made all of these sites less attractive and useful for Caldwell's purposes than Armslist.com.

118. Caldwell operated an illicit, unlicensed virtual firearms "store" via Armslist.com from at least 2015 through 2017.

119. Caldwell posted at least 202 listings for firearms on Armslist.com, often emphasizing that the weapons were new and unfired.

120. Upon information and belief, Caldwell included these details about the guns not having previously been used to attract Prohibited Purchasers/gun traffickers – who prefer to use new guns not linked to previous crimes.

121. Caldwell has now been convicted for violating § 923(a).

122. Police traced 11 firearms recovered in investigations back to Caldwell between 2004-2017.

123. The Armslist Defendants also designed and administered Armslist.com to motivate and assist gun traffickers like Jones in buying weapons through Armslist.com.

124. Upon information and belief, various design, policy and content choices implemented by the Armslist Defendants on Armslist.com motivated and assisted Jones in utilizing Armslist.com to acquire the Handgun with the intent to resell it on the broader criminal market.

125. Upon information and belief, safeguards and precautions on Armslist.com's competitor websites made all of these sites less attractive and useful for Jones's purposes than Armslist.com.

126. Jones was not a one-time customer of Caldwell; he was a bulk purchaser buying weapons at a rate inconsistent with any lawful purpose and clearly telegraphing to anyone paying attention that he was trafficking firearms to criminal third-parties.

127. Caldwell informed ATF that Jones purchased at least 15 firearms from him over the course of five years and would call him to discuss firearms sales around three times a month.

128. When police raided Jones's home, they uncovered a cache of at least 30 firearms, 2,500 rounds of ammunition, magazines, body armor and a ballistic helmet.

129. This arsenal, upon information and belief, represented the stock-in-trade Jones needed to supply his customers on the criminal firearms market.

130. Upon information and belief, Jones, like other gun traffickers, was particularly motivated to avoid a record associating him with trafficked firearms including the Handgun.

131. Jones took advantage of the Armslist.com policies/features enabling anonymity (such as the lack of a requirement for a verified account confirming an individual's identity) to

provide Caldwell with a false identity – "Kevin Sweepee" – in connection with his firearms transactions.

132. Even had Caldwell wanted to conduct a background check or create a record listing the true name of the buyer of the Handgun, the Armslist Defendants designed and administered their site in a manner which would have frustrated a background check or the creation of accurate records.

133. Jones had previously been arrested in relation to drug felony charges and drug paraphernalia was recovered from the raid of his home related to this case.

134. Jones may have feared that he was unable pass a background check.

135. Jones, consistent with his role as a gun trafficker, resold/transferred the Handgun into the Chicago criminal market either directly or through intermediaries.

136. The raid of Jones' home uncovered indications that Jones potentially had a contact linked to the Chicago area who may have been connected to Legghette.

137. Jones' resale/transfer of the Handgun to supply the Chicago criminal gun market was an easily foreseeable result of the Armslist Defendants' design, policy and content choices implemented on Armslist.com.

138. It is well known that guns bought in jurisdictions with laxer firearms laws than Illinois/Chicago are frequently resold by traffickers into the Chicago area.

139. Former Chicago police First Deputy Superintendent John Escalante said, in relation to Commander Bauer's shooting, that "I'm not surprised that gun changed hands and came from out of state."

140. Shomari Legghette, a Prohibited Purchaser unable to access the legal firearms market because of felony convictions which would have prevented him from passing a background

check at an FFL, foreseeably acquired the Handgun via the criminal market as a result of the trafficking operation assisted and encouraged by the Armslist Defendants via their website.

141. It is particularly foreseeable that violent criminals like Legghette who illicitly acquire firearms will utilize them against law enforcement officers like Commander Bauer because such criminals are much more likely than law-abiding citizens to encounter the police in confrontational situations.

142. On February 13, 2018, Commander Bauer was chasing Legghette as he fled from police.

143. Legghette foreseeably pulled out the Handgun and shot Commander Bauer approximately 6-7 times in his head, neck, chest and wrist.

