# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ERIN BAUER in her individual capacity
and as administratrix of the ESTATE OF
PAUL BAUER,

     Plaintiff,

v.

ARMSLIST, LLC and JONATHAN
GIBBON,

     Defendants.

Case No. 2:20-cv-00215-PP

---

## BRIEF IN SUPPORT OF MOTION TO DISMISS DEFENDANT GIBBON FOR LACK OF PERSONAL JURISDICTION OR, ALTERNATIVELY, FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

ARGUMENT ........................................................................................................ 3

    A. Rule 12(b)(2) Requires Dismissal Because The Court Lacks Personal Jurisdiction

    Over Mr. Gibbon. ........................................................................... 3

        1. Plaintiff cannot satisfy Wisconsin's long-arm statute. .......................................4

        2. The Court also lacks specific jurisdiction. ......................................... 5

        3. The Court lacks general jurisdiction. .................................................. 7

    B. Plaintiff Fails To State A Claim Under Rule 12(b)(6). ...................................8

        1. Plaintiff fails to state a plausible claim for relief because the CDA requires

        dismissal of the SAC. ...................................................................9

        2. Plaintiff fails to state a plausible claim for relief under either Illinois or

        Wisconsin law. ...................................................................11

            a. The Court should apply Illinois law under Wisconsin's choice of law

            analysis. ...................................................................11

            b. Plaintiff's claims fail under Illinois law per the Seventh Circuit's

            analysis in the *Vesely* case. ...................................................15

            c. Plaintiff also fails to allege negligence under Wisconsin law. .............16

            d. Wisconsin public policy also compels dismissal. ................................19

        4.  Plaintiff's claims suffer from additional pleading defects warranting dismissal.

    ........................................................................................21

            a. Public Nuisance (Count 2) ...................................................21

b. Negligence Per Se (Count 3) ...................................................21

c. Conspiracy (Count 4) ...........................................................22

d. Aiding and Abetting (Count 5) ..............................................23

e. Wrongful death claims (Counts 6-8) ....................................24

f. Veil piercing (Count 9) .........................................................24

CONCLUSION ......................................................................................26

# TABLE OF AUTHORITIES

**Cases:**                                                                                          **Pages:**

*Acuity, Ins. Co. v. Gonzalez*

       2014 U.S. Dist. LEXIS 176660 (E.D. Wis. Dec. 23, 2014) ........................................... 3-4

*Accurso v. Infra-Red Servs.*

       23 F. Supp.3d 494 (E.D. Pa. 2014) .................................................................................25

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*

       751 F.3d 796 (7th Cir. 2014) ........................................................................................... 5

*Antwaun A. v. Heritage Mut.  Ins., Co.*

       228 Wis.2d 44 (1999) ...............................................................................................21, 22

*Bartholomew v. Wis. Patients Comp. Fund*

       293 Wis.2d 38 (2006) ......................................................................................................24

*Bell Atlantic Corp. v. Twombly*

       550 U.S. 544 (2007) .........................................................................................................8

*Boatright Family, LLC v. Reservation Center, Inc.*

       2015 U.S. Dist. LEXIS 63051 (W.D. Okla. May 14, 2015) ............................................26

*Brooks v. Ross*

       578 F.3d 574 (7th Cir. 2009) ...........................................................................................8

*Burger King Corp. v. Rudzewicz*

       471 U.S. 462 (1985) .........................................................................................................5

*Butler v. Advanced Drainage Sys., Inc.*

       294 Wis.2d 397 (2006) ...................................................................................................21

*Calder v. Jones*

    465 U.S. 783 (1984) ...............................................................................6

*Casper v. American Intern. South Ins. Co.*

    336 Wis.2d 267 (2011) .....................................................................19, 20

*Clorox Co. v. S.C. Johnson & Son, Inc.*

    627 F.Supp.2d 954 (E.D. Wis. 2009) ..................................................14

*Dahl v. Keller*

    2019 U.S. Dist. LEXIS 84389 (E.D. Wis. May 20, 2019)....................5

*Daimler AG v. Bauman*

    571 U.S. 117 (2014) ........................................................................... 7-8

*Daniel v. Armslist, LLC*

    386 Wis.2d 449 (2019) ..................................................................2, 9, 10

*Elayyan v. Sol Melia, SA*

    571 F.Supp.2d 886 (N.D. Ind. 2008) ..................................................6

*Felland v. Clifton*

    682 F.3d 665 (7th Cir. 2012) ...............................................................5

*Gibson v. Craigslist, Inc.*

    2009 U.S. Dist. LEXIS 53246 (S.D.N.Y. June 15, 2009) ..................8

*Glaeske v. Shaw*

    261 Wis. 2d 549 (Ct. App. 2003) .......................................................12

*Heath v. Zellmer*

    35, Wis. 2d 578 (1967) .......................................................................13

*Heritage House Restaurants, Inc. v. Continental Funding Grp., Inc.*

    906 F.2d 276 (7th Cir. 1990) ............................................................3

*Hocking v. City of Dodgeville*

    318 Wis.2d 681 (2009) ...............................................................17

*Holt v. Hegwood*

    287 Wis.2d 853 (Ct. App. 2005) .....................................................22

*Hornback v. Archdiocese of Milwaukee*

    313 Wis.2d 294 (2008) ....................................................... 17, 18-19, 21

*International Shoe Co. v. Washington*

    326 U.S. 310 (1945) ...................................................................6

*Jankee v. Clark County*

    235 Wis. 2d 700 (2000) ..............................................................17

*J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.*

    2013 U.S. Dist. LEXIS 88363, *13 (M.D. Pa. Apr. 5, 2013) ...........................25

*Klayman v. Zuckerberg*

    753 F.3d 1354 (D.C. Cir. 2014) ..................................................9, 10

*Kopke v. A. Hartrodt S.R.L.*

    245 Wis.2d 396 (2001) ................................................................4

*Langley v. Am. Bank of Wis*.

    738 F. Supp. 1232 (E.D. Wis. 1990) ................................................23

*Lumax Indus. v. Aultmann*

    543 Pa. 38, 42 (1994) ...............................................................25

*McCauley v. City of Chi.*

    671 F.3d 611 (7th Cir. 2011) ....................................................................................24, 25

*Milsap v. Journal/Sentinel*

    897 F. Supp. 406 (E.D.Wis.1995), *rev'd in part on other grounds*, 100 F.3d 1265 (7th

    Cir.1996) ....................................................................................................................22

*Mt. Crest SRL, LLC v. Anheuser-Busch InBEV SA/NV*

    2020 U.S. Dist. LEXIS 72843 (W.D. Wis. Apr. 24, 2020) ...............................................24

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*

    591 F.3d 250 (4th Cir. 2009) .............................................................................................8

*Nieman v. Versuslaw, Inc.*

    2012 U.S. Dist. LEXIS 109066 (C.D. Ill. June 13, 2012) *report and recommendation*

    *adopted*, 2012 U.S. Dist. LEXIS 109069 (C.D. Ill. Aug. 3, 2012)......................................8

*On Command Video Corp. v. Roti*

    705 F.3d 267 (7th Cir. 2013) ...........................................................................................24

*Pavlic v. Woodrum*

    169 Wis. 2d 585 (Ct. App. 1992) ...................................................................................4, 5

*Perkins v. Benguet Consolidated Mining Co.*

    342 U.S. 437 (1952) .........................................................................................................8

*Rasmussen v. General Motors Corp.*

    335 Wis. 2d 1 (2011) .....................................................................................................6, 7

*Rush v. Savchuk*

    444 U.S. 320 (1980) .......................................................................................................6, 7

*Schmalfeldt v. Johnson*

    2016 U.S. Dist. LEXIS 86118 (E.D. Wis. July 1, 2016) ................................3, 5

*Segregated Account of Ambac Assur. Corp. v. Countrywide Home Loans*

    376 Wis.2d 528 (2017) ......................................................................................4

*Select Creations, Inc. v. Paliafito America, Inc.*

    852 F.Supp. 740 (E.D. Wis. 1994) ..................................................................25

*Skyview Film & Video, Inc. v. Safeco Life Ins. Co.*

    864 F. Supp. 755 (N.D. Ill. 1994) ....................................................................8

*Stokinger, et al. v. Armslist, LLC, et al.*

    Superior Court of Suffolk, Massachusetts, No. 1884CV03236-F (Mar. 13, 2020) ......2, 10

*Tamayo v. Blagojevich*

    526 F.3d 1074 (7th Cir. 2008) .........................................................................8

*Thomas v. Brinks*

    2020 U.S. Dist. LEXIS 13638 (Jan. 28, 2020) ............................................. 11-12, 13, 14

*Vesely v. Armslist, LLC*

    752 F.3d 658 (7th Cir. 2014) .......................................................2, 10, 15, 16

*Walden v. Fiore*

    571 U.S. 277 (2014) .........................................................................................5

*Weiskopf v. Kenworthy*

    326 Wis.2d 265 (Ct. App. 2010) ......................................................................4

*Winslow v. Brown*

    125 Wis.2d 327 (Ct. App. 1985) ....................................................................23

**Rules:**

Communications Decency Act, 47 U.S.C. § 230(c)(l), (e)(3) ........................................................9

Restatement (Second) of Conflicts of Laws § 307 (1971) ..........................................................25

12 Okla. Stat. § 682 ...................................................................................................................25

Defendants Jonathan Gibbon and Armslist, LLC ("Defendants"), move to dismiss Plaintiff Erin Bauer's ("Plaintiff") Second Amended Complaint ("SAC") as to Mr. Gibbon under Fed. R. Civ. P. 12(b)(2) and (6). Mr. Gibbon, a Pennsylvania resident, must be dismissed because there is no basis to assert personal jurisdiction over him. However, even if jurisdiction were proper, Plaintiff's claims fail as a matter of law because they are barred by the Communications Decency Act ("CDA") and prevailing state law.

## INTRODUCTION

Plaintiff claims Mr. Gibbon and Armslist, LLC—which operates Armslist.com, a bulletin board service that allows users to post ads regarding firearms and sporting equipment—are responsible for the shooting death of Plaintiff's husband, Chicago Police Department Commander Paul Bauer. Plaintiff claims Defendants are liable because they should have foreseen and prevented the following alleged events from occurring:

- Non-party Thomas Caldwell using Armslist.com to advertise a gun that non-party Ron Jones allegedly bought in Wisconsin in 2017. SAC, ¶¶ 13, 15-16.

- Mr. Jones selling the gun into the "broader criminal market" near Chicago, Illinois. *Id.* at ¶¶ 16, 133.

- At some point after that, non-party Shomari Legghette buying the gun in Chicago from the unknown parties and using it to kill Commander Bauer in Chicago in 2018. *Id.* at ¶¶ 16, 138, 140-42.

Plaintiff does ***not*** claim Armslist or Mr. Gibbon pulled the trigger. Plaintiff does not claim Mr. Gibbon sold the gun that caused Commander Bauer's death. Plaintiff's theory isn't even that a person who used Armslist.com to buy a gun killed Plaintiff's husband. Instead, Plaintiff's theory is two ***non***-parties to the lawsuit used Armslist.com, which Defendants should

Motion to Dismiss Gibbon  1

have foreseen and prevented because of their putative negligent and / or reckless operation of Armslist.com.  Defendants lament the tragedy Plaintiff and her husband have suffered.  However, neither Defendant bears liability for the loss.

Despite numerous legal and factual flaws, the SAC asserts a bevy of theories against Defendants: (1) negligence; (2) negligence per se; (3) public nuisance; (4) aiding and abetting; (5) civil conspiracy; (6) wrongful death; (7) loss of consortium; (8) survival; and (9) piercing the corporate veil.  Several other courts have already dismissed similar claims against Armslist — some virtually identical:

- *Vesely v. Armslist LLC,* 752 F.3d 661, 667 (7th Cir. 2014) (dismissing wrongful death claims arising from shooting in Chicago—also the site of the shooting alleged here—on black-letter Illinois law tort principles).

- *Daniel v. Armslist, LLC, et al.*, 386 Wis.2d 449, 484 (2019) (affirming dismissal under § 230 of the CDA  because it "prohibit[s] claims that treat Armslist, an interactive computer service provider, as the publisher or speaker of information posted by a third party on its website) (Petition for Writ of Certiorari to the United States Supreme Court, which was denied[1]).

- *Stokinger, et al. v. Armslist, LLC, et al.*, Superior Court of Suffolk, Massachusetts, 2020 Mass. Super. LEXIS 69, *5 (Mar. 13, 2020) (dismissing claim under § 230 that "Armslist.com's design and operational features facilitate illegal firearms sales and

---

[1] *Daniel v. Armslist, LLC,* 140 S.Ct. 562 (2019)
https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/19-153.html

encourage illegal firearms trafficking because Armslist.com makes it easy for prospective buyers to local private sellers by using a filter feature…").

The Court should do the same here for two broad reasons. (A) The Court cannot assert personal jurisdiction over Mr. Gibbon. And (B) Plaintiff fails to state a plausible claim for relief. If the Court does not dismiss for jurisdictional reasons, it can and should dismiss for failure to state a claim for any of the following three alternative reasons: (1) the CDA bars claims alleged in the SAC; (2) Illinois law as applied by the Seventh Circuit in *Vesely* requires dismissal; or, in the alternative, (3) Wisconsin law requires dismissal where Plaintiff has failed to plead duty, negligence, or the requisite elements of her causes.

## ARGUMENT

**A.      Rule 12(b)(2) Requires Dismissal Because The Court Lacks Personal Jurisdiction Over Mr. Gibbon.**

"In diversity cases, a federal district court has personal jurisdiction over a party if a court of the state in which it sits would have such jurisdiction." *Schmalfeldt v. Johnson*, 2016 U.S. Dist. LEXIS 86118, *7-8 (E.D. Wis. July 1, 2016) (citing *Heritage House Restaurants, Inc. v. Continental Funding Grp., Inc.,* 906 F.2d 276, 279 (7th Cir. 1990)). The Court cannot exercise personal jurisdiction over Mr. Gibbon because Wisconsin's long arm statute does not provide for personal jurisdiction under these circumstances. Wisconsin employs a statute employs a two-step inquiry. *Acuity, Ins. Co. v. Gonzalez*, 2014 U.S. Dist. LEXIS 176660, *4 (E.D. Wis. Dec. 23, 2014) ("Wisconsin courts employ a two-step inquiry when determining whether personal jurisdiction may be exercised over a nonresident defendant," citing Wis. Stat. section 801.05) "The first step is to determine whether the defendant meets the criteria for personal jurisdiction under the Wisconsin long-arm statute." *Id.* (*citing Kopke v. A. Hartrodt S.R.L.*, 245

Motion to Dismiss Gibbon  3

Wis.2d 396, 409 (2001)). Second, "[i]f the requirements of the long-arm statute are satisfied, then the court must consider whether the exercise of jurisdiction comports with due process requirements." *Id.* (same).

### 1. Plaintiff cannot satisfy Wisconsin's long-arm statute.

Wisconsin's long-arm statute "gives Wisconsin courts personal jurisdiction over a defendant 'engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise.'" *Segregated Account of Ambac Assur. Corp. v. Countrywide Home Loans*, 376 Wis.2d 528, 546 (2017) (holding appointment of registered agent in state insufficient to confer personal jurisdiction).

Plaintiff has omitted any allegation of a specific act or omission by Mr. Gibbon whatsoever other than generic allegations he created and operated Armslist negligently. *E.g.,* SAC, ¶¶ 8-9, 19. Plaintiff's assertion of personal jurisdiction over Mr. Gibbon can only be based upon his role as an officer and member of Armslist, LLC. Yet, "[p]ersonal jurisdiction over the corporation ***cannot be the sole basis for personal jurisdiction over an officer***." *Pavlic v. Woodrum*, 169 Wis. 2d 585, 590 (Ct. App. 1992) (emph. added); *see also Weiskopf v. Kenworthy*, 326 Wis.2d 265, *15 (Ct. App. 2010) ("We have previously recognized that 'personal jurisdiction over the corporation cannot be the sole basis for personal jurisdiction over an officer'"). To the contrary, "[t]here must be some act or omission by that officer in Wisconsin to justify personal jurisdiction." *Pavlic*, 169 Wis.2d at 594.

While Plaintiff also makes conclusory allegations of veil-piercing vis-à-vis Armslist's corporate form—*see infra* at p. 23-25—she conspicuously omits any allegations of specific facts supporting such claims. The SAC omits any allegation that Mr. Gibbon made an act or omission in Wisconsin justifying this Court's personal jurisdiction over him.

Motion to Dismiss Gibbon  4

## 2. The Court lacks specific jurisdiction.

The Court also lacks specific jurisdiction over Plaintiff's claims. A court can exercise specific jurisdiction only when: (1) the defendant purposefully directed its activities towards residents of the state or purposefully availed itself of the privilege of conducting activities in the state; (2) the plaintiff's claim arises out of or relates to those activities by the defendant; and (3) the exercise of jurisdiction would comport with due process. *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012).

Specific jurisdiction must be based on contacts that the defendant personally creates with the forum state—not the contacts of others. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (discussing requirements for specific jurisdiction); *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014) (rejecting argument that "[c]ontacts between the plaintiff or other third parties and the forum" could satisfy the minimum contacts needed for specific jurisdiction). Further, Plaintiff Bauer has the burden of demonstrating the existence of personal jurisdiction. *Dahl v. Keller*, 2019 U.S. Dist. LEXIS 84389, *3 (E.D. Wis. May 20, 2019). "[T] claim for relief for which personal jurisdiction is sought must be substantially connected to or arise out of the defendant's contacts with Wisconsin." *Schmalfeldt*, No. 15-CV-1516, at *8 (citing *Rasmussen v. General Motors Corp.*, 335 Wis. 2d 1 (2011)).

*International Shoe*'s requirements "…must be met as to each defendant over whom a state court exercises jurisdiction." *Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (discussing requirements of *International Shoe Co. v. Washington*, 326 U.S. 310 (1945)). As a result, "the assertion of jurisdiction over [any Defendant] based solely on the activities of [Armslist] ... is plainly unconstitutional." *Id*. at 331-32. Instead, "[e]ach defendant's contacts with the forum

State must be assessed individually." *Calder v. Jones*, 465 U.S. 783, 790 (1984). Thus, "[w]hen, as here, a case involves multiple defendants, personal jurisdiction must be assessed separately as to each defendant; the plaintiff may not treat the defendants collectively." *Elayyan v. Sol Melia, SA*, 571 F.Supp.2d 886, 895 (N.D. Ind. 2008).

The SAC fails to identify specific acts by Mr. Gibbon vis-a-vis the forum. Indeed, other than referencing public comments about Armslist.com by Mr. Gibbon, the SAC improperly treats Armslist and Mr. Gibbon collectively, referencing them as the "Armslist Defendants" at various points. *See, e.g.,* SAC, ¶¶ 2, 46. Yet, Mr. Gibbon has had zero contact with Plaintiff or any of the non-party individuals identified in the SAC. He did not participate in the alleged transaction among the various non-parties alleged in the SAC. *See* Gibbon Decl., ¶¶ 7- 13. Mr. Gibbon is not a Wisconsin resident—and has never been to the state. *Id.* at ¶¶ 2-6. He does not own or lease property in Wisconsin, conduct business in Wisconsin, or maintain employees, offices, phone numbers or bank accounts in Wisconsin. *Id.* Mr. Gibbon also has never traveled to Wisconsin in connection with business for Armslist, let alone the facts and allegations in the SAC. *Id.*

And, as a result, there is no contact—let alone "minimum contacts"—with Wisconsin. Plaintiff's evident reliance on Mr. Gibbon's affiliation with Armslist, a website that may be viewed and used in any of the *50* states, would have Mr. Gibbon subject to jurisdiction in *any* state, eviscerating the corporate form and the requirement of Due Process. Thus, exercising specific jurisdiction over Mr. Gibbon would not sufficiently "comport with notions of fair play and... justice"—to the contrary, it would flout those principles. *Rush*, 444 U.S. at 332. Plaintiff's claims against Mr. Gibbon should be dismissed accordingly.

**3.      The Court lacks general jurisdiction.**

Motion to Dismiss Gibbon  6

The Court also lacks general personal jurisdiction over Mr. Gibbon. General personal jurisdiction permits a court to exercise power over a defendant regardless of claim asserted. *See Rasmussen.,* 335 Wis.2d at 12-13. In *Daimler AG v. Bauman*, the Supreme Court of the United States held that "only a limited set of affiliations with a forum will render a defendant amenable to [general personal] jurisdiction there" under the Due Process Clause. 571 U.S. 117, 137 (2014). The Supreme Court ruled general personal jurisdiction is only applicable where the defendant's contact with the forum "are so 'continuous and systematic' as to render [him] essentially at home in the forum." *Id.* at 139 (citation omitted). To the Court, this was generally an "individual's domicile" and "[w]ith respect to a corporation, the place of incorporation and principal place of business…" *Id.* at 137. Aside from such places of residency, the Court found that general jurisdiction is only proper "in an exceptional case," such as where a Philippines corporation was found to be subject to general jurisdiction in its temporary place of business in Ohio during Japanese occupation of the Philippines in World War II. *Id.* at 139, fn. 19 (citing *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437 (1952)).

As Plaintiffs readily admit, Mr. Gibbon does not reside in Wisconsin. He lives in Pennsylvania. *See* SAC, ¶ 26. Mr. Gibbon lacks any contact with the forum, let alone the type that would support the sort of continuous and systematic contacts giving rise to general personal jurisdiction. Plaintiff's SAC lies far from the "exceptional case" noted in *Daimler AG.* The Court therefore does not have general jurisdiction over Mr. Gibbon.

**B.    Plaintiff Fails To State A Claim Under Rule 12(b)(6).**

Plaintiff's SAC may also be dismissed because she fails to allege facts showing she is plausibly entitled to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546 (2007). The allegations must show that it is plausible, rather than merely speculative, that the plaintiff is

entitled to relief. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). The Court should reject Plaintiff's abstract recitations of the elements of her claims and similar conclusory legal statements. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The Court also can, and should, dismiss pursuant to 47 U.S.C. § 230 under Rule 12(b)(6). *Gibson v. Craigslist, Inc*., 08-cv-7735-RMB, 2009 WL 1704355, *1 n.1 (S.D.N.Y. June 15, 2009); *Nieman v. Versulaw*, Inc., 12-3104, 2012 U.S. Dist. LEXIS 109066 (C.D. Ill. June 13, 2012) *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 109069 (C.D. Ill. Aug. 3, 2012); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 253 (4th Cir. 2009). Moreover, whether a defendant owes a duty to a plaintiff is a question of law that is appropriately decided under Rule 12(b)(6). *Skyview Film & Video, Inc. v. Safeco Life Ins. Co*., 864 F. Supp. 755, 757 (N.D. Ill. 1994).

1.      **Plaintiff fails to state a plausible claim for relief because the CDA requires dismissal of the SAC.**

The denial of the cert petition from the Wisconsin Supreme Court's dismissal in *Daniel v. Armslist, et al*., confirms the SAC has no legal support. To the extent there was doubt, the Supreme Court's cert denial removes it. Plaintiff's allegations show cosmetic differences from the *Daniel* pleading that are not legally significant and do alter the conclusion the SAC must be dismissed. *Compare*, *e.g.,* SAC, ¶¶ 19, 21, 57 *with Daniel*, 386 Wis.2d at 484.

The CDA states "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" and "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(c)(l), (e)(3). As a result "[t]he [CDA] mandates dismissal [of a Complaint] if (i) [the Defendant] is a 'provider or user of an interactive computer service,' (ii) the information for which [Plaintiff] seeks to hold

[Defendant] liable was 'information provided by another information content provider,' and (iii) the complaint seeks to hold [Defendant] liable as the 'publisher or speaker' of that information." *Klayman v. Zuckerberg,* 753 F.3d 1354, 1357 (D.C. Cir. 2014) (dismissing assault claim against Facebook). As more fully set forth in Armslist's Brief in Support of Motion to Dismiss, which was filed contemporaneously with this brief and incorporated herein by reference, Armslist is a "provider…of an interactive computer service" and the SAC seeks to hold Armslist and Mr. Gibbon liable as the publisher or speaker of information provided by another on the Armslist.com website. Plaintiff's claims against Armslist are necessarily barred by the CDA. *Daniel*, 386 Wis.2d at 484; *Stokinger*. 2020 Mass. Super. LEXIS 69, *4 (Mar. 13, 2020). The sole court not dismissing under the CDA dismissed on the basis of blackletter tort law. *Vesely*, 752 F.3d at 667.

The protection afforded by the CDA similarly applies to Mr. Gibbon because the SAC alleges liability for the "the design, architecture, and administration of Armslist.com." *E.g.,* SAC, ¶ 26. That theory fails as a matter of law. Specifically, in *Zuckerberg*, a plaintiff alleged tort claims against Facebook, Inc., for content placed on the site as well as claims against the owner of Facebook, Mark Zuckerberg, for his work developing Facebook like Plaintiff alleges here. *Id*. at 1356-57. The district court found that Facebook.com, like Armslist.com, is an interactive computer service within the ambit of the CDA and that the CDA precluded the plaintiff's claims. *Id*. at 1357. The court further found that "Mark Zuckerberg [Facebook's owner], too, qualifies for protection because he is a 'provider' of Facebook's interactive computer service, and [the] complaint seeks to hold him accountable for his role in making that service available." *Id*. at 1357-58.

Here, Plaintiff seeks to hold Mr. Gibbon liable for his "role in the design, architecture,

and administration of Armslist.com." SAC, ¶ 26. Indeed, with respect to Mr. Gibbon, the SAC

*only* alleges unlawful acts in connection with Armslist.com by labeling him with Armslist, LLC

as one of the "Armslist Defendants." *See, e.g.,* SAC, ¶ 2. Thus, for purposes of the SAC, Mr.

Gibbon is a "'provider' of [Armslist's] interactive computer service" under the CDA, which bars

Plaintiff's claims because they seek to hold him liable as the "publisher or speaker" of

information provided by a third party on that site. Plaintiff's claims against the Defendant should

be dismissed.

2.     **Plaintiff fails to state a plausible claim for relief under either Illinois or Wisconsin law.[2]**

Plaintiff carefully avoids alleging what state law governs her claims. *See generally* SAC.

Presumably, Plaintiff intends Wisconsin law to govern under the general presumption that courts

sitting in diversity jurisdiction apply the law of the state where they are located. But as noted

below, Wisconsin's choice of law analysis requires applying ***Illinois*** law to her claims because

Illinois has greater contacts with the alleged tort. And under the *Vesely* case by the Seventh

Circuit Court of Appeals, Plaintiff's claims must be dismissed. However, Plaintiff has also

failed to plead a plausible claim for relief under Wisconsin law; thus, in the alternative,

Plaintiff's claims must be dismissed under Wisconsin law. Regardless of the applicable law,

Plaintiff has failed to plead the predicate duty and negligence required to state a claim.

a.     **The Court should apply Illinois law under Wisconsin's choice of law analysis.**

---

[2] Plaintiff's SAC must be dismissed under the CDA notwithstanding substantive state law. Mr. Gibbon offers these arguments as an alternative theory that independent justifies dismissing the SAC with prejudice.

Motion to Dismiss Gibbon  10

Wisconsin's choice of law governs requires the Court to apply Illinois law. *See Thomas v. Brinks*, Case No. 2020 U.S. Dist. LEXIS 13638, *4 (Jan. 28, 2020). Wisconsin's choice of law test for "tort cases…begin[s] with the presumption that the law of the forum applies unless ***nonforum contacts are of greater significance***." *Id.* (citing *Glaeske v. Shaw,* 261 Wis. 2d 549 (Ct. App. 2003)) (emph. added). Only if Illinois' contacts are not of greater significance should the Court look to the second step, applying a multifactor analysis. *See id.*

The Court should apply Illinois law because Illinois contacts with the alleged tort are of greater significance. Plaintiff alleges Caldwell sold Jones the gun used to kill Commander Bauer; she does not allege Jones sold the gun to the shooter, Legghette. SAC, ¶¶ 13, 15-16, 133. Instead, she alleges Jones re-sold the gun into "the broader criminal market" near Chicago, Illinois. *Id.* Only after an indeterminate number of subsequent sales did Legghette later shoot Commander Bauer in Chicago. *Id.* at ¶ 1, 140-142[3]. The only connection with Wisconsin is that, at some point, however many transactions removed, Jones allegedly first purchased the gun from Caldwell in Wisconsin after Caldwell posted on Armslist. SAC, ¶¶ 15-16. Every other event that Plaintiff alleges occurred in Illinois: (a) shooting; (b) subsequent sales of the gun; (c) Jones' alleged supply of the criminal market in Chicago; (d) even the criminal marketplace in Chicago of which Armslist's was purportedly aware. *Id.* at 1, 133-145. Virtually ***no*** alleged facts demonstrate a connection with Wisconsin. *See, e.g., Brinks*, 2020 U.S. Dist. LEXIS 13638, *5 ("In cases involving automobile accidents between citizens of different states, it is sensible to apply the law of the state ***where the accident occurred***, particularly if there is some other

---

[3] Plaintiff is careful to avoid alleging declaratively that Commander Bauer was shot in Chicago—probably to avoid the very argument made here; however, it is the only available inference to be drawn from the SAC. *E.g.*, SAC, ¶¶ 140-141.

connection to that state than merely the accident") (emph. added).  Here, as in *Brinks*, the

incident in question occurred in Illinois.  SAC, ¶¶ 134-36, 140-42.  Plaintiff also concedes she

and the decedent are Illinois citizens, and the SAC's allegations suggest Legghette is too.  *See id.*

at ¶ 24.  While *Brinks* involved one participate in the alleged tortious act from Wisconsin, that

factor is missing here, and the Court can apply Illinois law without venturing further into

Wisconsin's choice of law analysis.

Wisconsin's five-factor analysis also compels dismissal under Illinois law.  Only "[i]f

***neither*** potential forum has clearly more significant contacts, the Court moves on to analyze five

'influencing factors,' including [i] predictability of results, [ii] maintenance of interstate and

international order, [iii] simplification of the judicial task, [iv] advancement of the forum's

governmental interests, and [v] application of the better rule of law." *Brinks*, 2020 U.S. Dist.

LEXIS 13638 at *4 (emph. added).  Applying Wisconsin's five-factor test compels applying

Illinois law, too:

- **(i) "Predictability of results" favors Illinois law.**  When the underlying tort occurs out
  of state "it is more predictable that defendants would be subject to [that state's] laws
  rather than Wisconsin laws." *Brinks*, 2020 U.S. Dist. LEXIS 13638, *6 (citing *Heath v.
  Zellmer*, 35, Wis. 2d 578 (1967)).

- **(ii) "Maintenance of interstate and international order" favors Illinois law.**  The
  second factor requires the jurisdiction "that is minimally concerned defer to the
  jurisdiction…that is substantially concerned." *Id.* at *7 (internal citations omitted).  Here,
  the alleged tort occurred in Illinois, and none of the parties are citizens of Wisconsin; as
  such, Wisconsin is the jurisdiction "minimally concerned." *Cf. id.*

- **(iii) "Simplification of the judicial task" favors Illinois law.** The third factor favors the state with "the more simple and easily applied rule of law." *Id.* at *8. Here, there is already controlling law in Illinois involving Armslist, which favors Illinois law under factor (iii). *Cf. Clorox Co. v. S.C. Johnson & Son, Inc.*, 627 F.Supp.2d 954, 967 (E.D. Wis. 2009) (third factor favored foreign law where foreign "courts have spoken on the specific application of the inevitable disclosure theory of trade secrets").

- **(iv) "Advancement of the forum's governmental interests" favors neither forum's law.** The fourth factor addresses "whether the proposed non-forum rule [*i.e.*, Wisconsin law] comports with the standards of fairness and justice that are embodied in the policies of the forum law…[D]oes the law [of the non-forum state] adequately serve the policies of the state, be it compensation, remediation, or deterrence?" *Brinks* at *9. Here, Plaintiff's faulty theories of liability are equally invalid under Illinois or Wisconsin law.

- **(v) "Application of the better rule of law" favors neither forum's law.** The fifth factor weighs whether a non-forum's law is anachronistic or whether it is "founded on a rational basis and serves a discernable purpose." *Id.* at *10 (quotations omitted). Here, though the formulation of a tort duty differs slightly between Illinois and Wisconsin, *see infra*, neither can be said to "anachronistic" and as such factor (v) does not favor either forum.

In short, though analyzing the SAC through Wisconsin's choice of law "influencing factors" is not necessary, they compel the same conclusion: Illinois law, as reflected in *Vesely*, should apply if the Court does not dismiss pursuant to the CDA.

      **b.**     **Plaintiff's claims fail under Illinois law per the Seventh Circuit's analysis in the *Vesely* case.**

In *Vesely*, a wrongful death plaintiff sued Armslist, alleging it negligently caused the death of Plaintiff's sister by creating and operating the Armslist.com website in a manner allowing a criminal to purchase a gun illegally. 762 F.3d at 663-64. The Northern District of Illinois granted Armslist's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6), and the Seventh Circuit Court of Appeals affirmed. *Id.* at 667.

The *Vesely* plaintiff alleged shooter Demetry Smirnov used Armslist.com to find an advertisement for a .40 caliber handgun that he bought and used to kill the plaintiff's sister, Jitka Vesel. 762 F.3d at 663-64. The purchaser and seller performed an illegal firearm transfer. *Id.* After Jitka was killed, her brother asserted common law claims under Illinois law sounding in negligence[4]. Much as Plaintiff does here, he claimed Armslist "design[ed] its website to encourage its users to circumvent existing gun laws,…by easily enabling prospective purchasers to search for and find gun sellers in any and all states." *Id.* at 666.

The Seventh Circuit rejected the existence of a duty owed from Armslist to either Jitka or her brother, noting for a duty to attach, a special relationship must exist:

> While breach and proximate cause are factual matters for the jury, the existence of a duty is a matter for the court to decide [citations omitted]. And the touchstone to determine the existence of a duty is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of plaintiff [citations omitted]. It has long been established that under common law, the universally accepted rule…is that a private person has no duty to act affirmatively to protect another from criminal attack by a third person absent a 'special relationship' between the parties [citations omitted]. Illinois recognizes four special relationships: (1) common-carrier passenger; (2) innkeeper and guest; (3) custodian and ward; and (4) business invitor and invitee [citations omitted].

---

[4] Specifically, (a) negligence under Illinois's Wrongful Death Act; (b) a survival claim for Jitka's pain and suffering; and (c) a family expense claim for funeral and burial expenses.

762 F.3d at 665.  The Seventh Circuit held that no conceivable special relationship compelled finding a duty owed.  *Id.*  Further, the Court also rejected Plaintiff's "last ditch attempt to label this case an 'affirmative conduct' case, wherein a duty can be found to exist without a 'special relationship.'"  *Id.* at 666.  Specifically, the Court rejected the claim that Armslist.com's very design constitutes negligence, holding that

> [S]imply enabling consumers to use a legal service is far removed from encouraging them to commit an illegal act…Armslist permitted [seller] to place an advertisement on its website and nothing more.  It did not invite [seller] or [purchaser] to break the law.  [Plaintiff's] allegations fall short of alleging any cognizable negligence claim for which Armslist could be held responsible for [purchaser and shooter's] acts."