144. Commander Bauer was pronounced dead on his arrival at a nearby hospital.

145. Legghette would never have had the Handgun on February 13, 2018 – and Commander Bauer would still be alive – had the Armslist Defendants been responsible, reasonable and lawful in how they designed and administered Armslist.com.

146. For example, Legghette would not have been able to acquire the Handgun had the Armslist Defendants adopted measures including, but not necessarily limited, to:

(a) monitoring high-volume sellers;

(b) preventing persons from engaging in high volume or repeated sales by designing the website to prevent such bulk sales and/or requiring high volume sellers to provide proof of a federal firearms license;

(c) removing sellers apparently "engag[ing] in the business" of selling firearms without a license;

(d) providing users with a tool to report repeat offenders to site administrators/law enforcement;

(e) notifying law enforcement regarding sellers appearing to be "engag[ing] in the business" of selling firearms without a license;

(f) informing users that law enforcement will be notified of persons who appear to be "engag[ing] in the business" of selling firearms without a license;

(g) requiring greater transparency from users – such as by requiring both buyers and sellers to create accounts and provide credit-card verified evidence of their identity before posting on or purchasing through the website;

(h) requiring sellers to conduct background checks on would-be gun buyers;

(i) requiring that buyers certify that they are legal purchasers;

(j) requiring that buyers provide evidence that they are legal purchasers;

(k) requiring that sellers certify that they are legal sellers;

(l) requiring that sellers provide evidence that they are legal sellers;

(m) recommending that sellers conduct background checks and providing tools to facilitate such background checks;

(n) requiring that any purchaser of a gun from a "private sellers" take delivery of the gun through an FFL who would run a background check and create a formal transaction record of the buyer;

(o) prominently encouraging users to flag potentially illegal conduct and to alert Armslist.com and law enforcement of any such conduct;

(p) requiring that buyers and sellers register with the website and

(q) providing extensive and regularly updated information regarding all applicable firearms laws.

147. The Armslist Defendants instead, via various design, policy and content choices implemented on Armslist.com, opted to target, motivate, and assist unlawful sellers like Caldwell and gun traffickers like Jones so that they would become critical components of their customer base.

148. This was all to gain the economic benefit from Armslist.com acting as a conduit supplying guns to the criminal market despite the fact that this would predictably cause death and/or serious injury to numerous members of the public.

149. Commander Paul Bauer was killed as a proximate, foreseeable result of the Armslist Defendants' knowing, reckless and/or negligent actions.

150. Plaintiff seeks to hold the Armslist Defendants accountable for the harm they caused to Commander Bauer and his family, and for the costs they have unjustly placed on others by actively aiding and abetting/conspiring with individuals like Caldwell in engaging in illegal and/or tortious conduct and/or directly committing illegal and/or tortious conduct.

151. Armslist.com is not a passive publisher of dangerous third-party content; it is liable for Commander Bauer's death because it is an active participant in creating, either directly or indirectly, content associated with the solicitation, encouragement, facilitation, advertisement and/or completion of illicit firearms transactions.

## Claims for Relief

### Count 1 – Negligence Against the Armslist Defendants

152. The preceding paragraphs are incorporated by reference herein.

153. At all relevant times, the Armslist Defendants had a general duty to the public –

including law enforcement personnel like Commander Bauer – to exercise reasonable care in creating and administering a marketplace for the sale of firearms so as to minimize the risk of death or serious injury to members of the public resulting from these firearms falling into the wrong hands.

154. As a facet of this general duty, the Armslist Defendants had specific duties to implement reasonable safeguards, screening and monitoring procedures on Armslist.com to inhibit the creation and operation of unlicensed, virtual firearms dealerships violating 18 U.S.C. § 923(a) and to curtail illegal sales from such dealerships.

155. The Armslist Defendants knew or should have known that such sales were likely to supply Prohibited Purchasers like Legghette either directly or through gun traffickers like Jones.