*Id.*  In other words, the Seventh Circuit rejected claims premised on the same underlying theories alleged here, and this Court should do the same.

### c. Plaintiff also fails to allege negligence under Wisconsin law.

Wisconsin recognizes "every person owes a duty to the world at large to protect others from foreseeable harm," *Jankee v. Clark County,* 235 Wis. 2d 700, 732 (2000), but "the duty owed to the world is not unlimited." *Hocking v. City of Dodgeville,* 318 Wis.2d 681, 690 (2009).  Whether Mr. Gibbon was negligent is a question of "whether [his] conduct satisfied the duty placed upon individuals to exercise that degree of care as would be exercised by a reasonable person ***under the circumstances***." *Hornback v. Archdiocese of Milwaukee*, 313 Wis.2d 294, 310 (citations omitted) (emph. added).  Further, "a person owes no duty to control the conduct of another person or warn of such conduct." *Id.* at 311.  This rule is especially strong when the "specific victim[] [was] ***un***foreseeable." *Id.* at 317 (emph. added).

In *Hornback*, the Supreme Court of Wisconsin held that the duty of ordinary care did not require an employer to warn all of an employee's potential future employers about the

employee's pedophilic tendencies. *Id.* at 320. The *Hornback* Court distinguished earlier cases in which a defendant had a duty to warn based on the fact that in the previous cases the specific victims to be warned were foreseeable and that "there [was] a special role or relationship among the parties." *Id.* at 317, ¶ 40. In contrast, extending the duty to warn to "unforeseen third parties" would "extend an employer's obligation to warn indefinitely into the future to a sweeping category of persons." *Id.* at ¶ 48. The *Hornback* Court concluded that "[t]he plaintiffs appear to interpret Wisconsin's duty of ordinary care as creating automatic negligence and liability for any person even tangentially connected in a causal chain of injury, with little concern about the relationship among those sued, or how many years have passed between causal events. There must be limits. We draw one here." *Id.* at 327-28. On that basis, the court rejected liability.

The Court here should do the same. Plaintiff claims Mr. Gibbon had a "role" in Armslist.com's design and administration. SAC, ¶¶ 26, 89, 91-94. She generically alleges he conspired with and aided and abetted "unlawful" users of Armslist.com. *Id.* at ¶¶ 18, 199-207. Finally, Plaintiff alleges conclusory statements that Mr. Gibbon has not respected Armslist's corporate form. *Id.* at ¶¶ 229-233. In short, Plaintiff's theory is Mr. Gibbon contributed to Armslist.com's operations in a manner that failed to prevent criminals from acquiring guns via ads posted by users of Armslist.com, breaching a duty owed to the public at large. *See* SAC, at ¶¶ 151-152; *see also id.* at ¶ 200.

This is not true. Defendants simply had no such duty to affirmatively prevent Caldwell, Jones, and Legghette from undertaking the actions alleged in the SAC. Nor are there allegations of a "special relationship" supporting the existence of a duty owed to Commander Bauer and Plaintiff. *See*, *e.g., Hornback*, 313 Wis.2d at 311. Plaintiff does **not** allege that Armslist or Mr. Gibbon caused Plaintiff's harm directly or that Armslist had any

Motion to Dismiss Gibbon 16

relationship to the Plaintiff. Instead, Plaintiff says Armslist breached its duty of care by not changing its business model and taking affirmative steps to prevent Legghette from committing a crime—*after* Legghette bought the gun *after* an unspecified number of firearms transfers *after* Jones' alleged purchase of the gun from Caldwell *after* Caldwell posted an ad on Armslist.com. *E.g.*, SAC, ¶¶ 16, 57.

Plaintiffs do not (and could not) allege that Mr. Gibbon knew or was aware of (i) Plaintiff, Commander Bauer, Legghette, or non-parties Caldwell, Jones, and the unspecified "criminal market" alleged in the SAC; (ii) the transaction between Jones and Caldwell, along with the subsequent transaction(s) culminating with Legghette's purchase of the gun from unknown persons; (iii) any of the non-parties' capacities to legally purchase a firearm or not; and / or (iv) what Legghette intended to do with the firearm purchased from unidentified persons. *See generally* SAC. Plaintiff omits allegations Mr. Gibbon in any way relates to or affiliates with non-parties identified in the SAC. *Id.* Instead, she apparently claims Mr. Gibbon had a duty to prevent the criminal act of third parties (*e.g.*, Caldwell, Jones, Legghette) to protect persons Mr. Gibbon never met—a duty rejected by Wisconsin law. Specifically, an expansive duty to "unforeseen third parties" was rejected in *Hornback* because it would provide no limit to an individual's obligations or liability. Plaintiff's negligence claims fail as a matter of law for this independent reason.

### d. Wisconsin public policy also compels dismissal.

Wisconsin "recognize[s] six public policy grounds upon which [a] court may deny liability even in the face of proven or assumed negligence." *Hornback,* 313 Wis.2d at 320. Public policy supports dismissal when "the injury is too remote from the negligence" and when "recovery would enter into a field that has no sensible or just stopping point." *Id.* (quotations

omitted). The Court "may refuse to impose liability on the basis of [either] of these factors without full resolution of a cause of action by trial." *Id.*  Both are present here.

*First*, Plaintiff's alleged injuries are too remote from Mr. Gibbon's supposed negligence to hold him liable. *See Casper v. American Intern. South Ins. Co.*, 336 Wis.2d 267, 308 (2011). In *Casper*, a plaintiff injured in a car accident with a semi-truck brought a negligence claim against the CEO who designed the truck's route, claiming the route "could not have been completed within federal safety requirements and was therefore illegal." *Id.* at 301. The Court dismissed the plaintiff's claim because "[a]ny negligence on [CEO's] part was remote from the [plaintiff's] injury in terms of time, distance, and cause." *Id*. at 307.

The Court based its conclusion on the facts that: (a) "[t]he route that [CEO] allegedly approved was designed at least a year and a half prior to the accident;" (b) the CEO's "office [was] located in Ohio" while the route "originated in Milwaukee, traveled through Indiana and Illinois, and ended in Milwaukee;" and (c) the "[driver] was under the influence of at least three prescription medications at the time of the accident," of which CEO was not aware. *Id.* at 307-08. Commenting on these facts, the Court explained, "the injury suffered by [plaintiffs] is... too remote from any alleged negligence [CEO] may have committed one-and-a-half years prior to the accident" and "[a]ny negligence on [CEO's] part in approving a route,  from  his office in Ohio, to be driven entirely in other states, is simply too far removed from the injury the [plaintiffs] suffered in Wisconsin" to hold the CEO liable. *Id.* at 307-09.

Likewise, Plaintiff's claims against Armslist all relate to decisions made years ago in another state about how to design Armslist.com.  The SAC acknowledges that Armslist.com was conceived in 2007, a decade plus before the alleged shooting.  *E.g.*, SAC, ¶ 46. None of Armslist's current or former owners live in Wisconsin, and decisions about Armslist.com's

design were not made there.  Plaintiff does not allege, nor is it plausible, that Armslist was aware

who responded to Caldwell's ad or who bought the gun from Jones and ultimately sold it to

Legghette—let alone that anyone involved might have been prohibited from owning a firearm.

As in *Casper,* "[a]ny negligence on [Armslist's] part was [too] remote from the [Plaintiffs'] injury

in terms of time, distance, and cause" to hold Armslist liable. 336 Wis.2d at 307.

      ***Second***, allowing Plaintiff to recover would create a slippery slope with no sensible or

just stopping point. In *Hornback,* the same analysis that led the Court to conclude the duty of

reasonable care did not extend to warning unforeseen third parties led it to conclude that the

same claims were barred by public policy because "there is no sensible stopping point to

recognizing negligence claims for such an open-ended and ill-defined sweeping claim."  313

Wis.2d at 327. The same rationale applies here.

    **3.**    **Plaintiff's claims suffer from additional pleading defects warranting**
             **dismissal.**

    *a.*    ***Public Nuisance (Count 2).***  "Nuisance arises when a particular type of harm

is suffered, *i.e.,* nuisance refers to the particular interest that is invaded." *Butler* v.

*Advanced Drainage Sys., Inc.,* 294 Wis.2d 397, 417 (2006).  However, regardless of

whether a public nuisance exists, "[p]roof that the underlying conduct was tortious is

necessary to liability predicated on nuisance." *Id.*  As discussed, Plaintiff's negligence

claims fail as a matter of law. No underlying tortious conduct predicates the public

nuisance claim, and Plaintiff has not alleged facts supporting injunctive or other relief from

a public nuisance.

    *b.*    ***Negligence Per Se (Count 3).***  Plaintiff's claim of negligence *per se* fails

because Plaintiff lacks a private right of action to enforce the alleged statutes. "The violation

of a statute or an ordinance does not automatically impose civil liability" under Wisconsin law. *Antwaun A. v. Heritage Mut. Ins., Co.,* 228 Wis.2d 44, 66 (1999). Three elements must be met "before the violation of a statute will constitute negligence per se": "(1) the harm inflicted [must be] the type the statute was designed to prevent; (2) the person injured was within the class of persons sought to be protected; and (3) there is some expression of legislative intent that the statute become a basis for the imposition of civil liability." *Id.* at 66-67.

Plaintiff references two criminal statutes as the basis of its negligence *per se* claim: 18 U.S.C. § 2 and 18 U.S.C. § 923(a). *See* SAC, ¶¶ 169-170. No private cause of action exists to enforce either. Neither law contains provisions for civil liability or a private right of action. Each is a criminal law that leads to criminal punishment, not civil liability. "In order to impose a duty beyond that imposed by common law, there must be an expression of that purpose in 'clear, unambiguous, and peremptory' language." *Holt v. Hegwood,* 287 Wis.2d 853, 865-66 (Ct. App. 2005). No such "clear" and "ambiguous" expression is present here.

"A statute that merely makes provision for the safety or welfare of the public generally, but does not purport to establish civil liability, is not to be construed to establish civil liability." *Id.* The laws alleged "merely make[] provision for the safety or welfare of the public generally, [and] do[] not purport to establish civil liability." *Id.* They are "not to be construed to establish civil liability." *Id.* Plaintiff's negligence *per se* claims should be dismissed. *Id.*

*c.* ***Conspiracy (Count 4).*** Wisconsin recognizes the intra-corporate conspiracy doctrine, which provides that a corporation cannot conspire with its agents because a conspiracy requires a meeting of the minds between two or more persons and the acts of a corporation and

Motion to Dismiss Gibbon  20

of its agents are considered to be those of a single legal actor. *See, e.g., Milsap v. Journal/Sentinel*, 897 F. Supp. 406, 409 (E.D.Wis.1995), *rev'd in part on other grounds*, 100 F.3d 1265 (7th Cir.1996) (holding employer and its employees cannot conspire under Wisconsin law); *see also Langley v. Am. Bank of Wis.*, 738 F. Supp. 1232, 1240-41 (E.D. Wis. 1990) (stating that bank cannot conspire with its employees). Yet, Plaintiffs' conspiracy claim makes this exact allegation—that Mr. Gibbon and Armslist entered into a civil conspiracy. *See* SAC, ¶ 209. Such a claim does not exist under Wisconsin law.

  *d.*    ***Aiding and abetting (Count 5).*** Plaintiff alleges Defendants aided and abetted Jones and Caldwell in conducting an illegal firearms transfer. SAC, ¶¶ 199-204. The claim fails as a matter of law. First, Mr. Gibbon owed no duty, and he cannot be liable for the tortious acts of others. *E.g., Winslow v. Brown*, 125 Wis.2d 327, 337 (Ct. App. 1985) (rejecting aiding and abetting claim premised on "negligent lookout" where "liability based on this ground would impose a duty to protect third persons from injury" and "there is no duty to protect in the absence of a special relationship"). Second, Plaintiff's aiding and abetting allegations underscore the fundamental weakness of her claims. She omits any allegation that Mr. Gibbon was specifically aware of the activities of Caldwell, Jones, or Legghette. *See* SAC, ¶¶ 199-207. Nor does she even mention Legghette in the allegations pertaining to aiding and abetting. *Id.* Thus, even assuming Mr. Gibbon could be liable for the conduct of Caldwell or Jones, Plaintiff fails to allege how Mr. Gibbon aided or abetted the tortious act at issue—the shooting of Commander Bauer. Plaintiff could have sued Caldwell, Jones, and Legghette. She chose not to, and she cannot make up for that choice by alleging faulty claims against Mr. Gibbon.

*e.* ***Wrongful death claims (Counts 6-8).*** Plaintiff alleges claims for wrongful death, survival, and loss of consortium. These are damage claims requiring predicate tortious conduct, which Plaintiff has failed to allege. As such, her claims should be dismissed. *See Bartholomew v. Wis. Patients Comp. Fund*, 293 Wis.2d 38, 58 (2006) ("This opinion now turns to discuss claims for wrongful death, that is, claims for noneconomic damages for postdeath loss of society and companionship…and other claims relating to the death of a tort victim").

*f.* ***Veil piercing (Count 9).*** Plaintiff claims Armslist is an alter ego of Mr. Gibbon. SAC, ¶¶ 229-233. Yet, Plaintiff omits any specific allegation supporting this theory. *See id.* Instead, she alleges conclusory statements of law echoing hornbook doctrine regarding veil piercing—*e.g.*, alleging "[u]pon information and belief" Armslist is not adequately capitalized and corporate formalities are not obeyed. As a threshold issue, Plaintiff's reliance on legal conclusions instead of factual allegations justifies dismissal. *Mt. Crest SRL, LLC v. Anheuser-Busch InBEV SA/NV*, 2020 U.S. Dist. LEXIS 72843, *26 (W.D. Wis. Apr. 24, 2020) (dismissing veil piercing claim and noting "[i]t is well established that legal conclusions are not enough to satisfy federal pleading standards"); *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) ("In reviewing the sufficiency of a complaint under the plausibility standard…we accept the well-pleaded facts in the complaint as true, but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to the presumption of truth.").

Plaintiff's allegations also must be dismissed under Oklahoma law. "[V]eil-piercing claims are governed by the law of the state of the corporation whose veil is sought to be pierced." *On Command Video Corp. v. Roti,* 705 F.3d 267, 270 (7th Cir. 2013); *see also Select Creations, Inc. v. Paliafito America, Inc.,* 852 F.Supp. 740, 774 (E.D. Wis. 1994); RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 307 (1971). Plaintiff alleges Armslist is

an Oklahoma limited liability company. *See* SAC, ¶ 25[5].  Oklahoma law thus governs

Plaintiff's alter ego claims against Mr. Gibbon.  Oklahoma law bars alter-ego and vicarious

liability claims, like those alleged here, until a plaintiff obtains a judgment against the

corporate defendant. Specifically, 12 Okla. Stat. § 682 provides in relevant part:

> B. No suit or claim of any nature shall be brought against any officer, director or shareholder for the debt or liability of a corporation of which he or she is an officer, director or shareholder, until judgment is obtained therefor against the corporation and execution thereon returned unsatisfied. This provision includes, but is not limited to, claims based on vicarious liability and alter ego. Provided, nothing herein prohibits a suit or claim against an officer, director or shareholder for their own conduct, act or contractual obligation arising out of or in connection with their direct involvement in the same or related transaction or occurrence.

> D. Members and managers of limited liability companies shall be afforded the same substantive and procedural protection from suits and claims as the protections provided to officers, directors and shareholders of a corporation as set forth in subsections B and C of this section.

As a result, "before a plaintiff can bring an alter ego claim against an officer,

director, or shareholder of a corporation or against a member or manager of a limited

liability company, there must be a judgment against the corporation or limited liability

company and execution on the judgment must have been returned unsatisfied." *Boatright*

*Family, LLC v. Reservation Center, Inc.,* 2015 U.S. Dist. LEXIS 63051, *10-11 (W.D. Okla.

---

[5] Plaintiff's allegation is incorrect because Armslist, LLC, is a Pennsylvania entity. However, Mr. Gibbon's Motion must accept allegations in the SAC as true, other than legal conclusions. *E.g.*, *McCauley*, 671 F.3d at 616.  But even under Pennsylvania law, Plaintiff's veil piercing claims would still fail. *See, e.g.*, *Lumax Indus. v. Aultmann*, 543 Pa. 38, 42 (1994) ("[T]here is a strong presumption in Pennsylvania against piercing the corporate veil," which requires allegations of fact showing "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of corporate form to perpetrate a fraud"); *Accurso v. Infra-Red Servs.*, 23 F. Supp.3d 494, 510 (E.D. Pa. 2014) (applying Pennsylvania veil piercing law under federal pleading standard, "reciting elements of the veil-piercing test, without any supporting facts, constitute legal conclusions"); *J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.*, 2013 U.S. Dist. LEXIS 88363, *13 (M.D. Pa. Apr. 5, 2013) ("These allegations are, thus, little more than legal conclusions cloaked as factual allegations, and represent a mere recitation of the elements for piercing the corporate veil").

May 14, 2015). Without such an unsatisfied judgment, alter ego claims against LLC members and managers must be dismissed. *Id*. Plaintiff never obtained a judgment against Armslist—indeed, every other lawsuit against Armslist like Plaintiff's has been dismissed. The alter-ego claim against Mr. Gibbon must be dismissed, too.

## CONCLUSION

Plaintiff's SAC should be dismissed for any of three independent reasons. (1) The Court has no personal jurisdiction over Mr. Gibbon. (2) If it did, Section 230 of the Communications Decency Act requires dismiss because the law is settled; there is no plausible claim against him for actions of non-party users of Armslist.com. Defendant maintains failure to dismiss under Section 230 would be error. (3) But, even if the Court did not dismiss under Section 230, any applicable state law—Illinois or Wisconsin—would demand dismissal, too, because Plaintiff has failed to plead sufficient facts to show a plausible claim against Mr. Gibbon.

This 8th day of June 2020.

/s/Timothy L. Moore
Timothy L. Moore, Esq.
*Admitted pro hac vice*
*Attorney for Armslist, LLC, and Jonathan Gibbon*
FISHERBROYLES, LLP
811 Mason Street
San Francisco, CA 94108
T: (619) 678-1588
F: (619) 275-7479
timothy.moore@fisherbroyles.com

# MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM – INDEX OF ATTACHED AUTHORITIES

| |
|---|
| *Acuity, Ins. Co. v. Gonzalez,*<br>2014 U.S. Dist. LEXIS 176660 (E.D. Wis. Dec. 23, 2014) |
| *Boatright Family, LLC v. Reservation Center, Inc*.,<br>2015 U.S. Dist. LEXIS 63051 (W.D. Okla. May 14, 2015) |
| *Dahl v. Keller,*<br>2019 U.S. Dist. LEXIS 84389 (E.D. Wis. May 20, 2019) |
| *Gibson v. Craigslist, Inc*.,<br>2009 U.S. Dist. LEXIS 53246 (S.D.N.Y. June 15, 2009) |
| *J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.,*<br>2013 U.S. Dist. LEXIS 88363 (M.D. Pa. Apr. 5, 2013) |
| *Mt. Crest SRL, LLC v. Anheuser-Busch InBEV SA/NV,*<br>2020 U.S. Dist. LEXIS 72843 (W.D. Wis. Apr. 24, 2020) |
| *Nieman v. Versuslaw, Inc*.,<br>2012 U.S. Dist. LEXIS 109066 (C.D. Ill. June 13, 2012) *report and recommendation adopted*,<br>2012 U.S. Dist. LEXIS 109069 (C.D. Ill. Aug. 3, 2012) |
| *Schmalfeldt v. Johnson,*<br>2016 U.S. Dist. LEXIS 86118 (E.D. Wis. July 1, 2016) |
| *Stokinger, et al. v. Armslist, LLC, et al.,*<br>2020 Mass. Super. LEXIS 69 (Mar. 13, 2020) |
| *Thomas v. Brinks,*<br>2020 U.S. Dist. LEXIS 13638 (Jan. 28, 2020) |

No *Shepard's* Signal™
As of: June 8, 2020 9:48 PM Z

# *Acuity v. Gonzalez*

United States District Court for the Eastern District of Wisconsin

December 23, 2014, Decided; December 23, 2014, Filed

Case No. 14-CV-1330

**Reporter**
2014 U.S. Dist. LEXIS 176660 *; 2014 WL 7345834

ACUITY, A MUTUAL INSURANCE COMPANY, Plaintiff, v. JUAN C. GONZALEZ, doing business as United Drywall, Defendant.

## Core Terms

personal jurisdiction, contacts, premium, long-arm, insurer, courts, due process, forum state, telephone, coverage, traveled, argues, mailed

**Counsel:** **[*1]** For Acuity A Mutual Insurance Company, Plaintiff: Zach S Whitney, Kohner Mann & Kailas SC, Milwaukee, WI.

For Juan C Gonzalez, doing business as United Drywall, Defendant: Michael L Johnson, Otjen Gendelman Zitzer Johnson & Weir SC, Waukesha, WI.

**Judges:** WILLIAM E. DUFFIN, United States Magistrate Judge.

**Opinion by:** WILLIAM E. DUFFIN

## Opinion

### OPINION AND ORDER

Plaintiff Acuity, an insurance company located in Wisconsin, brought this lawsuit against defendant Juan Gonzalez for breach of contract, alleging that Gonzalez failed to pay the premium due under a policy issued to him by Acuity. Gonzalez, a Nebraska resident, has filed a motion to dismiss for lack of personal jurisdiction. (ECF No. 6.) Acuity responded (ECF No. 12) and Gonzalez replied (ECF No. 14). The matter was reassigned to this court in accordance with *28 U.S.C. § 636(c)* and *Fed. R. Civ. P. 73(b)* after the parties all consented to the full jurisdiction of a magistrate judge. (ECF No. 4, 9, 11.)

### I. Background

Acuity is an insurance company incorporated in Wisconsin whose principal place of business is in Sheboygan, Wisconsin. Gonzalez is a Nebraska resident that does business as United Drywall. Gonzalez met with an insurance producer in Nebraska, who on his behalf purchased a Nebraska workers' **[*2]** compensation and business liability insurance policy from Acuity for coverage beginning on September 6, 2012. The policy provided coverage for Gonzalez's employees, all of whom work in Nebraska.

Acuity issued the policy based on Gonzalez's estimated payroll and assumed risks but reserved the right to retroactively adjust the premium if subsequent information revealed that its exposure was different than anticipated. In November 2013 Acuity audited Gonzalez's business and increased the premium. Acuity billed Gonzalez for the additional premium, but after making one payment Gonzalez has not made any further payments towards the premium.

Gonzalez has never been to Wisconsin. He does not own or lease real property in Wisconsin and does not maintain a telephone listing or a mailing address in Wisconsin. United Drywall is not registered to do business in Wisconsin, does not advertise in Wisconsin,

and has never sold any products here. To the best of his knowledge, Gonzalez has no customers in Wisconsin.

## II. Analysis

Gonzalez contends that this court lacks personal jurisdiction over him because his only connection to Wisconsin is that he purchased insurance from a company that happens to have **[*3]** its headquarters here. This fact, he argues, is insufficient to establish personal jurisdiction over him under Wisconsin's long arm statute. Alternatively, he argues that the exercise of personal jurisdiction over him would violate due process.

Acuity argues that personal jurisdiction over Gonzalez in Wisconsin is consistent with both the Wisconsin long-arm statute and due process principles. Specifically, Acuity asserts that Gonzalez is subject to the jurisdiction of this court because he "[i]s engaged in substantial...activities within this state" (quoting *Wis. Stat. § 801.05(1)(d)*) and because its lawsuit "[a]rises out of a promise, made anywhere to the plaintiff...by the defendant...to pay for services to be performed in this state by the plaintiff" or "[a]rises out of...services actually performed for the defendant by the plaintiff within this state...." (quoting *Wis. Stat. § 801.05(5)(a)* and *(b)*).

## A. Wisconsin's Long-Arm Statute

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman, 134 S. Ct. 746, 753, 187 L. Ed. 2d 624 (2014)* (citing *Fed. Rule Civ. Proc. 4(k)(1)(A))*. Thus, this court looks first to Wisconsin's long-arm statute to determine whether it has personal jurisdiction over the defendant. *Felland v. Clifton, 682 F.3d 665, 678 (7th Cir. 2012)*; *see also Steel Warehouse v. Leach, 154 F.3d 712, 714 (7th Cir. 1998)* ("A federal district court exercising diversity jurisdiction has **[*4]** personal jurisdiction over a nonresident only if a court of the state in which it sits would have such jurisdiction."). Wisconsin courts employ a two-step inquiry when determining whether personal jurisdiction may be exercised over a nonresident defendant. The first step is to determine whether the defendant meets the criteria for personal jurisdiction under the Wisconsin long-arm statute. *Kopke v. A. Hartrodt S.R.L., 2001 WI 99, 245 Wis.2d 396, 409, 629 N.W.2d 662 (2001)*. If the requirements of the long-arm statute are satisfied, then the court must consider whether the exercise of jurisdiction comports with due

process requirements. *Id.* Plaintiff bears the burden of establishing personal jurisdiction. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*.

### 1. *Wisconsin Statute § 801.05(5)*

Wisconsin courts may exercise personal jurisdiction in any action that "[a]rises out of a promise, made anywhere to the plaintiff...by the defendant...to pay for services to be performed in this state by the plaintiff," *Wis. Stat. § 801.05(5)(a)*, or that "[a]rises out of...services actually performed for the defendant by the plaintiff within this state...," *Wis. Stat. § 801.05(5)(b)*. The following minimum contacts must exist before a defendant is subject to jurisdiction under these provisions:

> (i) a claim arising out of a bargaining arrangement made with the defendant by or on behalf of the plaintiff; (ii) a promise or other **[*5]** act of the defendant, made or performed anywhere, which evidences the bargaining arrangement sued upon; and (iii) a showing that the arrangement itself involves or contemplates some substantial connection with the state.

*Capitol Fixture & Woodworking Group v. Woodma Distrib., 147 Wis.2d 157, 161-62, 432 N.W.2d 647, 650 (Ct. App. 1988)*.

Acuity argues that both subsections of *§ 801.05(5)* subject Gonzalez to personal jurisdiction in Wisconsin. It argues that Gonzalez submitted his application for insurance to Acuity in Wisconsin, Gonzalez made premium payments to Acuity in Wisconsin, and when he was notified by Acuity that his policy was being canceled due to nonpayment of premiums he negotiated with Acuity over the telephone for a payment plan to pay the premium due and owing.

In *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co., 18 F.3d 389 (7th Cir. 1994)*, the plaintiff insurer sued its insured in the Western District of Wisconsin, arguing that the defendant insured, who did business solely in the Pacific Northwest, was subject to personal jurisdiction in Wisconsin because it contacted the plaintiff insurer in Wisconsin via mail or telephone and its general manager had traveled to Wisconsin regarding its insurance policies. *Id. at 394*. Concluding that the service purchased by the defendant (insurance coverage) was to be provided in the state where the

defendant did business and not in the insurer's **[*6]** home state, the court found that the defendant did not have the type of "substantial connection" that would subject it to personal jurisdiction in Wisconsin. *Id. at 393-94*. "[O]ne who merely purchases insurance from an insurer residing in the forum state does not subject himself to jurisdiction of the state." *Federated, 18 F.3d at 394* (quoting *Capitol Indemnity Corp. v. Certain Lloyds Underwriters, 487 F. Supp. 1115, 1120 (W.D. Wis. 1980))*.

If anything, Gonzalez's contacts with Wisconsin are even more insignificant, isolated, and remote than those presented in *Federated*. In *Federated* the insured's general manager served as a member of Federated's board of directors and traveled to Wisconsin at least three times to attend board meetings; Gonzalez never traveled to Wisconsin. As was the case with Federated, Gonzalez did not directly seek out Acuity but instead utilized an independent agent who paired him with Acuity for workers' compensation and business liability coverage to cover his employees in Nebraska. Although Gonzalez mailed premium payments to Acuity in Sheboygan, Federated also mailed its premium payments to Wisconsin, and over a longer period of time. Gonzalez also had telephone communications with Acuity personnel who were in Sheboygan, but that was the case with Federated, too. Just as the court in *Federated* **[*7]** found that the defendant's purchase of insurance from a Wisconsin-based insurer did not, without more, establish a substantial connection with Wisconsin, Gonzalez's purchase of insurance coverage from Acuity does not satisfy the contract provisions of Wisconsin's long-arm statute, and thus Acuity cannot obtain personal jurisdiction over Gonzalez under these sections.

## 2. *Wisconsin Statute § 801.05(1)(d)*

Pursuant to *Wis. Stat. § 801.05(1)*, Wisconsin courts may exercise general personal jurisdiction over a defendant when that defendant takes up a "local presence or status" within the state. *Subsection (d)* provides that a nonresident defendant has the requisite "local presence or status" when he or she "[i]s engaged in substantial and not isolated activities within [the] state...." A finding of general jurisdiction under a statute like *§ 801.05(1)(d)* must be based on defendant's "continuous and systematic general business contacts" with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984)*. These contacts must be

"so extensive as to be tantamount to [defendant] being constructively present in the state." *Purdue Research, 338 F.3d at 787*. "In order to base personal jurisdiction on *section 801.05(1)(d)*, a court must find more than just contacts between the defendant and the forum. Rather, the activity of defendant must have been both 'continuous and systematic.'" **[*8]** *Capitol Indem. Corp., 487 F. Supp. at 1117*.

When arguing that *§ 801.05(1)(d)* provides a basis for personal jurisdiction over Gonzalez, Acuity relies upon no additional facts than it relied upon when asserting that personal jurisdiction could be obtained under the contract provisions of Wisconsin's long-arm statute. Those facts failed to establish that the purchase of insurance from Acuity constituted a substantial connection with Wisconsin; they certainly don't establish the type of substantial and not isolated activities necessary to obtain general personal jurisdiction under *§ 801.05(1)(d)*. Thus, *§ 801.05(1)(d)* does not provide a basis for Acuity to obtain personal jurisdiction over Gonzalez.

## B. Due Process

Even if Acuity were to prevail in either of its arguments concerning Wisconsin's long-arm statute, subjecting Gonzalez to suit in Wisconsin would be contrary to principles of due process. Personal jurisdiction will not exist if the facts do not establish that the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'" under the *due process clause of the Fourteenth Amendment*. *International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940))*. A state cannot force a nonresident to litigate in its courts unless there is "some act by which the defendant **[*9]** purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its law." *Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* (quoting *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958))*. These minimum contacts with the foreign state must be of a nature that the defendant could "reasonably anticipate being haled into court there." *Burger King v. Rudzewicz, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (quoting *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490*

*(1980)).*

In reaching the conclusion that exercising jurisdiction over the defendant would not comport with due process, the court in *Federated* applied the five-factor test articulated by the Wisconsin Supreme Court for evaluating whether an assertion of personal jurisdiction would constitute a due process violation: "(1) the quantity of the contacts with the state, (2) the nature and quality of the contacts, (3) the source of the cause of action, (4) the interest of Wisconsin in the action, and (5) the convenience of the parties in trying the matter in Wisconsin." *Id. at 395* (citing *Zerbel v. H.L. Federman & Co., 48 Wis. 2d 54, 64-66, 179 N.W.2d 872, 878-79 (1970)*; *Uni-Bond Ltd. v. Schultz, 607 F. Supp. 1361, 1366 (E.D. Wis. 1985)).*

The *Federated* court concluded that the defendant's contacts were insufficient to satisfy due process. In doing so, the court noted that "[s]everal courts have held that making telephone calls and mailing payments into the forum state are insufficient bases for jurisdiction." *Id. at 395* (citing *Lakeside Bridge & Steel Co. v. Mountain State Constr. Co., 597 F.2d 596, 604 (7th Cir. 1979)*; *Capitol Indem. Corp. v. Certain Lloyds Underwriters and/or London Cos., 487 F. Supp. 1115 (W.D. Wis. 1980)*; *Royal Globe Ins. Co. v. Logicon, 487 F. Supp. 1245 (N.D. Ill. 1980)).* It also concluded that [*10] "the purchase of goods or insurance from the forum state alone is an insufficient foundation upon which to assert personal jurisdiction." *Id.* (citing *Lakeside, 597 F.2d at 604*; *Capitol Indemnity, 487 F. Supp. at 1121* ("One who merely purchases insurance from an insurer residing in the forum state does not, by the purchase through an intermediary, subject himself to the jurisdiction of the courts of the insurer's state.")).

As discussed above, Gonzalez's contacts with Wisconsin are even less significant than those that existed for the defendant in *Federated*. In *Federated*, the relationship between the parties was sophisticated and spanned a number of years. *Id. at 390-91*. The insured's general manager served as a member of Federated's board of directors and traveled to Wisconsin at least three times to attend board meetings. *Id. at 391 n.1*. And there were certain other financial connections between the parties and between the defendant and Wisconsin. *Id. at 395*. Here, Gonzalez never traveled to Wisconsin in relation to his business with Acuity or for any purpose. There is no evidence that Gonzalez had any connection to this state other than the fortuitous fact that his insurance agent paired him with an insurer that happened to be located here.

The court concludes that the contacts [*11] cited by Acuity are insufficient to confer personal jurisdiction over Gonzalez in Wisconsin. Forcing Gonzalez to defend a lawsuit in Wisconsin runs afoul of due process.

**IT IS THEREFORE ORDERED** that the defendant's motion to dismiss for lack of personal jurisdiction (ECF No. 6) is **granted**. The plaintiff's complaint and this action are hereby dismissed.

Dated at Milwaukee, Wisconsin this 23rd day of December, 2014.

/s/ William E. Duffin

WILLIAM E. DUFFIN

U.S. Magistrate Judge

---

**End of Document**

 Positive

As of: June 8, 2020 9:53 PM Z

## *Boatright Family, Inc. v. Reservation Ctr. Inc.*

United States District Court for the Western District of Oklahoma

May 14, 2015, Decided; May 14, 2015, Filed

Case No. CIV-13-192-D

**Reporter**

2015 U.S. Dist. LEXIS 63051 *; 2015 WL 2345299

BOATRIGHT FAMILY, LLC an Oklahoma limited liability company, Plaintiff, v. RESERVATION CENTER, INC., a California Corporation; CCRA INTERNATIONAL, INC., a Delaware Corporation; OURLINK, LLC, a Texas limited liability company; DON BUCHHOLZ; EACR, Ltd.; HOPE HARVISON; JOHN H. HARVISON; MIKE HARVISON; RANDALL HARVISON; PERRY JOHNS; JOVE INVESTMENTS; RICHARD MARXEN; MCRK, Ltd.; KAY PARKER; MAX POYNER; KENNETH REES; and MICHAEL STINSON, Defendants.