156. The Armslist Defendants flagrantly and callously breached these duties by, *inter alia*:

(a) actively encouraging and assisting unlicensed bulk sellers like Caldwell to "engage in the business" of dealing in firearms in violation of § 923(a) through virtual "stores" on Armslist.com;

(b) failing to monitor high-volume sellers;

(c) failing to inhibit persons from engaging in high volume or repeated sales by designing the website to prevent such bulk sales and/or requiring high volume sellers to provide proof of a federal firearms license;

(d) failing to remove sellers apparently "engag[ing] in the business" of selling firearms without a license;

(e) failing to provide users with a tool to report repeat offenders violating this prohibition to site administrators/law enforcement;

(f) failing to notify law enforcement regarding sellers apparently "engag[ing] in the business" of selling firearms without a license;

(g) failing to inform users that law enforcement will be notified of persons who appear to be "engag[ing] in the business" of selling firearms without a license;

(h) failing to require greater transparency from users – such as by requiring both buyers and sellers to create accounts and provide credit-card verified evidence of their identity before posting on or purchasing through the website;

(i) failing to require sellers to conduct background checks on would-be gun buyers;

(j) failing to recommend that sellers conduct background checks and to provide tools to facilitate background checks;

(k) failing to require that buyers certify that they are legal purchasers;

(l) failing to require that buyers provide evidence that they are legal purchasers;

(m) failing to require that sellers certify that they are legal sellers;

(n) failing to require that sellers provide evidence that they are legal sellers;

(o) failing to require that any purchaser of a gun from a "private seller" take delivery of the gun through an FFL who would run a background check and create a formal transaction record of the buyer;

(p) failing to enable users to flag potentially illegal conduct and to alert Armslist.com and law enforcement of any such conduct;

(q) failing to require that buyers and seller register, and

(r) failing to provide extensive and regularly updated information regarding all applicable firearms laws.

157.    Breach of these duties constitutes negligence.

158.    These safeguards are not merely reasonable but also economically and technologically feasible.

159.    Upon information and belief, the Armslist Defendants' violations of their duties motivated and assisted Caldwell, an unlicensed firearms dealer, in foreseeably using Armslist.com to create and maintain a virtual firearms dealership in violation of 18 U.S.C. § 923(a).

160.    Upon information and belief, these violations foreseeably motivated and assisted Jones, a gun trafficker, in using Armslist.com to locate Caldwell's dealership and illegally acquire the Handgun while avoiding a background check or a record of the transaction.

161.    The Armslist Defendants knew or should have known that illegal enterprises like Caldwell's are disproportionately frequented by Prohibited Purchasers and/or gun traffickers like Jones.

162.    The Armslist Defendants knew or should have known that gun traffickers like Jones frequently transport firearms across state lines into states with strict gun violence prevention regimes like Illinois.

163.    The Armslist Defendants knew or should have known that gun traffickers like Jones primarily supply dangerous criminals unable or unwilling to access the legal firearms market – including, frequently, Prohibited Purchasers like Legghette – either directly or through other criminal intermediaries.

164.    The Armslist Defendants knew or should have known that these ultimate end users pose a serious risk of harm to members of the general public and are particularly likely to kill or injure law enforcement officers like Commander Bauer because they are especially likely to become involved in confrontations with law enforcement.

165. Thus, the diversion of the Handgun into the criminal market and Legghette's ultimate use of the Handgun to murder Commander Bauer were directly and foreseeably caused by the negligent and/or unlawful misconduct of the Armslist Defendants.

166. As a result of the Armslist Defendants' misconduct, Commander Bauer, whose estate is herein represented by Erin Bauer in her capacity as an administratrix, suffered damages – including significant pain, suffering, awareness of impending death, fear of impending death, mental anguish, funeral expenses and other compensable injuries and damages, all to the harm of his estate in an amount to be determined at trial.

167. As a result of the Armslist Defendants' misconduct, Erin Bauer, as an individual, has also suffered personal injuries and damages – including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, past and future medical expenses, past wage loss, a decrease in her family's future earning capacity, deprivation of society/companionship and other compensable injuries and damages, all to her harm in an amount to be determined at trial.