**Prior History:** *Boatright Family, LLC v. Reservation Ctr., Inc., 2013 U.S. Dist. LEXIS 96841 (W.D. Okla., July 11, 2013)*

## Core Terms

personal jurisdiction, transfers, cause of action, shareholder, alter ego, minimum contact, forum state, non-resident, Defendants', quotations, residents, alleges

**Counsel:** [*1] For Boatright Family LLC, an Oklahoma limited liability company, Plaintiff: Terry D Kordeliski, LEAD ATTORNEY, Jesse C Chapel, Riggs Abney Neal Turpen Orbison Lewis-OKC, Oklahoma City, OK.

For Reservation Center Inc, a California Corporation, CCRA International Inc, a Delaware Corporation, Ourlink LLC, a Texas limited liability company, Defendants: Clyde R Woody, LEAD ATTORNEY, Michael L Brooks, Hartzog Conger Cason & Neville, Oklahoma City, OK.

**Judges:** TIMOTHY D. DEGIUSTI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** TIMOTHY D. DEGIUSTI

## Opinion

**ORDER**

Before the Court is defendants Don Buchholz; EACR, Ltd.; Hope Harvison; John H. Harvison; Mike Harvison; Randall Harvison; Perry Johns; Jove Investments, Ltd.; Richard Marxen; MCRK, Ltd.; Kay Parker; Max Poyner; Kenneth Rees; and Michael Stinson's (collectively, "Defendants") Motion to Dismiss Amended Complaint, filed October 7, 2014. On November 11, 2014, plaintiff filed its response, and on November 18, 2014, Defendants filed their reply.

*I. Introduction*

On September 3, 2014, plaintiff filed its Amended Complaint, identifying and including fourteen new defendants, all of whom are members of defendant Ourlink, LLC ("Ourlink") and most of whom are now shareholders of defendant [*2] CCRA International, Inc. ("CCRA")[1] and alleging two new causes of action, an alter ego cause of action and a successor liability cause

---

[1] In its Amended Complaint, plaintiff alleges that Defendants were shareholders of CCRA when the transfers at issue in this matter occurred.

of action. Defendants now move this Court to dismiss the claims against them pursuant to *Federal Rules of Civil Procedure 12(b)(2)* and *12(b)(6)* and *Okla. Stat. tit. 12, § 682(B)*. Specifically, Defendants contend that no Defendant possesses the requisite minimum contacts with Oklahoma to justify the exercise of personal jurisdiction over him, her, or it. Additionally, Defendants contend plaintiff's first three causes of action — fraudulent transfers with actual intent, constructively fraudulent transfers, and insider preference transfer — are subject to dismissal under *Rule 12(b)(6)* because plaintiff fails to identify any individual defendant that received any particular transfer of stock or of assets from Reservation Center, Inc. ("RCI").[2] Finally, Defendants contend that plaintiff's alter ego cause of action is not ripe under Oklahoma law and, thus, should be dismissed.

## II. Personal Jurisdiction

When a court's jurisdiction is contested, the plaintiff has the burden of proving that jurisdiction exists. *See AST Sports Sci., Inc. v. CLF Distrib. Ltd., 514 F.3d 1054, 1056 (10th Cir. 2008)*. "Where a district court considers a pre-trial motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." *Id. at 1056-57*.

In ruling on motions under *Rule 12(b)(2)*, the Court considers the averments of the complaint, and the affidavits and other evidentiary materials submitted by the parties. The well pled factual averments of the complaint are accepted as true, unless controverted by defendants' evidentiary materials. Factual disputes arising from the evidentiary materials are resolved in favor of plaintiffs.

*McClelland v. Watling Ladder Co., 729 F. Supp. 1316, 1318 (W.D. Okla. 1990)* (internal citations omitted).

To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show both that jurisdiction is proper under the laws of the

forum state and that the exercise of jurisdiction would not offend due process. Because Oklahoma's **[*4]** long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry.

*Intercon, Inc. v. Bell Atl. Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000)* (internal citations omitted).

The *Due Process Clause* permits the exercise of personal jurisdiction over a nonresident defendant so long as there exist minimum contacts between the defendant and the forum State. The "minimum contacts" standard may be met in two ways. First, a court may, consistent with due process, assert specific jurisdiction over a non-resident defendant if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities. When a plaintiff's cause of action does not arise directly from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state.

*Id.* (internal quotations and citations omitted).

A specific jurisdiction analysis involves a two-step inquiry. First [a court] must consider whether the defendant's conduct and connection with the **[*5]** forum State are such that he should reasonably anticipate being haled into court there. Second if the defendant's actions create sufficient minimum contacts, [a court] must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice.

*Benton v. Cameco Corp., 375 F.3d 1070, 1075 (10th Cir. 2004)* (internal quotations and citations omitted). "A defendant's contacts are sufficient if the defendant purposefully directed its activities at residents of the forum, and . . . the plaintiff's claim arises out of or results from actions by the defendant *himself* that create a substantial connection with the forum state." *Id. at 1076* (internal quotations and citation omitted) (emphasis in original). The Tenth Circuit has defined the "purposeful direction" element of the minimum contacts analysis as an intentional action that was expressly aimed at

---

[2] In the alternative to dismissal, Defendants move the Court, pursuant to *Federal Rule of Civil Procedure 12(c)*, for an order directing plaintiff to provide a more definite statement **[*3]** regarding plaintiff's claims against the individual defendants so as to allow Defendants to respond specifically to the facts and claims alleged against them.

forum state with knowledge that the brunt of the injury would be felt in the forum state. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1072 (10th Cir. 2008)*. Further, whether a defendant has the required minimum contacts must be decided on the particular facts of each case. *See Benton, 375 F.3d at 1076*.

Additionally, the United States Supreme Court set forth an "effects" test in *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*.

> Under *Calder*, an act done outside the state **[*6]** that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct.

*Mullins v. TestAmerica, Inc., 564 F.3d 386, 400 (5th Cir. 2009)* (internal quotations and citation omitted). "Thus, [t]he key to *Calder* is that the effects of an alleged intentional tort are to be assessed as *part* of the analysis of the defendant's relevant contacts with the forum." *Id.* (internal quotations and citation omitted) (emphasis in original). However, a non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor does not *ipso facto* establish personal jurisdiction in the state where a complaining creditor resides. *See id.* "The 'effects' test in *Calder* does not supplant the need to demonstrate minimum contacts that constitute purposeful availment, that is, conduct by the non-resident defendant that invoked the benefits and protections of the state or was otherwise purposefully directed toward a state resident." *Id.*

In the case at bar, it is undisputed that Defendants are not Oklahoma residents or entities and that the transfers at issue occurred **[*7]** in Texas. Plaintiff does not assert that this Court has general personal jurisdiction over Defendants; instead, Plaintiff asserts that Defendants are subject to specific personal jurisdiction. Plaintiff alleges "the Defendants purposefully directed their activities at Oklahoma, by fraudulently transferring property, or aiding and abetting the transfer thereof, all to avoid the enforcement of an Oklahoma judgment." Amended Complaint at ¶ 6.

Having carefully reviewed Plaintiffs' Amended Complaint, as well as the parties' submissions, the Court finds Plaintiff has not made a prima facie showing of personal jurisdiction as to each particular Defendant. In relation to its first three causes of action, Plaintiff alleges:

> 9. In order to interfere with the enforcement of the Note and/or the Oklahoma Judgment, Defendant RCI transferred shares of CCRA stock to Defendant Ourlink and/or Defendants John Does. Defendant RCI made the transfer with the actual intent to hinder, delay or defraud the Plaintiff.

> 10. In order to interfere with the enforcement of the Note and [sic] and/or the Oklahoma Judgment, Defendant RCI transferred other property, including customer lists and other intangible assets, **[*8]** to CCRA, Ourlink and/or John Does. Defendant RCI made the transfer with the actual intent to hinder, delay or defraud the Plaintiff.

*Id.* at ¶¶ 9-10.[3] However, nowhere in its Amended Complaint does Plaintiff provide any specificity as to what was transferred to whom and as to what role, if any, each particular Defendant played in the alleged fraudulent transfers. Plaintiff simply alleges that Defendants are members of Ourlink and are shareholders of CCRA and they received shares of CCRA stock and/or other property; Plaintiff does not allege in its Amended Complaint that Defendants played an active role in the transfers at issue. Further, the Court finds that the documents and deposition testimony submitted by Plaintiff in its response to Defendants' motion to dismiss provide no additional specificity as to the transfers at issue and Defendants' role in those transfers, and provide no evidence showing that Defendants performed any intentional action that would subject them to personal jurisdiction. In short, Plaintiff's speculation as to Defendants' receipt of assets transferred by RCI with an intent to hinder, delay, or defraud a creditor, even if accepted as true, is clearly not enough **[*9]** to establish personal jurisdiction. *See Mullins, 564 F.3d at 400*.

Accordingly, the Court finds that Plaintiff's first three causes of action against Defendants should be dismissed for lack of personal jurisdiction.

## III. Alter Ego Claim

In its fourth cause of action, Plaintiff seeks to impose vicarious liability against Defendants for the debts of RCI under a theory of alter ego liability. Specifically, Plaintiff seeks to disregard the entities of RCI, Ourlink,

---

[3] Defendants are the John Does referenced in these paragraphs.

and CCRA in order to impose liability on Defendants for RCI's debt to Plaintiff. Relying upon *Okla. Stat. tit. 12, § 682(B)*, Defendants assert that Plaintiff's alter ego cause of action is premature.

*Section 682* provides, in pertinent part:

> B. No suit or claim of any nature shall be brought against any officer, director or shareholder for the debt or liability of a corporation of which he or she is an officer, director or shareholder, until judgment is obtained therefor against the corporation and execution thereon returned unsatisfied. This provision includes, but is not limited to, claims based on vicarious liability and alter ego. Provided, nothing herein prohibits a suit or claim against an officer, director or shareholder for their **[*10]** own conduct, act or contractual obligation arising out of or in connection with their direct involvement in the same or related transaction or occurrence.
> D. Members and managers of limited liability companies shall be afforded the same substantive and procedural protection from suits and claims as the protections provided to officers, directors and shareholders of a corporation as set forth in subsection B and C of this section.

*Okla. Stat. tit. 12, § 682 (B)*, *(D)*.

Therefore, before a plaintiff can bring an alter ego claim against an officer, director, or shareholder of a corporation or against a member or manager of a limited liability company, there must be a judgment against the corporation or limited liability company and execution on the judgment must have been returned unsatisfied. It is undisputed in this case that a judgment has been obtained by Plaintiff against RCI, but that judgments have not been obtained by plaintiff against Ourlink or CCRA. Additionally, in its Amended Complaint, Plaintiff alleges that Ourlink is the only shareholder of RCI. *See* Amended Complaint at ¶ 27. Thus, because Plaintiff has a judgment against RCI that has been returned unsatisfied, plaintiff may assert an alter ego claim against **[*11]** Ourlink. However, in order to impose vicarious liability against Defendants, who are shareholders of CCRA and members of Ourlink, there must be a judgment against CCRA and/or Ourlink. Because it is undisputed that no judgment has been obtained against either Ourlink or CCRA, the Court finds that pursuant to *§ 682* Plaintiff's alter ego cause of action against Defendants is premature and should be dismissed.

## IV. Conclusion

Accordingly, for the reasons set forth above, the Court GRANTS Defendants' Motion to Dismiss Amended Complaint [docket no. 90] and DISMISSES Plaintiffs' claims against defendants Don Buchholz; EACR, Ltd.; Hope Harvison; John H. Harvison; Mike Harvison; Randall Harvison; Perry Johns; Jove Investments, Ltd.; Richard Marxen; MCRK, Ltd.; Kay Parker; Max Poyner; Kenneth Rees; and Michael Stinson, without prejudice.

**IT IS SO ORDERED this 14th day of May, 2015.**

/s/ Timothy D. DeGiusti

TIMOTHY D. DeGIUSTI

UNITED STATES DISTRICT JUDGE

**End of Document**

No *Shepard's* Signal™
As of: June 8, 2020 10:26 PM Z

# *Dahl v. Keller*

United States District Court for the Eastern District of Wisconsin

May 20, 2019, Decided; May 20, 2019, Filed

Case No. 18-CV-1526

**Reporter**
2019 U.S. Dist. LEXIS 84389 *; 2019 WL 2193460

COLLIN DAHL, et al., Plaintiffs, v. BARBARA J. KELLER, et al., Defendants.

## Core Terms

personal jurisdiction, motion to dismiss, amended complaint, contacts, discovery, plaintiffs', constructive trust, defendants', domiciled, money had and received, alleges

**Counsel:** **[*1]** For Collin Dahl, Jennifer Dahl, The Estate of Olivia Dahl, Plaintiffs: Christopher T Hale, LEAD ATTORNEY, Milwaukee, WI.

For Endurance American Insurance Company, Defendant: Henry T M LeFevre-Snee, Margaret Hupp Fahey, Clausen Miller PC, Chicago, IL.

For The Estate of Ralph L Keller, Keller Aviation LLC, Defendants: Daniel J Mohan, Laura S Platt, Raymond H Groble, III, Daley Mohan & Groble PC, Chicago, IL.

For WCF Holdings Inc, also known as Windy City Flyers Inc, Defendant: Russell A Klingaman, Hinshaw & Culbertson LLP, Milwaukee, WI.

For Barbara J Keller, The Barbara J Keller Trust, Defendants: Daniel J Mohan, Raymond H Groble, III, Laura S Platt, Daley Mohan & Groble PC, Chicago, IL.

For State Farm Fire and Casualty Company, Intervenor Defendant: Mark D Malloy, Meissner Tierney Fisher & Nichols SC, Milwaukee, WI.

**Judges:** WILLIAM E. DUFFIN, United States Magistrate Judge.

**Opinion by:** WILLIAM E. DUFFIN

## Opinion

**DECISION AND ORDER ON THE DEFENDANTS' MOTIONS TO DISMISS**

### 1. Background

A small single-engine aircraft crashed on September 18, 2016, in Door County, Wisconsin. Killed in the crash were the pilot, Ralph L. Keller, and a passenger, sixteen-year-old Olivia Dahl. Olivia's estate and her parents, Collin and Jennifer Dahl, **[*2]** initiated this lawsuit in Milwaukee County Circuit Court. The defendants timely removed it to federal court. Two of the defendants, Barbara J. Keller, who is the widow of the pilot, and a trust she controls, The Barbara J. Keller Trust, have moved to dismiss the plaintiffs' amended complaint.

### 2. Motion to Dismiss Under *Rule 12(b)(2)*

Barbara argues that she lacks sufficient contacts with Wisconsin to subject her to the state's personal jurisdiction. She contends that, contrary to what is alleged in the complaint, she is domiciled in Illinois, not

Wisconsin—a fact about which there is no dispute. The court addressed this fact previously as part of its inquiry into whether complete diversity of citizenship existed. (ECF No. 49.) If Barbara were domiciled in Wisconsin, as the amended complaint alleges, complete diversity of citizenship would not exist and the court would lack subject matter jurisdiction. *See 28 U.S.C. § 1332(a)(1)*. But while domicile is determinative of citizenship for diversity purposes, personal jurisdiction may be established through means other than domicile.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman, 571 U.S. 117, 125, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)* (citing *Fed. R. Civ. P. 4(k)(1)(A)*). Thus, this court looks first **[*3]** to Wisconsin's long-arm statute to determine whether it has personal jurisdiction over a defendant. *Felland v. Clifton, 682 F.3d 665, 678 (7th Cir. 2012)*; *see also Steel Warehouse v. Leach, 154 F.3d 712, 714 (7th Cir. 1998)* ("A federal district court exercising diversity jurisdiction has personal jurisdiction over a nonresident only if a court of the state in which it sits would have such jurisdiction."). Wisconsin courts employ a two-step inquiry when determining whether personal jurisdiction may be exercised over a nonresident defendant. The first step is to determine whether the defendant meets the criteria for personal jurisdiction under the Wisconsin long-arm statute. *Kopke v. A. Hartrodt S.R.L., 2001 WI 99, 245 Wis.2d 396, 409, 629 N.W.2d 662 (2001)*. If the requirements of the long-arm statute are satisfied, then the court must consider whether the exercise of jurisdiction comports with due process requirements. *Id.* Plaintiff bears the burden of establishing personal jurisdiction. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*.

A person is subject to personal jurisdiction in Wisconsin if she "[i]s engaged in substantial and not isolated activities within this state ...." *Wis. Stat. § 801.05(1)(d)*. Stated another way, a person is subject to personal jurisdiction in Wisconsin if she "takes up local presence or status within the state." *Rasmussen v. GMC, 2011 WI 52, ¶18, 335 Wis. 2d 1, 803 N.W.2d 623* (internal quotation marks omitted). Factors courts consider are "the quantity of the contacts, the nature **[*4]** and quality of those contacts, the source and connection of the contacts to the claim made, the interest of Wisconsin in the action and the convenience of the parties." *Id. at ¶19*. Although due process may independently limit the reach of Wisconsin's long-arm statute, the statutory and constitutional analyses are intertwined in that Wisconsin's statute is intended "to provide for the

exercise of jurisdiction over nonresident defendants to the full extent consistent with the requisites of due process of law." *Id. at ¶20* (internal quotation marks omitted).

As stated above, Barbara's sole argument in support of her contention that she is not subject to personal jurisdiction in Wisconsin is that she is not domiciled here. But, again, simply because she is not domiciled in Wisconsin does not mean she is not subject to personal jurisdiction in Wisconsin.

The plaintiffs argue that, because Barbara owns a vacation home in Wisconsin, she is subject to Wisconsin's personal jurisdiction. But that, by itself, does not establish that the court has personal jurisdiction over Barbara or the trust. *Rush v. Savchuk, 444 U.S. 320, 328, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980)* ("We held in *Shaffer[ v. Heitner, 433 U.S. 186, 208-09, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)*,] that the mere presence of property in a State does not establish a sufficient **[*5]** relationship between the owner of the property and the State to support the exercise of jurisdiction over an unrelated cause of action.") "The ownership of property in the State is a contact between the defendant and the forum, and it may suggest the presence of other ties. Jurisdiction is lacking, however, unless there are sufficient contacts to satisfy the fairness standard of *International Shoe*." *Rush, 444 U.S. at 328*.

Recognizing that the ownership of a home in Wisconsin may suggest additional contacts, the plaintiffs ask to pursue discovery regarding Barbara's contacts with Wisconsin in the event the court finds mere property ownership insufficient. (ECF No. 81 at 4.) Barbara does not address this issue in reply.

"If a defendant files a motion to dismiss for lack of personal jurisdiction, a plaintiff 'is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum.'" *Bancoult v. McNamara, 214 F.R.D. 5, 10 (D.D.C. 2003)* (quoting *El-Fadl v. Cent. Bank of Jordan, 316 U.S. App. D.C. 86, 75 F.3d 668, 676 (D.C. Cir. 1996))*; *see also Andersen v. Sportmart, Inc., 179 F.R.D. 236, 241 (N.D. Ind. 1998)*. However, "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 946 (7th Cir. 2000)*; *see also In re Honey Transshipping Litig., 87 F. Supp. 3d 855, 873 (N.D. Ill.*

*2015)*; *Bancoult, 214 F.R.D. at 10*.

As the Court noted in *Rush*, the ownership of property **[*6]** in a state may suggest the existence of other contacts. Therefore, under the facts presented, ordinarily it would be appropriate to deny without prejudice the motion to dismiss and grant the plaintiffs' request to pursue discovery limited to the question of whether the court has personal jurisdiction over Barbara and the trust she controls. However, discovery related to Barbara's contacts with Wisconsin is necessary only if the amended complaint alleges a plausible claim against Barbara and her trust. Because Barbara and her trust separately move to dismiss the amended complaint under *Rule 12(b)(6)* for failure to state a claim, the court turns to the question of whether the plaintiffs have adequately alleged a cause of action against these defendants.

### 3. Motion to Dismiss Under *Rule 12(b)(6)*

To survive a motion to dismiss under *Rule 12(b)(6)* "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678*. A claim satisfies this pleading standard when its factual **[*7]** allegations "raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555-56*. The court accepts "all well-pleaded facts as true and constru[es] all inferences in favor of the plaintiff[]." *Gruber v. Creditors' Prot. Serv., 742 F.3d 271, 274 (7th Cir. 2014)*.

The amended complaint does not explicitly denote any cause of action against any particular defendant. Anyone reading the amended complaint is left to speculate as to the nature of the claims the plaintiffs are alleging against the defendants. Nonetheless, the court understands the plaintiffs to be alleging claims of negligence against Ralph Keller, the pilot, and WCF Holdings, Inc., who leased the plane. (ECF No. 51 at ¶¶ 15, 17, 18, 22.) The plaintiffs also suggest that Keller Aviation, LLC, and WCF are liable by way of respondeat superior for Ralph Keller's negligence. (ECF No. 51, ¶¶ 20, 21.) The amended complaint further alleges a direct action against these defendants' insurer, Endurance American Insurance Company. (ECF No. 51, ¶ 6.)

But the nature of any claims against Barbara Keller and her trust is significantly more oblique. However, now aided by the explanations contained in the plaintiffs' brief in response to the motion to dismiss, the court is able to make better sense of the plaintiffs' allegations. **[*8]**

Although the plaintiffs "demand[] judgment against the Defendants, jointly and severally" (ECF No. 51 at 7), the amended complaint contains no allegation that Barbara Keller or her trust were negligent in any way with respect to the plane crash. Thus, it is unclear on what basis Barbara and her trust could plausibly be found jointly and severally liable for the injuries sustained by the plaintiffs. In fact, in response to the motion to dismiss, the plaintiffs do not allege Barbara and her trust were negligent, nor do they argue that they may be jointly and severally liable. Nor are the plaintiffs attempting to hold Barbara liable for her husband's negligence; such a claim would be barred under Wisconsin law, *Wis. Stat. § 766.55(2)(cm)*.

Rather, the plaintiffs contend that the amended complaint sets forth two claims against Barbara and her trust: constructive trust and money had and received. The amended complaint never uses these terms, nor does it refer to the elements of such claims. Nonetheless, the plaintiffs argue the following paragraph supports their claims:

> Upon information and belief, after the death of Ralph Keller on September 18, 2016 WCF Holdings, Inc., Keller Aviation, LLC., Barbara Keller and/or **[*9]** The Barbara Keller Trust have been the beneficiaries of and received assets belonging to Ralph L. Keller before his death on September 18, 2016 without paying a reasonably equivalent value in exchange during the time when the assets of Ralph L. Keller were not sufficient to pay the debts he created prior to his death, including, but not limited to, his liability to Olivia Dahl for her severe emotional distress before the crash on September 18, 2016.

(ECF No. 51, ¶ 24.)

### 3.1. Constructive Trust

Setting aside the question of whether a constructive trust is a claim or is merely a remedy, *see Tikalsky v. Stevens, 2018 WI App 39, 382 Wis. 2d 830, 917 N.W.2d*

232, 2018 Wisc. App. LEXIS 520 (unpublished); see also *Watts v. Watts, 137 Wis. 2d 506, 533-34, 405 N.W.2d 303, 315 (1987)*, the plaintiffs' assertion of a constructive trust is easily resolved. "To state a claim on the theory of constructive trust the complaint must state facts sufficient to show (1) unjust enrichment and (2) abuse of a confidential relationship or some other form of unconscionable conduct." *Watts, 137 Wis. 2d at 533-34, 405 N.W.2d at 315*; see also *Ross v. Specialty Risk Consultants, 2000 WI App 258, 240 Wis. 2d 23, 34, 621 N.W.2d 669, 676* (citing *Wilharms v. Wilharms, 93 Wis. 2d 671, 678-79, 287 N.W.2d 779 (1980)*; *Capitol Indem. Corp. v. Reasbeck, 166 Wis. 2d 332, 339, 479 N.W.2d 247, 250 (Ct. App. 1991)*.

The amended complaint does not allege that it was through unconscionable conduct that Barbara or her trust received property from Ralph Keller following his death. In fact, the amended complaint offers no suggestion as to how Barbara and her trust might have received any **[*10]** property from Ralph Keller. But innocent means for coming into possession of Ralph's property—for example, as a result of the termination of marital property or joint tenancy interests—are readily recognizable. Having failed to allege that Barbara and the trust obtained assets through unconscionable conduct, the plaintiffs' constructive trust claim as to Barbara Keller and her trust is subject to dismissal.

## 3.2. Money Had and Received

Whether specific property can be used to pay obligations a decedent incurred prior to his death is ordinarily a matter of statute. See generally *Wis. Stat. ch. 859*.[1] For example, although a torfeasor spouse's interest in marital property generally may be used to satisfy a tort liability, see *Wis. Stat. § 766.55(2)(cm)*, should the tortfeasor spouse die "[s]urvivorship marital property ... is not available to satisfy the obligation of the deceased tortfeasor spouse." *Wonka v. Cari, 2001 WI App 274, 249 Wis. 2d 23, 28, 637 N.W.2d 92, 95* (citing *Wis. Stat. § 859.18(4)(a)*); see also *Wis. Stat. § 859.18(4)(a)*2 (exempting "[j]oint tenancy property in which the decedent spouse was a tenant ...."); *Berg v.*

Garves (In re Estate of Berg), 2012 WI App 27, ¶¶ 9-14, 339 Wis. 2d 491, 809 N.W.2d 901 (unpublished). However, the defendants do not move to dismiss on this basis. Thus, the court will not consider this subject further.

Rather, the defendants offer a terse assertion that a claim of money had and received does not include **[*11]** claims sounding in tort. (ECF No. 85 at 5 (quoting *Cleansoils Wisconsin, Inc. v. State of Wisconsin Department of Transportation, 229 Wis. 2d 600, 599 N.W.2d 903 (Ct. App. 1999)*). However, the plaintiffs' claims against Barbara Keller and her trust do not sound in tort. The amended complaint asserts a claim against Barbara and her trust not because of any alleged negligence on their part toward the plaintiffs but because, following Ralph's death, they came to possess assets that the plaintiffs allege otherwise would have been available to satisfy liabilities to the plaintiffs that Ralph incurred during his life.

Distilled to its basic terms (and setting aside questions as to whether such a claim is consistent with Wisconsin law that otherwise controls the availability of a decedent's property to satisfy obligations incurred during his life), these facts would seem to fit within a claim for money had and received. "An action for money had and received is maintainable whenever the defendant receives money which, in equity and good conscience, he ought to pay to the plaintiff." *Wells v. Am. Express Co., 49 Wis. 224, 229-30, 5 N.W. 333, 335 (1880)*; see also *Glendale Invest Ass'n v. Harvey Land Co., 114 Wis. 408, 414, 90 N.W. 456, 458 (1902)* ("An action for money had and received is maintainable wherever the money of one man has, without consideration, got into the pocket of another.") (quoting *Hudson v. Robinson*, 4 Maule & S. 478). The action is "employed as a remedy to prevent the unjust enrichment **[*12]** of one at the expense of another or to prevent one from retaining a benefit conferred upon him by another which would be, under all of the circumstances of the case, unjust or inequitable." *Richland Cty. Bank v. Joint Sch. Dist., 213 Wis. 178, 184, 250 N.W. 407, 409 (1933)*. "The purpose of such an action is not to recover damages, but to make the party disgorge, and the recovery must necessarily be limited by the party's enrichment from the alleged transaction." *Glendale Invest Ass'n v. Harvey Land Co., 114 Wis. 408, 413, 90 N.W. 456, 457 (1902)* (quoting *Ltd. Inv. Ass'n v. Glendale Inv. Ass'n, 99 Wis. 54, 74 N.W. 633 (1898)*).

Having developed no further argument, the defendants fail in their burden to show that there are no plausible

---

[1] Given that Ralph Keller's estate is being administered in Illinois, it is unclear whether Wisconsin law would govern such questions. However, the defendants rely on Wisconsin law, and in the absence of any dispute a federal court will apply the substantive law of the state in which it sits. *Mass. Bay Ins. Co. v. Vic Koenig Leasing, 136 F.3d 1116, 1120 (7th Cir. 1998)*.

means by which the plaintiffs may prevail on this claim. *See Yeksigian v. Nappi, 900 F.2d 101, 104 (7th Cir. 1990).* Consequently, the court finds that the plaintiffs have (barely) alleged a plausible claim against Barbara Keller and her trust such that it is appropriate to permit discovery as to whether she has sufficient contacts with Wisconsin to be subject to personal jurisdiction in the state.

**IT IS THEREFORE ORDERED** that the defendants' motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* is **denied without prejudice**. The plaintiffs may undertake discovery relevant to the existence of personal jurisdiction over Barbara Keller and her trust. Unless otherwise agreed to by the parties, any discovery shall be limited to matters relevant to personal jurisdiction **[\*13]** and shall be completed no later than **60 days after the date of this order**. The defendants may file a renewed motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)* not later than **28 days thereafter**.

**IT IS FURTHER ORDERED** that the defendants' motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* is **held in abeyance** pending resolution of the defendants' motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2)*. The motion is terminated for administrative purposes.

**IT IS FURTHER ORDERED** that the defendants' motion to stay discovery (ECF No. 69) is **dismissed as moot**.

**IT IS FURTHER ORDERED** that the parties' joint motion to dismiss W. Brown & Associates Insurances Services as a defendant (ECF No. 80) is **granted**.

Dated at Milwaukee, Wisconsin this 20th day of May, 2019.

/s/ William E. Duffin

WILLIAM E. DUFFIN

U.S. Magistrate Judge

 Positive

As of: June 8, 2020 9:54 PM Z

# *Gibson v. Craigslist, Inc.*

United States District Court for the Southern District of New York

June 15, 2009, Decided; June 15, 2009, Filed

08 Civ. 7735 (RMB)

**Reporter**

2009 U.S. Dist. LEXIS 53246 *; 2009 WL 1704355

GIBSON, Plaintiff, - against - CRAIGSLIST, INC., Defendant.

## Core Terms

amended complaint, provider, website, Craigslist, interactive, computer service, advertisement, publisher, immunity, monitor, quotations, sanctions, Reply

**Counsel:** **[*1]** For Calvin Gibson, Plaintiff: Paul Benjamin Dalnoky, LEAD ATTORNEY, Paul B. Dalnoky, New York, NY.

For Craigslist, Inc., Defendant: Justin Nolan Kinney, LEAD ATTORNEY, Coughlin Duffy LLP (NYC), New York, NY; Elizabeth L. McDougall-Tural, PRO HAC VICE, Perkins Coie LLP(Seattle), Seattle, WA.

**Judges:** RICHARD M. BERMAN, United States District Judge.

**Opinion by:** RICHARD M. BERMAN

## Opinion

### DECISION & ORDER

### I. Background

On September 4, 2008, Calvin Gibson ("Plaintiff" or "Gibson") filed an amended complaint ("Amended Complaint") against Craigslist, Inc. ("Defendant" or "Craigslist") alleging, among other things, that "in or around July 2008, an individual, whose identity is unknown, advertised to sell handguns on [D]efendant's internet website," *www.craigslist.org*, and that "on July 14, 2008, at approximately 8:00 a.m., in the City of New York, Plaintiff was shot several times by Jesus Ortiz with a handgun which Mr. Ortiz "purchase[d] from [that unknown] individual who advertised its sale [on] [D]efendant's internet website." (Am. Compl. PP 14, 19.) Plaintiff asserts that Defendant breached its "duty of care to [e]nsure that inherently hazardous objects, such as handguns, did not come into the hands of . . . individual[s], **[*2]** such as Mr. Ortiz," and seeks, among other relief, "compensatory damages in the amount of [$ 10 million]," punitive damages, and the "appointment of a Federal monitor." (Am. Compl. P 17, p.5; *see also id.* PP 10, 18, 20.)

On November 6, 2008, Defendant moved pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* ("Fed. R. Civ. P.") to dismiss the Amended Complaint, arguing, among other things, that: (1) dismissal of the Amended Complaint under *Section 230* of the Communications Decency Act of 1996 ("CDA"), *47 U.S.C. § 230, et seq.*, pursuant to *Rule 12(b)(6)* "is proper and warranted"; [1] and (2) Plaintiff's claims fail

_____

[1] An Affirmative defense, **[*3]** such as *Section 230* immunity, is generally addressed on a *Rule 12(c)* motion for judgment on the pleadings or a *Rule 56* motion for summary judgment, *see Novak v. Overture Servs., Inc., 309 F. Supp. 2d 446, 452 (E.D.N.Y. Mar. 25, 2004)*, but some courts have held that it is proper to evaluate a *Section 230* immunity defense "in the context of a *12(b)(6)* motion" where the necessary facts are

because "*Section 230 of the CDA* provides an absolute bar to any cause of action that would make an interactive service provider, like [C]raigslist, liable for third-party content posted on the Internet through its service." (Def. Mot. to Dismiss, dated Nov. 6, 2008 ("Def. Mot."), at 4; Def. Reply in Further Supp. of Plaintiff's Mot. to Dismiss, dated Dec. 2, 2008 ("Def. Reply"), at 2; *see also* Hearing Tr., dated May 21, 2009 ("Hearing Tr."); Ltr. from Justin N. Kinney to Hon. Richard M. Berman, dated May 21, 2009 Ltr.").)

On November 19, 2008, Plaintiff filed an opposition arguing, among other things, that: (1) *Section 230 of the CDA* provides an affirmative defense and "an affirmative defense is generally not fodder for a *Rule 12(b)(6)* motion"; and (2) *Section 230* "does not provide blanket immunity to interactive computer services." (Pl. Opp'n to Def. Mot. to Dismiss, dated Nov. 18, 2008 ("Pl. Opp'n"), at 4, 5 (internal quotations and citation omitted); *see also id.* at 7; **[\*4]** Ltr. from Paul B. Dalnoky to Hon. Richard M. Berman, dated May 22, 2009 ("Pl. May 22, 2009 Ltr."), at 1.) Plaintiff also seeks an order, pursuant to *Fed. R. Civ. P. 11*, compelling "[D]efendant to pay sanctions in the form of costs and reasonable attorney's fees for [its] meritless motion." (Pl. Opp'n at 12.)

On December 2, 2008, Defendant filed a reply arguing, among other things, that there are no grounds for *Fed. R. Civ. P. 11* sanctions against Defendant because "[t]here is ample precedent . . . acknowledging the breadth of *Section 230*'s protection and its application to claims such as those asserted by the [P]laintiff." (Def. Reply at 9.)

The parties waived oral argument. (*See* Case Management Plan.)

**For the reasons set forth below, Defendant's motion to dismiss the Amended Complaint is granted and Plaintiff's application for sanctions is denied**.

## II. Legal Standard

"When considering a motion to dismiss under *Rule*

apparent on the face of the complaint and the immunity available under the CDA precludes a plaintiff from stating a claim. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 564 F. Supp. 2d 544, 550 (E.D. Va. 2008)*; *see also Doe v. Bates, No. 05 Civ. 91, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at \*9-10 (E.D. Tex. Dec. 27, 2006)*. As reflected below, that is the position taken here.