168. Upon information and belief, the damages for which these Defendants are liable are well in excess of $75,000.

Count 2 – Negligence Per Se Against the Armslist Defendants

169. The preceding paragraphs are incorporated by reference herein.

170. Breach of a statutory standard of care constitutes negligence.

171. Caldwell was ultimately convicted of being a commercial dealer "engage[d] in the business" of selling firearms without a license in violation of 18 U.S.C. § 923(a) for his activity on Armslist.com.

172. A party who acts as an accomplice or co-conspirator to a party who directly violates a statue can be held responsible, indirectly, for the violation of that statute. *See* 18 U.S.C. § 2.

173. "Willful blindness" to clear "red flags" of criminal activity equates to constructive knowledge under the law and is sufficient to support indirect criminal liability for statutory violations directly committed by a third-party.

174. The Armslist Defendants had, prior to 2017, actual and/or constructive knowledge based on "willful blindness" to clear "red flags" that a large number of individuals were operating unlicensed firearms dealerships on Armslist.com in violation of 18 U.S.C. § 923(a).

175. Caldwell, based on his at least 202 firearms advertisements between 2015-2017, was unquestionably one of these individuals.

176. The Armslist Defendants are responsible as accomplices/co-conspirators for the direct statutory violations of 18 U.S.C. § 923(a) committed by Caldwell.

177. The Armslist Defendants' violations directly and foreseeably caused Commander Bauer's death, and this harm was precisely the type of injury 18 U.S.C. § 923(a) was designed to prevent.

178. Indeed, Congress enacted 18 U.S.C. § 923(a) based on the recognition that unlicensed dealers like Caldwell are a primary source of weapons for gun traffickers like Jones and that weapons sold by such unlicensed dealers are very likely to end up in the hands of dangerous third-parties – including Prohibited Purchasers like Legghette – and used in unlawful acts of violence. Congress wanted to protect the general public from such violence by prohibiting the operation of unlicensed dealers.

179. Because Commander Bauer falls within the class of individuals the statute was designed to protect, his death was the type of harm contemplated by the statute and the Armslist Defendants' indirect violations of the statute were a proximate cause of Plaintiff's harm, Plaintiff is entitled to a theory of relief under negligence per se.

180. The Armslist Defendants may well also be responsible for violating one or other state and/or federal firearms statutes, either directly or as accomplices/co-conspirators, which would also support a negligence per se claim for the same reasons articulated herein.

181. As a result of the Armslist Defendants' misconduct, Commander Bauer, whose estate is herein represented by Erin Bauer in her capacity as an administratrix, suffered damages – including significant pain, suffering, awareness of impending death, fear of impending death, mental anguish, funeral expenses and other compensable injuries and damages, all to the harm of his estate in an amount to be determined at trial.

182. As a result of the Armslist Defendants' misconduct, Erin Bauer, as an individual, has also suffered personal injuries and damages – including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, past and future medical expenses, past wage loss, a decrease in her family's future earning capacity, deprivation of society/companionship and other compensable injuries and damages, all to her harm in an amount to be determined at trial.

183. Upon information and belief, the damages for which these Defendants are liable are well in excess of $75,000.

Count 3 – Public Nuisance Against the Armslist Defendants

184. The preceding paragraphs are incorporated by reference herein.

185. By intentionally, recklessly and/or negligently encouraging and assisting the completion of sales of vast quantities of firearms to the criminal market – including both through direct sales to Prohibited Purchasers and through sales to gun traffickers who are known to frequently supply Prohibited Purchasers – the Armslist Defendants have intentionally, recklessly and/or negligently participated in creating and maintaining an unreasonable interference with rights held in common by the general public.

186. Without limitation, the Armslist Defendants' acts and omissions as alleged herein continue to cause create, and maintain substantial and unreasonable interference with the public's health, safety, convenience, comfort, peace, and use of public property and/or private property.

187. The conduct of the Armslist Defendant constitutes a public nuisance under both common and statutory law.

188. For example, by intentionally, recklessly and/or negligently channeling vast quantities of guns to the criminal market – including through sales to traffickers like Jones who then foreseeably supply Prohibited Purchasers like Legghette – the Armslist Defendants substantially and unreasonably interfere with the public's use of public facilities such as public highways and walkways.