*12(b)(6)*, the Court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Murawski v. Pataki, 514 F. Supp. 2d 577, 582 (S.D.N.Y. 2007)*. At the same time, "a plaintiff's obligation to provide the grounds of **[\*5]** his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal quotations and citation omitted); *see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 173 L. Ed. 2d 868, 2009 WL 1361536, \*12 (2009)*. The complaint must plead enough facts to state a claim for relief that is plausible on its face. *See Atlantic Recording Corp. v. Project Playlist, Inc., 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009)*.

"A motion to dismiss under [*Fed. R. Civ. P.*] *12(c)* is governed by the same standard as a motion under [*Fed. R. Civ. P.*] *12(b)(6)*." *In re Ades and Berg Group Investors, 550 F.3d 240, 243 n.4 (2d Cir. 2008)*.

## III. Analysis

### (1) *Fed. R. Civ. P. 12(b)(6)*

Defendant argues that *Fed. R. Civ. P. 12(b)(6)* is the "appropriate vehicle" to seek dismissal of the Amended Complaint because, among other reasons, any discovery regarding Defendant's efforts to stop the selling of illegal goods on its website is "irrelevant to [Defendant's] *Section 230* protection and cannot provide a basis to deny [Defendant's] motion." (Def. May 21, 2009 Ltr. at 1, 2; *see also* Def. Reply at 2-4.) Plaintiff counters, **[\*6]** among other things, that "discovery [should] be had to determine what efforts, if any, [D]efendant made to stop the selling of illegal goods and services on its website" and "there is no [*Section 230*] defense . . . evident on the face of the [Amended] [C]omplaint as the [Amended] [C]omplaint does not treat the Defendant as a speaker or a publisher or a business." (Pl. Opp'n at 5 (internal quotations and citation omitted); Pl. May 22, 2008 Ltr. at 1.)

A defendant may raise an affirmative defense in a pre-answer *Rule 12(b)(6)* motion where, as here, the defense appears on the face of the complaint. *See Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 426 (2d Cir. 2008)*; *see also MCW, Inc. v. Badbusinessbureau.com LLC, No. 02 Civ. 2727, 2004 U.S. Dist. LEXIS 6678, 2004 WL 833595, at \*7 (N.D. Tex. Apr. 19, 2004)* ("The CDA, if applicable, is an

appropriate ground for dismissal of the complaint under *Rule 12(b)(6)* because the Act would preclude [plaintiff] from establishing a set of facts that would entitle it to relief."); *Murawski, 514 F. Supp. 2d at 582-83, 591*; *Atlantic Recording, 603 F. Supp. 2d at 698-703*. And, the Court concludes that it is proper and appropriate to evaluate Defendant's *Section 230* immunity **[*7]** defense in the context of *Fed. R. Civ. P. 12(b)(6)* because, as further explained below, (*see infra* pp. 5-8), the elements necessary to make a finding regarding Section 230 immunity are apparent from the face of the Amended Complaint, *see Nemet Chevrolet, 564 F. Supp. 2d at 550*, and discovery into Defendant's efforts to prevent the sale of illegal goods and services on its website "would [not] establish a set of facts that would entitle Plaintiff[] to relief," *Bates, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *10*. *See also Global Royalties, Ltd. v. Xcentric Ventures, LLC, No. 07 Civ. 956, 2007 U.S. Dist. LEXIS 77551, 2007 WL 2949002, at *2 (D. Ariz. Oct. 10, 2007)* ("[G]iven the allegations, the application of the CDA is a question of law and will not be affected by discovery."). [2]

**(2) *Section 230***

Defendant argues persuasively **[*8]** that it is entitled to immunity under *Section 230 of the CDA* because, among other reasons, "[C]raigslist is a provider (and user) of interactive computer services"; "[t]he alleged handgun advertisement identified in the [Amended] Complaint was provided by another information content provider, not [C]raigslist"; and "the [Amended] Complaint on its face improperly seeks to treat [C]raigslist as the publisher or speaker of the alleged advertisement." (Def. Mot. at 9, 10, 11.) Plaintiff counters unpersuasively that he does not seek to hold Defendant liable as a speaker or in the role of a publisher but, rather, "as a business, plain and simple." (Pl. May 22, 2009 Ltr. at 1; *see also* Pl. Opp'n at 7.)

*Section 230 of the CDA* provides clearly that "'[n]o provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider,' and

that '[n]o cause of action may be brought and liability may be imposed under any State or local law that is inconsistent with this section.'" *Murawski, 514 F. Supp. 2d at 591* (quoting *47 U.S.C. §§ 230(c)(1)*, *230(e)(3)*) (alterations in original); *see also Blumenthal v. Drudge, 992 F. Supp. 44, 51 (D.D.C. 1998)* **[*9]** (in enacting the CDA, "Congress made a policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."). [3]

Courts engage in a three part inquiry when determining the availability of immunity under the CDA, *i.e.*, "[i] whether Defendant is a provider of an interactive computer service; [ii] if the postings at issue are information provided by another information content provider; and [iii] whether Plaintiff's claims seek to treat Defendant **[*10]** as a publisher or speaker of third party content." *Nemet Chevrolet, 564 F. Supp. 2d at 548*. "Courts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." *Atlantic Recording, 603 F. Supp. 2d at 699*.

Plaintiff's claims against Defendant are barred by the CDA because each prong of the *Section 230* immunity test is satisfied based upon the allegations in the Amended Complaint. *See Nemet Chevrolet, 564 F. Supp. 2d at 550*; *see also Murawski, 514 F. Supp. 2d at 591*; *Myspace, 528 F.3d at 420*; *Green v. Am. Online (AOL), 318 F.3d 465, 470-71 (3d Cir. 2003)*, *cert. denied*, 540 U.S. 877, 124 S. Ct. 200, 157 L. Ed. 2d 140 (2003); *Kruska v. Perverted Justice Found. Inc., No. 08 Civ. 54, 2008 U.S. Dist. LEXIS 109347, 2008 WL 2705377, at *2-3 & n.1 (D. Ariz. July 9, 2008)*. First, the Amended Complaint alleges that Defendant is "an internet merchant," (Am. Compl. P 1), and Plaintiff does not appear to dispute that Craigslist is a provider of an interactive computer service. *See Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist,*

---

[2] Even if the Court were to conclude that Defendant should have moved pursuant to *Rule 12(c)*, the Court could properly treat the instant *Rule 12(b)(6)* motion as a *Rule 12(c)* motion for judgment on the pleadings, with the same result. *See Bates, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *9*; *see also Doe v. MySpace, Inc., 474 F. Supp. 2d 843, 850 n.5 (W.D. Tex. 2007)*, *aff'd*, *528 F.3d 413 (5th Cir. 2008)*, *cert. denied*, **129 S. Ct. 600, 172 L. Ed. 2d 456 (2008)**.

---

[3] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *47 U.S.C. § 230(f)(2)*.

"The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id. § 230(f)(3)*.

*Inc.,* 461 F. Supp. 2d 681, 698 (N.D. Ill. 2006) (internal quotations and citation omitted), *aff'd,* 519 F.3d 666 (7th Cir. 2008); *see also Carafano v. Metrosplash.com Inc., 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002),* **[*11]** *aff'd,* 339 F.3d 1119 (9th Cir. 2003).

Second, the Amended Complaint acknowledges that an "unknown individual," not the Defendant, placed the advertisement under a coded category on the Craigslist website. (Am. Compl. P 15); *see also Craigslist, 461 F. Supp. 2d at 698* (housing notices posted on Craigslist's website "are 'information' that originates, not from Craigslist, but from 'another information content provider,' namely the users of Craigslist's website") (quoting *47 U.S.C. § 230(f)(3)*); *Atlantic Recording,* 603 F. Supp. 2d at 701-02.

Third, Plaintiff seeks to hold Defendant liable for its alleged failure to block, screen, or otherwise prevent the dissemination of a third party's content, *i.e.,* the gun advertisement in question, *see Bates, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *20,* alleging, among other things, that Defendant "failed to monitor, regulate, properly maintain and police the merchandise being bought and sold on its . . . website" and "is either unable or unwilling to allocate the necessary resources to monitor, police, maintain and properly supervise the goods and services sold on its . . . website." (Am. Compl. P 1, 20; *see also* Pl. Opp'n at 5.) It is clear that Plaintiff's claims are **[*12]** directed toward Craigslist as a "publisher" of third party content and "*Section 230* specifically proscribes liability in such circumstances." *Green, 318 F.3d at 471* (internal quotations and citation omitted) *see Myspace, 474 F. Supp. 2d at 849* ("Plaintiffs argue this suit is based on MySpace's negligent failure to take reasonable safety measures to keep young children off of its site and not based on MySpace's editorial acts . . . . No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities."); *Green, 318 F.3d at 470-71* (affirming dismissal of claim that AOL "negligent[ly] fail[ed] to properly police its network for content transmitted by its users" because *Section 230* bars "attempts to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network -- actions quintessentially related to a publisher's role"); *see also Stoner v. eBay, Inc.,* No. 305666, 2000 WL 1705637, at *3 (Cal. Super. Nov. 1, 2000) (rejecting plaintiff's "contention . . . that eBay should be held responsible for failing to monitor the products auctioned **[*13]** over its service" because "Congress intended to remove

[through *Section 230*] any legal obligation of interactive computer service providers to attempt to identify or monitor the sale of such products").

## Fed. R. Civ. P. 11

Defendant having prevailed on its motion, it is apparent that it violated no stricture of *Fed. R. Civ. P. 11. See Beyah v. Scully, No. 91 Civ. 2720, 1996 U.S. Dist. LEXIS 2753, 1996 WL 103829, at *4 (S.D.N.Y. Mar. 11, 1996).* Even assuming, *arguendo,* that Plaintiff's claims were not barred by *Section 230 of the CDA,* Defendant's motion cannot be called frivolous and Defendant "has every right to move for dismissal" at this time. *Koch v. CGM Group, Inc.,* No. TH 00-216--C M/H, 2001 U.S. Dist. LEXIS 5558, 2001 WL 392523, at *4 (S.D. Ind. Apr. 3, 2001).* Plaintiff's application for sanctions is, accordingly, denied. *See Murawski, 514 F. Supp. 2d at 590.*

## IV. Conclusion and Order

For the foregoing reasons, Defendant's motion to dismiss [# 6] is granted and Plaintiff's application for sanctions is denied. The Clerk of Court is respectfully requested to close this case.

## SO ORDERED.

Dated: New York, New York

June 15, 2009

/s/ Richard M. Berman

## RICHARD M. BERMAN, U.S.D.J.

 Positive

As of: June 8, 2020 9:55 PM Z

# *J.B. Hunt Transp., Inc. v. Liverpool Trucking Co.*

United States District Court for the Middle District of Pennsylvania

April 5, 2013, Decided; April 5, 2013, Filed

CIVIL NO. 1:11-CV-1751

**Reporter**

2013 U.S. Dist. LEXIS 88363 *

J.B. HUNT TRANSPORT, INC., Plaintiff, v. LIVERPOOL TRUCKING COMPANY, INC.; SHAMSHER NAGRA d/b/a LIVERPOOL TRUCKING COMPANY, INC.; SHAMSHER NAGRA; AND FUEL CITY TRUCK STOP, INC., Defendants.

**Subsequent History:** Adopted by, Dismissed without prejudice by, Motion denied by *J.B. Hunt Transp., Inc. v. Liverpool Trucking Co., 2013 U.S. Dist. LEXIS 87886 (M.D. Pa., June 24, 2013)*

**Prior History:** *J.B. Hunt Transp., Inc. v. Liverpool Trucking Co., 2012 U.S. Dist. LEXIS 79046 (M.D. Pa., June 7, 2012)*

## Core Terms

Amend, corporate veil, piercing, recommendations, second amended complaint, motion to dismiss, cause of action, Trucking, workers' compensation, allegations, formalities, recitation, parties, entity, funds, magistrate judge, joint venture, undercapitalized, transportation

**Counsel:** **[*1]** For J.B. Hunt Transport, Inc., Plaintiff: Jon Michael Dumont, Rawle & Henderson LLP, Philadelphia, PA.

For Liverpool Trucking Company, Inc., Shamsher Nagra, d/b/a Liverpool Trucking Company, Inc., Shamsher Nagra, Defendants: Michael D. Reed, Caldwell & Kearns, Harrisburg, PA.

For Fuel City Truck Stop, Inc., Defendant: Elizabeth J. Goldstein, Dilworth Paxson, Harrisburg, PA.

**Judges:** Martin C. Carlson, United States Magistrate Judge. Judge Conner.

**Opinion by:** Martin C. Carlson

## Opinion

**REPORT AND RECOMMENDATION**

### I. INTRODUCTION

This case, which comes before us on a motion to dismiss, asks us to apply a highly fact-specific legal doctrine relating to piercing the corporate veil, at a stage of the proceedings where our inquiry is limited to an assessment of the allegations set forth in a complaint.

J.B. Hunt Transport, Inc. ("J.B.Hunt" or "Plaintiff") initiated this action by filing a complaint on September 20, 2011, alleging that defendant, Liverpool Trucking Company, Inc. ("Liverpool") breached an Outsource Carrier Agreement executed between plaintiff and Liverpool by failing to indemnify J.B. Hunt for money paid relating to a worker's compensation claim. On December 15, 2011, plaintiff filed its first amended complaint, **[*2]** adding a second instance where J.B. Hunt was forced to pay a worker's compensation claim

for which it sought indemnification. Plaintiff, on October 12, 2012, filed a second amended complaint adding as defendants Shamsher Nagra d/b/a Liverpool Trucking, Inc. [1] ("Nagra d/b/a Liverpool"), Shamsher Nagra ("Nagra"), and Fuel City Truck Stop, Inc. ("Fuel City" and collectively "Defendants").

Now pending before this court are motions from defendants Nagra d/b/a Liverpool, Nagra and Fuel City, to dismiss the second amended complaint for failure to state a claim for which relief can be granted, pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. This court will address the motions together as they are substantially related.

The motions have been fully briefed and have been assigned to the undersigned for the purposes of issuing this report and recommended disposition. For the reasons that follow, [*3] we find that the plaintiff has failed to plead its claims adequately under *Rule 8 of the Federal Rules of Civil Procedure*. Plaintiff's accusations amount to nothing more than a recitation of the elements for the particular causes of action he asserts. As such, we recommend that the court grant defendants' motions to dismiss. We further recommend that these motions be dismissed without prejudice so that J.B. Hunt may amend its complaint in order to allege facts to support the legal conclusions that they have already set forth.

## II. BACKGROUND

J.B. Hunt Transport, Inc. is a Georgia corporation with its principal place of business in Arkansas. J.B. Hunt entered into a contract with Liverpool Truck Company, Inc., a Pennsylvania corporation with its principal place of business in Liverpool, Pennsylvania, which obligated Liverpool to supply certain outsourced transportation services for the plaintiff by way of an Outsource Carrier Agreement (OCA). (Doc. 41, Sec. Amend. Compl. ¶¶ 1, 2, 9.) Pursuant to the OCA, which was signed on behalf of Liverpool by Jasbir Nagra [2] in her capacity as

---

[1] While Liverpool Trucking Company, Inc. is a registered corporation in the state of Pennsylvania, there is no registered entity of Shamsher Nagra d/b/a Liverpool Trucking Company, Inc. Further, there are not any fictitious names listed in affiliation with Liverpool Trucking Company, Inc.

[2] Jasbir Nagra is named in the second amended complaint (Doc. 41, ¶ 5) as "an adult individual who is the president/owner of Fuel City Truck Stop, Inc." She is not listed in the caption as a defendant nor is she named as a defendant

manager, Liverpool would serve as an independent contractor. (Doc. 41, Sec. Amend. Compl. ¶¶ 10, 11.) The contract [*4] expressly disclaimed the creation of an employer/employee relationship between Liverpool and J.B. Hunt. (Doc. 41, Sec. Amend. Compl. ¶ 11.) As such, Liverpool was responsible for the supervision of, and liability associated with all personnel, contractors, subcontractors and other agents whom Liverpool utilized in providing the services contracted for in the OCA. (Doc. 41, Sec. Amend. Compl. ¶ 12.)

According to the OCA, Liverpool was required to carry and maintain worker's compensation insurance and coverage for persons engaged in the performance of transportation services under the OCA. As part of the OCA, Liverpool agreed to indemnify and hold harmless J.B. Hunt from "any fines, costs, penalties, liabilities and claims of every kind...on account of bodily injury to persons rising out of, or in connection with, [*5] the transportation of property under the [OCA.]" (Doc. 41, Sec. Amend. Compl. ¶¶ 13, 14.) This obligation could not be limited in any way based on any immunity provision available under applicable worker's compensation acts. (Doc. 41, Sec. Amend. Compl. ¶14.)

On the same day that she signed the OCA, Jasbir Nagra executed a Hold Harmless Covenant between Liverpool and J.B. Hunt. (Doc. 41, Sec. Amend. Compl. ¶ 15.) By executing this document, Liverpool assumed "full and complete responsibility for compensation of any and all work-related injury occurring to any of its personnel during the term of the [OCA]." Doc. 41, Sec. Amend. Compl. ¶ 17.) Had this covenant not been executed, Liverpool would not have been required to carry worker's compensation insurance, as the company was exempt under state law. (Doc. 41, Sec. Amend. Compl. ¶16.)

On or about August 16, 2010, Awad Idries was driving a truck for Liverpool and completed two deliveries to J.B. Hunt customers pursuant to the OCA. (Doc. 41, Sec. Amend. Compl. ¶ 18.) While driving that day Indries was involved in a serious motor vehicle accident, which resulted in the loss of his left arm. (Doc. 41, Sec. Amend. Compl. ¶ 19.) Indries filed [*6] a petition with the Commonwealth of Pennsylvania Bureau of Worker's Compensation. (Doc. 41, Sec. Amend. Compl. ¶ 20.) In this petition Indries sought worker's compensation benefits for the injuries he sustained in the motor vehicle

---

in the second amended complaint, and there are no direct allegations made against her. Therefore, we do not find that she has been named a defendant.

accident, claiming J.B. Hunt as his employer at the time of the accident. (Doc. 41, Sec. Amend. Compl. ¶ 20.)

Then, on or about May 14, 2011, Dane Marritt injured himself in a motor vehicle accident while driving a truck for Liverpool pursuant to the OCA, while making deliveries to J.B. Hunt customers. (Doc. 41, Sec. Amend. Compl. ¶¶ 21, 22.) Merritt suffered injuries to the cervical, thoracic and lumbar spine, he also suffered from a concussion, headaches and facial contusions. (Doc. 41, Sec. Amend. Compl. ¶ 22.) Merritt filed a petition with the Bureau of Worker's Compensation seeking benefits as a result of these injuries on or about June 9, 2011. (Doc. 41, Sec. Amend. Compl. ¶ 23.) Subsequently, Liverpool filed a petition for joinder of an additional defendant claiming that J.B. Hunt, not Liverpool, was the statutory employer of Merritt at the time of his motor vehicle accident pursuant to Section 302(a) of the Pennsylvania Worker's Compensation Act, [*7] codified at *77 P.S. § 501*. (Doc. 41, Sec. Amend. Compl. ¶ 24.)

Plaintiff asserts several theories on which it predicates that even though the named defendants other than Liverpool are not party to the OCA, they can nevertheless be named as defendants in the case against Liverpool. First J.B. Hunt attempts to pierce the corporate veil of Liverpool alleging that the corporation failed to adhere to statutorily mandated corporate formalities, the corporation's assets were intermingled with the assets of Shamsher Nagra, Jasbir Nagra and Fuel City, and that Liverpool was undercapitalized for its corporate purpose and activities. (Doc. 41, Sec. Amend. Compl. ¶¶ 40-42.) Next, J.B. Hunt alleges that Liverpool and Fuel City acted as a single entity even though they are two separate and distinct corporate entities. (Doc. 41, Sec. Amend. Compl. ¶¶ 45, 48.) Finally, plaintiff asserts, in the alternative, that Liverpool and Fuel City acted in a joint venture, and as such should be added to the case. (Doc. 41, Sec. Amend. Compl. ¶ 54.) Defendants counter by asserting that J.B. Hunt fails to plead adequately in their complaint anything more than a mere recitation of the elements of the causes of action [*8] asserted in the complaint, and do not allege facts which would justify causes of action based upon a piercing of the corporate veil. (Doc. 58, Def. Brief at 4, 5; Doc. 59, Def. Brief at 3.)

## III. **STANDARD OF REVIEW**

*Federal Rule of Civil Procedure 12(b)(6)* provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)*, and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (abrogating "no set of facts" language found in *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929*. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of necessary elements of the plaintiff's cause of action. *Id. at 556*. Furthermore, [*9] in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008)* (brackets and quotation marks omitted) (quoting *Twombly, 550 U.S. at 555*).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007)*. The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)*. Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002)*; *see also, U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002)* (holding [*10] that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment."). However, the court may not rely on other parts of the record in determining a motion to dismiss. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994)*.

## IV. **DISCUSSION**

Initially, J.B. Hunt filed suit only against Liverpool Tucking Company, Inc., but in plaintiff's second amended complaint, plaintiff added three new defendants: Shamsher Nagra d/b/a Liverpool Trucking Company, Inc.; Shamsher Nagra, in his individual capacity, and Fuel City Truck Stop, Inc. The joining of these defendants is predicated on the assertion that Shamsher Nagra and his wife Jasbir Nagra, who are the owners and sole shareholders of Liverpool and Fuel City respectively, did not conform to corporate formalities, intermingled personal and corporate funds between the two entities and, in essence, each corporation acted as the alter ego of the other. In legal parlance, the plaintiff seeks to "pierce the corporate veil" in order to implicate these three **[\*11]** defendants in an action that would otherwise be between J.B. Hunt and Liverpool - the actual parties to the OCA.

Courts do not lightly entertain requests to set aside corporate structures and pierce the corporate veil. Quite the contrary, courts have found corporate veil piercing to be appropriate only "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime," *Pearson v. Component Tech. Corp.,247 F.3d 471, 484-85 (3d Cir. 2001)* (quoting *Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967))*, or when "the parent so dominated the subsidiary that it had no separate existence[.]" *Id.* (quoting *New Jersey Dep't of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 468 A.2d 150, 164 (N.J. 1983))*. Veil piercing is not a remedy to be taken lightly, but should only be used as an "<u>extraordinary</u> equitable remedy." *Shenango, Inc. v. American Coal Sales Co., No. 6-149, 2007 U.S. Dist. LEXIS 58110, 2007 WL 2310869 at \*3(W.D. Pa. Aug. 9, 2007)* (emphasis added). The Third Circuit has enumerated eight non-conjunctive factors to analyze when determining if the corporate veil can be pierced:

> gross undercapitalization, failure to observe **[\*12]** corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stakeholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stakeholder.

*Pearson, 247 F.3d at 484-85*.

As this recitation reveals, the task of piercing the corporate veil often entails an intensely fact-specific inquiry, an inquiry that is particularly ill-suited for resolution in favor of parties at the outset of litigation, when our review is cabined and confined to well-pleaded allegations. District courts are to use a two- part analysis when dealing with motions to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)*. The first step the court must take is separate the facts in the complaint from the legal conclusions, and while all facts must be taken as true, the legal elements and conclusions may be disregarded. *Id.* After this separation the court must decide if the facts, taken as true, show a "plausible claim for relief." *Id.*

In the instant case, the averments in the complaint, standing **[\*13]** alone, do not permit us to pierce the corporate veil. The complaint states that, *inter alia*, Liverpool did not comply with corporate formalities, intermingled funds and was undercapitalized, but J.B. Hunt fails to plead any facts to support a single one of these conclusions. (Doc. 41, Sec. Amend. Compl. ¶¶ 40-42.) These allegations are, thus, little more than legal conclusions cloaked as factual allegations, and represent a mere recitation of the elements for piercing the corporate veil. This is a form of pleading which has consistently been found to be inadequate to justify claims that pierce the corporate veil and hold individuals liable for corporate obligations. As such, this count should be dismissed with respect to all of the moving defendants. *See, e.g., Patroski v. Ridge; No. 11-1065, 2011 U.S. Dist. LEXIS 119920, 2011 WL 4955274 (W.D. Pa. 2011)* (count dismissed when complainant "provided little or nothing in the way of factual allegations to support her contention that liability should be imposed...to pierce the veil."); *Essex Insurance Co. v. Miles, No. 10-3598, 2010 U.S. Dist. LEXIS 128888, 2010 WL 5069871 (E.D. Pa. December 3, 2010)* (holding that averments based on information and belief that the defendants "failed to observe corporate **[\*14]** formalities, intermingled funds, used corporate property for personal expenses, left [the company] grossly undercapitalized, and used [the company] as a 'facade' or 'alterego[,]'" was "merely a 'formulaic recitation of the elements of a cause of action' for piecing the corporate veil."); *Preferred Real Estate Investments, LLC v. Lucent Technologies, Inc., No. 07-5374, 2009 U.S. Dist. LEXIS 51805, 2009 WL 1748954 (D.N.J. June 19, 2009)* (dismissing count to pierce the corporate veil when complainant alleged common ownership, common principal place of business, common email addresses, common corporate letterhead, and funds of principals of one company were used to make payments to the other company.);

*Shenango, Inc., 2007 U.S. Dist. LEXIS 58110, 2007 WL 2310869 (W.D. Pa. Aug. 9, 2007)* (motion to dismiss granted where complainant alleged "on information and belief" various factors that have been identified as elements to the cause of action but failed to specify any particular facts that have lead to these conclusion). *Lumax Indus., Inc. v. Aultman, 543 Pa. 38, 669 A.2d 893, 895 (1995)* (finding that in order to withstand a motion to dismiss, the pleader must state what the defendant allegedly did that would bring his actions within the parameters of a **[\*15]** cause of action based on a theory of piercing the corporate veil).

In sum, we find that the claims brought pursuant to the single-entity theory and the joint venture, as presently alleged, fail to plead sufficient specific facts to state a claim, for the same reasons that the veil piercing claim fails. The second amended complaint is, in essence, little more than a list of elements of the particular causes of action alleged with the newly named defendants woven in. Since the second amended complaint lacks any suitable facts to support these counts, we find that there is not a claim for which the court could grant relief. Therefore, the single-entity theory count and the joint venture count should be dismissed for all moving defendants.

Recognizing that veil piercing is appropriate only "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime," *Pearson v. Component Tech. Corp.,247 F.3d 471, 484-85 (3d Cir. 2001)* (quoting *Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967)),* we conclude that since none of the moving parties were party to the OCA between J.B. Hunt and Liverpool, **[\*16]** and J.B. Hunt has not yet pled sufficient facts to plausibly allege that these moving parties could be liable on the claims in this case in either a joint venture, single entity theory or corporate veil piercing situation, the counts in the second amended complaint alleged against the moving defendants should be dismissed. However, we believe it is possible that in the course of litigation with the lone remaining defendant, Liverpool Trucking Company, Inc., that the plaintiff could learn of facts that would enable them to adequately plead counts against the moving defendants by piercing the corporate veil, under a single-entity theory, or alleging a joint venture. We thus believe that it would be improper to preclude J.B. Hunt from bringing these claims at such a time when the appropriate facts are ascertained. Therefore, the second amended complaint should be dismissed without prejudice and leave should be granted to the plaintiff so

that it may amend this complaint against the moving defendants in the future to comply with *Rule 8 of the Federal Rules of Civil Procedure* in light of the interpretations by *Twombly* and *Iqbal* if it develops evidence which would support piercing the corporate **[\*17]** veil based upon:

> gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stakeholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stakeholder.

*Pearson, 247 F.3d at 484-85.*

## V. RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS HEREBY RECOMMENDED THAT defendants' motion to dismiss plaintiff's second amended complaint (Doc. 41.) be GRANTED and the second amended complaint be dismissed, as pertaining to the moving defendants, for failure to state a claim upon which relief could be granted, without prejudice. It is further recommended, that the plaintiff be granted leave to amend the complaint at such a time when plaintiff has the requisite facts which lead him to his conclusions of law that he states in his second amended complaint.

The parties are further placed on notice that pursuant to *Local Rule 72.3:*

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in *28 U.S.C § 636 (b)(1)(B)* **[\*18]** or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days of being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part,

Timothy Moore

the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*/s/ Martin C. Carlson*

Martin C. Carlson

United States Magistrate Judge

Dated: **[*19]** April 5, 2013

---

**End of Document**


Neutral

As of: June 8, 2020 9:55 PM Z

# *Mt. Crest SRL, LLC v. Anheuser-Busch InBEV SA/NV*

United States District Court for the Western District of Wisconsin

April 24, 2020, Decided; April 24, 2020, Filed

17-cv-595-jdp

**Reporter**

2020 U.S. Dist. LEXIS 72843 *; 2020-1 Trade Cas. (CCH) P81,195

MOUNTAIN CREST SRL, LLC, Plaintiff, v. ANHEUSER-BUSCH InBEV SA/NV, individually and as successor to InBev SA/NV and Interbrew S.A. and MOLSON COORS BREWING COMPANY, individually and as successor to Molson Canada Inc., Defendants.

**Prior History:** *Mt. Crest SRL, LLC v. Anheuser-Busch InBEV SA/NV, 2018 U.S. Dist. LEXIS 83471 (W.D. Wis., May 16, 2018)*

## Core Terms

beer, defendants', boycott, group boycott, six-pack, allegations, court of appeals, Sherman Act, subsidiaries, act of state doctrine, anticompetitive, causation, practices, antitrust, immunity, antitrust violation, quotation, marks, restraint of trade, antitrust claim, reconsideration, conspiracy, brewers, sales, cooperative, challenges, marketing, motion to dismiss, unjust enrichment, Breweries

**Counsel: [*1]** For Mountain Crest SRL, LLC, Plaintiff: Charles E Benoit, LEAD ATTORNEY, Washington, DC; Charles J. Crueger, Erin K. Dickinson, Krista Kay Baisch, LEAD ATTORNE, Crueger Dickinson LLC, Whitefish Bay, WI.

For Anheuser-Busch InBEV SA/NV, Individually and as successor to InBev SA/NV and Interbrew S.A., Defendant: Steven Sunshine, LEAD ATTORNEY, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DCs; Kendall W. Harrison, Kevin J. O'Connor, Godfrey & Kahn S.C., Madison, WI; Tara Reinhart, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC.

For Molson Coors Brewing Company, Individually and as successor to Molson Canada Inc., Defendant: Donald Bruce Hoffman, LEAD ATTORNEY, David I Gelfand, Matthew Bachrack, Cleary, Gottlib, Steen & Hamilton, LLP, Washington, DC; Donald Karl Schott, LEAD ATTORNEY, Stacy Ann Alexejun, Quarles & Brady, Madison, WI; James Eric Goldschmidt, Quarles & Brady LLP, Milwaukee, WI; Matthew Charles Vogel, Sr., Quarles & Brady, Milwaukee, WI.

**Judges:** JAMES D. PETERSON, District Judge.

**Opinion by:** JAMES D. PETERSON

## Opinion

OPINION and ORDER

Plaintiff Mountain Crest SRL, LLC, which owns and operates Minhas Brewery in Monroe, Wisconsin, is suing defendants Anheuser-Busch Imbrue SA/NV (ABI) and Molson **[*2]** Coors Brewing Company (Molson Coors) for alleged anticompetitive behavior in Ontario, Canada. The case is now on remand after the Court of Appeals for the Seventh Circuit affirmed in part and reversed in part the judgment dismissing all of Mountain Crest's claims. *See Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV, 937 F.3d 1067 (7th Cir. 2019).*

This court dismissed the case under the act of state

doctrine, which prohibits federal courts from invalidating the public acts of a foreign government. The court understood Mountain Crest's challenge to be limited to the so-called "six-pack rule," which prohibits some Ontario liquor stores from selling larger packs of beer or offering discounts for buying multiple six-packs.[1] Because the six-pack rule is embodied in Ontario law, Liquor Control Act, R.S.O. 1990, c. L.18, § 10(3) (Can.), the act of state doctrine required dismissal.

The court of appeals agreed that the act of state doctrine required dismissal of Mountain Crest's challenge to the six-pack rule. But the court concluded that Mountain Crest was also challenging other conduct not implicated by the act of state doctrine. The court did not determine whether the other challenges should proceed but instead directed "the district court [to] address these claims in due [*3] course." *Id. at 1086*.

Now defendants have filed a new motion to dismiss all of the claims remanded by the court of appeals. Dkt. 75. For its part, Mountain Crest moves for reconsideration of the decision that its challenge to the six-pack rule is barred by the act of state doctrine, contending that a new bill by the Ontario legislature undermines that decision. Dkt. 73.

The court isn't persuaded that the bill cited by Mountain Crest requires reconsideration of the holding regarding the six-pack rule, so the court will deny Mountain Crest's motion. As for defendants' motion to dismiss, the court concludes that Mountain Crest hasn't stated a claim upon which relief may be granted. Some of Mountain Crest's claims arise out of injuries caused by the Ontario government's conduct, not defendants' conduct. And the remaining claims relate to conduct by an Ontario cooperative that is not a party to this case. Although Mountain Crest includes conclusory allegations in its complaint that defendants were involved in a conspiracy to control the cooperative to harm American beer exporters, conclusory allegations are not enough to state a claim, especially in a complex lawsuit involving alleged antitrust violations. [*4] So the court will grant defendants' motion to dismiss.

BACKGROUND

---

[1] *See* Dkt. 60, at 10 n.3 ("[B]oth sides have assumed in their briefing that Mountain Crest's claims under the Sherman Act are limited to restrictions on selling larger packs of beer and pack-up pricing, so the court has made the same assumption.").

A full summary of Mountain Crest's allegations may be found in the court of appeals' decision, *Mountain Crest, 937 F.3d at 1069-77*, and in this court's decision granting defendants' original motion to dismiss, Dkt. 60, at 2-9, so only a brief overview of factual and regulatory background is provided here.

Under Ontario law, there are only two places that an individual may purchase beer for off-site consumption in Ontario: (1) stores operated by the Liquor Control Board of Ontario (LCBO); and (2) The Beer Store, which is operated by Brewers Retail Inc. (BRI). The LCBO is a government agency that regulates liquor sales. BRI is a cooperative of Ontario brewers. The primary members of BRI are Labatt Breweries of Canada and Molson Inc. (Canada), which each own 49 percent of the cooperative. Labatt is a subsidiary of defendant ABI and Molson is a subsidiary of defendant Molson Coors.

The LCBO controls the sale and delivery of beer at BRI stores and establishes specific terms and conditions related to the operation of such stores. When the Beer Store and an LCBO store are in the same community, their inventories differ. LCBO "ordinary" stores sell wine and spirits [*5] as well as beer in packages of six or fewer; the Beer Store may sell larger packages of beer. This arrangement was reflected in a 2000 agreement between BRI and LCBO and is now codified in a 2015 Ontario law.