189. Public highways and walkways are made substantially and unreasonably unsafe because of the presence of guns possessed by Prohibited Purchasers that were illegally and/or negligently supplied, either directly or indirectly, through transactions brokered on Armslist.com.

190. The Armslist Defendants' acts and omissions as alleged herein have led to a substantial and unreasonable increase in the number of people in the general public who are killed or injured by guns obtained through illegal and/or negligent sales encouraged and assisted by the design, policy and content choices implemented on Armslist.com.

191. The Armslist Defendants' practices, in addition to increasing the number of victims of unlawful violence, have also emboldened criminals to commit more crimes involving the threat of violence (such as armed robbery), have increased disturbances of the public order caused by Prohibited Purchasers who have used Armslist.com to illicitly arm themselves and have forced society to divert substantial law enforcement, medical and legal resources to the gun violence fueled by weapons supplied through Armslist.com.

192.    The Armslist Defendants' creation and operation of Armslist.com remains an abnormally dangerous activity that imposes unreasonable costs on society.

193.    As alleged herein, prior to facilitating the transaction of the Handgun at issue, the Armslist Defendants were specifically aware that their website was enabling the sale of weapons being used by Prohibited Purchasers in violent crimes in both Illinois and Wisconsin.

194.    The Armslist Defendants thus had actual or constructive notice that they were causing a nuisance endangering the lives of members of the public – including in the jurisdictions relevant to this case – prior to 2017.

195.    The Armslist Defendants willfully chose to callously disregard the rights of the public and to take no actions to abate this nuisance by installing reasonable safeguards on Armslist.com.

196.    In addition to the generalized harms suffered by the public from the acts and omissions of the Armslist Defendants, the Armslist Defendants' creation of a public nuisance caused Plaintiff to suffer discrete personal injuries of a direct and substantial character other than that which the general public shares by causing Commander Bauer's murder.

197.    The public nuisance caused by the Armslist Defendants is substantial, ongoing, poses a continual threat to the public and merits injunctive relief.

198.    As a result of the Armslist Defendants' misconduct, Commander Bauer, whose estate is herein represented by Erin Bauer in her capacity as an administratrix, suffered damages – including significant pain, suffering, awareness of impending death, fear of impending death, mental anguish, funeral expenses and other compensable injuries and damages, all to the harm of his estate in an amount to be determined at trial.

199. As a result of the Armslist Defendants' misconduct, Erin Bauer, as an individual, has also suffered personal injuries and damages – including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, past and future medical expenses, past wage loss, a decrease in her family's future earning capacity, deprivation of society/companionship and other compensable injuries and damages, all to her harm in an amount to be determined at trial.

200. Upon information and belief, the damages for which these Defendants are liable are well in excess of $75,000.

Count 4 – Aiding and Abetting Tortious Conduct Against the Armslist Defendants

201. The preceding paragraphs are incorporated by reference herein.

202. The Armslist Defendants had a duty to exercise reasonable care to protect the public by not assisting and encouraging others in transferring weapons to dangerous individuals displaying a propensity to misuse such weapons in a manner that would cause harm to innocent third-parties.

203. Aiding and abetting such entrustments in breach of this duty constitutes negligence.

204. Jones had already demonstrated to Caldwell, prior to the purchase of the Handgun, that he was a trafficker likely to resell purchased firearms, either directly or indirectly, to one or more violent criminals. Therefore, Jones was displaying a clear propensity to use the Handgun in a manner that would cause harm to others.

205. Caldwell acted negligently by transferring the Handgun to Jones despite knowledge of Jones's proclivity to use the Handgun in such a manner.

206. The Armslist Defendants were on notice that unlicensed dealers like Caldwell disproportionately engage in precisely such negligent entrustments. But the Armslist Defendants

continued to design and administer Armslist.com so as to encourage and assist such individuals in operating illicit, unlicensed firearms "stores" that are particularly associated with such negligent entrustments – thereby knowingly aiding and abetting this tortious conduct.