Mountain Crest entered the Ontario beer market in 2009. Since then, Mountain Crest alleges that its ability to sell its beer in Ontario has been unfairly restricted, both at LCBO stores and at the Beer Store. As for the LCBO, Mountain Crest says that the six-pack rule is harmful, especially to a "value beer" such as Mountain Crest, because it prevents Mountain Crest from offering discounts on purchases for larger quantities of beer. Mountain Crest says that defendants are responsible for the six-pack rule because they pressured the LCBO into adopting the rule, using tactics that are prohibited under antitrust law. As for the Beer Store, Mountain Crest says that the stores are stocked and laid out in a way that discriminates against Mountain Crest and other American brands not owned by defendants.

MOTION FOR RECONSIDERATION

Mountain Crest seeks reconsideration of the portion of this court's decision that was affirmed by the court of appeals. Dkt. 73. Specifically, Mountain Crest says [*6] that the act of state doctrine has no application to this case in light of a bill passed by the Ontario legislature in June 2019.

The parties disagree about whether Mountain Crest is entitled to a consideration of the merits of its motion. Mountain Crest cites footnote 78 of the court of appeals's decision, in which the court declined to consider any effect that the bill might have, stating instead that "the most expeditious manner of evaluating this development is to permit the district court to address it on remand." *Mountain Crest, 937 F.3d at 1085*. Defendants don't directly address footnote 78, but they contend that Mountain Crest must still meet the requirements of either *Rule 59* or *Rule 60 of the Federal Rules of Civil Procedure* if it wants to disturb the judgment. *Rule 59* motions must be brought within 28 days of entering judgment, and *Rule 60* motions must be brought within one year or "within a reasonable time," depending on which provision is at issue. Defendants contend that Mountain Crest has failed to meet any of those deadlines.

*Rule 59* and *Rule 60* apply only to final judgments. After the court of appeals remanded the case, "the earlier final judgment became interlocutory. What had been a judgment on all claims in the case became a judgment on only some claims. And without a *Rule 54* certification, [*7] that judgment was not final." *Carmody v. Bd. of Trustees of Univ. of Illinois, 893 F.3d 397, 408 (7th Cir. 2018)*. So the court need not determine whether Mountain Crest's motion complied with the time limits in *Rule 59* or *Rule 60*. Rather, the more appropriate question is whether reconsideration is permitted by the mandate rule and the law of the case doctrine, which "prohibit a district court from revisiting on remand any issues expressly or impliedly decided on appeal." *United States v. Fox, 783 F. App'x 630, 632 (7th Cir. 2019)*. In this case, the court of appeals did decide that the act of state doctrine precluded some of Mountain Crest's claims. But footnote 78 appears to give this court permission to consider the June 2019 bill, so that is what the court will do. *See also Carmody, 893 F.3d at 408* ("[T]he law-of-the-case doctrine may yield if an intervening change in the law, or some other special circumstance, warrants reexamining the claim." (internal quotation marks omitted)).

Mountain Crest attached a copy of the bill to its motion. Dkt. 73-1. The bill "enacted an amendment to the Liquor Control Act terminating the 2015 Agreement," but "[t]he effective date of the termination is to be announced by the province's Lieutenant Governor" and "this date has not yet been announced." *Mountain Crest, 937 F.3d at 1077*.

The court is not persuaded that a bill that has not been given legal effect [*8] is enough to require a different result in this case. The court of appeals described the act of state doctrine as "a judicial rule that generally forbids an American court to question the act of a foreign sovereign that is lawful under that sovereign's laws." *Id. at 1080* (internal quotation marks omitted). The court articulated a two-part test for determining whether the doctrine applied in this case: (1) "whether the six-pack rule is attributable to the government of Ontario for the purposes of the act of state doctrine"; and (2) "whether a decision in Mountain Crest's favor would invalidate those acts." *Id. at 1083*. The court concluded that the answer to both questions was "yes."

The June 2019 bill, even once it takes effect, does not change the answer to either question. The six-pack rule is still attributable to the government of Ontario and a decision in Mountain Crest's favor would still invalidate acts of the Ontario government. Mountain Crest doesn't argue otherwise, and it doesn't point to any portion of the court of appeals's decision that is undermined by the bill. The court will deny Mountain Crest's motion for reconsideration.

MOTION TO DISMISS

Mountain Crest is raising claims under *Section 1* and *Section 2* of the [*9] Sherman Act as well as a claim for unjust enrichment under Wisconsin common law. *Section 1* applies to conspiracies in restraint of trade. *15 U.S.C. § 1*. *Section 2* applies to monopolies. *15 U.S.C. § 2*. Although *§ 1* and *§ 2* are criminal laws, "any person . . . injured in his business or property" because of a violation of those laws may bring a civil action. *15 U.S.C. § 15(a)*.

The court of appeals identified two types of conduct alleged in the complaint that are not barred by the act of state doctrine: (1) "antecedent and allegedly deliberate acts to bring about the six-pack rule"; and (2) "a pattern of other marketing and distribution practices that . . . disfavor[ed] American products, including Mountain Crest's product." *Mountain Crest, 937 F.3d at 1086*. Defendants' motion to dismiss challenges Mountain's Crest's claims based on both types of conduct.[2]

---

[2] In addition to challenging the merits of Mountain Crest's claims, defendants raise secondary and relatively brief arguments about whether the United States is the proper forum for this case under the doctrines of comity and forum non conveniens. But defendants' comity argument rests entirely on a test that neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has adopted. *See In re*

## A. Acts leading up to the six-pack rule

The court of appeals identified three acts discussed in the complaint related to alleged attempts to promote the six-pack rule. First, Labatt Breweries of Canada and Molson Inc. (Canada) pressured the LCBO through a group boycott, restricting the supply of beer to the LCBO. Second, Anheuser-Busch and Molson Coors threatened to sue the LCBO under the North American [*10] Free Trade Agreement. Third, BRI offered small ownership stakes to all Ontario-based brewers to dissuade them from opposing the six-pack rule. Although defendants seek dismissal of all three claims, Mountain Crest discusses only the group boycott in its opposition brief, so the court will assume that Mountain Crest has abandoned any challenges based on defendants' threat to sue or offer of ownership stakes.[3]

The court of appeals described the alleged boycott as follows: "Labatt and Molson refused to supply additional six packs of beer beyond what the LCBO already had, to provide packages of their beer in cans larger than a six pack, or to provide any beer in cans." *Mountain Crest, 937 F.3d at 1073*. Defendants' arguments for dismissing the group boycott claim focus on the LCBO's involvement: the boycott doesn't give rise to an antitrust claim against defendants because the boycott did not harm Mountain Crest, and the only alleged indirect harm—the six-pack rule—was imposed by the LCBO and the Ontario government, not defendants. Defendants rely on several related doctrines to make this argument.

_____

*Vitamin C Antitrust Litig., 837 F.3d 175, 183 (2d Cir. 2016)*, vacated and remanded sub nom. *Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co., 138 S. Ct. 1865 201 L. Ed. 2d 225 (2018)*. And defendants' forum non conveniens argument is not well developed. So the court concludes that defendants have not satisfied their "heavy burden" to show that Mountain Crest should have filed this case in Canada rather than in Mountain Crest's home district. *See In re Factor VIII or IX Concentrate Blood Products Litigation, 484 F.3d 951, 955-56 (7th Cir. 2007)* ("[W]hen the plaintiff has sued in his or her home forum, there is a strong presumption in favor of that choice. Under those circumstances, a defendant invoking forum non conveniens bears a heavy burden in opposing the plaintiff's chosen forum." (internal quotation marks, citations, and alterations omitted)).

[3] Even if Mountain Crest hadn't abandoned those aspects of its claim, the court would conclude that they fail for the same reasons as the challenge to the group boycott.

## 1. *Noerr-Pennington* doctrine

Defendants invoke the *Noerr-Pennington* doctrine, which "extends absolute immunity under the antitrust [*11] laws to businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects." *Mercatus Grp., LLC v. Lake Forest Hosp., 641 F.3d 834, 841 (7th Cir. 2011)* (internal quotation marks and citations omitted).[4] Because Mountain Crest is alleging that defendants were using the boycott to influence the LCBO, defendants say that they are entitled to immunity under *Noerr-Pennington.*

Mountain Crest says that *Noerr-Pennington* doesn't apply when a defendant's conduct is a group boycott, citing *Federal Trade Commission. v. Superior Court Trial Lawyers Association, 493 U.S. 411, 110 S. Ct. 768, 107 L. Ed. 2d 851 (1990)* (*SCTLA*). Mountain Crest is right, but only to a point.

In *SCTLA*, an association of criminal defense lawyers refused to represent any more clients for the District of Columbia until the district enacted legislation that increased the lawyers' compensation. The federal government sued, contending that the association's conduct was a group boycott that qualified as a restraint of trade. The Supreme Court agreed and rejected the association's assertion of immunity under *Noerr-Pennington*. The Court explained that *Noerr-Pennington* applies when "the alleged restraint of trade was the intended *consequence* of public action;" it does not apply when a "boycott was the *means* by which [the [*12] defendants] sought to obtain favorable legislation." *Id. at 424-25*. Applying that principle to the case before it, the Court observed that "[t]he restraint of trade that was implemented while the boycott lasted would have had precisely the same anticompetitive consequences during that period even if no legislation had been enacted." *Id. at 425*.

*SCTLA* makes it clear that defendants aren't entitled to immunity for a claim based on harm caused by the alleged boycott itself. The Court of Appeals for the First Circuit has stated the rule succinctly: "private actors who

_____

[4] The doctrine gets its name from two Supreme Court cases that applied it, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961)*, and *United Mine Workers v. Pennington, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965)*.

Timothy Moore

conduct an economic boycott violate the Sherman Act and may be held responsible for their marketplace injury caused by the boycott, even if the boycotters' ultimate goal is to obtain favorable state action." *Sandy River Nursing Care v. Aetna Cas., 985 F.2d 1138, 1142 (1st Cir. 1993)*. So if Mountain Crest could point to an injury caused by the boycott, it could seek damages for the boycott. But Mountain Crest hasn't done that. After all, the alleged boycott wasn't against Mountain Crest, it was against the LCBO. And the boycott involved defendants withholding their *own* products from the LCBO, not Mountain Crest's products. Mountain Crest identifies no way it suffered as a result of that alleged conduct. If anything, limiting **[*13]** the supply of defendants' beer would give Mountain Crest an opportunity to sell more beer to the LCBO.

As the court of appeals recognized, Mountain Crest's challenge to the boycott "raise[s] significant questions of causality." *Mountain Crest, 937 F.3d at 1086*. Mountain Crest's theory is not that it was harmed directly by the boycott but that the boycott induced the LCBO to enact the six-pack rule, which limited Mountain Crest's sales by preventing it from providing discounts for higher-volume sales. But Mountain Crest can't challenge the six-pack rule directly because of the act of state doctrine. So the question is whether Mountain Crest can maintain an antitrust claim based on an alleged group boycott that caused it no direct harm but that Mountain Crest says set off a chain of events that hurt Mountain Crest's sales in Ontario.

*SCTLA* provides little guidance in answering that question because there were no issues of causation in that case. The plaintiff was representing the interests of the District of Columbia, which was directly harmed by the group boycott. Other cases more similar to this one suggest that a private defendant cannot be held liable for an alleged antitrust violation when the harm was caused directly **[*14]** by the government, even if the defendant "improperly" influenced the government. In that situation, the government's conduct is a supervening cause that breaks the link between the defendant and any injury the plaintiff suffered. *See Associated Bodywork & Massage Professionals v. Am. Massage Therapy Ass'n, 897 F. Supp. 1116, 1120 (N.D. Ill. 1995)* ("Although Defendant may have encouraged the legislatures' actions, the choice to enact massage therapy regulations constituted an independent governmental choice, comprising a supervening 'cause,' and breaking the link between Defendant's actions and any injury Plaintiff may have suffered."); 1A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 202c

(4th ed. 2015).

*Sandy River Nursing Care* is a good example. In that case, the plaintiffs alleged that a group of insurance companies used a group boycott to coerce the state legislature into allowing them to charge higher rates for workers' compensation insurance. When a group of employers sued the insurers for antitrust violations, the court concluded that the boycott was a restraint of trade and that *Noerr-Pennington* did not provide immunity for the boycott. But, as in this case, the plaintiffs in *Sandy River Nursing Care* weren't claiming damages for the boycott itself. *985 F.2d at 1143*. Rather, they contended that the boycott **[*15]** coerced the state legislature into allowing higher rates, which the defendants then imposed. The court rejected that claim, holding that the legislation was an act of the legislature, not the insurers. The court also rejected the argument that the higher rates could be attributed to the insurers because they used "unlawful activity to coerce the favorable legislation," reasoning that the legislature's motive was irrelevant. *Id. at 1144*.

*Sandy River Nursing Care* is not identical to this case because the court relied on the principle that the "Sherman Act d[oes] not apply to anticompetitive restraints imposed by the States 'as an act of government.'" *Id.* (quoting *City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991)*). But that principle, which is called "state action immunity," is similar to the act of state doctrine. Both doctrines rest on the principle that the Sherman Act doesn't reach conduct of a sovereign, whether domestic or foreign. The important point is the same: there is no liability under the Sherman Act when the "only anticompetitive injuries that [the plaintiff] complains of are the direct result of governmental action." *Sessions Tank Liners, Inc. v. Joor Mfg., Inc., 17 F.3d 295, 300-01 (9th Cir. 1994)*.

This is not simply an issue of immunity. Rather, it is a basic question of causation. *See* Arreda & Hovenkamp ¶201a **[*16]** ("Setting aside the Constitution and the substantive meaning of the statute, when the anticompetitive harm results from the government action . . . then the government itself becomes the 'cause' of action."). The court in *Sessions Tank* recognized this. Allowing parties to assert antitrust claims for private conduct alleged to have caused the government to impose a restraint of trade "would entail deconstructing the decision-making process to ascertain what factors prompted the various governmental bodies to erect the anticompetitive barriers at issue." *Id. at 301*.

In this case, the deconstruction process would be complicated by an additional factor. Specifically, when Mountain Crest entered the Ontario market in 2009, it had already been nine years since the LCBO had officially adopted the six-pack rule in the 2000 agreement.[5] And Mountain Crest doesn't contend that defendants can be held liable for anything that happened before 2000. So this is not a situation in which the plaintiff is alleging that a group boycott caused the government to *adopt* an anticompetitive policy. In other words, Mountain Crest's theory is not that defendants' alleged group boycott caused any change in government policy; **[*17]** rather, Mountain Crest's theory is that the boycott persuaded the Ontario government to retain a policy that had already been in place for nearly a decade, if not longer. *See Hughes v. Liquor Control Bd. of Ontario*, 2018 CarswellOnt 3969, para. 157 (Can. Ont. S.C.J.) (WL) ("The LCBO would have needed the Provincial Government's approval to change this status quo, and the Government refused to grant such approval."). This makes the alleged causal connection between defendants' conduct and Mountain Crest's harm even more attenuated than in other cases involving the *Noerr-Pennington* doctrine.

So Mountain Crest is correct that the *Noerr-Pennington* doctrine does not provide unequivocal support to defendants because, under *SCTLA*, a group boycott against the government is not entitled to immunity. But, as the other cases and authorities cited above demonstrate, *Noerr-Pennington* is about more than simply immunizing protected conduct. It is also a recognition of both the evidentiary and policy-based reasons for limiting antitrust liability when anticompetitive harm is the direct result of government action. Applying those reasons to the facts **[*18]** of this case supports a conclusion that Mountain Crest cannot maintain an antitrust claim against defendants based on the group boycott. But the court need not rest its decision on *Noerr-Pennington* because there are other causation doctrines that point to the same result.

─────────────────────

[5] In fact, as noted in one of the attachments to Mountain Crest's complaint, even in 2000, the LCBO recognized that the six-pack rule was "[c]onsistent with historical practice." Dkt. 49-14. *See also Hughes v. Liquor Control Bd. of Ontario*, 2018 CarswellOnt 3969, para. 157 (Can. Ont. S.C.J.) (WL) *aff'd* 145 O.R.3d 401 (Can. Ont. C.A.). ("The 2000 Beer Framework Agreement did not change much in the way that the LCBO and Brewers Retail each operated. . . . Both before and after the Agreement was adopted, government policy precluded the LCBO from selling 12-packs and 24-packs at Ordinary Stores.").

## 2. Other causation doctrines

Apart from their reliance on *Noerr-Pennington*, defendants say that there are three other causation-related problems for any antitrust claim based on the group boycott: (1) Mountain Crest's injury is not "fairly traceable" to defendants' conduct, as required by Article III of the Constitution; (2) Mountain Crest has not satisfied the requirements for an "antitrust injury," as required for its claims under both *§ 1* and *§ 2* of the Sherman Act; and (3) Mountain Crest has not satisfied the requirement in the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), *15 U.S.C. § 6a*, to allege a "direct" injury on domestic export commerce.

Defendants' first argument is about constitutional standing, which requires the litigant to show that he has suffered a concrete and particularized injury that is fairly traceable to the defendants' conduct and is likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. Defendants rely on the proposition that **[*19]** the plaintiff's injury is not fairly traceable to the defendant if the injury is "the result of the independent action of some third party not before the court." *Id.* (internal quotation marks and alterations omitted). Defendants say that Mountain Crest's injury is the result of the LCBO, not defendants, so Mountain Crest doesn't have standing. Mountain Crest doesn't respond to this argument in its opposition brief; it doesn't address constitutional standing at all. That could be reason enough to dismiss this claim. *Kirksey v. R.J. Reynolds Tobacco Co., 168 F.3d 1039, 1041 (7th Cir. 1999)* ("If [courts] are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

Having said that, the causation requirement for standing is fairly liberal; it doesn't require a showing of proximate cause. *See Bennett v. Spear, 520 U.S. 154, 169, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)* ("While . . . it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." (internal quotation marks and alterations omitted)). But even if the court assumes **[*20]** that Mountain Crest has standing to sue, that doesn't mean it meets the requirements to sue under the Sherman Act. *See McGarry & McGarry, LLC v. Bankr. Mgmt. Sols.,*

*Inc.*, *937 F.3d 1056, 1063 (7th Cir. 2019)* (concluding that plaintiffs had standing but failed to prove causation under the Sherman Act).

Two causation requirements for antitrust claims are relevant to this analysis. First, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action," so courts have required "the plaintiff [to] demonstrate[] [a] direct link between the alleged antitrust violation and the claimed antitrust injury." *Id. at 1064* (internal quotation marks omitted). For example, in *McGarry and McGarry*, the court held that the plaintiff could not bring a claim under the Sherman Act because its alleged injury was "entirely derivative" of the injury of a third party, who the court said was "a more appropriate person to pursue the claim." Defendants make the same argument in this case, contending that Mountain Crest's injury is derivative of the injury to the LCBO, so the LCBO, as the target of the alleged group boycott, is the proper plaintiff, if any.

Second, the FTAIA imposes additional limits on Sherman Act claims that are based on anticompetitive conduct **[*21]** in a foreign country. For the purpose of this case, Mountain Crest must show that the group boycott had a "direct, substantial, and reasonably foreseeable effect" on exports from the United States. *15 U.S.C. § 6a(1)(B)*. "Direct" in this context means "proximate cause." *Minn-Chem, Inc. v. Agrium, Inc., 683 F.3d 845, 856-57 (7th Cir. 2012)*. "Just as tort law cuts off recovery for those whose injuries are too remote from the cause of an injury, so does the FTAIA exclude from the Sherman Act foreign activities that are too remote from the ultimate effects on U.S. domestic or import commerce." *Id. at 857*. Defendants contend that the LCBO's six-pack rule, not the group boycott, was the proximate cause of the harm alleged by Mountain Crest in this case.

Again, Mountain Crest doesn't meaningfully respond to defendants' arguments on causation. It says that defendants committed "myriad" antitrust violations that were "independent of Ontario's regulatory scheme," Dkt. 85, at 23, but it doesn't explain how the group boycott harmed it other than as a barrier to removing the six-pack rule.

Mountain Crest also relies on *United States v. Sisal Sales Corp., 274 U.S. 268, 47 S. Ct. 592, 71 L. Ed. 1042 (1927)*, for the proposition that defendants are not "absolve[d]" simply because "they were assisted by an act of state." Dkt. 85, at 23. But Mountain Crest is

conflating issues. The court **[*22]** of appeals relied on *Sisal Sales* to hold that the act of state doctrine does not "bar an antitrust complaint where defendants took deliberate acts to bring about forbidden results simply because the anticompetitive conspiracy was aided by discriminatory legislation." *Mountain Crest, 937 F.3d at 1085-86* (internal quotation marks and alterations omitted). This principle would allow Mountain Crest to bring a claim for an antitrust injury caused by the alleged group boycott. But *Sisal Sales* isn't about causation, and the facts of that case aren't helpful for Mountain Crest. The alleged harm in that case was a monopoly controlled by the defendant; the "discriminatory legislation" facilitated defendants' conduct but was not a direct cause of the harm.

Mountain Crest's only discussion in its brief of a "direct effect" is a reference to past litigation by Miller Brewing Company against Molson Coors, but Mountain Crest doesn't explain how that litigation is connected to the group boycott or to its own injuries.

The bottom line is that Mountain Crest hasn't pointed to any direct harm it suffered as the result of the group boycott. So the court will dismiss this claim with prejudice.

### B. Marketing and distribution practices

Neither **[*23]** Mountain Crest's brief nor its complaint enumerates the marketing and distribution practices it is challenging. But it doesn't take issue with the list provided by defendants: (1) BRI's failure to stock Mountain Crest's beer in sufficient quantities; (2) BRI's decision to give the store's top selling beers a more prominent display; (3) BRI's decision to discontinue its practice of allowing brewers to pay for in-store advertisements; (4) the layout of BRI's stores; and (5) fees charged to brewers by BRI. The court understands Mountain Crest to be challenging these practices under both *§ 1* and *§ 2* of the Sherman Act as restraints on trade and an attempt to create a monopoly.

Causation does not appear to be a problem with these challenged practices. Mountain Crest alleges that it was directly harmed, either through loss of sales, or, in the case of fees, as a result of direct payments. Defendants challenge these claims on numerous grounds, some of which apply only to a subset of the claims.[6] But a

---

[6] For example, defendants say that BRI is an integrated joint

problem common to all of the claims is that Mountain Crest hasn't identified any participation by *defendants* in the alleged practices.

All of these claims relate to practices of BRI, a cooperative of [*24] Ontario brewers, not defendants. Mountain Crest alleges that BRI is controlled by Labatt Breweries of Canada and Molson Inc. (Canada), but even if BRI's conduct could be imputed to Labatt and Molson, those are Canadian subsidiaries of defendants. And it is well established that parent companies generally cannot be held liable for the conduct of their subsidiaries. *See Motorola Mobility LLC v. AU Optronics Corp., 775 F.3d 816, 820 (7th Cir. 2015)* ("[C]orporate formalities should be respected unless one of the recognized justifications for piercing the veil, or otherwise deeming a parent and a subsidiary one, is present."); *IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 540 (7th Cir. 1998)* ("Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent, but unless there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent, the parent is not liable for those torts.").

Mountain Crest devotes half of a page to its argument that it has "pled facts which directly implicate the named defendants." Dkt. 85, at 28. But instead of explaining how it has done that, it simply refers the court to "rows [of] citations" in the complaint without elaboration. *Id* (citing ¶¶ 25-26, 79, 82-84, 86-88, 90, 98, 110-112, 118, 130, 142-145, ¶ 147-50, 152-154, [*25] 160, 162, 166, 168, 177-178, 180-183, 187, 192-195, 197-98, 201-03, 206, 210, 213). "It is not the job of this court to develop arguments" for the parties. *Fabriko Acquisition Corp. v. Prokos, 536 F.3d 605, 609 (7th Cir. 2008)*. *See also McKevitt v. Pallasch, 339 F.3d 530, 533 (7th Cir. 2003)* (string cite unaccompanied by explanation not sufficient to preserve argument). In their opening brief, defendants went through the allegations in the complaint, explaining why they believed that the allegations weren't sufficient to show defendants' involvement. To support a contrary view, Mountain Crest must do more than direct defendants and the court to review the 93-page complaint again.

In any event, the paragraphs cited by Mountain Crest do not tie defendants to the alleged marketing and distribution practices, let alone identify an agreement between defendants to adopt those practices. Rather, the vast majority of the allegations relate to attempts to influence the LCBO or the decision to offer ownership interests in the BRI to smaller Ontario breweries. Mountain Crest doesn't point to any allegations describing a conspiracy between defendants directing BRI to understock certain brands, to change the layout of its stores, or to charge importers a discriminatory fee.

Mountain Crest does cite some allegations about [*26] defendants' involvement that are broad enough to include the marketing and distribution practices. For example, Mountain Crest alleges that executives for defendants "conspired . . . to continue and enforce the restraints on U.S. export sales to Ontario," Dkt. 49, ¶ 160, "worked closely . . . on maintaining their price fixing and market allocation restraints to limit competing brewers' ability to export beer to Ontario," *id.*, ¶ 181, and "conspired to continue and enforce the restraints, "*id.*, ¶ 187. But those allegations are so broad and conclusory that they cannot be accepted as true.

It is well established that legal conclusions are not enough to satisfy federal pleading standards. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "[A] complaint must be dismissed unless it contains a plausible claim." *Bank of Am., N.A. v. Knight, 725 F.3d 815, 818 (7th Cir. 2013)*. This means that the complaint "must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level." *Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing Services, Inc., 536 F.3d 663, 667-68 (7th Cir. 2008)* (internal quotation marks omitted).

Courts apply the plausibility requirement with added rigor in the context of complex cases: "[t]he [*27] required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago, 671 F.3d 611, 616-17 (7th Cir. 2011)*. This is in part because of the added burdens associated with defending a complex claim. *Stark Trading v. Falconbridge Ltd., 552 F.3d 568, 574 (7th Cir. 2009)* ("[T]he complaint in a complex case must, to avert dismissal for failure to state a claim, include sufficient allegations to enable a judgment that the claim has enough possible merit to warrant the protracted litigation

venture, so it is "incapable" of engaging in a conspiracy; Mountain Crest has failed to define the relevant market; Mountain Crest hasn't identified an agreement that is "per se" illegal; a joint monopolization claim is not cognizable under *§ 2* of the Sherman Act; and the complaint includes no facts showing an intent to monopolize. Dkt. 76, at 34-42.

likely to ensue from denying a motion to dismiss."); *Limestone Dev. Corp. v. Vill. of Lemont, Ill., 520 F.3d 797, 802-03* (7th Cir. 2008 ("[A] defendant should not be forced to undergo costly discovery unless the complaint contains enough detail, factual or argumentative, to indicate that the plaintiff has a substantial case."). Conspiracy allegations are also reviewed carefully because they are so easy to allege and so hard to prove. *See Cooney v. Rossiter, 583 F.3d 967, 970-71 (7th Cir. 2009)*. Even at the pleading stage, it is "essential to show that a particular defendant joined the conspiracy and knew of its scope." *Knight, 725 F.3d at 818*.

It was an antitrust case that gave rise to the plausibility requirement. *See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. In *Twombly*, the Court could not have been clearer: "a bare assertion of conspiracy will not suffice." *Id. at 556*. Because that is all that Mountain Crest offers in this case, it has not stated a plausible claim.

Mountain Crest identifies **[*28]** two other theories in its complaint for holding defendants liable. First, Mountain Crest invokes the concept of "enterprise liability," under which parents and subsidiaries can be viewed as a single "enterprise" for the purpose of antitrust violations. But Mountain Crest doesn't respond to defendants' argument that no court has recognized such a theory under the Sherman Act, and Mountain Crest doesn't explain in its brief why the court should adopt the theory in this case. Second, Mountain Crest refers to "single-factor piercing" of the corporate veil, Dkt. 49, ¶ 237, without explaining what that means. But Mountain Crest doesn't attempt to defend that theory in its brief. Instead, it insists that "none of [its] allegations are aimed at any of Defendants' subsidiaries." Dkt. 85, at 28. So the court concludes that Mountain Crest has abandoned both of these theories, and the court declines to consider them.

When a plaintiff fails to plead adequate facts, the general rule is that a plaintiff should have at least one opportunity to amend its complaint. But Mountain Crest has already amended its complaint twice. *See* Dkt. 30 and Dkt. 49. It did not ask for leave to amend its complaint after **[*29]** the remand, and it does not request leave to amend now. Under these circumstances, the court sees no reason to give Mountain Crest leave to replead. *See Alarm Detection Sys., Inc. v. Vill. of Schaumburg, 930 F.3d 812, 829 (7th Cir. 2019)* (plaintiffs "have never requested leave to amend," so "[t]hey . . . waived any right to replead"). The court will dismiss these claims with prejudice.

## C. Unjust enrichment

This leaves Mountain Crest's claim for unjust enrichment under Wisconsin common law. That claim has three elements: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had an appreciation or knowledge of the benefit; and (3) the defendant accepted or retained the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value. *Buckett v. Jante, 2009 WI App 55, ¶ 10, 316 Wis. 2d 804, 812, 767 N.W.2d 376, 380*. Mountain Crest alleges that it conferred a benefit on "defendants" by paying listing fees to BRI and that it would be inequitable to allow defendants to keep the fees because of the alleged restraints of trade alleged in the complaint.

Defendants contend that the unjust enrichment claim must be dismissed if the antitrust claims are dismissed because the alleged antitrust violations are Mountain Crest's only basis for contending that defendants were unjustly enriched. **[*30]** Mountain Crest doesn't respond to this argument. In any event, the fees at issue in this claim went to BRI, not defendants, so defendants are not a proper party. *See State Mech. Servs., LLC v. NES Equip. Servs. Corp., No. 17-cv-5950, 2018 U.S. Dist. LEXIS 80584, 2018 WL 2193248, at *5 (N.D. Ill. May 14, 2018)* (plaintiff may not sue parent company for benefit conferred on subsidiary). The court will dismiss this claim as well.

## D. Conclusion

The allegations in the complaint make it clear that Mountain Crest's claims relate solely to events in Canada and conduct by Canadian entities that are not before this court. The alleged group boycott by defendants did not cause Mountain Crest any harm. Rather, the harm Mountain Crest is complaining about is the direct result of decisions by the Ontario government. And the marketing and distribution policies at the Beer Store were put in place by BRI, which is controlled by defendants' subsidiaries, not defendants. So Mountain Crest has sued the wrong parties.

Mountain Crest may have had good reasons for not bringing claims against a foreign provincial government, an Ontario cooperative, and defendants' Canadian subsidiaries. But whatever substantive or procedural barriers those claims would have faced, it does not give Mountain **[*31]** Crest a cause of action against

defendants. Mountain Crest hasn't plausibly alleged that defendants caused it any harm, so the court will dismiss the complaint with prejudice.

ORDER

IT IS ORDERED that:

    1. Plaintiff Mountain Crest SRL, LLC's motion for reconsideration, Dkt. 73, is DENIED.

    2. The motion to dismiss filed by defendants Anheuser-Busch InBev SA/NV and Molson Coors Brewing Compan, Dkt. 76, is GRANTED, and this case is DISMISSED with prejudice.

    3. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered April 24, 2020.

BY THE COURT:

/s/ JAMES D. PETERSON

District Judge

---

End of Document



Positive
As of: June 8, 2020 9:56 PM Z

# *Nieman v. Versuslaw, Inc.*

United States District Court for the Central District of Illinois, Urbana Division

June 13, 2012, Decided; June 13, 2012, Filed

Case No. 12-3104

**Reporter**
2012 U.S. Dist. LEXIS 109066 *; 2012 WL 3201935

JASON NIEMAN, Plaintiff, v. VERSUSLAW, INC., JOSEPH W. ACTON, YAHOO, INC., GOOGLE INC., and MICROSOFT, INC., Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Motion granted by, Complaint dismissed at *Nieman v. Versuslaw, Inc., 2012 U.S. Dist. LEXIS 109069 (C.D. Ill., Aug. 2, 2012)*

## Core Terms

allegations, provider, interactive, Versuslaw, computer service, immunity, publisher, motion to dismiss, plaintiff's claim, brings, civil conspiracy, public record, third party, Recommendation, documents, internet, Rights, user, prospective economic advantage, internet service provider, unjust enrichment, search engine, websites, links

**Counsel:** [*1] Jason Lee Nieman, Plaintiff, Pro se, Springfield, IL.

For Microsoft Corporation, Defendant: Steven P Mandell, MANDELL MENKES LLC, Chicago, IL; Lynn U Thorpe, GONZALES SAGGIO & HARLAN LLP, Chicago, IL.

For Versuslaw, Inc., Joseph W. Acton, Defendants: Steven P Mandell, LEAD ATTORNEY, Elizabeth Anne Ferrari Morris, MANDELL MENKES LLC, Chicago, IL.

For Yahoo, Inc., Defendant: Lynn U Thorpe, LEAD ATTORNEY, GONZALES SAGGIO & HARLAN LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

For Google, Inc., Defendant: Jade R Lambert, LEAD ATTORNEY, PERKINS COIE LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

**Judges:** DAVID G. BERNTHAL, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** DAVID G. BERNTHAL

## Opinion

### REPORT AND RECOMMENDATION

In April 2012, Defendants filed a Notice of Removal (#1), bringing this case to this Court from the Circuit Court of Sangamon County. Plaintiff Jason Nieman, acting pro se, brings suit against the following defendants: Microsoft Corp., Versuslaw, Inc., Joseph W. Acton, Yahoo! Inc., and Google, Inc. Plaintiff brings suit for an alleged violation of his civil rights pursuant to *§ 1981*, in addition to other federal and state law claims. The operative complaint in this litigation [*2] is Plaintiff's Second Amended Complaint at Law (#1-5).

The Court now has pending before it several motions to dismiss. In this Report and Recommendation, the Court addresses the following motions: Defendant Google Inc.'s 12(b)(6) Motion to Dismiss Plaintiff's Second Amended Complaint (#16), Defendants' Microsoft

Corporation and Yahoo!, Inc.'s *Rule 12(b)(6)* Motion to Dismiss Counts III, VI, VII, VIII, IX and X of the Second Amended Complaint (#18), Defendants Microsoft Corporation's and Yahoo!, Inc.'s *Rule 12(c)* Motion for Judgment on the Pleadings on Counts III, IV, VIII, IX and X of the Second Amended Complaint (#22), and Defendants Versuslaw, Inc.'s and Joseph W. Acton's Motion to Dismiss Plaintiff's Second Amended Complaint at Law (#27). [1] Plaintiff has responded to each of these motions. [2] After reviewing the parties' pleadings and memoranda, this Court recommends, pursuant to its authority under *28 U.S.C. § 636(b)(1)(B)*, that all of these motions **(#16, 18, 22, and 27)** be **GRANTED**, and that Plaintiff's complaint be dismissed in its entirety with respect to all Defendants.