207. As a result of the Armslist Defendants' misconduct, Commander Bauer, whose estate is herein represented by Erin Bauer in her capacity as an administratrix, suffered damages – including significant pain, suffering, awareness of impending death, fear of impending death, mental anguish, funeral expenses and other compensable injuries and damages, all to the harm of his estate in an amount to be determined at trial.

208. As a result of the Armslist Defendants' misconduct, Erin Bauer, as an individual, has also suffered personal injuries and damages – including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, past and future medical expenses, past wage loss, a decrease in her family's future earning capacity, deprivation of society/companionship and other compensable injuries and damages, all to her harm in an amount to be determined at trial.

209. Upon information and belief, the damages for which these Defendants are liable are well in excess of $75,000.

Count 5 – Civil Conspiracy Against the Armslist Defendants

210. The preceding paragraphs are incorporated by reference herein.

211. At some point before Caldwell's sale of the Handgun to Jones through Armslist.com in 2017, the Armslist Defendants and/or other parties known or unknown explicitly or implicitly conspired with one another to participate in a collaboration/combination to accomplish an unlawful purpose – the supply of firearms to Prohibited Purchasers either directly or through gun traffickers like Jones. Said conspiracy involved the deliberate decision of the Armslist Defendants and/or other actors to act in concert and with a common purpose to breach

various duties imposed by federal and/or state firearms statutes (either directly or as accomplices/co-conspirators) as well as to violate the common law duty of reasonable care.

212.    In particular, the above parties conspired in a concerted effort to encourage and assist the proliferation and operation of unlicensed, illicit virtual firearms "stores" like Caldwell's on Armslist.com and to motivate and empower gun traffickers like Jones in finding and utilizing these "stores" through various design, policy and content choices implemented on Armslist.com.

213.    Defendants Mancini, Gibbon and Elmore, in collaboration with parties known and/or unknown, advised, encouraged assisted and enabled Armslist.com to function as a haven for illegal firearms transactions that foreseeably placed guns in the hands of Prohibited Purchasers and/or gun traffickers in violation of both the common law duty of reasonable care and various firearms statutes.

214.    All of the above actors urged and/or acquiesced in Armslist's misconduct, and Armslist continues to operate negligently and unlawfully as a direct result of the continued explicit or implicit agreement and collaboration of these actors.

215.    As a result of the Armslist Defendants' misconduct, Commander Bauer, whose estate is herein represented by Erin Bauer in her capacity as an administratrix, suffered damages – including significant pain, suffering, awareness of impending death, fear of impending death, mental anguish, funeral expenses and other compensable injuries and damages, all to the harm of his estate in an amount to be determined at trial.

216.    As a result of the Armslist Defendants' misconduct, Erin Bauer, as an individual, has also suffered personal injuries and damages – including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, past and future medical expenses, past wage loss, a decrease in her family's future earning capacity, deprivation of

society/companionship and other compensable injuries and damages, all to her harm in an amount to be determined at trial.

217. Upon information and belief, the damages for which these Defendants are liable are well in excess of $75,000.

Count 6 –Wrongful Death Against the Armslist Defendants

218. The preceding paragraphs are incorporated by reference herein.

219. As a result of all of the misconduct discussed in this Complaint, the Armslist Defendants directly and foreseeably caused the wrongful death of Commander Bauer.

220. As a result of the Armslist Defendants' misconduct, Commander Bauer, whose estate is herein represented by Erin Bauer in her capacity as an administratrix, suffered damages – including significant pain, suffering, awareness of impending death, fear of impending death, mental anguish, funeral expenses and other compensable injuries and damages, all to the harm of his estate in an amount to be determined at trial.

221. As a result of the Armslist Defendants' misconduct, Erin Bauer, as an individual, has also suffered personal injuries and damages – including significant past and future pain, suffering, disability, emotional distress, loss of enjoyment of life, past and future medical expenses, past wage loss, a decrease in her family's future earning capacity, deprivation of society/companionship and other compensable injuries and damages, all to her harm in an amount to be determined at trial.