## I. Background

The following background is taken from Plaintiff's Second Amended Complaint at Law (#1-5). Plaintiff is an insurance claims industry professional. From November 2009 through March 2011, Plaintiff pursued litigation against his former employer, Nationwide Mutual Insurance Company (hereinafter "Nationwide"), and several related defendants. In approximately January 2009, Plaintiff discovered that certain Internet websites were linking copies of information related to the litigation to his name, such that an internet browser search for his name would provide results that referenced the filings or rulings in his litigation against Nationwide. Plaintiff alleges that these references were occurring by way of paid legal search websites such as Lexis/Nexis.com, Justia.com, Leagle.com, and Versuslaw.com. Plaintiff alleges these entities "secure the case information and related documents by way of sites such [4] as PACER and then 'mirror' it on to the internet by way of their sites and servers." (#1-5, p. 10, ¶ 15).

From January 2009 to present, Plaintiff has applied to various positions of employment. Plaintiff alleges that these potential employers have completed internet browser searches of his name using search engines operated by Defendants, such as Google.com, Yahoo.com, and Bing.com. Plaintiff alleges that prospective employers have found documents related to his litigation against Nationwide through conducting these searches, and have consequently disqualified him from candidacy for the positions to which he has applied. In summary, Plaintiff alleges that "Plaintiff has been effectively 'blacklisted' as to employment opportunities due to the ease at which these references appear pursuant to a simple name search, and due to the unlawful acts of third parties who then use such information to unlawfully disqualify the Plaintiff's candidacy." (#1-5, p. 10).

## II. Standard

Defendants' motions to dismiss seek dismissal under *Fed. R. Civ. P. 12(b)(6)*. The purpose of a motion to dismiss for failure to state a claim is to test the sufficiency of the complaint, not to decide the merits of the case. [*5] *Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990)*. Dismissal is appropriate only if Plaintiff cannot demonstrate that he is plausibly entitled to relief under the facts he has alleged. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 546, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The complaint must give fair notice of what the claim is and the grounds upon which it rests. *E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 776-77 (7th Cir. 2007)*. However, fair notice is not enough by itself; the allegations must show that it is plausible, rather than merely speculative, that the plaintiff is entitled to relief. *Tamayo v. Blagojevich, 526 F.3d 1074, 1083 (7th Cir. 2008)*.

When considering a motion to dismiss for failure to state a claim, the Court is limited to the allegations contained in the pleadings. *Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)*. The Court must treat all well-pleaded allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *McMillan v. Collection Prof'ls, Inc., 455 F.3d 754, 758 (7th Cir. 2006)*; [*6] *see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (requiring plausible grounds for inferences if those inferences are to sustain a complaint). In considering the plaintiff's factual allegations, the Court should not accept as adequate

---

[1] With respect to (#22), Defendants moved to amend this motion, in Microsoft Corporation's and Yahoo!, Inc.'s Motion [3] to Correct Their Motion for Judgment on the Pleadings to Add Count VI. (#35).

[2] Plaintiff's responses to the various motions are in the record as follows: Plaintiff responds to (#16) in (#26), Plaintiff responds to (#18 and #22) in (#31), and Plaintiff responds to (#27) in (#33).

abstract recitations of the elements of a cause of action or conclusory legal statements. *Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009)*. District courts, however, are required to liberally construe complaints filed by pro se litigants. *Marshall v. Knight, 445 F.3d 965 (7th Cir. 2006)* (citing *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972))*.

## III. Discussion

Plaintiff brings the following claims against all Defendants: claims under the Illinois Human Rights Act, commercial misappropriation, violation of *§ 1981* of the Civil Rights Act, violation of the Lanham Act, intentional interference with current and prospective economic advantage, unjust enrichment / civil conspiracy, and violations of the RICO Act. All of the Defendants argue that Plaintiff's claims are barred by *Section 230* of the Communications Decency Act (hereinafter "the CDA"). Additionally, all the Defendants argue that, even apart from the question of immunity presented by the CDA, Plaintiff has [*7] failed to state a claim for which relief can be granted.

The Court will begin by addressing a basic point: reproducing information obtained from judicial records maintained in connection with a public court proceeding cannot give rise to liability. Second, the Court will address the issue of Defendants' immunity under the CDA and whether Plaintiff otherwise fails to state a claim.

## A. Privilege to Publish Matters Contained in the Public Record

As the Court has already noted, Plaintiff's complaint is based on the harm caused to him as a result of documents related to his litigation against Nationwide being readily accessible on the internet. The Court notes that Plaintiff's previous litigation against Nationwide is a matter of public record. The *First Amendment* creates a privilege to publish matters contained in the public record, even in cases where publication would offend the sensibilities of a reasonable person. *Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1231-32 (7th Cir. 1993)*. The Seventh Circuit has further noted that "the *First Amendment* greatly circumscribes the right of even a private figure to obtain damages for the publication of newsworthy facts about him, even when they [*8] are facts of a kind that people want very much to conceal." *Id. at 1232*. This Court therefore

concludes that Plaintiff has not stated a claim for which he is plausibly entitled to relief, given the *First Amendment* protections applicable to this case.

## B. *Section 230* of the Communications Decency Act

*Section 230 of the CDA* directs that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *47 U.S.C. § 230(c)(1)*. The statute provides broad immunity to internet service providers as to any cause of action that would make service providers liable for information originating with a third-party user of the service. *Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006)*. In discussing the statute, the Fourth Circuit has noted:

> Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran v. AOL, 129 F.3d 327, 331 (4th Cir. 1997)*. [*9] However, the Seventh Circuit has noted that the statute itself does not refer specifically to "immunity," and that this statute does not operate as a general prohibition of civil liability for web-site operators and other online content hosts. *Chi. Lawyer's Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669 (7th Cir. 2008)*.

*Section 230* applies whenever three elements are satisfied: (1) the defendant is a provider of an interactive computer service; (2) the plaintiff's claims seek to treat the defendant as a "publisher or speaker" of allegedly harmful or unlawful information, and (3) the information at issue was "provided by another information content provider." *See 47 U.S.C. § 230(c)(1)*.

In the following analysis, the Court will consider whether Plaintiff's claims are barred by *§ 230* or are otherwise implausible claims. In so doing, the Court will distinguish between groups of Defendants, as Plaintiff has done in his complaint. Plaintiff indicates that Defendant Versuslaw, Inc., and its owner, Defendant Joseph W. Acton are more responsible for Plaintiff's injuries than the "search engine defendants," Defendants Google, Microsoft, and Yahoo. (#1-5, p. 3). Plaintiff [*10] alleges that paid legal search websites, such as

Lexis/Nexis.com, Justia.com, and Versuslaw.com secured the documents related to his litigation against Nationwide and posted it online. At Plaintiff's request, some entities removed the references that caused the litigation documents to turn up as results when querying Plaintiff's name. However, Plaintiff alleges that Defendant Versuslaw, Inc. and Defendant Acton did not comply with the request, and that "the only remaining offending links," found when Plaintiff's name is used as a query in a search engine, are attributable to these Defendants. (#1-5, p. 14, ¶ 23). Plaintiff further alleges that "Defendant Versuslaw, Inc. has paid the search Defendants (Google, Yahoo, and Microsoft) to increase and/or maintain the prominence of the links as to the Plaintiff's protected conduct in association with a simple search of his name." (#1-5, p. 11, ¶ 18). The Court is mindful of these additional factual allegations against Defendant Versuslaw, Inc. and Defendant Acton.

To begin an assessment of whether Plaintiff's claims are barred by the CDA: The CDA defines an "interactive computer service" to include "any information service, system, or access **[*11]** software provider that provides or enables computer access by multiple users to a computer server." _47 U.S.C. § 230(f)(2)_. This definition clearly encompasses search engines. _See, e.g., Jurin v. Google Inc., 695 F.Supp.2d 1117, 1122-23 (E.D. Cal. 2010)_. In this case, the allegations against Defendants Google, Yahoo, and Microsoft are based solely on Plaintiff's factual allegations concerning search results obtained when querying Plaintiff's name using search engines operated by these defendants. Therefore, these defendants are "interactive computer service" providers under the statute. Additionally, a typical example of an "interactive computer service" is a website, such as Defendant Versuslaw, which operates versuslaw.com. _See Batzel v. Smith, 333 F.3d 1018, 1030-31 (9th Cir. 2003)_ (noting that _Section 230_ immunity may apply to providers and users of interactive computer services). The Court concludes that all of defendants are internet service providers or users to whom _Section 230_ may apply.

Second, the Eight Circuit has succinctly summarized how the CDA operates to ensure that internet service providers are not held liable for content developed primarily by third parties:

The CDA **[*12]** states that '[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider,' _47 U.S.C. § 230(c)(1)_, and expressly preempts any

state law to the contrary, id. _§ 230(e)(3)_. The CDA defines an 'information content provider' as 'any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the internet or any other interactive computer service.' _Id._ at _§ 230(f)(3)_. Read together, these provision bar plaintiffs from holding ISPs legally responsible for information that third parties created and developed [citation omitted]. 'Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them.' _Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir. 2009)_.

_Johnson v. Arden, 614 F.3d 785, 790-91 (8th Cir. 2010)_.

Stated another way, an internet service provider qualifies for immunity so long as it does not also function as an "information content provider" for the portion of the statement or publication at issue. _Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003)_. **[*13]** _Section 230_ provides broad immunity to internet service providers that publish content provided primarily by third parties. _Id._

In this case, Plaintiff has specifically alleged that the offensive search results giving rise to his claim against Defendants Google, Yahoo, and Microsoft are links to copies of information related to his litigation against Nationwide. Plaintiff indicates that the links include attachments to rulings on general court matters. It is indisputable that Defendants Google, Yahoo, and Microsoft were not involved in the creation or development of these court rulings. Additionally, though Plaintiff argues Defendant Versuslaw has greater liability because it secured the documents related to his litigation against Nationwide and posted them online, this would still be considered content provided primarily by third parties. _See Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003)_ (stating "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process"). The Court concludes that the information at issue was "provided by another **[*14]** information content provider." _47 U.S.C. § 230(c)(1)_.

The only remaining issue is whether Plaintiff's specific claims seek to treat defendants as publishers. Plaintiff brings claims federal claims under _§ 1981 of the Civil Rights Act_, the Lanham Act, and the RICO Act. Plaintiff

also brings state law claims under the Illinois Human Rights Act, and he brings state law tort claims of commercial misappropriation, intentional interference with current and prospective economic advantage, unjust enrichment, and civil conspiracy.

The Court will first address the federal claims. To begin, the claims brought under § 1981 and RICO are, quite simply, not applicable to the facts as Plaintiff has pled. See Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996) (setting forth elements of a § 1981 claim); see also Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992) (setting forth elements of a RICO claim). Plaintiff's civil rights claim is implausible, as Plaintiff is not a member of a racial minority. Plaintiff's RICO claim is also implausible, as Plaintiff's complaint is devoid of allegations that could support a finding of an enterprise or a pattern of racketeering activity. [*15] Next, considering Plaintiff's claim under the Lanham Act, the Seventh Circuit considered an analogous case in Stayart v. Yahoo! Inc., 623 F.3d 436 (7th Cir. 2010), in which a plaintiff brought suit against Yahoo! Inc. based on search results obtained when using her name as a search query. In that case, the Seventh Circuit did not reach the issues concerning the CDA. Instead, the court held that the plaintiff lacked standing to bring suit under the Lanham Act because she lacked a commercial interest in her name. Plaintiff's case here is no different, as the Seventh Circuit's reasoning reflects that one's interest in their professional reputation does not amount to a commercial interest in their name.

Second, Defendants argue that Plaintiff's state claims are barred by the CDA. Though Plaintiff nominally brings a variety of types of claims, ranging from claims under IHRA to civil conspiracy, the Court notes that the factual essence of Plaintiff's claims is actually more akin to defamation and various privacy torts. Many circuit courts have held that the CDA bars claims under any state law theory to persons harmed by allegedly defamatory material, where the defendant is not a "publisher [*16] or speaker" as defined by the act. Johnson v. Arden, 614 F.3d 785, 791 (8th Cir. 2010) (summarizing holdings in five other circuit courts). While the Seventh Circuit has not directly addressed the issue of the scope of the CDA with respect to state claims for defamation, the Court is persuaded by the authority from other circuits that such immunity for defendants is appropriate in this case. Furthermore, with respect to Plaintiff's claim for commercial misappropriation, such a claim is pre-empted by the Illinois Right of Publicity Act. 765 ILCS 1075/30(a). Under the statute, there can be

no liability where a person's identity is used for a non-commercial purpose, including in any news or public affairs account. 765 ILCS 1075/35(b)(2). This exemption is applicable to this case, as Plaintiff's prior litigation is a matter of public interest and public record. The Court concludes that any claim Plaintiff may have for defamation is barred by the CDA, and any privacy tort he may claim against Defendants is similarly not actionable.

Additionally, several of the state claims that Plaintiff has brought are not supported by his factual allegations. Specifically, Plaintiff brings a claim under [*17] the Illinois Human Rights Act, and also brings counts for intentional interference with current and prospective economic advantage, for unjust enrichment, and for civil conspiracy. To establish a prima facie case of retaliation under IHRA, a plaintiff must show that he engaged in a protected activity, and that as a result his employer committed an adverse act against him. Carter Coal Co. v. Human Rights Comm'n, 261 Ill.App.3d 1, 7, 633 N.E.2d 202, 198 Ill. Dec. 740 (Ill. App. Ct. 1994). In this case, Defendants have no employment relationship with Plaintiff. Similarly, Plaintiff's claim for interference with prospective economic advantage must fail because the facts, as Plaintiff has alleged them, indicate Plaintiff did not have any valid business relationship or expectancy. See Small v. Sussman, 306 Ill.App.3d 639, 648, 713 N.E.2d 1216, 239 Ill. Dec. 366 (Ill. App. Ct. 1999) (stating elements of tortious interference with prospective economic advantage). Plaintiff's Count IX for unjust enrichment and civil conspiracy is also factually unsupported. These specific claims are most simply addressed by noting, as this Court has already discussed above, that providing online access to judicial public records implicates First Amendment privileges, and so these [*18] activities cannot form the basis of a tort for civil conspiracy or unjust enrichment.

As such, this Court concludes that the facts, as Plaintiff has alleged them, indicate he does not have any viable claim against Defendants. Defendants enjoy a First Amendment privilege to publish matters of public record, any state law defamation or privacy claim would be barred by CDA, and the facts, as Plaintiff has alleged them, do not support his other various statutory and common law claims.

## IV. Summary

For these reasons, the Court recommends that Defendants' various motions to dismiss (#16, 18, 22,

and **27**) be **GRANTED**, and that Plaintiff's complaint be dismissed in its entirety with respect to all Defendants.

The parties are advised that any objection to this recommendation must be filed in writing with the clerk within 14 days after being served with a copy of this Report and Recommendation. See *28 U.S.C. § 636(b)(1)*. Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986)*.

ENTERED this 13th day of June, 2012.

/s/ DAVID G. BERNTHAL

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

 Caution

As of: June 8, 2020 9:57 PM Z

# *Nieman v. Versuslaw, Inc.*

United States District Court for the Central District of Illinois, Springfield Division

August 2, 2012, Decided; August 3, 2012, Filed

No. 12-3104

**Reporter**

2012 U.S. Dist. LEXIS 109069 *; 40 Media L. Rep. 2191

JASON LEE NIEMAN, Plaintiff, v. VERSUSLAW, INC., JOSEPH W. ACTON, YAHOO!, INC., GOOGLE INC., and MICROSOFT, CORP., Defendants.

**Subsequent History:** Affirmed by *Nieman v. Versuslaw, Inc., 2013 U.S. App. LEXIS 5549 (7th Cir. Ill., Mar. 19, 2013)*

**Prior History:** *Nieman v. Versuslaw, Inc., 2012 U.S. Dist. LEXIS 109066 (C.D. Ill., June 13, 2012)*

## Core Terms

allegations, Recommendation, Pleadings, Lanham Act, Publicity Act, expectancy, documents, motion for judgment, public record, unjust enrichment, interactive, links, intellectual property, civil conspiracy, computer service, former employer, provider, websites, prospective economic advantage, intentional interference, commercial interest, potential employer, motion to dismiss, cause of action, third party, misappropriation, immunity, notice

**Counsel:** [*1] Jason Lee Nieman, Plaintiff, Pro se, Springfield, IL.

For Microsoft Corporation, Defendant: Steven P Mandell, MANDELL MENKES LLC, Chicago, IL; Lynn U Thorpe, GONZALES SAGGIO & HARLAN LLP, Chicago, IL.

For Versuslaw, Inc., Joseph W. Acton, Defendants: Steven P Mandell, LEAD ATTORNEY, Elizabeth Anne Ferrari Morris, MANDELL MENKES LLC, Chicago, IL.

For Yahoo, Inc., Defendant: Lynn U Thorpe, LEAD ATTORNEY, GONZALES SAGGIO & HARLAN LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

For Google, Inc., Defendant: Jade R Lambert, LEAD ATTORNEY, PERKINS COIE LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

**Judges:** SUE E. MYERSCOUGH, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SUE E. MYERSCOUGH

## Opinion

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on the Report and Recommendation (d/e 39) entered by Magistrate Judge David G. Bernthal on June 13, 2012. Plaintiff filed "Plaintiff's Objections to the Magistrate's Report and Recommendation (In Favor of Dismissal of All Causes In This Action)" (Objections) (d/e 40) on June 14, 2012. See *28 U.S.C. § 636(b)(1)*; *Fed.R.Civ.P. 72(b)*.

The Report and Recommendation recommends granting Defendants' various motions to dismiss (see

d/e **[*2]** 16, d/e 18, d/e 22, and d/e 27) and dismissing Plaintiff's Second Amended Complaint in its entirety with respect to all Defendants. This Court reviews de novo any part of the Report and Recommendation that has been properly objected to. *28 U.S.C. § 636(b)(1)(C).* For the reasons set forth below, the Court overrules Plaintiff's Objections and adopts Judge Bernthal's Report and Recommendation.

## BACKGROUND

A. Plaintiff's Second Amended Complaint

The operative complaint in this matter is Plaintiff's Second Amended Complaint at Law (Second Amended Complaint). The Second Amended Complaint brings claims against the following Defendants: Microsoft Corp. (Microsoft); Versuslaw, Inc. (Versuslaw); Yahoo!, Inc. (Yahoo); Google, Inc. (Google); and Joseph W. Acton (Acton). In the Second Amended Complaint Plaintiff brings suit for an alleged violation of *42 U.S.C. § 1981*, in addition to several other federal and state law claims. The claims arise from the following facts that Plaintiff has alleged in his Second Amended Complaint.

Plaintiff is an insurance claims industry professional with over 20 years of experience. Between November 2009 and March 2011, Plaintiff was involved in litigation against his **[*3]** former employer, Nationwide Mutual Insurance Company (Nationwide) and several related defendants.

In approximately January 2009, Plaintiff discovered that certain Internet websites were linking copies of information related to the litigation to Plaintiff's name, such that a simple Internet browser search for his name would provide immediate results that referenced one or more of the filings or rulings in the active litigation. According to Plaintiff, rather than linking his name to significant rulings, such as appellate decisions or even trial court summary judgment rulings, the links included attachments to rulings on matters as common as a stipulated motion to quash a subpoena. Plaintiff has alleged that these references were occurring by way of paid legal search websites such as Lexis/Nexis.com, Justia.com, Leagle.com, and Versuslaw.com (and/or its related site, Findacase.com). These entities secure the case information and related documents by way of sites such as PACER and then "mirror" them onto the Internet by way of their sites and servers.

Between January 2009 and the date of filing this action,

Plaintiff applied for one or more positions of employment. Plaintiff believes that **[*4]** the potential employers have performed Internet browser searches by way of Google.com, Yahoo.com, or Bing.com, and found documents related to litigation against his former employer Nationwide. Plaintiff also believes that the potential employers have used this information to disqualify him from candidacy for the applied position or have shared this information with others who have done so. In other words, Plaintiff alleges he "has been effectively 'blacklisted' as to employment opportunities due to the ease at which these references appear pursuant to a simple name search, and due to the unlawful acts of third parties who then use such information to unlawfully disqualify" his candidacy.

Plaintiff filed the Second Amended Complaint which brings the following claims against Defendants: (1) claims under the Illinois Human Rights Act; (2) commercial misappropriation; (3) violation of *§ 1981* of the Civil Rights Act (*42 U.S.C. § 1981*); (4) violation of the Lanham Act; (5) intentional interference with current and prospective economic advantage; (6) unjust enrichment /civil conspiracy; and (7) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).

B. Defendants' Motions

Defendants **[*5]** have all brought Motions to Dismiss. See d/e 16, d/e 18, and d/e 27. Additionally, Defendants Microsoft and Yahoo have brought a Motion for Judgment on the Pleadings on Counts III, IV, VIII, IX, and X of the Second Amended Complaint. [1] See d/e 22. All of the Defendants argue that Plaintiff's claims are barred by *Section 230* of the Communications Decency Act (CDA). All Defendants also argue that, even apart from the question of whether the CDA bars Plaintiff's claims, Plaintiff has failed to state a claim for which relief can be granted.

C. Judge Bernthal's Report and Recommendation and Plaintiff's Objections Thereto

As stated, Judge Bernthal has recommended that Defendants' Motions d/e 16,18, 22, and 27 be granted for several reasons. First, Plaintiff's litigation against Nationwide is a matter of public record and the *First*

---

[1] On June 13, 2008, the same day Judge Bernthal issued the Report and Recommendation, Microsoft and Yahoo filed a Corrected Motion for Judgment on the Pleadings (d/e 38) which included Count VI, which had been left out of the original Motion for Judgment on the Pleadings.

*Amendment* creates a privilege to public matters contained in the public record. Second, Plaintiff's **[*6]** claims are barred by *§ 230 of the CDA* (*47 U.S.C. § 230(c)(1)*). Finally, the facts as Plaintiff has alleged them do not support Plaintiff's various statutory and common law claims.

On June 14, 2012, Plaintiff filed his Objections to the Report and Recommendation. Plaintiff argues that: (1) the *First Amendment* does not protect Defendants, (2) *Section 230 of the CDA* does not bar Plaintiff's claims, and (3) Judge Bernthal erred in concluding that Plaintiff failed to state any federal or state claims.

## ANALYSIS

Under *Rule 12(b)(6)*, dismissal is proper where a complaint fails to state a claim upon which relief can be granted. *Fed.R.Civ.P. 12(b)(6)*. To state a claim upon which relief can be granted, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2)*. That statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)*; *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, 940 (2007)*. This means that (1) "the complaint must describe the claim in sufficient detail to give the defendant **[*7]** 'fair notice of what the ... claim is and the grounds upon which it rests'" and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level." *EEOC v. Concentra Health Services, Inc., 496 F.3d 773, 776 (7th Cir.2007)*. While detailed factual allegations are not needed, a "formulaic recitation of a cause of action's elements will not do." *Twombly, 550 U.S. at 555, 127 S.Ct. at 1965, 167 L.Ed.2d at 940*. Conclusory allegations are "not entitled to be assumed true." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868, 885 (2009)* (citing *Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "In ruling on *Rule 12(b)(6)* motions, the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc., 589 F.3d 901, 904 (7th Cir. 2009)* (citing *Tamayo, 526 F.3d at 1081*).

A motion for judgment on the pleadings is "designed to provide a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take

judicial notice." *All Amer. Inc. Co. v. Broeren Russo Const., Inc., 112 F. Supp. 2d 723, 728 (C.D. Ill. 2000)* **[*8]** (internal quotations omitted). *Rule 12(c)* permits judgment based on the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir. 1998)*. The court may also "take judicial notice of documents that are part of the public record, including pleadings, orders, and transcripts from the prior proceedings." *Hernandez ex rel. Gonzalez v. Tapia, 2010 U.S. Dist. LEXIS 132984, 2010 WL 5232942, at *3 (N.D. Ill. 2010)*. "A motion for judgment on the pleadings is subject to the same standard as a *Rule 12(b)(6)* motion to dismiss." *Medeiros v. Client Services, Inc., 2010 U.S. Dist. LEXIS 84976, 2010 WL 3283050, at *1 (N.D. Ill. 2010)*, citing *Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007)*.

### 1. Defendants' Motions to Dismiss Are Granted Because Plaintiff Has Not Stated a Claim

#### a. Counts I and III - Illinois Human Rights Act

Counts I and III are brought against Defendants and purport to allege violations of the Illinois Human Rights Act (IHRA), specifically, *775 ILCS 5/6-101(A)* and/or *(B)*. In these Counts, Plaintiff alleges that he has given Defendants notice that their actions, *i.e.*, "publicizing the Plaintiff's **[*9]** protected conduct without justification[,] acts to aid and/or abet those who would seek to retaliate or discriminate against the Plaintiff for taking part in protected employment activities, and that their continuing refusal to remove such references or links constitute retaliation as to his prior protected conduct."

*Section 6-101 of the IHRA* provides that it is a civil rights violation for a person, or two or more people to, conspire to "retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." *775 ILCS 5/6-101(A)*). It is also a violation of the IHRA to "[a]id, abet, compel or coerce a person to commit any violation of [the IHRA]." *775 ILCS 5/6-101(B)*).

The elements of a claim for retaliation under the IHRA are that (1) the employee was engaged in a protected activity; (2) the employer committed a material adverse act against him; and (3) a causal nexus existed between the protected activity and the adverse act. *Hoffelt v. Ill.*

*Dep't of Human Rights, 367 Ill. App. 3d 628, 634, 867 N.E.2d 14, 310 Ill. Dec. 701 (Ill. App. Ct. 2006)*. Plaintiff has not stated a claim for any violation of the IHRA where the allegations against Defendants [*10] are that they provided links to public court documents involving litigation between Plaintiff and his former employer and refused to remove the documents when requested by Plaintiff. Here, the Second Amended Complaint does not allege that any of the Defendants are an employer or potential employer of Plaintiff, nor does it allege that any of the Defendants have committed a material adverse act against Plaintiff. The allegations, which are assumed to be true for purposes of Defendants' Motions, only establish that Defendants provided access to public information that potential employers used to deny Plaintiff employment. This is not sufficient to state a claim under the IHRA.

### b. Counts II and IV - Commercial Misappropriation

Counts II and IV are state law claims for commercial misappropriation. These Counts allege that when Plaintiff's name is entered into one of the various Defendants' (Google, Yahoo, or Microsoft) search engines, a link appears to one of Defendant Versuslaw's websites. When the link is "triggered", the searching party is steered to a page where the searching party can buy a copy of the document for $4.95. The Plaintiff alleges this is "misappropriating his identity [*11] for commercial purposes."

First, the Court notes that the Right of Publicity Act, effective January 1, 1999, replaced the common-law tort of appropriation of likeness. *Maremont v. Susan Fredman Design Group, Ltd., 772 F. Supp. 2d 967, 972 (N.D. Ill. 2011)*; see also *765 ILCS 1075/60*. *Section 30* of the Right of Publicity Act provides, "A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent . . . ." *765 ILCS 1075/30(a)*. The Right of Publicity Act defines "commercial purpose" as "public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." *765 ILCS 1075/5*. Moreover, *section 35* of the Right of Publicity Act states that the Act does not apply to the use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign."

Here, Plaintiff has not stated a claim under the Right of Publicity [*12] Act. First, the exemption from liability for using a person's identity for a non-commercial purpose, including in a news or public affairs account is applicable here. Plaintiff's prior litigation is a matter of public record and public interest. Moreover, Plaintiff's identity is not being used for a "commercial purpose" as defined by the Right of Publicity Act because his name is used only to find documents related to his case, which are part of the public record. His name is not being held out or used to entice anyone to buy a product. Under Plaintiff's theory, every person who is involved in litigation who has public court documents that can be accessed for a fee on the Internet by doing a browser search or found by using Westlaw, Lexis, Versuslaw, or any other legal research site can state a claim under the Right of Publicity Act. This cannot be the case.

### c. Counts V and VI - *42 U.S.C. § 1981*

In Counts V and VI, Plaintiff attempts to allege a claim under *42 U.S.C. § 1981*. In order to state a claim of discrimination under *§ 1981*, Plaintiff must allege that (1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination [*13] concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 756 (7th Cir. 2006)*. Here, Plaintiff has failed to allege any of these elements. Plaintiff's allegations have nothing to do with discrimination based on race. Nor do the allegations relate to the making or enforcing of a contract. Therefore, Plaintiff has not stated a claim under *§ 1981*.

### d. Count VII - Lanham Act

Count VII is a claim under the Lanham Act against all Defendants. Plaintiff alleges that he has a "substantial property interest in his name" and "the commercial use of his name is only expected to grow in the future." Plaintiff further alleges Defendants Versuslaw and Acton are attempting to associate Plaintiff with their for-profit website. Plaintiff accuses Defendants Google, Yahoo, and Microsoft of actively participating in "these unlawful acts . . . by way of their paid search ranking and/or AdWords mechanisms." While Plaintiff never actually states what violation of the Lanham Act he is attempting to plead, the allegations and his filings in this matter make clear he is alleging a claim under *section 43(a)* (*15 U.S.C. § 1125(a)*) of the Lanham Act. "*Section 43(a)* of the Lanham [*14] Act provides two general theories

of liability: (1) false representations regarding the origin, endorsement, or association of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ("false endorsement" or "false association"); and (2) false representations in advertising concerning the quality of services or goods ("false advertising"). *Stayart v. Yahoo! Inc., 651 F. Supp. 2d 873, 880 (E.D. Wis. 2009)*. Plaintiff's claims are consistent with the first theory of liability.

As an initial matter, the Court notes that Plaintiff must establish he has standing under the Lanham Act. *Stayart v. Yahoo! Inc., 623 F.3d 436, 438 (7th Cir. 2010)*. Judge Bernthal, in his Report and Recommendation, concluded that Plaintiff does not have a commercial interest in his name, and therefore lacks standing. This Court agrees with Judge Bernthal and his Report and Recommendation.

"[S]tanding to assert a § 43 claim is limited to a 'purely commercial class of plaintiffs.'" *Id. at 439* (quoting *Berni v. Int. Gourmet Rest. of Am., 838 F.2d 642, 648 (2d Cir.1988))*. Plaintiff has simply made conclusory allegations that he has a commercial interest in his professional **[*15]** reputation. In Stayart, the Seventh Circuit Court of Appeals rejected the plaintiff's argument that she had a commercial interest in her name because of her extensive activities, including humanitarian efforts. *Stayart, 623 F.3d at 439*. In doing so, the court stated that "the good name that a person garners in such altruistic feats is not what § 43 of the Lanham Act protects: it 'is a private remedy for a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor.'" *Id.* (citation omitted). Similarly, Plaintiff's individual reputation in the insurance industry is not the commercial interest the Lanham Act seeks to protect. Therefore, Plaintiff lacks standing to bring a claim under the Lanham Act.

*e. Count VIII - Intentional Interference with Current and Prospective Economic Advantage*

Count VIII is a claim against all Defendants for intentional interference with current and prospective economic advantage. Plaintiff attached a report to the Second Amended Complaint which indicates that 75% of hiring managers or recruiters use the Internet as part of their review of candidates/applicants. According to Plaintiff, the most common method **[*16]** of research is using a search engine, like Yahoo, Google, or Microsoft's Bing. Plaintiff again alleges he has been "blacklisted" based upon the online availability of the documents related to his litigation against his former employer. Plaintiff claims that Defendants should reasonably have been able to anticipate "these adverse employment actions."

Under Illinois law, the elements of a claim for tortious interference with prospective economic advantage or business relationship are: (1) the existence of a valid business relationship or expectancy; (2) the defendant's knowledge of plaintiff's relationship or expectancy; (3) an intentional and unjustified interference by the defendant inducing or causing a breach or termination of the expectancy; and (4) damages to plaintiff resulting from such interference. *Anderson v. Vanden Dorpel, 172 Ill.2d 399, 406-07, 667 N.E.2d 1296, 217 Ill. Dec. 720 (Ill. 1996)*. "A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *Associated Underwriters of America Agency, Inc. v. McCarthy, 356 Ill. App. 3d 1010, 1020, 826 N.E.2d 1160, 292 Ill. Dec. 724 (Ill. App. Ct. 2005)*.

Here, Plaintiff's Second Amended **[*17]** Complaint does not state a claim for this tort. First, Plaintiff has not alleged the existence of a valid business relationship or expectancy. See *Buchanan v. Serbin Fashions, Inc., 698 F. Supp. 731, 734 (N.D. Ill 1988)* (rejecting claim that prospect of receiving job offer constitutes a sufficient expectancy); *Werblood v. Columbia College, 180 Ill. App. 3d 967, 536 N.E.2d 750, 129 Ill. Dec. 700 (Ill. App. Ct. 1989)* (the plaintiff's expectation of a renewal of her current college employment contract was not sufficient to support a cause of action for intentional interference, even though officials of her college had assured her that her employment there was secure). Moreover, Plaintiff has not alleged that Defendants had knowledge of Plaintiff's alleged business relationship or expectancy. Nor has he alleged an intentional and unjustified interference by Defendants which induced or caused a breach or termination of the business relationship or expectancy. Finally, Plaintiff has not met the requirement, as stated in *McCarthy*, that he allege a business expectancy with a specific third party as well as action by the Defendants directed towards that third party. Therefore, Plaintiff has not stated a claim for intentional **[*18]** interference with current and prospective economic advantage in Count VIII.

*f. Count IX - Unjust Enrichment/Civil Conspiracy*

In Count IX, Plaintiff alleges unjust enrichment and civil conspiracy against all Defendants. In Count IX, Plaintiff repeats the allegations he has set forth in his other claims. Additionally, he alleges Defendants "have acted individually, and/or in concert, by the actions of two or more persons in conspiracy as to their actions."

"To establish an unjust enrichment claim under Illinois common law, a plaintiff must show: (1) the defendant has 'unjustly retained a benefit to the plaintiff's detriment' and (2) the defendant's 'retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Siegel v. Shell Oil Co., 656 F. Supp. 2d 825, 834 (N.D. Ill. 2009)* (citation omitted). "For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty." *Martis v. Grinnell Mut. Reinsurance Co., 388 Ill. App. 3d 1017, 1025, 905 N.E.2d 920, 329 Ill. Dec. 82 (Ill. App. Ct. 2009)*. Plaintiff cannot state a claim because **[*19]** there was no independent basis that established a duty on Defendants to act. Moreover, Plaintiff's unjust enrichment claim cannot stand on allegations that Defendants were unjustly enriched by providing electronic access to public case information. Defendants are not "retaining a benefit" to Plaintiff's detriment just because they are selling electronic access to public information and Plaintiff does not like the information contained in those public documents.