222. Upon information and belief, the damages for which these Defendants are liable are well in excess of $75,000.

Count 7 – Loss of Consortium Against the Armslist Defendants

223. The preceding paragraphs are incorporated by reference herein.

224. Erin Bauer is the surviving spouse of Commander Bauer.

225. She was entitled to the companionship, society, services, maintenance, aid and support of her husband without interference from the Armslist Defendants.

226. The Armslist Defendants' misconduct resulting in Commander Bauer's murder has deprived her of her husband's presence, support, affection and companionship since February 13, 2018.

227. As a result of this loss of consortium, Erin Bauer has suffered damages in an amount to be determined at trial.

Count 8 – Survival Action Against the Armslist Defendants

228. The preceding paragraphs are incorporated by reference herein.

229. Erin Bauer, as the administratrix of Commander Bauer's estate, is entitled to maintain any actions which Commander Bauer would have been able to bring against the Armslist Defendants as a result of their misconduct leading to his shooting.

230. All statements in this Complaint to this effect reflect this right.

Count 9 – Piercing the Corporate Veil against Mancini, Gibbon and Elmore

231. The preceding paragraphs are incorporated by reference herein.

232. Armslist acts as the alter ego of Mancini, Gibbon and Elmore who, collectively, control its operations.

233. Upon information and belief, Armslist is not appropriately capitalized and does not follow corporate formalities.

234. Mancini, Gibbon and Elmore use Armslist as a vehicle for improper, unlawful and negligent conduct that poses a grave risk of harm to the public.

235. Because Armslist is not, in reality, an independent corporate entity, and is, in effect simply a collective name for Mancini, Gibbon and Elmore, this Court should pierce the corporate

veil and hold the all Armslist Defendants who are natural persons individually responsible for all liabilities imposed on Armslist in connection with this case.

**Requested Relief**

WHEREFORE, Plaintiff respectfully prays for judgment against the Defendants as follows:

(i) an award of compensatory damages, on behalf of the estate of Commander Paul Bauer, from Defendants in amount to be determined at trial;

(ii) an award of compensatory damages, on behalf of Erin Bauer, from Defendants in an amount to be determined at trial;

(iii) an award of punitive damages, on behalf of the estate of Commander Paul Bauer, from Defendants in amount to be determined at trial;

(iv) an award of punitive damages, on behalf of Erin Bauer, from Defendants in an amount to be determined at trial;

(v) an injunction directing the Armslist Defendants to stop creating a public nuisance in regards to supplying a criminal firearms market by instituting various safeguards and reforming their business practices on Armslist.com or, in the alternative, to shut down their operations;

(vi) a ruling piercing the corporate veil to hold Mancini, Gibbon and Elmore personally liable for any damages imposed on Armslist;

(vii) for all costs, disbursements and actual attorneys' fees, and all interest due and following pursuant to Wis. Stat. § 628.46 and

(viii) granting such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Dated: February 12, 2020

By: **CANNON & DUNPHY, S.C.**

/s/ Patrick O. Dunphy
Patrick O. Dunphy
State Bar No. 1036964
595 North Barker Road
P.O. Box 1750
Brookfield, WI 53008-1750

(262) 796-3701 (Telephone)
(262) 796-3711 (Facsimile)
pdunphy@c-dlaw.com

/s/ Brett A. Eckstein
Brett A. Eckstein
State Bar No. 1036964
P.O. Box 1750
Brookfield, WI 53008-1750
(262) 796-3702 (Telephone)
(262) 796-3711 (Facsimile)
beckstein@c-dlaw.com

**BRADY**

/s/ Jonathan E. Lowy*
Jonathan E. Lowy *(pro hac vice to be filed)
Chief Counsel and Vice President Legal
840 First Street NE
Suite 400
Washington, DC 20002
202-370-8104
jlow@bradyunited.org

/s/ Christa Y. Nicols*
Christa Y. Nicols *(pro hac vice to be filed)
Legal Counsel, Policy
840 First St., NE, Suite 400
Washington, DC, 20002
202-370-8131
www.bradyunited.org

**BLANK ROME, LLP**

/s/ John D. Kimball*
John D. Kimball *(pro hac vice to be filed)
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
jkimball@blankrome.com