"Under Illinois law, the 'elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Id. at 836*. Civil conspiracy is not an independent tort, rather there must be an independent cause of action underlying a civil conspiracy claim. Id. Plaintiff's allegations fall short of establishing the last two elements of this claim. Plaintiff's allegations do not establish that Defendants worked together to accomplish an action that had an unlawful purpose or a lawful purpose by unlawful means in **[*20]** the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

### g. Count X - RICO

Count X of the Second Amended Complaint purports to allege a RICO violation. This Count fails to state a RICO claim as there are no allegations that any of the Defendants were involved in a "racketeering activity" as defined in *18 U.S.C. § 1961* or that they engaged in any of the prohibited activities enumerated in *18 U.S.C. § 1962*.

### 2. Defendants Microsoft's and Yahoo! Inc.'s Motion for Judgment on the Pleadings is Granted

Judge Bernthal recommended that Microsoft's and Yahoo! Inc.'s Motion for Judgment on the Pleadings [2] on Counts III, IV, VIII, IX, and X of the Second Amended Complaint be granted. Judge Bernthal concluded that Plaintiff's claims are barred by the *First Amendment* because reproducing and selling public information obtained in the form of judicial opinions issued in connection with a public court proceeding cannot give rise to liability. See *Rubin v. City of Berwyn, 553 F. Supp. 476, 479 (N.D. Ill. 1982)* (stating "the right to sell and disseminate public information is protected by the *First Amendment*"). Judge Bernthal also concluded that Plaintiff's state law **[*21]** claims, which Judge Bernthal found are more akin to defamation and various privacy torts, are barred by *§ 230 of the CDA*.

#### a. The *First Amendment* Bars Plaintiff's Claims

All of Plaintiff's claims are based upon the following core allegations. Plaintiff was involved in litigation against his former employer. A search of Plaintiff's name on Defendants' websites results in links to copies of filings and court rulings in the Plaintiff's case against his former employer. Potential employers are doing searches of Plaintiff's name and have seen this information. Plaintiff has been "blacklisted" and has lost out on several potential job opportunities because of this.

However, "the *First Amendment* creates a privilege to publish matters contained in public records even if publication would offend the sensibilities of a reasonable person." *Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1231-32 (7th Cir. 1993)*. Moreover, "the *First Amendment* greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him, even when they are facts of a kind that people **[*22]** want very much to conceal." *Id. at 1232*. As stated, all of Plaintiff's allegations rest on

---

[2] A Corrected Motion for Judgment on the Pleadings that included Count VI was filed later.

the premise that Defendants' websites provide links to information that is in the public record. Plaintiff cannot show he is plausibly entitled to relief. Therefore, judgment on the pleadings is appropriate.

### b. Section 230 of the Communications Decency Act

Judge Bernthal, in his Report and Recommendation, also concludes that Plaintiff's state law claims are really variations of defamation and invasion of privacy claims that are barred by § 230 of the CDA. In enacting the CDA, Congress sought to "promote the continued development of the Internet and other interactive computer services and other interactive media," and to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b).

Section 230 of the CDA provides, in part, that (1) "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" and (2) "[n]o cause of action may be brought and no liability may be **[*23]** imposed under any State or local rule that is inconsistent with this section." 47 U.S.C. §§ 230(c)(1) & (e)(3).

The language of § 230 sets three limits on the "immunity" [3] provided. First, the "immunity" is available only to a "provider or user of an interactive computer service." 47 U.S.C. § 230(c)(1). The CDA defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Second, "immunity" is only available for liability based on the defendant having acted as a "publisher or speaker." 47 U.S.C. § 230(c)(1). Finally, "immunity" can be claimed only with respect to "information provided by another information content provider." 47 U.S.C. § 230(c)(1). An "information content provider" is "any person or entity

---

[3] The Seventh Circuit has noted that the statutory text of § 230(c)(1) does not mention "immunity" or any synonym, and explained "why § 230(c) as **[*24]** a whole cannot be understood as a prohibition of civil liability for web-site operators and other online contents." Chicago Laywers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669-70 (7th Cir. 2008) (citing Doe v. GTE Corp., 347 F.3d 655, 659-60 (7th Cir. 2003)

that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

The Court has reviewed the Report and Recommendation closely and agrees with the conclusions therein that § 230 bars many of Plaintiff's claims in the Second Amended Complaint. However, the Court notes that nothing in § 230 shall be construed to (1) impair the enforcement of any Federal criminal statute or (2) limit or expand any law pertaining to intellectual property. 47 U.S.C. § 230(e)(1) & (2). Therefore, the Court questions whether § 230 would serve to bar Plaintiff's Lanham Act, Right of Publicity Act, and RICO claims.

First, the Lanham Act claim would most certainly be considered an intellectual property claim. See Stayart, 651 F. Supp. 2d at 885 (stating if the Plaintiff has stated a claim for false endorsement under the Lanham Act, the defendant would not be immune from liability for those claims because such a claim would probably be considered an intellectual property claim). Moreover, **[*25]** Plaintiff's commercial misappropriation claims, which this Court has treated as claims under the Right of Publicity Act, would also likely be considered intellectual property claims and would therefore not be barred by the § 230 of the CDA. See id. at 887-88 (stating that a right-to-publicity claim is generally considered an intellectual property claim and recognizing the disagreement among various federal courts regarding the scope of the intellectual property exception in § 230(e)(2)").

Finally, it is unclear whether § 230 would bar a RICO claim. This Court has found no caselaw on the issue. As stated, "[n]othing in [§ 230] shall be construed to impair the enforcement of . . . any other Federal criminal statute." 47 U.S.C. § 230(e)(1). RICO provides for both civil and criminal enforcement. See 18 U.S.C. § 1963 (setting forth RICO's criminal penalties) and 18 U.S.C. § 1964 (setting forth RICO's civil remedies). However, even claims brought pursuant to the civil enforcement provision of RICO may only be brought by the Attorney General or a person injured in his business or property by reason of a violation of 18 U.S.C. § 1962. See 18 U.S.C. § 1964(b), (c). Section 1962 sets forth the **[*26]** activities prohibited by RICO, all of which are "unlawful." See 18 U.S.C. § 1962. Also of note, the RICO statute located in Title 18 of the United States Code, which is entitled "Crimes and Criminal Procedure." Therefore, arguably, § 230 of the CDA may

not be used to bar a civil RICO claim because that would impair the enforcement of a Federal criminal statute.

However, the Court need not resolve these issues as the Court has already determined that Plaintiff has not stated a claim under any of the Counts he alleged in his Second Amended Complaint. More importantly, the Court concluded the *First Amendment* bars all of Plaintiff's claims.

IT IS THEREFORE ORDERED that Plaintiff's Objections to the Report and Recommendation are OVERRULED and Judge Bernthal's Report and Recommendation (d/e 39) is ADOPTED. Defendants' Motions to Dismiss (d/e 16, d/e 18, and d/e 27) are GRANTED. Additionally, Defendants Microsoft's and Yahoo! Inc.'s Motion for Judgment on the Pleadings (d/e 22) is GRANTED. Because all of Plaintiff's claims are based on providing information that is in the public record, Plaintiff's claims are barred by the *First Amendment* and any amendment of the Second Amended Complaint would **[*27]** be fruitless. Therefore, the Second Amended Complaint is DISMISSED WITH PREJUDICE. This ruling renders moot both (1) Plaintiff's Motion for Preliminary Injunction against Acton and Versuslaw (d/e 10) because there is no likelihood of success on the merits, and (2) Microsoft's and Yahoo's Corrected Motion for Judgment on the Pleadings (d/e 38) because Count VI has been dismissed with prejudice and the *First Amendment* bars such a claim. Therefore, Plaintiff's Motion for Preliminary Injunction (d/e 10) and Defendants Microsoft's and Yahoo's Corrected Motion for Judgment on the Pleadings (d/e 38) are DENIED AS MOOT. This case is CLOSED.

IT IS THEREFORE SO ORDERED.

ENTERED: August 2, 2012.

FOR THE COURT:

/s/ Sue E. Myerscough

SUE E. MYERSCOUGH

UNITED STATE DISTRICT JUDGE

## JUDGMENT IN A CIVIL CASE

**JURY VERDICT**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**DECISION BY THE COURT**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** pursuant to an order entered by the Honorable Sue E. Myerscough: judgment is entered in favor of the **[*28]** defendants and against the plaintiff. This case is closed with prejudice.

**Dated:** August 3, 2012

End of Document

 Neutral

As of: June 8, 2020 10:00 PM Z

# *Schmalfeldt v. Johnson*

United States District Court for the Eastern District of Wisconsin

July 1, 2016, Decided; July 1, 2016, Filed

Case No. 15-CV-1516

**Reporter**

2016 U.S. Dist. LEXIS 86118 *; 2016 WL 3659901

WILLIAM M. SCHMALFELDT, Plaintiff, v. ERIC P. JOHNSON, SARAH PALMER, and JOHN AND JANE DOES, Defendants.

**Prior History:** *Schmalfeldt v. Johnson, 2016 U.S. Dist. LEXIS 55527 (E.D. Wis., Apr. 20, 2016)*

## Core Terms

alleges, personal jurisdiction, blog, exercise jurisdiction, forum state, contacts, due process, privacy, libel, false light invasion, motion to dismiss, solicitation, comport, email, lack of personal jurisdiction, misappropriation, likeness, website

**Counsel:** [*1] William M Schmalfeldt, Sr, Plaintiff, Pro se, St. Francis, WI.

For Eric P Johnson, Sarah Palmer, also known as Rose, Defendants: Aaron J Walker, Manassas, VA.

**Judges:** NANCY JOSEPH, United States Magistrate Judge.

**Opinion by:** NANCY JOSEPH

## Opinion

**DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

This diversity lawsuit arises out of a long-standing internet feud between the parties. The plaintiff, William M. Schmalfeldt, alleges that the defendants have engaged in a campaign of harassment against him primarily orchestrated over the internet. Specifically, he raises claims of libel *per se*, false light invasion of privacy, and misappropriation of name and likeness against defendants Sarah Palmer and Eric P. Johnson, as well as John and Jane Does. (Docket # 6.)

The defendants' have moved to dismiss on a number of grounds. (Docket # 11 and # 39.) For the reasons explained below, the case will be dismissed for lack of personal jurisdiction.

**BACKGROUND**

Plaintiff William Schmalfeldt is a resident of the State of Wisconsin. (First Am. Compl., Docket # 6 at ¶ 1.) Defendant Eric Johnson is a resident of the State of Tennessee (*id.* at ¶ 2), and defendant Sarah Palmer is a resident of the State of North Carolina (*id.* at ¶ 3). Schmalfeldt [*2] pleads that he is involved in a long-standing dispute with several of the members of what he calls "a cult of right wing bloggers." (*Id.* at ¶ 7.) He claims that the dispute began when he wrote a series of articles defending a man who had previously been convicted of serious crimes, whom the "cult" was trying to "put back in jail." (*Id.*) The group grew larger (*id.* at ¶ 8), and became enraged when Schmalfeldt began to use "publicly available information to identify" them (*id.* at ¶ 9). Thereafter, Schmalfeldt alleges that they "turned their attention to ruining [his] life." (*Id.*) He further alleges

Timothy Moore

that the bloggers targeted his late wife and filed "nearly 400 criminal charges against [him] in Carroll County, Maryland." (*Id.* at ¶ 10.) When he moved from Maryland to Wisconsin in August 2015, Schmalfeldt alleges that the bloggers adopted a tactic of contacting him and then filing for a restraining order when he responded, claiming that Schmalfeldt had contacted them without their permission. (*Id.* at ¶ 11.) Schmalfeldt also alleges that another tactic employed by these bloggers was to "portray [him] as a child pornographer," based on three self-produced audio comedy bits that he voiced and **[\*3]** recorded in 2013. (*Id.* at ¶ 14.) Johnson made several written and telephone contacts with the managements of the apartment complex where Schmalfeldt lives "to 'warn' them about the 'child pornographer' in their midst." (*Id.* at ¶ 15.) Schmalfeldt alleges that Johnson also posted the names, home addresses, phone numbers, and email addresses of the board members of the management group that manages the property where he lives. (*Id.* at ¶ 16.)

### Libel Per Se

In support of his claim for libel *per se* against all defendants (Johnson, Palmer, and John and Jane Does), Schmalfeldt begins with allegations that Johnson "made several online comments on the blogs of other people in which he accused [Schmalfeldt] of the manufacture and sale of child pornography." (*Id.* at ¶ 21.) Schmalfeldt lists various specific incidences from September, October, and November 2015 that he believes were instances of Johnson committing libel against him, from accusing him of "boy scout rape fantasies" and threatening to send the information both to Vanderbilt University (where Schmalfeldt participated in a study) and the management of his apartment complex (*id.* at ¶ 22); made allegations on a blog post concerning, among **[\*4]** other things, allegations of Schmalfeldt describing the sex acts of his own daughter, filing false charges, committing perjury, admitting to using illegal drugs with his stepson, and deleting thousands of pages of evidence to avoid prosecution and civil suits (*id.* at ¶ 25). Schmalfeldt alleges that on November 2, 2015, Johnson posted on Palmer's blog a list of the names, addresses, phone numbers, and email addresses of the board members of the management group that manages his apartment complex. (*Id.* at ¶ 26.) Johnson also forwarded Schmalfeldt's tweets to the management group in early 2016. (*Id.* at ¶ 27.)

As to Palmer, Schmalfeldt's allegations concern Palmer's blog, which Schmalfeldt states is "a blog completely devoted to [Schmalfeldt's] personal destruction." (*Id.* at ¶ 29.) Palmer claims to use Schmalfeldt's own words, and Schmalfeldt alleges that "[w]hat she does not tell her readers is that she takes the words out of context and twists them to fit her mold." (*Id.*) Schmalfeldt alleges that Palmer wrote a blog post on January 16, 2016, in which she stated, in short, that if Schmalfeldt wanted to blame the "cult" for his wife's death, he needed to take responsibility as well, stating his **[\*5]** wife begged him to stop harassing "[redacted]." (*Id.* at ¶ 29.)[1] Schmalfeldt alleges that his wife "never 'begged' [him] to 'stop harassing' anyone." (*Id.* at ¶ 30.) Schmalfeldt also references a December 2015 blog post in which Palmer admitted that she takes his words out of context "to make them more entertaining to her readership." (*Id.* at ¶ 30.)[2] Finally, Schmalfeldt alleges that "[b]ecause of the actions of these named defendants and others, Plaintiff's online reputation has been permanently scarred." (*Id.* at ¶ 31.)

### Misappropriation of Name and Likeness

Schmalfeldt's misappropriation of name and likeness claim centers around defendant Palmer's blog, which is titled using his name. (*Id.* at ¶ 43.) He also alleges that she "uses multiple copyrighted images of [him] on her blog," which she has altered to "further defame" him. (*Id.* at ¶ 44.) Schmalfeldt alleges that Palmer's blog has a prominent donations button. (*Id.* at ¶ 45.)

### False Light Invasion of Privacy [\*6]

The general basis for Schmalfeldt's false light invasion of privacy claim concerns several audio recordings of "three comedy sketches." (*Id.* at ¶ 35.) According to the complaint, Johnson has "publicly label[ed] Plaintiff as a child pornographer" based on these recordings. (*Id.* at ¶ 34.) (This allegation also appears to relate to Johnson's alleged contact with the management company for Schmalfeldt's apartment building.) Additionally, Schmalfeldt alleges that Palmer's website "defines [him] as 'the fevered ravings of lying, cry-bully Bill Schmalfeldt,'" and he denies he is any of those things.

---

[1] Schmalfeldt has two paragraphs numbered 29 in his amended complaint. This citation refers to the second paragraph 29.

[2] There are also two paragraphs numbered 30 in Schmalfeldt's amended complaint. This citation is to the second paragraph numbered 30.

(*Id.* at ¶ 37.)[3] Schmalfeldt further alleges that Palmer filed for restraining orders in places she knows he will have trouble getting to. (*Id.* at ¶ 38.)

## ANALYSIS

In their motion to dismiss, Johnson and Palmer argue that the case should be dismissed on several different grounds: for lack of subject matter jurisdiction; for lack of personal jurisdiction; for insufficient service of process; and for failure to state a claim upon which relief can be granted. Because I find that this Court lacks personal jurisdiction **[*7]** over the defendants, I will address only that issue.

As a preliminary matter, only the libel *per se* and misappropriation of likeness claims are considered here. Schmalfeldt's false light invasion of privacy claim is not a claim Wisconsin recognizes. While Wisconsin does recognize "invasion of privacy" as a tort, *see Wis. Stat. § 995.50*, it does not recognize a "false light invasion of privacy claim." *Zinda v. Louisiana Pac. Corp., 149 Wis. 2d 913, 929, 440 N.W.2d 548, 555 (1989)* (noting that the invasion of privacy tort statute "does not provide a cause of action for placing a person in a false light in the public eye"); *see also Ladd v. Uecker, 2010 WI App 28, ¶ 5, 323 Wis. 2d 798, 804, 780 N.W.2d 216, 218* (noting that the appellant acknowledged in her brief "that Wisconsin does not recognize 'false light invasion of privacy'").

On a motion to dismiss for lack of personal jurisdiction under *Fed. R. Civ. P. 12(b)(2)*, the burden of proof rests on the party asserting jurisdiction to make a *prima facie* showing supporting that assertion. *Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 713 (7th Cir. 2002)*. In deciding the dismissal motion, the court must accept as true all well-pleaded facts alleged in the complaint and also resolve in plaintiff's favor all disputes concerning relevant facts presented in the record. *Purdue Research Found. v. Sanofi—Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003)*.

In diversity cases, a federal district court has personal jurisdiction over a party if a court of the **[*8]** state in which it sits would have such jurisdiction. *Heritage House Restaurants, Inc. v. Continental Funding Grp., Inc., 906 F.2d 276, 279 (7th Cir. 1990)*. In Wisconsin, this is a two-pronged inquiry. The first prong requires a

---

[3] There are two paragraphs numbered 37, and this citation refers to the second paragraph numbered 37.

court to determine whether the defendant falls within the grasp of Wisconsin's long-arm statute, *Wis. Stat. § 801.05*. *Logan Products, Inc. v. Optibase, Inc., 103 F.3d 49, 52 (7th Cir. 1996)*. The Wisconsin Supreme Court has determined that the long-arm statute "is to be liberally construed in favor of the exercise of jurisdiction." *Federated Rural Elec. Ins. Corp. v. Inland Power & Light Co., 18 F.3d 389, 391 (7th Cir. 1994)* (citing *Schroeder v. Raich, 89 Wis. 2d 588, 593, 278 N.W.2d 871 (1979)*). The second inquiry requires a court to consider whether the exercise of jurisdiction over the defendant comports with the due process requirements of the *Fourteenth Amendment of the United States Constitution*. *Logan Products, 103 F.3d at 52*.

I will begin with the first inquiry. Wisconsin's long-arm statute contemplates that personal jurisdiction can be either general or specific. *Rasmussen v. General Motors Corp., 2011 WI 52, ¶ 15, 335 Wis. 2d 1, 803 N.W.2d 623*. If a plaintiff can establish general jurisdiction over a nonresident defendant under *Wis. Stat. § 801.05(1)*, "the defendant may be brought before Wisconsin courts for claims that are unrelated to the defendant's activities in Wisconsin." *Id.* Specific jurisdiction is more limited, and "the claim for relief for which personal jurisdiction is sought must be substantially connected to or arise out of the defendant's contacts with Wisconsin." *Id. at ¶ 15*. Here, Schmalfeldt contends that this court has specific jurisdiction **[*9]** under *Wis. Stats. § 801.05(2)* and *§ 801.05(4)(a)*.

*Section 801.05(2)* confers jurisdiction in "any action which may be brought under statutes of this state that specifically confer grounds for personal jurisdiction over the defendant." *Section 801.05(4)(a)* provides that the court has personal jurisdiction "[i]n any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury . . . [s]olicitation or service activities were carried on within this state by or on behalf of the defendant." Schmalfeldt has not identified, and I have not found, any indication that his actions for libel and misappropriation of name or likeness authorize specific jurisdiction. Accordingly, *Section 801.05(2)* does not apply.

As to *Section 801.05(4)(a)*, it confers jurisdiction when an injury occurs in this state because of a foreign action and "at the time of the injury . . . [s]olicitation or service activities were carried on within this state by or on behalf of the defendant." To implicate this section, Schmalfeldt "must show three jurisdictional facts: (1) an

act committed outside the state by the defendant, (2) an injury to person or property within the state which is claimed to arise out of the foreign act, and (3) some additional [*10] contact such as solicitation activities [or service activities] carried out by the defendant which link the defendant to the state." *Knot Just Beads v. Knot Just Beads, Inc., 217 F. Supp. 2d 932, 934 (E.D. Wis. 2002)*. Assuming for purposes of this inquiry that Schmafeltd has met the first two factors, he fails on the third factor.

"In order for solicitation activities in Wisconsin to trigger personal jurisdiction, the solicitor must anticipate receiving a financial benefit from the solicitation." *Id.* (citing *Schimpf v. Gerald Inc., 2 F. Supp. 2d 1150, 1162 (E.D. Wis. 1998)* (citing *Pavlic v. Woodrum, 169 Wis. 2d 585, 592, 486 N.W.2d 533 (Ct. App. 1992))*. As the *Knot Just Beads* court explained, the Wisconsin Supreme Court quoted with approval the following language from *Tilley v. Keller Truck & Implement Corp., 200 Kan. 641, 438 P.2d 128, 133-34 (1968)*, when discussing the rationale behind exercising jurisdiction over those who solicit or provide service activities in Wisconsin:

> If the defendant advertises, solicits, or sells its product in the forum state it then has or can anticipate some direct or indirect financial benefit from the sale, trade, use or servicing of its products in the forum state. It is then subject to in personam jurisdiction. The particular product or service causing the injury need not be sold or performed in the forum state but the defendant must reasonably have or anticipate financial benefit from the sale, trade, use or servicing on its products in the foreign [*11] state.

Schmalfeldt has not alleged any facts that suggest that either Johnson or Palmer have engaged in solicitation or service activities in Wisconsin. Johnson's alleged contacts with Wisconsin include telephone calls and emails; Palmer's is a blog about Schmalfeldt. *Section 801.05(4)(a)*, therefore, does not confer specific jurisdiction over the defendants.

Even if a provision of Wisconsin's long-arm statute applied, exercising jurisdiction over the defendants would violate due process. In determining whether exercising jurisdiction comports with due process, there are three essential requirements in this analysis: (1) the defendant must have purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed his activities at the state, *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct.*

*2174, 85 L. Ed. 2d 528 (1985)*; (2) the alleged injury must have arisen from the defendant's forum-related activities, *id.*; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice, *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*. The crucial inquiry is whether a defendant's contacts with the state are such that he should reasonably anticipate being haled into court. *Int'l Med. Grp., Inc. v. Am. Arbitration Ass'n, Inc., 312 F.3d 833, 846 (7th Cir. 2002)*.

Schmalfeldt relies on *Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*, a case in which the Supreme Court found that California [*12] had personal jurisdiction over a Florida-based newspaper when it was sued for committing libel against the plaintiff, to support his position that because Palmer and Johnson intended to cause a "tortious injury" in Wisconsin, Wisconsin has jurisdiction over the defendants. However, in *Walden v. Fiore, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)*, the Supreme Court explained that it was more than just a defendant's intent to commit a tort against someone in a foreign jurisdiction that conferred jurisdiction. In *Walden*, the Supreme Court found that Nevada could not exercise jurisdiction over a defendant from Georgia merely on the defendant's knowledge that his affidavit would cause harm to two plaintiffs in Nevada. *Id. at 1125-26*. As such, *Walden* reinforced the principle that the connections sufficient to establish personal jurisdiction must be to the forum, not to the injured plaintiff. The Court explained, "The crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Id. at 1123-24*. Thus, in *Walden*, "the Supreme Court rejected [the] theory" suggested in *Calder* "that, if a defendant knows that its intentional acts will cause effects in a state, then that state can exercise jurisdiction [*13] over the defendant." *Maxitrate Tratamento Termico E Controles v. Super Sys., Inc., 617 Fed. Appx. 406, 408 (6th Cir. 2015)*.

Under this framework, it is clear that exercising personal jurisdiction over Palmer would be incongruous with due process. It is not enough that Palmer knew, or should have known, that her blog would cause injury in Wisconsin, and Schmalfeldt has alleged no other connection to or contact with Wisconsin. I also note that the Seventh Circuit has not adopted a special due process test for internet cases. "We have faced that problem on several occasions . . . and thus far it has appeared to use 'that the traditional due process inquiry

[ ] is not so difficult to apply in cases involving internet contacts that courts need some sort of easier-to-apply categorical test.'" *Advanced Tactical Ordinancy Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 802 (7th Cir. 2014)* (quoting *Illinois v. Hemi Grp., LLC, 622 F.3d 754, 759 (7th Cir. 2010)* (internal string citation omitted)). Moreover, the Seventh Circuit has added that courts should be cautious "in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state." *be2 LLC v. Ivanov, 642 F.3d 555, 558 (7th Cir. 2011)* (citation omitted). "If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, *but does not target*, the forum **[*14]** state, then the defendant may not be haled into court in that state without offending the Constitution." *Id. at 559* (emphasis in original); *see also Salfinger v. Fairfax Media Ltd., 2016 WI App 17, 367 Wis. 2d 311, 876 N.W.2d 160* (determining that state courts do not have personal jurisdiction over a website that does not "target" the forum state).

As to defendant Johnson, he falls somewhere between the defendants in *Calder* and *Walden*. He, according to the complaint, made "several written and telephone[] contacts with the management of the apartment complex where Plaintiff dwells to 'warn' them about the 'child pornographer' in their midst" (Am. Compl., Docket # 6 at ¶ 15) and "also posted the names, home addresses, phone numbers and email addresses of the board members" of the management company that manages that property for the Catholic Sisters of Saint Francis of Assisi (*id.* at ¶ 16). He has done more than the defendants in *Walden*, whose only actions that could possibly be construed as targeting the forum was writing a false affidavit, but it does not rise to the level of the defendant in *Calder*, who distributed a widely-read newspaper in the forum state and also depended on people and information in the forum state to write the story itself.

"Emails and calls directed **[*15]** at the forum state can be meaningful enough to create personal jurisdiction," *United Airlines, Inc. v. Zaman, No. 14 C 9214, 152 F. Supp. 3d 1041, 2015 U.S. Dist. LEXIS 56982, 2015 WL 2011720, at *8 (N.D. Ill. Apr. 30, 2015)* (citing *Walden, 134 S. Ct. at 1122*). However, Johnson's contact is not such meaningful contact. Several phone calls and emails to Schmalfeldt's apartment complex's management company are not substantial enough to permit a Wisconsin court to exercise jurisdiction over Johnson. For example, In *Bushelman v. Bushelman, 2001 WI App 124, 246 Wis. 2d 317, 629 N.W.2d 795*, the Wisconsin Court of Appeals found that due process would be violated by exercising jurisdiction over an out-of-state party to a divorce action, even though he made child support payments to Wisconsin as well telephone calls and sent letters to his children in Wisconsin. Johnson's contacts hardly compare to the out-of-state party's in *Bushelman*.

In determining whether exercising jurisdiction comports with due process, the Supreme Court has placed much emphasis on foreseeability. *Purdue Research Found., 338 F.3d at 781* (internal citations omitted). The defendant must "purposefully avail" itself to a particular jurisdiction, ensuring "that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contact." *Burger King, 471 U.S. at 475* (internal citations omitted). Though Johnson's contact with Wisconsin was not random, the nature and quality of the contact **[*16]** does not rise to the level of satisfying the requirement that being sued in Wisconsin should have been foreseeable to Johnson.

In sum, exercising jurisdiction over Palmer and Johnson would not comport with due process. Schmalfeldt has not shown that, with respect to the incident at issue, either Palmer or Johnson would have foreseen or been given fair warning that they could and would be sued in Wisconsin in relation to incidents underlying this lawsuit. Because I find that exercising jurisdiction would not comport with due process, I need not consider the remainder of the defendant's arguments for dismissal.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motions to dismiss for lack of personal jurisdiction (Docket # 11, 39) are **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 1st day of July, 2016.

BY THE COURT

/s/ Nancy Joseph

NANCY JOSEPH

United States Magistrate Judge

**JUDGMENT IN A CIVIL CASE**

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came before **[*17]** the court, the issues have been decided and a decision has been rendered.

**IT IS ORDERED** that this action is hereby **DISMISSED** for lack of personal jurisdiction.

Approved: */s/ Nancy Joseph*

NANCY JOSEPH

United States Magistrate Judge

Dated: July 1, 2016

---

**End of Document**

No *Shepard's* Signal™
As of: June 8, 2020 8:46 PM Z

# *Stokinger v. Armslist, LLC*

Superior Court of Massachusetts, At Suffolk

March 13, 2020, Decided; April 28, 2020, Filed

Opinion No.: 144647, Docket Number: 1884CV03236-F

**Reporter**
2020 Mass. Super. LEXIS 69 *

Kurt Stokinger et al.[1] v. Armslist, LLC et al.[2]

## Core Terms

firearms, website, sellers, provider, sales, trafficking, gun, third-party, publisher, immunity, licensed, computer service, advertisements, interactive, dealers, posted, third party, users, sex, motion to dismiss, facilitates, purchaser, internet, buyers, background check, design feature, transactions, editorial, shooting, alleges

## Case Summary

### Overview

HOLDINGS: [1]-An online firearm marketplace's motion to dismiss was allowed since the claims against it since the martketplace's conduct fell within the scope of immunity set out in the Communications Decency Act (CDA), *47 U.S.C.S. § 230*, similarly to the challenges raised in the Backpage.com. LLC decision, plaintiffs' challenges related to the design and structure of the website, which were editorial decisions, so their claims were precluded under the CDA, their claim that the marketplace created the content at issue was reviewed and rejected in the Daniel decision, a similar case; the marketplace was not an information content provider, and plaintiffs' claims were based on complaints about posted content created or developed by a third party.

### Outcome

Motion to dismiss allowed.

## LexisNexis® Headnotes

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN1*[🔻] **Content Regulation, Communications Decency Act**

In enacting the Communications Decency Act, *47 U.S.C.S. § 230*, Congress recognized that the internet was an extraordinary advancement in the availability of education and informational resources as well as a forum for free speech and cultural development. *47 U.S.C.S. § 230(a)*.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN2*[🔻] **Content Regulation, Communications Decency Act**

To achieve its goals, the Communications Decency Act (CDA), *47 U.S.C.S. § 230*, provides broad immunity to web-based service providers for all claims arising from their publication of information from third parties. *47 U.S.C.S. § 230(c)(1)*. In fact, the CDA was enacted partially in response to cases in which internet

---

[1] Janella Stokinger.

[2] Grant Headley and Sara Johnson.

Timothy Moore

publishers were held liable for defamatory statements posted by third parties on their message boards. In reaction, Congress recognized the threat and obvious chilling effect that tort-based lawsuits could pose to the free exchange of information over the internet. The CDA addresses the chill by immunizing interactive computer service providers from claims or theories of liability that would treat it as the publisher or speaker of information provided by a third party.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN3*[🔽] **Content Regulation, Communications Decency Act**

The Communications Decency Act , 3*47 U.S.C.S. § 230*, states, in part that no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. *47 U.S.C.S. § 230(c)(1)*. An interactive computer service is as any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions. *47 U.S.C.S. § 230(f)(2)*.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN4*[🔽] **Content Regulation, Communications Decency Act**

In the context of the Communications Decency Act , *47 U.S.C.S. § 230*, it is well-established that notice of the unlawful nature or the information provided is not enough to make it the service provider's own speech. Immunity applies even after notice of the potentially unlawful nature of the third-party content.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Preemption

*HN5*[🔽] **Content Regulation, Communications Decency Act**

The Communications Decency Act, *47 U.S.C.S. § 230*, expressly preempts all state claims that are inconsistent with this section. *Section 230(e)(3)* provides that no cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN6*[🔽] **Content Regulation, Communications Decency Act**

In the context of the Communications Decency Act, *47 U.S.C.S. § 230*, whether a website's design features employ neutral tools is helpful in determining whether those features materially contribute to the unlawfulness of the content. A neutral tool is a feature provided by an interactive computer service provider that can be utilized for proper or improper purposes. A defendant who provides a neutral tool that is subsequently used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness, even if the interactive computer service provider knew, or should have known, that its neutral tools were being used for illegal purposes. Material contribution does not mean merely taking action that is necessary to the display of allegedly illegal content, such as providing a forum for third-party posts. 'Rather, it means being responsible for what makes the displayed content allegedly unlawful.

**Judges:** [*1] Heidi E. Breiger, Justice of the Superior Court.

**Opinion by:** Heidi E. Breiger

# Opinion

*MEMORANDUM OF DECISION AND ORDER ON ARMSLIST, LLC'S MOTION TO DISMISS*

This action arises from the shooting of Boston Police Officer Kurt Stokinger ("Officer Stokinger") during a police investigation. Officer Stokinger and his wife, Janella Stokinger ("Mrs. Stokinger") (collectively, "the Stokingers"), assert various claims against the shooter, Grant Headley ("Headley"), the gun's seller, Sara Johnson ("Johnson"), and Armslist, LLC ("Armslist"), an online marketplace facilitating the purchase and sale of firearms. The Stokingers allege that Johnson used Armlist to purchase firearms—including the gun used to shoot Stokinger—and then illegally sold or transferred those firearms to individuals who were legally prohibited from possessing firearms. Before the court is Armslist's motion to dismiss the Stokingers' claims against it (Counts Three, Four, Five, Six, and Seven) on the ground that each claim is barred by the *Communications Decency Act, 47 U.S.C. §230 (2018)*. For the following reasons, Armslist's motion to dismiss is *ALLOWED*.[3]

BACKGROUND

Following is a summary of the well-pleaded factual allegations of the First Amended Complaint (the **[*2]** "complaint").[4] See *Sisson v. Lhowe, 460 Mass. 705, 707, 954 N.E.2d 1115 (2011)*.

A. Relevant Federal and State Regulation of Firearm Sales

Federal law requires that only federally licensed firearms dealers may engage in the firearms business. To obtain a federal firearms license, a person or entity must apply for—and be granted—a license from the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Federally licensed firearms dealers are subject to duly promulgated regulations. For example, licensed dealers are required to conduct background checks of potential buyers to ensure that guns are not sold to individuals who are prohibited from possessing firearms, such as felons, the mentally ill, domestic abusers, and minors (collectively, "prohibited purchasers"). In addition, licensed dealers must keep records of firearms sales to assist law enforcement with criminal investigations. Licensed dealers also must inform law enforcement whenever a purchaser engages in a "multiple sale," which is when a purchaser buys more than one firearm within five business days as it may indicate firearms trafficking. Licensed dealers also have a duty to screen for suspicious sales and may refuse a sale when the dealer believes that the sale is dangerous **[*3]** or risky.

Under federal law, unlicensed "private sellers"—persons not engaged in the firearms business—are permitted to sell a maximum of four firearms per year. Such private sellers are not required to conduct background checks of potential buyers or keep a record of their transactions.

In Massachusetts, all firearm purchasers—licensed or not—must obtain a permit prior to buying a firearm, and the issuance of such a permit requires the individual to undergo a background check. *G.L.c. 140, §§129B-129C*.

B. Armslist.com

Armslist.com is a for-profit online firearms marketplace that facilitates sales of firearms and accessories. Armslist owns and operates Armslist.com, which it developed after several major websites chose to cease online firearm sales.

Armslist.com is not a federally licensed firearms dealer. Instead it functions as an intermediary by providing information to both firearms sellers and buyers so as to facilitate transactions. Prospective firearms customers use the website's internal e-mail system to contact firearms sellers to arrange a transaction. Customers may also contact sellers outside of the website by using the seller's contact information provided on the website.

C. The Firearm Involved in **[*4]** the Shooting

On January 8, 2016, Headley shot Stokinger in the leg with a .40 caliber Glock Model 27 semi-automatic handgun. Headley, a convicted felon, is a prohibited purchaser of firearms under Massachusetts law. *G.L.c. 140, §129B*. After the shooting, fellow officers recovered Headley's firearm. The post-shooting investigation produced information giving rise to the Stokingers'

---

[3] Armslist also filed a motion to dismiss for lack of personal jurisdiction but in light of the instant ruling, the court need not address the jurisdictional issue.

[4] As additional support for its motion, Armslist submitted a declaration from Jonathan Gibbon, the co-founder and President of Armslist, to which the Stokingers objected. Insofar as the court has resolved the instant motion without the benefit of Mr. Gibbon's declaration, this objection is moot.

allegation that Headley's possession of the firearm was traced to Armslist.com transactions.[5] The Stokingers believe that shortly after Johnson purchased the firearm from McNamara, either Johnson or Sullivan sold the gun to Headley.

D. Instant Action

On October 18, 2018, the Stokingers filed this action against Headley, Johnson, and Armslist. Count One is a claim against Headley for assault and battery. Counts Two and Three are negligence claims against Johnson and Armslist, respectively. Count Four alleges that Armslist aided and abetted in Johnson's negligent sale of the firearm to Headley. Count Five asserts a claim of public nuisance against Armslist. Counts Six and Seven assert claims by Mrs. Stokinger against all defendants for loss of consortium and loss of support. Armslist now moves to dismiss each of the claims against [*5] it (Counts Three, Four, Five, Six, and Seven) on the ground that the Stokingers' claims are barred by the *Communications Decency Act ("CDA" or the "Act"), 47 U.S.C. §230*.

The gravamen of the Stokingers' negligence claim (Count Three) is that Armslist.com's design and operational features facilitate illegal firearms sales and encourage illegal firearms trafficking because Armslist.com makes it easy for prospective buyers to locate private sellers by using a filter feature permitting prospective buyers to browse advertisements by private sellers. Inasfar as most states do not require private firearm sellers to conduct background checks on prospective customers, private sales are more attractive to prohibited purchasers. Additionally, prospective

customers may use the website's "location" filter to narrow their search to sales to specific states, enabling them to weed out sales in states with stricter gun laws.

The Stokingers further allege that Armslist is negligent because it permits users to maintain their anonymity, and takes no action to monitor or prevent illegal sales. The Stokingers also claim that Armslist is aware that its website is a magnet for illegal gun transactions and negligently failed [*6] to institute reasonable safeguards to minimize the risks of such transactions, such as limiting the number of guns that can be sold or purchased by each user or requiring sellers to conduct background checks.[6]

Count Four alleges that in brokering the firearm transaction between Johnson and McNamara, Armslist aided and abetted in the negligent subsequent sale of the firearm to Headley.

Count Five alleges that Armslist created a public nuisance by designing and maintaining an online marketplace tailored to attract and encourage persons who wish to buy or sell firearms in contravention of federal and state gun laws. As a result, the Stokingers claim that Armslist substantially and unreasonably interfered with the public's safety and comfort.

Counts Six and Seven allege that Armslist's aforementioned conduct was the proximate cause of Mrs. Stokinger's loss of consortium and loss of spousal support.

For the following reasons, the court concludes that Armslist is immune from each of these claims pursuant to the *CDA*.

DISCUSSION

A. CDA Generally

*HN1*[↑] In enacting the *CDA*, Congress recognized that the internet was an extraordinary advancement in the availability of education and informational resources as [*7] well as a forum for free speech and cultural development. *47 U.S.C. §230(a)*. It also found that the internet had "flourished, to the benefit of all Americans, with a minimum of government regulation." *47 U.S.C.*

---

[5] In particular, ATV learned that Derek McNamara ("McNamara") purchased the firearm on March 3, 2015, from. Black Op Arms, a federally licensed firearms dealer in Claremont, New Hampshire. McNamara informed ATF that he then sold the firearm to Johnson, a New Hampshire woman who contacted him through Armslist.com. McNamara met Johnson in a McDonald's parking lot in Warner, New Hampshire, in July 2015, and sold her the firearm. Her confederate, Daniel Ray Sullivan ("Sullivan"), was a convicted felon. On July 26, 2017, Johnson and Sullivan were indicted in on federal firearms charges in the United States District Court in New Hampshire; each pleaded guilty. Sullivan admitted he contacted Armslist.com to arrange various firearms purchases.

According to ATF's investigation, Johnson purchased and then sold an estimated thirty to sixty-three firearms that she procured from Armslist.com. At least four of the firearms she purchased were recovered on the streets of Greater Boston within seven months of Johnson's purchase.

[6] Because the court concludes that Armslist is immune from the negligence claim pursuant to the *CDA*, the court need not determine whether Armslist owed a duty of care to the Stokingers.

§230(a)(4). In light of its findings, Congress sought "to promote the continued development of the Internet" and "to preserve the vibrant and competitive free market that presently exists . . ." 47 U.S.C. §230(b)(1)-(2).

HN2[↑] To achieve its goals, the CDA provides broad immunity to web-based service providers for all claims arising from their publication of information from third parties. Doe v. MySpace, Inc., 528 F.3d 413, 418 (5th Cir. 2008), citing 47 U.S.C. §230(c)(1). In fact, the CDA was enacted partially in response to cases in which internet publishers were held liable for defamatory statements posted by third parties on their message boards. Doe v. Backpage.com, LLC, 817 F.3d 12, 18 (1st Cir. 2016), citing Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 N.Y.Misc. LEXIS 229, *12-*14 (N.Y.Sup.Ct. May 24, 1995). In reaction, Congress recognized the threat and "obvious chilling effect" that tort-based lawsuits could pose to the free exchange of information over the internet. Zeran v. America Online, Inc., 129 F.3d 327, 331 (4th Cir. 1997). The CDA addresses the chill by immunizing interactive computer service providers from claims or theories of liability that "would treat [it] as the publisher or speaker of . . . information" provided by a third party. See Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007) (quotations omitted) (interactive computer service providers still liable [*8] for their own conduct and their own speech).

B. The Instant Claims

The Stokingers' claims are predicated on Armslist's creation, design, and maintenance of Armslist.com. HN3[↑] The CDA states, in pertinent part, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1). An interactive computer service is as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. §230(f)(2). Here, the Stokingers do not dispute that Armslist.com is an interactive computer service. Rather, the central question before the court is whether the Stokingers' claims treat Armslist as the publisher or speaker of the content provided by the sellers and buyers of firearms who access its site.[7] Backpage.com,

LLC, 817 F.3d at 19. The Stokingers argue that their claims do not treat Armslist as the publisher or speaker of third-party content; instead, they claim that Armslist's liability is predicated on [*9] its role in developing, designing, and maintaining a website that facilitates and encourages illegal gun trafficking.

It appears that this issue is one of first impression in the Commonwealth, although the highest state court in Wisconsin and the Court of Appeals for the First Circuit have already addressed and resolved the same issue. Review of the pleadings and case law in this area leads the court to agree that Armslist's conduct falls within the scope of the immunity set out in the CDA, consequently barring the Stokingers' claims.

C. Analysis

There has been "near-universal agreement that section 230 should be not be construed grudgingly." Backpage.com, LLC, 817 F.3d at 18. "This preference for broad construction recognizes that websites displaying third-party content may have an infinite number of users generating an enormous amount of potentially harmful content, and holding website operators liable for that content 'would have an obvious chilling effect' in light of the difficulty of screening posts for potential issues." Id. at 18-19, quoting Zeran, 129 F.3d at 331. This broad construction has resulted in the recognition by courts across the country that many causes of action are premised on the publication or speaking of third-party content. See National Ass'n of the Deaf v. Harvard Univ., 377 F.Supp.3d 49, 65 (D.Mass. 2019).

For example, [*10] in Backpage.com, LLC, 817 F.3d at 20-21, the court concluded that "publishing" functions include not only "editorial decision[s] with respect to" the content of a particular posting, but also "the structure and operation of the website." In that case, three young sex trafficking victims filed suit against Backpage, alleging it engaged in a course of conduct that deliberately facilitated sex trafficking, Id. at 16. In so doing, Backpage removed postings by victim support organizations as well as law enforcement "sting advertisements" from the "Escorts" section of the website. Id. The plaintiffs also alleged that Backpage's rules governing advertising content were designed to encourage and facilitate sex trafficking, particularly where it did not require a content poster to provide

---

[7] An information content provider is "any person or entity that

is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. §230(f)(3).

identifying information and did not require phone or email verification. *Id. at 16 & n.2*. Although Backpage's filtering system prohibited advertisements containing certain words or phrases associated with sex trafficking, a content poster could bypass that ban by using an abbreviated form of the word or phrase. *Id. at 16*. The plaintiffs also claimed that Backpage charged for advertisements posted in the "Adult Entertainment" section, thus profiting from sex trafficking. **[\*11]** *Id. at 17*.

Plaintiffs argued that the *CDA* did not bar their claims because they did not seek to hold Backpage liable as a "publisher or speaker" of third-party content; rather, they sought to hold Backpage liable for designing a website that made it a participant in sex trafficking. *Id. at 20*. The court disagreed, concluding that the complained-of conduct was "part and parcel of the overall design and operation of the website," and consequently such features were editorial choices falling "within the purview of traditional publisher functions." *Id. at 21*. The court also noted that other jurisdictions had rejected similar claims attempting to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others. See *id. at 21*, citing *MySpace, Inc., 528 F.3d at 419-20* (failing to implement basic safety measures was another way of claiming website operator was liable for publishing third-party content).

In response to *Backpage.com, LLC*, Congress enacted *Public Law 115-164*, titled "Allow States and Victims to Fight Online Sex Trafficking Act of 2017" (the "2018 Amendment") to clarify that the *CDA* "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution **[\*12]** . . ." *Id*. The 2018 Amendment did not narrow the broad scope of the CDA's immunity—except in relation to sex trafficking. The court's holding in *Backpage.com, LLC* was superseded by the enactment of the 2018 Amendment, but the broad legal principles immunizing other website operators, like Armslist, remain in effect.[8]

---

[8] The Stokingers refer to various Congressional floor statements, claiming that the *CDA* should be read in light of its purpose, which is to promote decency and to prevent results like *Stratton Oakmont, Inc., 1995 N.Y.Misc. LEXIS at \*14*, which held a website operator liable for publishing defamatory third-party posts. Is not the role of this court to rewrite legislation to comport with a perceived or presumed purpose motivating its enactment. The quite legitimate question of whether websites like Armslist.com should operate in the

Here the Stokingers' challenges to Armslist.com, see *supra*, are the same as or similar to those raised in *Backpage.com, LLC*. As was the case in *Backpage.com, LLC*, the challenges relate to the design and structure of the website, which are editorial decisions, so the Stokingers' claims are precluded under the *CDA*. See *Backpage.com, LLC, 817 F.3d at 21* ("Features such as these, which reflect choices about what content can appear on the website and in what form, are editorial choices . . ."). See also *Green v. America Online (AOL), 318 F.3d 465, 471 (3rd Cir. 2003)* cert. denied, *540 U.S. 877, 124 S. Ct. 200, 157 L. Ed. 2d 140 (2003)* ("decisions relating to the monitoring, screening, and deletion of content from its network [are] actions quintessentially related to a publisher's role" and protected by *CDA*).

The Stokingers claim that Armslist could have done more to discourage or delete the offending or unlawful content or changed its policies so as to reduce the harmful content posted on its website is merely **[\*13]** another way of stating that Armslist is liable for publishing the third-party content. See *MySpace, Inc., 528 F.3d at 420-21*, cert. denied, *555 U.S. 1031, 129 S. Ct. 600, 172 L. Ed. 2d 456 (2008)* (where sexual assault victim alleged website operator failed to implement measures that would have prevented her from communicating with predator, court dismissed victim's claims because her allegations were another way of claiming website was liable for publishing the communications of another). See also *Universal Commc'n Sys., Inc., 478 F.3d at 422* (website operator's decision not to reduce misinformation by changing its website policies was "as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting"); *Green, 318 F.3d at 470* (failure properly to police its network for content transmitted by users treats website as "publisher or speaker" of that content).

The Stokingers allege that Armslist either knew or should have known that its website facilitates and encourages illegal gun trafficking. *HN4* ] It is well-established that "notice of the unlawful nature or the information provided is not enough to make it the service provider's own speech. *Universal Commc'n Sys., Inc., 478 F.3d at 420*. Immunity applies "even after notice of the potentially unlawful nature of the third-party

---

fashion they do must be addressed by Congress. If Congress did not intend to immunize firearms markets like Armslist, then it need only amend *§230* to reflect that intent as it did in response to the court's decision in *Backpage.com, LLC*.

content." *Id.*

The Stokingers suggest their claims are directed **[*14]** not to content-posters, but to Armslist's conduct and to the content that Armslist itself created.[9] While the Stokingers are correct that an interactive computer service provider remains liable for its own conduct and its own speech, see *Universal Commc'n Sys., Inc., 478 F.3d at 419*, the Stokingers' claim that Armslist created the content at issue here was reviewed and rejected in a similar case. See *Daniel v. Armslist, LLC, 2019 WI 47, 386 Wis. 2d 449, 926 N.W.2d 710 (Wis. 2019)*, cert. denied. *140 S. Ct. 562, 205 L. Ed. 2d 356 (2019)*.

*Daniel* involved a mass shooting in Wisconsin, where the shooter purchased the firearm from a private seller on Armslist.com. *Id. at 714*. Daniel, a child of one of the victims, subsequently filed suit against Armslist asserting the same claims alleged in this case—negligence, aiding and abetting tortious conduct, and public nuisance—among others. *Id. at 716*. Armslist moved to dismiss the complaint, arguing there, as here, that the *CDA* barred Daniel's claims. Daniel claimed there, as do the Stokingers here, that through the design and operation of its website, Armslist helped "develop" the content of the advertisement that led to the firearm sale; therefore, it was an "information content provider" within the meaning of *§230(f)(3)*. See *id. at 718*. Daniel also argued that her claims were not based on Armslist's publication of third-party content, but instead **[*15]** were based on Armslist's facilitation and encouragement of illegal firearm sales by third parties. *Id.* The Stokingers advance those same arguments in this case.

Initially, Wisconsin's court of Appeals agreed with Daniel, declaring that the *CDA* did not bar Daniel's claims. See *Daniel v. Armslist, LLC, 2018 WI App 32, 382 Wis. 2d 241, 913 N.W.2d 211, 217-24 (Wis. 2018)*. The Supreme Court of Wisconsin disagreed, reversing,

and holding that Armslist did not develop the content at issue (i.e., the firearm advertisement that led to the sale), and because Daniel's claims treated Armslist as the publisher of that content, her claims were barred. *Daniel v. Armslist, LLC, 926 N.W.2d at 722, 726-27*.

In reaching its conclusion, the court employed the "material contribution" test to determine whether Armslist materially contributed to the illegality of the third-party content or whether it merely published content created by someone else.[10] *Id. at 720*, citing *Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1168 (9th Cir. 2008)*. *HN6*[⬆]] Whether a website's design features employ "neutral tools" is helpful in determining whether those features materially contribute to the unlawfulness of the content. *Id. at 721*. A "neutral tool" is a feature provided by an interactive computer service provider that can be "utilized for proper or improper purposes" (citations omitted). *Id.* "A defendant who provides a neutral tool that is subsequently **[*16]** used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness," even if the interactive computer service provider knew, or should have known, that its neutral tools were being used for illegal purposes. *Id. at 721, 722*.

Although Daniel claimed that Armslist's design features made it easier for prohibited purchasers to illegally obtain firearms the court held that the complained-of design features were "neutral tools," and therefore, Armslist did not materially contribute to the development of the firearm advertisement. *Id. at 722*. The court also concluded that the other design features that Daniel claimed could have been implemented were merely "precautions" that were permissible but not required under the *CDA*.[11] *Id.* Additionally, the court was not

---

[9] The Stokingers also argue that the presumption against the preemption of state common-law claims applies in this case. See *Ajemian v. Yahoo!, Inc., 478 Mass. 169, 178, 84 N.E.3d 766 (2017)* ("In interpreting a Federal statute, we presume that Congress did not intend to intrude upon traditional areas of State regulation or State common-law unless it demonstrates a clear intent to do so"). However, this argument fails because *HN5*[⬆]] the *CDA* expressly preempts all state claims that are "inconsistent with this section." See *47 U.S.C. §230(e)(3)* ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section").

[10] "[M]aterial contribution 'does not mean merely taking action that is necessary to the display of allegedly illegal content,' such as providing a forum for third-party posts. 'Rather, it means being responsible for what makes the displayed content allegedly unlawful.' " *Daniel, 926 N.W.2d at 719*, quoting *Jones v. Dirty World Entm't Recordings, LLC, 755 F.3d 398, 410 (6th Cir. 2014)*.

[11] Congress did not want to discourage interactive computer service providers from voluntarily screening unlawful third-party content. Therefore, under *§230(c)(2)*, an interactive computer service provider is not liable for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent,

persuaded by Daniel's argument that Armslist.com made illegal firearm sales easier, stating that such an argument merely attempted to distinguish the case "from the litany of cases dismissing suits against website operators who failed to screen for unlawful content." *Id. at 723*. The court also noted that Armslist's intent did not affect immunity because the *CDA* does not contain a good faith requirement. *Id.* *[\*17]* For those reasons, the court held that Armslist was not a content provider within the meaning of *§230(f)(3)*; rather, the content at issue was provided by a third party. *Id.*[12]

Here, the Stokingers' claims concern both the same design features and the same arguments raised in *Daniel*. The court concludes that Armslist is not an information content provider, and that the Stokingers' claims are based on complaints about posted content created or developed by a third party. Armslist is thus entitled to immunity under the *CDA*, and the Stokingers' claims must be dismissed.

ORDER

For the foregoing reasons, it is hereby *ORDERED* that the defendant Armslist, LLC's motion to dismiss is ALLOWED.

Heidi E. Breiger

Justice of the Superior Court

Dated at Lowell, Massachusetts, this 13th day of March 2020.

---

**End of Document**

---

harassing, or otherwise objectionable . . ."

[12] The court also concluded that with respect to Daniel's claims (negligence, aiding and abetting, and public nuisance), that the duty Armslist allegedly violated derived from its immunized role as a publisher of third-party content. *Daniel, 926 N.W.2d at 725-26*.

No *Shepard's* Signal™
As of: June 8, 2020 10:04 PM Z

## *Thomas v. Brinks, Inc.*

United States District Court for the Eastern District of Wisconsin

January 28, 2020, Decided; January 28, 2020, Filed

Case No. 19-CV-1224-JPS

**Reporter**
2020 U.S. Dist. LEXIS 13638 *; 2020 WL 433886

JAMES THOMAS, Plaintiff, MIDDLESEX INSURANCE CO. and UNITED HEALTHCARE INSURANCE COMPANY, Involuntary Plaintiffs, v. BRINKS, INC. and BALDWIN & LYONS, INC., Defendants.

**Opinion by:** J.P. Stadtmueller

## Core Terms

negligent hiring, weigh, supervision, training, pleadings, insurer, respondeat superior theory, motion for judgment, predictability, allegations, involuntary, parties, cases

**Counsel:** [*1] For James Thomas, Plaintiff: Drew J DeVinney, LEAD ATTORNEY, Martin Law Office SC, Oak Creek, WI.

For Middlesex Insurance Co, Involuntary Plaintiff: Phillip C Theesfeld, Yost & Baill LLP, Milwaukee, WI.

For United Healthcare Insurance Company, doing business as AARP Medicare Supplement Plans, doing business as Medicare Solutions, Involuntary Plaintiff: Matthew S Mayer, Mallery & Zimmerman SC, Wausau, WI.

For Brinks Inc, Baldwin & Lyons Inc, Defendants: Shimon B Kahan, Haynes Strudnicka Kahan & Poulakidas LLC, Chicago, IL; Eugene M LaFlamme, McCoy Leavitt Laskey LLC, Riverwood Corporate Center III, Waukesha, WI.

**Judges:** J.P. Stadtmueller, United States District Judge.

## Opinion

**ORDER**

On August 23, 2019, this case was removed to federal court pursuant to *28 U.S.C. § 1332* from Milwaukee County Circuit Court. (Docket #1). The case arises from a car accident in Illinois between Plaintiff, a Wisconsin citizen, and Jovani Garcia ("Garcia"), a non-party Illinois citizen. Plaintiff sued Brinks, Inc., ("Brinks"), the security company that employed Garcia, for negligence under a *respondeat superior* theory of liability, as well as for negligent hiring, training or supervision under Wisconsin law. Plaintiff also sued [*2] Baldwin & Lyons, Inc., ("Baldwin"), the company that insures Brinks, under a Wisconsin law allowing direct actions against insurers in negligence cases.

On December 17, 2019, Brinks and Baldwin filed separate, but similar, motions for judgment on the pleadings, which are now fully briefed. Both defendants argue that Illinois law, rather than Wisconsin law, applies to the matter at hand. Under Illinois law, Brinks cannot be sued for negligent hiring, supervising or training when it has conceded responsibility for Garcia's conduct under a theory of *respondeat superior*, as it has in this case. *Gant v. L.U. Transp., Inc., 331 Ill. App. 3d 924, 770 N.E.2d 1155, 1159, 264 Ill. Dec. 459 (Ill. Ct. App. 2002)* (holding that although negligent hiring, retention, or entrustment "may establish independent fault on the part of the employer, it should not impose additional liability on the employer" if *respondeat*

Timothy Moore

*superior* applies).[1] Similarly, under Illinois law, there is no direct action against insurers in negligence cases—rather, there must be a judgment against Brinks before Plaintiff can sue Baldwin for a recovery. *Direct Auto Ins. Co. v. Bahena, 2019 IL App (1st) 172918, 433 Ill. Dec. 249, 131 N.E.3d 1094, 1107 (Ill. Ct. App. 2019)*.

The overarching issue, then, is whether Wisconsin or Illinois law governs this action. For the reasons explained below, Illinois law **[*3]** applies. The motions for judgment on the pleadings will be granted, the claims against Baldwin will be dismissed, and Baldwin will be dismissed without prejudice from the action. Additionally, Plaintiff's claim for negligent hiring will be dismissed with prejudice. Finally, since Illinois law governs these cases, it is not clear whether the involuntary plaintiffs, who were added pursuant to *Wis. Stat. § 803.03*, should remain in the case. Within twenty-one days of the date of this order, Plaintiff is instructed to file a document with the Court that either explains the basis for including the involuntary plaintiffs under an Illinois corollary to *Wis. Stat. § 803.03*, or dismisses the involuntary plaintiffs and their crossclaims.[2]

─────────────────────

[1] The tort of negligent hiring or supervision allows an employer to be held liable for "injuries proximately caused by the employee's incompetence or unfitness. . .[but] is not dependent upon a finding that the employee acted within the scope of his or her employment." **Sherrill v. Smart, 181 Wis. 2d 366, 514 N.W.2d 422, 1993 WL 535121, at *3 (Wis. Ct. App. 1993)**. Unlike *respondeat superior*, which holds an employer vicariously liable for the torts of its employees conducted within the scope of employment, negligent hiring or supervision holds employers directly liable for the actions of its employees—regardless of whether the employee's actions were conducted within the scope of employment or were technically negligent—provided that (1) the employee's act caused the plaintiff's injury and (2) the employer caused the employee's wrongful act. *Miller v. Wal-Mart Stores, Inc., 219 Wis. 2d 250, 580 N.W.2d 233, 238-39 (Wis. 1998)*. Because negligent hiring is "predicated on. . .[and] entirely derivative of, the negligence of the employee, [and] cannot exceed the liability of the employee," Illinois courts have found that if *respondeat superior* applies, then a negligent hiring claim is duplicative. *Gant, 770 N.E.2d at 1159*. Wisconsin courts do not have this rule. The Court notes, however, both *respondeat superior* and negligent hiring seek to remedy the same harm, i.e., the plaintiff's injury caused by the employee's conduct. This harm does not grow or shrink depending on the number of theories of liability upon which a plaintiff prevails.

[2] Please note that the document filed under the title "Answer to Complaint AND COUNTERCLAIM against Baldwin & Lyons

## 1. LEGAL STANDARD

*Federal Rule of Civil Procedure Rule 12(c)* permits a party to move for judgment after the complaint and answer have been filed by the parties. *Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)*. A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim under *Rule 12(b)(6)*. *Adams v. City of Indianapolis, 742 F.3d 720, 727-28 (7th Cir. 2014)*. To survive a challenge under *Rule 12(c)* or *12(b)(6)*, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon **[*4]** which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chi., 810 F.3d 476, 480 (7th Cir. 2016)* (citation omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id. at 480-81*.

## 2. RELEVANT ALLEGATIONS

The allegations in this complaint are relatively straightforward. Plaintiff alleges that he was driving on Route 83 near Vernon Township, Illinois. As he approached the intersection with Route 53, the rear of Plaintiff's car was struck from behind by a pickup truck driven by Garcia, a Brinks employee. Plaintiff alleges that Garcia's negligence caused the accident.

## 3. ANALYSIS

The parties agree that this Court should apply Wisconsin's choice-of-law rules to determine the law governing this case, because a court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *See Assembly Component Sys. v. Platinum Equity, L.L.C., No. 09-CV-778, 2010 U.S. Dist. LEXIS 67228, 2010 WL 2719978, at *6 (E.D. Wis. July 7,*

─────────────────────

Inc. and Brinks Inc. filed by Middlesex Insurance Co., ANSWER to Complaint AND CROSSCLAIM against Baldwin & Lyons Inc. and Brinks Inc. filed by Middlesex Insurance Co.,"(Docket #9), is not the correct document.

*2010)*. In tort cases, courts begin with the presumption that the law of the forum applies unless nonforum contacts are of greater significance. *Glaeske v. Shaw, 2003 WI App 71, 261 Wis. 2d 549, 661 N.W.2d 420, 427 (Wis. Ct. App. 2003)*. If neither potential forum has clearly more significant contacts, the Court [*5] moves on to analyze five "choice influencing factors," including predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *Id.*

On first impression, the non-forum contacts do appear to be of greater significance to the facts underlying this action. The accident giving rise to this lawsuit occurred in Illinois, while Plaintiff was driving through Illinois, and involved a Brinks employee from Illinois, who was driving an Illinois truck. It is true that Plaintiff is a Wisconsin citizen and the action was filed in Wisconsin, but these are the only facts supporting application of Wisconsin law in this case. In cases involving automobile accidents between citizens of different states, it is sensible to apply the law of the state where the accident occurred, particularly if there is some other connection to that state than merely the accident. *See Conklin v. Horner, 38 Wis. 2d 468, 157 N.W.2d 579, 582 (Wis. 1968)* (applying Wisconsin law when the accident occurred in Wisconsin and the lawsuit was filed in Wisconsin).

Applying Wisconsin's choice-of-law tort factor test confirms this initial impression. "The first [*6] factor, predictability of results, deals with the parties' expectations." *State Farm Mut. Auto. Ins. Co. v. Gillette, 2002 WI 31, 251 Wis. 2d 561, 641 N.W.2d 662, 676 (Wis. 2002)*. Generally, predictability "has little or no relevancy to an automobile accident or other tort that was never intended or planned." *Heath v. Zellmer, 35 Wis. 2d 578, 151 N.W.2d 664, 672 (Wis. 1967)*. However, in assessing this low-weight factor in the context of automobile accidents, Wisconsin courts have noted that it may be "reasonable to assume that a Wisconsin resident who drives in [another state], and then is involved in a collision involving [another state's resident]. . .would have tort damages computed under [that state's] law." *State Farm, 641 N.W.2d at 686* (Wilcox, J., concurring in part and dissenting in part). Thus, although this factor weighs lightly in the analysis, it bears consideration. Here, on the facts of this case, the Court finds that it is more predictable that defendants would be subject to Illinois laws rather than Wisconsin laws. Not only did the tort occur in Illinois, but it was allegedly caused by an Illinois citizen with whom

the defendants contracted to carry out business in Illinois. The defendants are now being sued over the Illinois citizen's conduct in the course of that business. The Court therefore agrees with the defendants that application of Illinois law to the [*7] parties and facts of this case is slightly more predictable than application of Wisconsin law. This case is not about an insurance policy that was issued in Wisconsin, as was the case in *State Farm*. Nor is this a situation in which the car accident occurred in Illinois, but no other facts tether the parties to Illinois. Rather, in this case, the victim is a Wisconsin citizen, but the facts of the case arose in Illinois, and the defendants, who are not citizens of Wisconsin, are being held responsible for an Illinois citizen's actions, which occurred while he was carrying out their business in Illinois. This factor weighs in favor of Illinois law.

The second factor, "maintenance of interstate and international order, requires that the jurisdiction that is minimally concerned defer to the jurisdiction. . .that is substantially concerned." *Id. at 676*. Here, both Wisconsin and Illinois are equally concerned with this action: Wisconsin has an interest in rectifying the harms visited upon its citizens, and Illinois has an interest in deterring negligence on its interstates. Although none of the parties are citizens of Illinois, the defendants do business in Illinois and employ Illinois citizens, including [*8] the one who allegedly caused the accident in question, which occurred in Illinois. Therefore, Illinois is not, as Plaintiff argues, simply "minimally concerned." Rather, Illinois also has an interest in ensuring that the companies that carry out business there are responsible for the actions of their employees. This factor does not clearly weigh in favor of either state's law.

The third factor, "simplification of the judicial task," seeks the state with the more "simple and easily applied rule" of law. *Id.* (citations and quotations omitted). This factor weighs in favor of Illinois law. Brinks has already conceded responsibility under a theory of *respondeat superior, see* (Docket #22 at 2) ("Once the principal has admitted its liability under a respondeat superior theory, as in this case, the cause of action for negligent hiring, training and supervision is duplicative and unnecessary.").[3] Thus, applying Illinois law would avoid a duplicative lawsuit on the issue of negligent hiring,

---

[3] Notwithstanding this confusing language, it seems that Brinks intends to litigate some aspect of the employee's alleged underlying negligence, for which it has conceded it would be liable.

training, or supervision. *Gant, 770 N.E.2d at 1159*. As to Baldwin, applying Illinois law would relieve the insurance company of litigating the case unless and until a judgment is granted in Plaintiff's favor. *Direct Auto Ins., 131 N.E.3d at 1107*. Applying Wisconsin **[*9]** law, on the other hand, would protract and inflate the litigation. This factor weighs in favor of applying Illinois law.

The fourth factor concerns the advancement of the forum's governmental interests. In cases such as automobile accidents, the question presents itself as "whether the proposed non-forum rule comports with the standards of fairness and justice that are embodied in the policies of the forum law." *Heath, 151 N.W.2d at 673*. In other words, does the law adequately serve the policies of the state, be it compensation, remediation, or deterrence? *See State Farm, 641 N.W.2d at 678*. Either Illinois or Wisconsin law would compensate Plaintiff for his harms, as he seeks redress from Brinks for the negligence of its employee. In Wisconsin, he can bring this lawsuit as two causes of action; in Illinois, it is as a single cause of action, but the liability for Garcia's faults does not increase with the number of claims brought. Put another way, Plaintiff may prevail under one or multiple theories of liability against Brinks, but the damages caused by Garcia do not change. Similarly, while Illinois may have a greater interest in applying its tort law to accidents that occur on its interstates, there is no reason why a negligence suit **[*10]** brought under Wisconsin laws would not deter any avoidable negligence on the part of an employer. On balance, this factor does not weigh in favor of either state's law.

The fifth and final factor asks which law is "better." *Id.* Courts typically consider whether a law is "anachronistic" or whether it is founded "on a rational basis and serves a discernable purpose." *Id.* It does not appear that either law is anachronistic or otherwise impracticable. Although Wisconsin law allows Plaintiff to bring a direct action against a defendant's insurer, Plaintiff will be equally able to recoup from the insurer under Illinois law if a judgment is entered in Plaintiff's favor. Moreover, although Wisconsin law allows Plaintiff an additional claim, i.e., negligent hiring, training, or supervision, it seems that Brinks has already conceded that it would be liable under a theory of respondeat superior, (Docket #22 at 2), i.e., that it would be liable for the negligence of its employee. There is no allegation or suggestion in Plaintiff's briefs that this relief would be insufficient to redress his harms. This factor, too, does not weigh in favor of either state's law.

The state of Illinois appears to have **[*11]** a stronger connection to the facts of this case than the Wisconsin forum. Moreover, taken as a whole, the factors weigh in favor of applying Illinois law to the facts at hand. Under Illinois law, the negligent hiring, training, and supervision claim is duplicative, and the claims against the insurer are anticipatory. Therefore, the Court will grant the motions for judgment on the pleadings.

## 4. CONCLUSION

For the reasons explained above, the Court finds that Illinois law applies, and the motions for judgment on the pleadings should be granted. Plaintiff's claims against Baldwin will be dismissed, and Baldwin will be dismissed without prejudice. Plaintiff's second claim will be dismissed with prejudice as duplicative of the first claim.

Accordingly,

**IT IS ORDERED** that the defendants' motions for judgment on the pleadings (Docket #19 and #21) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the second claim for negligent hiring, training, or supervision be and the same is hereby **DISMISSED with prejudice** as to all defendants;

**IT IS FURTHER ORDERED** that Plaintiff's first claim for negligence, as well as any involuntary plaintiffs' counterclaims against Baldwin & Lyons, Inc., **[*12]** be and the same are hereby **DISMISSED without prejudice** as to Baldwin & Lyons, Inc.;

**IT IS FURTHER ORDERED** that Baldwin & Lyons, Inc. be and the same is hereby **DISMISSED without prejudice** from this action; and

**IT IS FURTHER ORDERED** that, within twenty-one (21) days of the date of this order, Plaintiff submit either a document explaining the basis for the involuntary plaintiffs' continued participation in the action under Illinois state law, or a motion to dismiss them from the action.

Dated at Milwaukee, Wisconsin, this 28th day of January, 2020.

BY THE COURT:

/s/ J.P. Stadtmueller

J.P. Stadtmueller

U.S. District Judge

---

**End of Document**