# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ERIN BAUER in her individual capacity
and as administratrix of the ESTATE OF
PAUL BAUER,

       Plaintiff,

v.

ARMSLIST, LLC and JONATHAN
GIBBON,

       Defendants.

Case No. 2:20-cv-00215-PP

---

## BRIEF IN SUPPORT OF DEFENDANT ARMSLIST LLC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)

---

TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL AND PROCEDURAL BACKGROUND ................................................ 3

     A.  Congress Enacted Section 230 of the CDA in 1998 to Encourage Internet

         Speech ...................................................................................................... 3

     B.  Since 1998, State and Federal Courts have broadly agreed that Section 230

         Immunizes Websites from Claims like Plaintiff's. ................................................ 4

     C.  Despite Roughly 20 Years of Settled Law, Plaintiff Alleges Third-Party Content

         Renders Defendants Liable. ................................................................. 7

III. PLAINTIFF'S CLAIMS AGAINST ARMSLIST SHOULD BE DISMISSED ......... 8

     A.  The CDA Immunizes Interactive Computer Services Like Armslist From Liability

         For Materials Posted By Third Parties. .............................................................. 8

         1. Plaintiff's SAC treats Armslist as the publisher or speaker of information

            provided by another information content provider. ................................. 10

         2. Armslist did not create or develop content. ........................................... 13

         3. Plaintiff improperly alleges liability for conduct expressly permitted by

            47 U.S.C. § 230(s)(2). ............................................................... 17

     B.  Plaintiff's Claims Must Also Be Dismissed Because She Fails to Allege

         Sufficient Facts Establishing Duty or Negligence. .............................................. 19

IV.  CONCLUSION ................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases:**                                                                                  **Pages:**

*Barnes v. Yahoo!, Inc.*

      570 F.3d 1096 (9th Cir. 2009) ............................................................................ 12, 13, 17

*Batzel v. Smith*

      333 F.3d 1018 (9th Cir. 2003). ........................................................................................ 3

*Chi. Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craiglist, Inc.*

      519 F.3d 666 (7th Cir. 2008) ................................................. 5, 6, 12, 15, 17, 18

*Cohen v. Facebook, Inc.*

      252 F. Supp.3d 140 (E.D. N.Y. 2017) ........................................................................ 18

*Daniel v. Armslist, LLC, et al.*

      386 Wis.2d 449 (2019) ..................................................... 1, 5, 6, 12, 16, 17, 18

*Dart v. Craigslist, Inc.*

      665 F.Supp.2d 961 (N.D. Ill. 2009) .................................... 5, 6, 10, 11, 12, 14, 15, 16-17

*Dryoff v. Ultimate Software Grp., Inc.*

      934 F.3d 1093 (9th Cir. 2019) ........................................................................................ 16

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*

      521 F.3d 1157 (9th Cir. 2008) ................................................................................... 5, 13

*Force v. Facebook*

      934 F.3d 53 (2d. Cir. 2019) ................................................................................... 3, 4, 19

*FTC v. Accusearch, Inc.*

      570 F.3d 1187 (10th Cir. 2009) ...................................................................................... 5

*Gibson v. Craigslist, Inc.*

    No. 08 Civ. 7735 (RMB), 2009 U.S. Dist. LEXIS 53246

    (S.D.N.Y. June 15, 2009) ........................................................................ 6, 9, 11

*Goddard v. Google, Inc.*

    640 F. Supp.2d 1193 (N.D. Cal. 2009) ............................................... 5, 7, 9, 16

*Gregerson v. Vilana Financial, Inc.*

    2008 U.S. Dist. LEXIS 11727 (D. Minn. Feb. 15, 2008) ......................... 12, 17

*Hornback v. Archdiocese of Milwaukee*

    313 Wis.2d 294 (2008) ..................................................................................... 20

*Huon v. Denton*

    841 F.3d 733 (7th Cir. 2016) ............................................................................. 5

*J.S. v. Vill. Voice Media Holdings, LLC*

    359 P.3d 714 (Wash. 2015) ............................................................................... 5

*Jane Doe No. 1 v. Backpage.com, LLC*

    817 F.3d 12 (1st Cir. 2016) .............................................................................. 13

*Jankee v. Clark County*

    235 Wis. 2d 700 (2000) ................................................................................... 20

*Jones v. Dirty World Entm't Recordings LLC*

    755 F.3d 398 (6th Cir. 2014) ................................................................... 4, 5, 16

*Kimzey v. Yelp! Inc.*

    836 F.3d 1263 (9th Cir. 2016) ......................................................................... 16

*Klayman v. Zuckerberg*

    753 F.3d 1354 (D.C. Cir. 2014) ......................................................................... 9

*Lemmon v. Snap, Inc.*

    2020 U.S. Dist. LEXIS 34671 (C.D. Cal. Feb. 25, 2020) ................................................ 16

*MA. v. Vill. Voice Media Holdings, LLC*

    809 F.Supp.2d 1041 (E.D. Mo. 2011) ............................................................ 6, 7, 12, 17

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*

    591 F.3d 250 (4th Cir. 2009) ........................................................................ 10

*Nieman v. Versuslaw, Inc.*

    2012 U.S. Dist. LEXIS 109066 (C.D. Ill. June 13, 2012), *report and recommendation*

    *adopted,* 2012 U.S. Dist. LEXIS 109069 (C.D. Ill. Aug. 3, 2012) .................................. 9

*Stayart v. Yahoo! Inc.*

    651 F. Supp. 2d 873 (E.D. Wis. 2009) ...................................................................... 8, 10

*Stokinger, et al. v. Armslist, LLC, et al.*

    2020 Mass. Super. LEXIS 69 (Mar. 13, 2020) ...................................................... 1, 6, 12, 17

*Thomas v. Brinks*

    2020 U.S. Dist. LEXIS 13638 (Jan. 28, 2020) ................................................................ 19

*U.S. v. Lacey*

    2020 U.S. Dist. LEXIS 2645 (D. Ariz. Jan. 8, 2020) ...................................................... 5

*Universal Communication Systems, Inc. v. Lycos, Inc.*

    478 F.3d 413 (1st Cir. 2007) .......................................................................... 7, 9, 12, 17

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*

    987 F.2d 429 (7th Cir. 1993) ..................................................................................... 15-16

*Vesely v. Armslist, LLC*

    752 F.3d 658 (7th Cir. 2014) .......................................................................... 20

*Zeran v. Am. Online, Inc.*

129 F.3d 327 (4th Cir. 1997) ........................................................... 3, 8

**Rules:**

Communications Decency Act, 47 U.S.C.  230(c)(1) .............................................. 1, 3

Communications Decency Act, 47 U.S.C.  230(c)(2) .............................................. 17-18

Communications Decency Act, 47 U.S.C.  230(f)(3) .............................................. 4

Communications Decency Act, 47 U.S.C.  230(b) .............................................. 9

Defendant Armslist, LLC moves to dismiss Plaintiff Erin Bauer's Second Amended Complaint ("SAC") under Fed. R. Civ. P. 12(b)(6) because the Communications Decency Act ("CDA") requires dismissal and, in the alternative, Plaintiff's claims fail under any applicable state law.

## I.     INTRODUCTION

Plaintiff claims Mr. Gibbon and Armslist, LLC—which operates Armslist.com, a bulletin board service that allows users to post ads regarding firearms and sporting equipment—are responsible for the shooting death of Plaintiff's husband, Chicago Police Department Commander Paul Bauer.  Plaintiff does not claim either Defendant participated directly in Commander Bauer's shooting.  Instead, Plaintiff claims Defendants enticed users of Armslist.com seeking "private seller" transactions, which do not necessarily require background checks under federal firearm transfer laws, to use the website.  The SAC is full of allegations that Defendants were reckless, negligent, or intentional in designing and operating the website to court users seeking to avoid background check requirements.  SAC, ¶¶ 1, 12, 19, 147, 183, 186.

Courts have repeatedly held claims like Plaintiff's must be dismissed—indeed, multiple courts have ruled as such specifically regarding Armslist[1].  Settled law requires dismissal under Section 230 of the CDA, which states "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C.  230(c)(1). The Supreme Court of the United States has indirectly weighed on the issue by denying certiorari from a plaintiff in the *Daniel v. Armslist, LLC, et al.*

---

[1] *Daniel v. Armslist, LLC, et al.*, 386 Wis.2d 449, 484 (2019) *cert denied* 140 S.Ct. 562 (2019); *Stokinger, et al. v. Armslist, LLC, et al.*, Superior Court of Suffolk, Massachusetts, No. 1884CV03236-F, *5 (Mar. 13, 2020) (dismissing claim under § 230 that "Armslist.com's design and operational features facilitate illegal firearms sales and encourage illegal firearms trafficking because Armslist.com makes it easy for prospective buyers to local private sellers by using a filter feature…").

case bringing virtually identical claims against Armslist[2] as those alleged here. There, the Wisconsin Supreme Court held the CDA barred wrongful death claims against Armslist because "all of [plaintiff's] claims for relief require Armslist to be treated as the publisher or speaker of information posted by third parties on armslist.com." 386 Wis.2d at 484.

The Court should reach the same conclusion both under the CDA and under governing state law. Plaintiff's theory is not that Armslist or Mr. Gibbon pulled the trigger. Nor is her theory that Defendant sold the gun that caused Commander Bauer's death. Indeed, it cannot be because, as the SAC concedes, Armslist does not take part in any transactions arranged by persons using the Armslist.com website. Plaintiff's theory isn't even that a person who used Armslist.com to buy a gun shot Plaintiff's husband. No—Plaintiff claims two *non*-parties to the lawsuit transferred a gun in 2017 that had been advertised on Armslist.com. The purchaser then allegedly sold the gun into the "broader criminal market" near Chicago, Illinois, where sometime later in February 2018 a man named Shomari Legghette (not a party) bought the gun and tragically killed Commander Bauer.

Plaintiff's theory of liability inherently relies on claims barred by the CDA because Plaintiff relies on conduct by users of Armslist.com to assign liability to Defendants; to the extent Plaintiff attempts to plead around Section 230, she claims Defendants helped website users conduct illicit transactions through website design and content. In support, Plaintiff misleadingly alleges that Armslist.com hosts "stores" created by users unlicensed to sell firearms. But the "stores" nomenclature exists only in the SAC. *Id.* at ¶¶ 6-8, 16, 53-55, 58, 63, 65, 74, 154(a), 204, 210. ***Armslist.com does not contain any such feature.*** Nor has either Defendant developed any such feature for Armslist. Indeed, Plaintiff attempts to skirt the

---

[2] Plaintiff in the *Daniel* case was represented by many of the same counsel representing Plaintiff.

boundary of bad faith by never directly alleging Armslist.com hosts such "stores"—every instance of that allegation appears in scare quotes. If such a feature actually existed, rest assured it would appear as a direct allegation in the SAC with a screenshot, as Plaintiff has alleged other putatively offensive website features[3].

But when stripped of conclusory legal assertions and misdirection, the features Plaintiff claims as "content" are nothing more than neutral features courts have repeatedly held do not abrogate Section 230 protections. The Court can and should dismiss with prejudice for this reason alone. However, if the Court does not, Plaintiff's SAC must still be dismissed with prejudice under governing state law.

## II.   FACTUAL AND PROCEDURAL BACKGROUND.

### A.   Congress Enacted Section 230 Of The CDA In 1998 To Encourage Internet Speech.

"Section 230 was enacted, in part, to maintain the robust nature of internet communication, and accordingly, to keep government interference in the medium to a minimum." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003). "Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *see also Force v. Facebook*, 934 F.3d 53, 63 (2d. Cir. 2019). To facilitate Congress' goals, Section 230(c) provides protections for "interactive service providers" by, *inter alia*, stating "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Interactive computer service" means "any information service, system, or access software provider that providers or enables computer access by multiple users to a computer server…" *Id.*

---

[3] As such, the Court need not look beyond the four corners of the pleading to ascertain that Plaintiff's allegation regarding the existence of "stores" to be misleading.

at § 230(f)(2). "[I]nformation content provider…means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* at § 230(f)(3). Since Section 230 was enacted, courts have broadly agreed that "interactive computer service" generally includes websites akin to Armslist.com, and "information content provider" generally includes users who post content on such websites.

**B.     Since 1998, State And Federal Courts Have Broadly Agreed That Section 230 Immunizes Websites From Claims Like Plaintiff's.**

Following its enactment, "the Circuits [have come to] general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity." *Force*, 934 F.3d at 64. While immunity under Section 230 may be compromised if an interactive computer service develops content giving rise to a claim, the level of "development" required is significant. *Id.* ("Plaintiffs' suggestion that publishers must have no role in organizing or distributing third-party content in order to avoid 'develop[ing]' that content is both ungrounded in the text of Section 230 and contrary to its purpose"); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 409 ("An overly inclusive interpretation of 'development' in § 230(f)(3) would posit that a website operator is responsible for the development of content created by a third party merely by displaying or allowing access to it" and "[o]ur recognition that the CDA affords immunity forecloses this overbroad reading of 'development'").

For "development" to abrogate Section 230 immunity, the interactive computer service must make a "material contribution" to the alleged unlawful conduct—*i.e.*, a website has no immunity under Section 230 "if it contributes materially to the alleged illegality of the conduct." *Id.* at 410 (citing *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d

1157, 1167-68 (9th Cir. 2008)).  A website's "neutral tools" that are not themselves illegal, but which a user may use unlawfully or illicitly, does not constitute "development" for purposes of breaching Section 230 immunity.  *See, e.g., Daniel v. Armslist, LLC, et al.*, 386 Wis.2d 449, 484 473 (2019) ("A 'neutral tool' in the CDA context is a feature provided by an interactive service provider that can 'be utilized for proper or improper purposes'") (citing *Roommates.com, LLC,* 521 F.3d at 1172 and *Goddard v. Google, Inc.,* 640 F. Supp.2d 1193, 1197-98 (N.D. Cal. 2009); *see also Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 411 (6th Cir. 2014) ("…providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception" of Section 230) (emph. original).  For example, passively allowing content written by a website user does not constitute development.  *E.g.*, *Chi. Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F.3d 666, 671-72 (7th Cir. 2008).  Likewise, creating an 'erotic services' section with 21 categories of sexual preference failed to confer liability on Craigslist for claims that prostitution was a foreseeable result. *Dart v. Craigslist, Inc*., 665 F.Supp.2d 961, 967-68 (N.D. Ill. 2009) ; *see also*; *Chi. Lawyers' Comm.,* 519 F.3d at 671-72 (dismissing discrimination claim against Craiglist based on third party postings, stating "given § 230(c)(l) [plaintiff] cannot sue the messenger just because the message reveals a third party's plans to engage in unlawful discrimination")[4].

---

[4] Courts that failed to apply Section 230 immunity analyzed claims under more permissive state court pleading standards, dealt with clear content development by an interactive computer service, criminal prosecutions, or other factors taking the alleged misconduct out of 230's ambit.  *E.g.*, *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016) ("A company can…be liable for creating and posting, inducing another to post, or otherwise actively participating in the posting of a defamatory statement…" where among other things defendant's employees allegedly authored defamatory comments); *U.S. v. Lacey*, 2020 U.S. Dist. LEXIS 2645, *20-21 (D. Ariz. Jan. 8, 2020) (rejection criminal defendants' Section 230 defense); *J.S. v. Vill. Voice Media Holdings, LLC*, 359 P.3d 714 (Wash. 2015) (declining to dismiss under Section 230 under Washington state's pleading standard); *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (holding Accusearch was information content provider without Section 230 protections because it paid researchers to acquire confidential telephone records protected by the Telecommunications Act).

Courts applying the CDA statute consistently hold that claims like Plaintiff's fail as a matter of law. *E.g., Daniel*, 386 Wis.2d at 484 (affirming dismissal under § 230 of the CDA because it "prohibit[s] claims that treat Armslist, an interactive computer service provider, as the publisher or speaker of information posted by a third party on its website); *Stokinger, et al. v. Armslist, LLC, et al.*, 2020 Mass. Super. LEXIS 69, *5 (Mar. 13, 2020) (dismissing claim under § 230 that "Armslist.com's design and operational features facilitate illegal firearms sales and encourage illegal firearms trafficking because Armslist.com makes it easy for prospective buyers to local private sellers by using a filter feature…"); *see also Gibson v. Craigslist, Inc.,* 2009 U.S. Dist. LEXIS 53246, *10-12 (S.D.N.Y. June 15, 2009) (CDA barred tort claims of the estate of murder victim where firearm was advertised on Craigslist and purchased in a subsequent private transaction); *Dart,* 665 F.Supp.2d at 967-68 (CDA barred tort claims against Craigslist relating to prostitution facilitated by Craigslist's "Adult Services" section because such claims "treat the defendant as the publisher of' prostitution-related postings); *MA. v. Vill. Voice Media Holdings, LLC,* 809 F.Supp.2d 1041, 1049-52 (E.D. Mo. 2011) (CDA barred claims against owner of website relating to child sex trafficking postings on website created by third-party, noting "however horrific the consequences to [sex trafficking victim] of [third party's] posted ads were, the ads were created by [third party]"); *Chi. Lawyers' Comm.,* 519 F.3d at 671-72.

Courts have likewise held, repeatedly, that an interactive computer service's alleged bad faith or knowledge of illegal conduct by does not breach Section 230 immunity. *E.g., Daniel*, 386 Wis.2d at 475 (rejecting argument Armslist intended to facilitate illegal gun sales) (citing, among others, *Chi. Lawyers' Comm.*, 519 F.3d at 670). Public policy favoring free operation of electronic bulletin boards is so strong that "even if a service provider knows that third parties are posting illegal content, the service provider's failure to intervene is immunized." *Vill. Voice*, 809

F.Supp.2d at 1049-52; *see also Universal Communication Systems, Inc. v. Lycos, Inc*., 478 F.3d 413, 420 (1st Cir. 2007) ("[i]t is... well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech"). Further, "the fact that a website elicits online content for profit is immaterial" to determining a bulletin board's liability. *Goddard*, 2008 WL 5245490 at *10; *see also Vill. Voice*, 809 F.Supp.2d at 1051.

**C.      Despite Roughly 20 Years Of Settled Law, Plaintiff Alleges Third-Party Content Renders Defendants Liable.**

Though Plaintiff does not address Section 230 expressly in the SAC, she plainly attempts to plead around it.  For example, she alleges "the Armslist Defendants produced content such as computer code, website features and statements of policy which assisted and encouraged illegal firearms transactions."  SAC, ¶ 21.  Plaintiff also alleges Armslist "materially contributed to the illegal firearms transactions" and "acted collaboratively with [Armslist.com's] unlawful users to make them co-authors…"  *Id.*  Of course, every website includes "content such as computer code, website feature and statements of policy," and the claim that creating such routine website equals "produc[ing] content" to abrogate Section 230 immunity has no legal support.  Plaintiff fails to allege specific facts showing Armslist "materially contributed" to any firearm transaction or "acted collaboratively" with any user, lawful or otherwise—instead making conclusory allegations that it has done so.  Instead, Plaintiff's theory appears to be Armslist.com is liable to her because it allegedly defaults to "private seller" tag when users create "for sale" or "want to buy" postings and do not have an established account. *Id.* at ¶ 57(c)-(k).  And because "private sellers" are exempt in some instances from the background check and record-keeping requirements, Plaintiff seems to allege that by allegedly defaulting to a "private seller" tag, Armslist has signaled to criminals to use its website.  *E.g. id.* at ¶¶ 47-50.

But private seller transactions are **not** inherently unlawful. Facilitating private seller transactions, even if it were a goal of Defendants, cannot support Plaintiff's claims.[5]

### III. PLAINTIFF'S CLAIMS AGAINST ARMSLIST SHOULD BE DISMISSED.

**A. The CDA Immunizes Interactive Computer Services Like Armslist From Liability For Materials Posted By Third Parties.**

Armslist.com, like many internet businesses, enjoys broad immunity for content posted by its users. The immunity results from specific policy decisions made by Congress. Specifically, the CDA "represents a legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material… created by others." *Stayart v. Yahoo! Inc.,* 651 F. Supp. 2d 873, 884 (E.D. Wis. 2009) (quotations omitted). As this Court explained in *Stayart:*

> Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer services providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Id.* (quoting *Zeran,* 129 F.3d at 331). The policy concerns behind the CDA were similarly explained by the Seventh Circuit in *Chicago Lawyers:*

> [S]creening, [of web postings] though lawful, is hard... An online service could hire a staff to vet the postings, but that would be expensive and may well be futile: if postings had to be reviewed before being put online, long delay could make the service much less useful, and if the vetting came only after the material was online the buyers and sellers might already have made their deals. Every month more than 30 million notices are posted to the Craigslist system. Fewer than 30 people, all based in California, operate

---

[5] Defendants dispute the accuracy and method of the studies cited by Plaintiff in the SAC. Defendants also reject the notion that a significant number of posts on Armslist.com culminate in illegal firearm transfers.

the system, which offers classifieds and forums for 450 cities. It would be necessary to increase that staff (and the expense that users must bear) substantially to conduct the sort of editorial review that the [plaintiff] demands-and even then errors would be frequent.

519 F.3d at 668-69[6]; *see also,* 47 U.S.C. § 230(b).

Given Congressional policy to protect websites and internet bulletin boards, under the CDA "the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content." *Goddard,* 2008 WL 5245490 at *10-11. If it does not, the website cannot be liable. *Id.*

"The [CDA] mandates dismissal [of the SAC] if (i) [the Defendant] is a 'provider or user of an interactive computer service,' (ii) the information for which [Plaintiff] seeks to hold [Defendant] liable was 'information provided by another information content provider,' and (iii) the complaint seeks to hold [Defendant] liable as the 'publisher or speaker' of that information." *Klayman v. Zuckerberg,* 753 F.3d 1354, 1357 (D.C. Cir. 2014) (dismissing assault claim against Facebook). Knowledge that others use a website for illegal or tortious purposes does not affect Section 230 immunity. *Lycos, Inc*., 478 F.3d at 420.

The Court may dismiss pursuant to 47 U.S.C. § 230 under Rule 12(b)(6). *Gibson*, 2009 U.S. Dist. LEXIS 53246, *3, n.1; *Nieman v. Versuslaw*, Inc., 2012 U.S. Dist. LEXIS 109066, *4-6 (C.D. Ill. June 13, 2012) *report and recommendation adopted* 2012 U.S. Dist. LEXIS (C.D. Ill. Aug. 3, 2012); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 253 (4th Cir. 2009).

---

6 This rationale applies with equal force to Armslist. As with Craigslist, "if postings [on Armslist.com] had to be reviewed before being put online, long delay could make the service much less useful, and if the vetting came only after the material was online the buyers and sellers might already have made their deals." Further "[i]t would be necessary to increase [Armslist's] staff (and the expense that users must bear) substantially to conduct the sort of editorial review that the [plaintiff] demands-and even then errors would be frequent." Preventing such a chilling effect on internet speech is why the CDA exists.

1. **Plaintiffs' SAC treats Armslist as the publisher or speaker of information provided by another information content provider.[7]**

Deprived of hyperbole and legal conclusions, Plaintiff's theory against Defendants begins chronologically with a post on Armslist.com by Caldwell to advertise a firearm for sale. SAC, ¶¶ 13-16. Absent Caldwell's post, there would be no connection between Commander Bauer's death and Defendants. *Id.* ¶¶ 133-36, 140-42. Plaintiff does not, and cannot, allege Armslist had any input into the original content of Caldwell's post other than the assertion that an alleged default "private party" tag constitutes authoring content. *Id.* ¶¶ 13, 57(f). Plaintiff also does not claim Armslist was (or could have been) aware Jones purchased the gun from Caldwell in response to the advertisement. *Id.* at ¶ 15. Indeed, Plaintiff alleges Caldwell and Jones communicated via telephone to discuss firearm sales without involving Armslist at all. *Id.* at ¶ 125. Plaintiff instead claims Defendants should have been generally aware that "prohibited purchasers"—those barred from purchasing firearms—were drawn to user posts ceated on the website and, presumably, Defendants allegedly were put on notice of the specific post alleged in the SAC. *Id.*, at ¶¶ 153, 159.

The CDA bars precisely such theories. For example, in *Dart,* the Northern District of Illinois—applying Seventh Circuit precedent—dismissed a nuisance claim against Craiglist under the CDA. 665 F. Supp.2d at 967- 68. The *Dart* plaintiff alleged "[i]t was foreseeable to Defendant that prostitution would be a likely result where it created a section named 'erotic services' and designated twenty-one categories based on sexual preference." *Id.* at 967. That is

---

7. The SAC alleges Armslist is a provider of an interactive computer service within the meaning of the CDA. *See, e.g.,* SAC at ¶¶ 2, 8, 11, 16; 47 U.S.C. § 230(f)(2) (CDA) (an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server"); *Stayart,* 651 F. Supp. 2d at 1357-58 ("Consistent with the Congressional policy in favor of the expansive application of CDA immunity, the definition of interactive computer service is construed broadly"). It is equally apparent from the Complaint that Caldwell, not Armslist or its owners, created the post on the website. SAC, ¶ 13.

virtually identical to what Plaintiffs are alleging here (though in the firearms context): "[t]he Armslist Defendants knew, or should have known, that their irresponsible design policy, and content choices[8] would create and supply a criminal market in firearms…the Armslist Defendants have come to know with certainty that their website repeatedly and continuously arms criminals and causes deaths and injuries to members of the public." SAC, ¶ 9.

A plaintiff cannot avoid application of the CDA by artful pleading. For example, the *Dart* court noted the complaint "carefully avoids using the word 'publish,'" but allegations like the preceding should "be construed to allege 'negligent publishing.'" 665 F. Supp.2d at 967. The court then held "[a] claim against an online service provider for negligently publishing harmful information created by its users treats the defendant as the 'publisher' of that information" and so is barred by the CDA. *Id.* at 967-68. The same result should follow here.

For example, in *Gibson v. Craigslist, Inc.*, the Southern District of New York applied this same reasoning to dismiss a claim against Craigslist for publishing an advertisement selling a handgun used to shoot the plaintiff—the precise claim here. 2009 U.S. Dist. LEXIS 53246, *10-11. The *Gibson* court explained "[i]t is clear that Plaintiff's claims are directed toward Craigslist as a 'publisher' of third-party content and Section 230 specifically proscribes liability in such circumstances." *Id.* at *12 (quotations omitted).

To the extent Plaintiff contends she is trying to hold Armslist liable for its website design rather than for the content of Caldwell's post, that is a distinction without a difference. The alleged "design flaw" in Armslist.com is that "prohibited purchasers,"

---

[8] As noted below, Plaintiff's allegations that Armslist develops content is faulty as a matter of controlling law.

including Legghette, allegedly viewed postings by private sellers despite allegedly being barred from purchasing firearms. *See, e.g.,* SAC, ¶ 16. If this exception to the CDA existed, it would swallow the rule. Every CDA case can be reframed this way. For example, in *Dart,* the plaintiffs could have argued that Craigslist should have censored the prostitution postings completely, since prostitution is illegal, and everyone is a prohibited purchaser. Craiglist was not liable. Nor is Armslist.

Settled law supports this conclusion. *See, e.g., Daniel*, 386 Wis.2d at 484 (affirming dismissal under § 230 of the CDA because it "prohibit[s] claims that treat Armslist, an interactive computer service provider, as the publisher or speaker of information posted by a third party on its website); *Stokinger, et al.*, 2020 Mass. Super. LEXIS at *5; *Vill. Voice*, 809 F.Supp.2d at 1049-52; *Chi. Lawyers' Comm.*, 519 F.3d at 671-72; *Lycos, Inc.*, 478 F.3d at 421-22; *Barnes v. Yahoo!,* 570 F.3d 1096, 1102-03 (9th Cir. 2009) (dismissing negligent undertaking claim based on failure to remove explicit content because "removing content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party of the content it failed to remove"); *Gregerson v. Vilana Financial, Inc.,* 2008 U.S. Dist. LEXIS at *23-25 (D. Minn. Feb. 15, 2008) (claims for deceptive trade practices, interference with contractual and business relationships, and invasion of privacy by appropriation were barred by CDA to the extent based on content posted by users).

In sum, "what matters is not the name of the cause of action-defamation versus negligence versus intentional infliction of emotional distress-what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another... If it does, section 230(c)(l) precludes liability."

*Barnes*, 570 F.3d at 1101-02 (9th Cir. 2009); *See also Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016) ("Whatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content"). That is the case here. Plaintiffs' claims should be dismissed.

### 2. Armslist did not create or develop content.

Plaintiff attempts to skirt the CDA be alleging Defendants developed content on Armslist.com giving rise to her claims here. *E.g.*, SAC, ¶¶ 20-21, 51-57. Plaintiff's theory hinges on Defendants' putative awareness that "prohibited purchasers" would be attracted to posts tagged "private party" because of the alleged likelihood transactions arising from such posts would not require a background check. *Id.* at ¶¶ 16-32-33. Plaintiff also alleges "private party" is a tag applied by default to posts made on the website. *Id.* at ¶ 57(f). Finally, Plaintiff repeatedly refers to "stores"—the SAC's allegations include scare quotes—to suggest Armslist.com includes such "stores" as a feature. It does not, and such "stores" are solely a figment of the SAC. *E.g.*, SAC, ¶¶ 5-6[9].

Plaintiff's allegations appear intended to invoke the Ninth Circuit's holding in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC,* 521 F.3d 1157 (9th Cir. 2008). In *Roomates.com,* the Ninth Circuit held the CDA did not bar a discrimination claim against a website helping users find roommates where the website asked users to provide information about themselves (*e.g.,* race, family status, sexual orientation) that was illegal to consider in deciding whether to rent to or live with someone else. The Court explained:

> [T]he part of the profile that is alleged to offend the Fair Housing

---

[9] Plaintiff's attempt to mislead the Court regarding the existence of a "stores" feature seems designed to mislead the Court into rejecting Section 230 immunity.

Act and state housing discrimination laws-the information about sex, family status and sexual orientation-is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services. By requiring subscribers to provide the information as a condition of accessing its service, and ***by providing a limited set of prepopulated answers,*** Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information. And section 230 provides immunity only if the interactive computer service does not "creat[e] or develop[]" the information "in whole or in part."

*Id*. at 1166 (emph. added). The *Roommates.com* holding relied on the website soliciting information that could only be used for unlawful purposes, so that asking the questions themselves was illegal. *Id*. ("The [Fair Housing Act] makes it unlawful to ask certain discriminatory questions for a very good reason: Unlawful questions solicit (a.k.a. "develop") unlawful answers"). The court also stressed that it was ***always*** illegal to ask for the information Roommates.com was seeking, whether online or in person. *Id*. at 1164 ("[A] real estate broker may not inquire as to the race of a prospective buyer, and an employer may not inquire as to the religion of a prospective employee. If such questions are unlawful when posed face-to-face or by telephone, they don't magically become lawful when asked electronically online").

Roommates.com does not support liability here. *Dart* helps illustrate why. There, the court rejected an argument—relying on *Roommates.com*—that hosting an "Adult Services" section on Craiglist "cause[d] or induce[d] its users to post unlawful ads." 665 F. Supp.2d at 969. The court based its holding on the fact that "[t]he phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content." *Id*. It concluded that if Craiglist "caused" the prostitution ads "it is only 'in the sense that no one could post unlawful content if Craigslist did not offer a forum.' Section 230(c)(1) would

serve little if any purpose if companies like Craigslist were found liable under state law for "causing" or "inducing" users to post unlawful content in this fashion." *Id*. at 968 (quoting *Chi. Lawyers' Comm.*, 519 F.3d at 671). The *Dart* court also noted that Craiglist "repeatedly warn[ed] users not to post" illegal content, so that "[w]hile we accept as true for the purposes of this motion plaintiffs allegation that users routinely flout Craigslist's guidelines, it is not because Craigslist has caused them to do so." 665 F. Supp.2d at 969.

Here, "private seller" status is not inherently illegal. Plaintiff appears to concede as much, however obliquely. *E.g.,* SAC, ¶ 30. Neither buying a gun from a private seller nor stating a preference for doing the same is against the law. Like Craiglist, Armslist does not solicit information from its users that can only be used unlawfully, nor does it ask questions that are illegal to ask. And like Craigslist, Armslist admonishes users to obey the law. Before viewing the website, each user is required to agree, among other things, that: (1) the user will not "use Armslist.com for any illegal purpose;" (2) the user "understand[s] that ARMSLIST DOES NOT become involved in transactions between parties and does not certify, investigate, or in any way guarantee the legal capacity of any party to transact;" and (3) if the user is "at all unsure about firearm sales or transfers, [he or she] will contact the Bureau of Alcohol, Tobacco, Firearms, and Explosive at 1-800-ATF-GUNS and visit the ATF website at http://www.atf.gov." *See* Gibbon Decl., ¶ 17, Exh. 1[10]. As with Craigslist, if Armslist.com's users ignore these terms "it is not because [Armslist] has caused them to do

---

[10] Plaintiff refers to the terms of use in her complaint, *see* SAC, ¶ 57, and inasmuch as the terms reflect document beyond the SAC upon which Plaintiff relies, it is fair game for a motion to dismiss under Rule 12(b)(6). *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim"). Specifically, Plaintiff claims the terms of use demonstrate Defendants tried o "explicitly and repeatedly assure their unlawful users they [Defendants] will exercise no oversight regarding illegal conduct" on the website. SAC, ¶¶ 57 (n)-(p). Mr. Gibbon's declaration was filed contemporaneously with his separate Motion to Dismiss.

so." *Roommates.com* does not change the general rule that websites like Craigslist and Armslist cannot be held liable for content posted to them by their users. *Roommates.com* simply clarifies a website can be liable for content the website generates that is illegal. Because that is not what happened here, the CDA bars Plaintiffs' claims against Defendants.

Further, the "private seller" tag on which Plaintiff hinges her claims is precisely the sort of "neutral tool" that cannot breach Section 230 immunity. *E.g., Daniel*, 386 Wis.2d at 473 ("...the CDA immunizes interactive computer service providers form liability when...neutral tools are used for unlawful purposes...This is true even when an interactive computer service knows, or should know, that its neutral tools are being used for illegal purposes"); *see also Dryoff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099-1100 (9th Cir. 2019) ("[A] website does not become a developer of content when it provides neutral tools that a user exploits..."); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016) ("...[T]he star-rating system is best characterized as the kind of 'neutral tool[] operating on 'voluntary inputs' that we determined did not amount to content development or creation..."); *Jones*, 755 F.3d at 411 (6th Cir. 2014); *Lemmon v. Snap, Inc.*, 2020 U.S. Dist. LEXIS 34671, *13-14 (C.D. Cal. Feb. 25, 2020) (court need not accept allegation that neutral tool constitutes "content"); *Goddard*, 2008 U.S. Dist. LEXIS at *9 ("[P]roviding third parties with neutral tools to create web content is considered to be squarely within the protections of § 230"); *Dart*, 665 F. Supp.2d at 969 ("The word-search function is a 'neutral tool'...it does not cause or induce anyone to create, post, or search for illegal content"); *Cf. also Chi. Lawyers' Comm.*, 519 F.3d at 671-72 (dismissing discrimination claim against Craiglist based on third party postings, stating "given § 230(c)(l) [plaintiff] cannot sue the messenger just because the message reveals a third party's plans to engage in unlawful

discrimination").

Plaintiff also alleges Defendants are liable for Commander Bauer's death because they were on notice Armslist.com was, allegedly, being used by "prohibited purchasers" to find "private sellers" of firearms. SAC, ¶¶ 153, 159. Putative knowledge that website users have, or are, using an otherwise neutral feature of the website cannot affect Section 230 immunity. *See, e.g., Daniel*, 386 Wis.2d at 484; *Stokinger, et al. v. Armslist, LLC, et al.*, Superior Court of Suffolk, Massachusetts, 2020 Mass. Super. LEXIS 69, *5; *Vill. Voice Media Holdings, LLC*, 809 F.Supp.2d at 1049-52; *Chicago Lawyers'*, 519 F.3d at 671-72; *Lycos, Inc.*, 478 F.3d at 421-22; *Barnes*, 570 F.3d at 1102-03; *Gregerson*, 2008 U.S. Dist. LEXIS at *23-25.

### 3. Plaintiff Improperly Alleges Liability For Conduct Expressly Permitted By 47 U.S.C. § 230(c)(2).

The portions of the CDA discussed *supra* pertain to immunity for speech by users of an "interactive computer service," like a website. However, the CDA also confers immunity for certain activities undertaken by an interactive computer service to the content from "information content providers." Specially,

> …No provider or user of an interactive computer service shall be held liable on account of—
>
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or ***otherwise objectionable***, whether or not such material is constitutionally protected; or
>
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph 1.

47 U.S.C. § 230(c)(2) (emph. added). In effect, Plaintiff alleges Defendants have developed

content, precluding Section 230 immunity, for "action[s] voluntarily taken in good faith to restrict access...material" they consider "otherwise objectionable" and actions "taken to...restrict access to material described in paragraph 1" of the Section 230(c). *See, e.g.*, SAC, ¶ 57(a)-(z). Specifically, she claims Armslist allegedly does not allow users to flag "illegal" posts (*id.* at ¶ 57(l)) and allegedly defaults to "private seller" when users do not create an account (*id.* at ¶ 57(t)) and allegedly permits searches by "private seller." *Id.* at ¶ 57(a). Plaintiff also selectively refers to Armslist.com's terms of use and FAQ page to allege Armslist "chose to provide...assurances to give unlawful users even more confidence that they will face minimal risk of identification..." *Id.* at ¶ 57(n)-(s). Plaintiff's allegations mischaracterize Armslist's terms of use and also demonstrate a fundamental misunderstanding of the governing law—the CDA. *Cf.* Gibbon Decl., Exh. A. Congress created Section 230(c)(2)—"Protection for 'Good Samaritan Block and Screening of Offensive Material"—to incentivize interactive computer services like Armslist.com to police themselves, and that is precisely the purpose of the measures, processes, and procedures Plaintiff alleges to show liability. *E.g., Daniel*, 386 Wis.2d at 475 ("lack of a 'flag' option for illegal activity, failing to require users to create an account, failure to create restrictions on who may post or view advertisements, and failing to provide sufficient legal guidance to sellers—are voluntary precautions that the CDA permits but does not require") (citing *Cohen v. Facebook, Inc.,* 252 F. Supp.3d 140, 158 (E.D. N.Y. 2017) and *Chi. Lawyers' Comm.,* 518 F.3d at 670); *see also Force*, 934 F.3d at 54 (noting legislative goal behind Section 230(c)(2) to reverse case law "that by making good-faith efforts to remove offensive material Prodigy became liable for any actionable material it did *not* remove")[11]. Plaintiff's allegations

---

[11] The Supreme Court of the United States recently denied a cert petition from the Circuit Court's ruling in *Force*. 206 L. Ed. 2d 936 (2020); https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/19-

on this score reflect a misguided attempt to generate liability for "content" that is not content for purposes of Section 230(c)(1), *i.e.*, Armslist's terms of use, FAQ, etc.—demonstrating an implicit acknowledgment she has not, and cannot, pin liability to Armslist for content developed by its users.

**B.      Plaintiff's Claims Must Also Be Dismissed Because She Fails To Allege Sufficient Facts Establishing Duty Or Negligence.**

Defendants maintain the CDA provides ample basis to dismiss the CDA with prejudice.  Indeed, there is no longer any controversy that websites like Armslist.com, and specifically Armslist.com, benefit for the immunity granted by Section 230.  But if the Court disagrees, it must still dismiss the SAC with prejudice because Plaintiff has failed to allege sufficient facts to state a claim under the controlling law of Illinois or, alternatively, Wisconsin.

As argued at length in Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) and (6), which Armslist, LLC, incorporates by reference as if fully stated herein, Wisconsin's choice of law analysis compels applying Illinois law here because Illinois has more significant contacts to the alleged tort and because Wisconsin's choice of law "significant contacts" and "influencing factors" analyses compel this result. *Thomas v. Brinks*, 2020 U.S. Dist. LEXIS 13638, *4-10 (Jan. 28, 2020) ("We decline to rule that under the general duty of ordinary care recognized in Wisconsin, an employer may be found negligent for failing to warn unforeseen third parties of a dangerous former employee"). While the firearm used to kill Commander Bauer was allegedly sold in Wisconsin, the alleged shooter, Commander Bauer, and Plaintiff each appear to be Illinois citizens or residents.  SAC, ¶¶ 16,

859.html

24, 133, 137, 140-41.  The alleged shooting happened in Chicago, too.  *Id.*at ¶¶ 140-41.

Illinois law should apply here if the CDA does not. Applying Illinois law, Seventh Circuit

Court of Appeals in *Vesely v. Armslist, LLC,* affirmed dismissal of wrongful death claims

against Armslist after an alleged user of the website used it to locate and purchase a gun,

then kill the plaintiff's sister. 752 F.3d 658, 660 (7th Cir. 2014). Plaintiff's allegations in the

present case, stripped of hyperbole and conclusory statements of legal principles, are not

legally distinct from the *Vesely* case—and the Court should dismiss with prejudice for the

same reasons[12] identified by the Court of Appeals.

But even under Wisconsin law, Plaintiff's claims fail.  She has failed to allege facts

showing a duty or negligence by any Defendant.  Under Wisconsin law, Armslist had no

duty to intervene or warn of a stranger's criminal acts (*i.e.*, those of Caldwell, Jones, and

Legghette) where no special relationship existed among Defendants, Plaintiff, Commander

Bauer, or non-parties Caldwell, Jones, and Legghette.  *E.g., Jankee v. Clark County,* 235

Wis. 2d 700, 755 (2000); *Hornback v. Archdiocese of Milwaukee*, 313 Wis.2d 294, 311

(2008).  Further, Armslist could not have plausibly foreseen the specific alleged facts

surrounding Caldwell's alleged sale of a gun to Jones, alleged but undefined intermediate

sales in Illinois, or Legghette's alleged purchase and use of the gun to shoot Commander

Bauer.  *E.g. Hornback*, 313 Wis.2d at 320.  Neither Defendant could plausibly foresee this

chain of events in the specific context of the tort alleged here, and Wisconsin public policy

factors compel dismissal for this reason, too.  *See id.* And while the SAC should be

dismissed for these fundamental defects, each Count also omits critical factual allegations

---

[12] *See Vesely*, 762 F.3d at 666 ([S]imply enabling consumers to use a legal service is far removed from encouraging
them to commit an illegal act…Armslist permitted [seller] to place an advertisement on its website and nothing
more.  It did not invite [seller] or [purchaser] to break the law").

under Wisconsin law compelling dismissal. *See* Defendants' Motion to Dismiss as to Mr. Gibbon, p. 10-25. In short, no matter which potentially applicable state law the Court applies, Plaintiff has failed to plead facts supporting here claims. The Court should dismiss with prejudice for this independent reason if it does not dismiss under the CDA.

## IV. CONCLUSION.

Plaintiff has sued Armslist, and its member Jonathan Gibbon, on the theory both are liable for the shooting death of Commander Bauer. Plaintiff claims a stranger to this case bought the gun allegedly used in the shooting after an unspecified number of strangers in Wisconsin and Illinois bought and sold the gun—without using Armslist.com—***after*** an Armslist.com user sold the gun in Wisconsin. That tenuous connection alone suffices to dismiss the SAC with prejudice under both Illinois and Wisconsin law. However, the Court can and should dismiss for a more compelling reason: Plaintiff's claims are precisely the claims barred by Section 230 of the CDA. The United States Supreme Court removed any possible doubt by denying certiorari—filed by some of the same lawyers representing Plaintiff here—from the Supreme Court of Wisconsin's ruling in *Daniel v. Armslist, LLC, et al.*

This 8th day of June, 2020.

/s/Timothy L. Moore
Timothy L. Moore, Esq.
*Admitted pro hac vice*
*Attorney for Armslist, LLC and Jonathan Gibbon*
FISHERBROYLES, LLP
811 Mason Street
San Francisco, CA 94108
T: (619) 678-1588
F: (619) 275-7479
timothy.moore@fisherbroyles.com

| |
|---|
| *Gibson v. Craigslist, Inc.*,<br>U.S. Dist. LEXIS 53246 (S.D.N.Y. June 15, 2009) |
| *Gregerson v. Vilana Financial, Inc.*,<br>2008 U.S. Dist. LEXIS 11727 (D. Minn. Feb. 15, 2008) |
| *Lemmon v. Snap, Inc.*,<br>2020 U.S. Dist. LEXIS 34671 (C.D. Cal. Feb. 25, 2020) |
| *Nieman v. Versuslaw, Inc.*,<br>2012 U.S. Dist. LEXIS 109066 (C.D. Ill. June 13, 2012)*, report and recommendation adopted,* 2012 U.S. Dist. LEXIS 109069 (C.D. Ill. Aug. 3, 2012) |
| *Stokinger, et al. v. Armslist, LLC, et al.*,<br>2020 Mass. Super. LEXIS 69 (Mar. 13, 2020) |
| *Thomas v. Brinks,*<br>2020 U.S. Dist. LEXIS 13638 (Jan. 28, 2020) |
| *U.S. v. Lacey,*<br>2020 U.S. Dist. LEXIS 2645 (D. Ariz. Jan. 8, 2020) |


Positive
As of: June 8, 2020 9:54 PM Z

## *Gibson v. Craigslist, Inc.*

United States District Court for the Southern District of New York

June 15, 2009, Decided; June 15, 2009, Filed

08 Civ. 7735 (RMB)

**Reporter**
2009 U.S. Dist. LEXIS 53246 *; 2009 WL 1704355

GIBSON, Plaintiff, - against - CRAIGSLIST, INC., Defendant.

## Core Terms

amended complaint, provider, website, Craigslist, interactive, computer service, advertisement, publisher, immunity, monitor, quotations, sanctions, Reply

**Counsel:** [*1] For Calvin Gibson, Plaintiff: Paul Benjamin Dalnoky, LEAD ATTORNEY, Paul B. Dalnoky, New York, NY.

For Craigslist, Inc., Defendant: Justin Nolan Kinney, LEAD ATTORNEY, Coughlin Duffy LLP (NYC), New York, NY; Elizabeth L. McDougall-Tural, PRO HAC VICE, Perkins Coie LLP(Seattle), Seattle, WA.

**Judges:** RICHARD M. BERMAN, United States District Judge.

**Opinion by:** RICHARD M. BERMAN

## Opinion

### *DECISION & ORDER*

## I. Background

On September 4, 2008, Calvin Gibson ("Plaintiff" or "Gibson") filed an amended complaint ("Amended Complaint") against Craigslist, Inc. ("Defendant" or "Craigslist") alleging, among other things, that "in or around July 2008, an individual, whose identity is unknown, advertised to sell handguns on [D]efendant's internet website," *www.craigslist.org*, and that "on July 14, 2008, at approximately 8:00 a.m., in the City of New York, Plaintiff was shot several times by Jesus Ortiz with a handgun which Mr. Ortiz "purchase[d] from [that unknown] individual who advertised its sale [on] [D]efendant's internet website." (Am. Compl. PP 14, 19.) Plaintiff asserts that Defendant breached its "duty of care to [e]nsure that inherently hazardous objects, such as handguns, did not come into the hands of . . . individual[s], [*2] such as Mr. Ortiz," and seeks, among other relief, "compensatory damages in the amount of [$ 10 million]," punitive damages, and the "appointment of a Federal monitor." (Am. Compl. P 17, p.5; *see also id.* PP 10, 18, 20.)

On November 6, 2008, Defendant moved pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure* ("Fed. R. Civ. P.") to dismiss the Amended Complaint, arguing, among other things, that: (1) dismissal of the Amended Complaint under *Section 230* of the Communications Decency Act of 1996 ("CDA"), *47 U.S.C. § 230, et seq.,* pursuant to *Rule 12(b)(6)* "is proper and warranted"; [1] and (2) Plaintiff's claims fail

_____

[1] An Affirmative defense, [*3] such as *Section 230* immunity, is generally addressed on a *Rule 12(c)* motion for judgment on the pleadings or a *Rule 56* motion for summary judgment, *see Novak v. Overture Servs., Inc., 309 F. Supp. 2d 446, 452 (E.D.N.Y. Mar. 25, 2004)*, but some courts have held that it is proper to evaluate a *Section 230* immunity defense "in the context of a *12(b)(6)* motion" where the necessary facts are

because "Section 230 of the CDA provides an absolute bar to any cause of action that would make an interactive service provider, like [C]raigslist, liable for third-party content posted on the Internet through its service." (Def. Mot. to Dismiss, dated Nov. 6, 2008 ("Def. Mot."), at 4; Def. Reply in Further Supp. of Plaintiff's Mot. to Dismiss, dated Dec. 2, 2008 ("Def. Reply"), at 2; *see also* Hearing Tr., dated May 21, 2009 ("Hearing Tr."); Ltr. from Justin N. Kinney to Hon. Richard M. Berman, dated May 21, 2009 ("Def. May 21, 2009 Ltr.").)

On November 19, 2008, Plaintiff filed an opposition arguing, among other things, that: (1) Section 230 of the CDA provides an affirmative defense and "an affirmative defense is generally not fodder for a Rule 12(b)(6) motion"; and (2) Section 230 "does not provide blanket immunity to interactive computer services." (Pl. Opp'n to Def. Mot. to Dismiss, dated Nov. 18, 2008 ("Pl. Opp'n"), at 4, 5 (internal quotations and citation omitted); *see also id.* at 7; **[*4]** Ltr. from Paul B. Dalnoky to Hon. Richard M. Berman, dated May 22, 2009 ("Pl. May 22, 2009 Ltr."), at 1.) Plaintiff also seeks an order, pursuant to Fed. R. Civ. P. 11, compelling "[D]efendant to pay sanctions in the form of costs and reasonable attorney's fees for [its] meritless motion." (Pl. Opp'n at 12.)

On December 2, 2008, Defendant filed a reply arguing, among other things, that there are no grounds for Fed. R. Civ. P. 11 sanctions against Defendant because "[t]here is ample precedent . . . acknowledging the breadth of Section 230's protection and its application to claims such as those asserted by the [P]laintiff." (Def. Reply at 9.)

The parties waived oral argument. (*See* Case Management Plan.)

**For the reasons set forth below, Defendant's motion to dismiss the Amended Complaint is granted and Plaintiff's application for sanctions is denied**.

## II. Legal Standard

"When considering a motion to dismiss under Rule

apparent on the face of the complaint and the immunity available under the CDA precludes a plaintiff from stating a claim. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 564 F. Supp. 2d 544, 550 (E.D. Va. 2008); *see also* Doe v. Bates, No. 05 Civ. 91, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *9-10 (E.D. Tex. Dec. 27, 2006). As reflected below, that is the position taken here.

12(b)(6), the Court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." Murawski v. Pataki, 514 F. Supp. 2d 577, 582 (S.D.N.Y. 2007). At the same time, "a plaintiff's obligation to provide the grounds of **[*5]** his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal quotations and citation omitted); *see also* Ashcroft v. Iqbal, 129 S. Ct. 1937, 173 L. Ed. 2d 868, 2009 WL 1361536, *12 (2009). The complaint must plead enough facts to state a claim for relief that is plausible on its face. *See* Atlantic Recording Corp. v. Project Playlist, Inc., 603 F. Supp. 2d 690, 699 (S.D.N.Y. 2009).

"A motion to dismiss under [Fed. R. Civ. P.] 12(c) is governed by the same standard as a motion under [Fed. R. Civ. P.] 12(b)(6)." In re Ades and Berg Group Investors, 550 F.3d 240, 243 n.4 (2d Cir. 2008).

## III. Analysis

### (1) Fed. R. Civ. P. 12(b)(6)

Defendant argues that Fed. R. Civ. P. 12(b)(6) is the "appropriate vehicle" to seek dismissal of the Amended Complaint because, among other reasons, any discovery regarding Defendant's efforts to stop the selling of illegal goods on its website is "irrelevant to [Defendant's] Section 230 protection and cannot provide a basis to deny [Defendant's] motion." (Def. May 21, 2009 Ltr. at 1, 2; *see also* Def. Reply at 2-4.) Plaintiff counters, **[*6]** among other things, that "discovery [should] be had to determine what efforts, if any, [D]efendant made to stop the selling of illegal goods and services on its website" and "there is no [Section 230] defense . . . evident on the face of the [Amended] [C]omplaint as the [Amended] [C]omplaint does not treat the Defendant as a speaker or a publisher but as a business." (Pl. Opp'n at 5 (internal quotations and citation omitted); Pl. May 22, 2008 Ltr. at 1.)

A defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion where, as here, the defense appears on the face of the complaint. *See* Staehr v. Hartford Fin. Servs. Group, Inc., 547 F.3d 406, 426 (2d Cir. 2008); *see also* MCW, Inc. v. Badbusinessbureau.com LLC, No. 02 Civ. 2727, 2004 U.S. Dist. LEXIS 6678, 2004 WL 833595, at *7 (N.D. Tex. Apr. 19, 2004) ("The CDA, if applicable, is an

appropriate ground for dismissal of the complaint under *Rule 12(b)(6)* because the Act would preclude [plaintiff] from establishing a set of facts that would entitle it to relief."); *Murawski, 514 F. Supp. 2d at 582-83, 591*; *Atlantic Recording, 603 F. Supp. 2d at 698-703*. And, the Court concludes that it is proper and appropriate to evaluate Defendant's *Section 230* immunity **[*7]** defense in the context of *Fed. R. Civ. P. 12(b)(6)* because, as further explained below, (*see infra* pp. 5-8), the elements necessary to make a finding regarding Section 230 immunity are apparent from the face of the Amended Complaint, *see Nemet Chevrolet, 564 F. Supp. 2d at 550*, and discovery into Defendant's efforts to prevent the sale of illegal goods and services on its website "would [not] establish a set of facts that would entitle Plaintiff[] to relief," *Bates, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *10*. *See also Global Royalties, Ltd. v. Xcentric Ventures, LLC, No. 07 Civ. 956, 2007 U.S. Dist. LEXIS 77551, 2007 WL 2949002, at *2 (D. Ariz. Oct. 10, 2007)* ("[G]iven the allegations, the application of the CDA is a question of law and will not be affected by discovery."). [2]

## (2) *Section 230*

Defendant argues persuasively **[*8]** that it is entitled to immunity under *Section 230 of the CDA* because, among other reasons, "[C]raigslist is a provider (and user) of interactive computer services"; "[t]he alleged handgun advertisement identified in the [Amended] Complaint was provided by another information content provider, not [C]raigslist"; and "the [Amended] Complaint on its face improperly seeks to treat [C]raigslist as the publisher or speaker of the alleged advertisement." (Def. Mot. at 9, 10, 11.) Plaintiff counters unpersuasively that he does not seek to hold Defendant liable as a speaker or in the role of a publisher but, rather, "as a business, plain and simple." (Pl. May 22, 2009 Ltr. at 1; *see also* Pl. Opp'n at 7.)

*Section 230 of the CDA* provides clearly that "'[n]o provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider,' and

that '[n]o cause of action may be brought and liability may be imposed under any State or local law that is inconsistent with this section.'" *Murawski, 514 F. Supp. 2d at 591* (quoting *47 U.S.C. §§ 230(c)(1)*, *230(e)(3)*) (alterations in original); *see also Blumenthal v. Drudge, 992 F. Supp. 44, 51 (D.D.C. 1998)* **[*9]** (in enacting the CDA, "Congress made a policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages."). [3]

Courts engage in a three part inquiry when determining the availability of immunity under the CDA, *i.e.*, "[i] whether Defendant is a provider of an interactive computer service; [ii] if the postings at issue are information provided by another information content provider; and [iii] whether Plaintiff's claims seek to treat Defendant **[*10]** as a publisher or speaker of third party content." *Nemet Chevrolet, 564 F. Supp. 2d at 548*. "Courts across the country have repeatedly held that the CDA's grant of immunity should be construed broadly." *Atlantic Recording, 603 F. Supp. 2d at 699*.

Plaintiff's claims against Defendant are barred by the CDA because each prong of the *Section 230* immunity test is satisfied based upon the allegations in the Amended Complaint. *See Nemet Chevrolet, 564 F. Supp. 2d at 550*; *see also Murawski, 514 F. Supp. 2d at 591*; *Myspace, 528 F.3d at 420*; *Green v. Am. Online (AOL), 318 F.3d 465, 470-71 (3d Cir. 2003)*, *cert. denied*, 540 U.S. 877, 124 S. Ct. 200, 157 L. Ed. 2d 140 (2003); *Kruska v. Perverted Justice Found. Inc., No. 08 Civ. 54, 2008 U.S. Dist. LEXIS 109347, 2008 WL 2705377, at *2-3 & n.1 (D. Ariz. July 9, 2008)*. First, the Amended Complaint alleges that Defendant is "an internet merchant," (Am. Compl. P 1), and Plaintiff does not appear to dispute that Craigslist is a provider of an interactive computer service. *See Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist,*

---

[2] Even if the Court were to conclude that Defendant should have moved pursuant to *Rule 12(c)*, the Court could properly treat the instant *Rule 12(b)(6)* motion as a *Rule 12(c)* motion for judgment on the pleadings, with the same result. *See Bates, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *9*; *see also Doe v. MySpace, Inc., 474 F. Supp. 2d 843, 850 n.5 (W.D. Tex. 2007)*, *aff'd*, *528 F.3d 413 (5th Cir. 2008)*, *cert. denied*, **129 S. Ct. 600, 172 L. Ed. 2d 456 (2008)**.

---

[3] "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *47 U.S.C. § 230(f)(2)*.

"The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id. § 230(f)(3)*.

*Inc.*, 461 F. Supp. 2d 681, 698 (N.D. Ill. 2006) (internal quotations and citation omitted), *aff'd*, 519 F.3d 666 (7th Cir. 2008); *see also* Carafano v. Metrosplash.com Inc., 207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002), **[\*11]** *aff'd*, 339 F.3d 1119 (9th Cir. 2003).

Second, the Amended Complaint acknowledges that an "unknown individual," not the Defendant, placed the advertisement under a coded category on the Craigslist website. (Am. Compl. P 15); *see also* Craigslist, 461 F. Supp. 2d at 698 (housing notices posted on Craigslist's website "are 'information' that originates, not from Craigslist, but from 'another information content provider,' namely the users of Craigslist's website") (quoting 47 U.S.C. § 230(f)(3)); Atlantic Recording, 603 F. Supp. 2d at 701-02.

Third, Plaintiff seeks to hold Defendant liable for its alleged failure to block, screen, or otherwise prevent the dissemination of a third party's content, *i.e.*, the gun advertisement in question, *see* Bates, 2006 U.S. Dist. LEXIS 93348, 2006 WL 3813758, at *20, alleging, among other things, that Defendant "failed to monitor, regulate, properly maintain and police the merchandise being bought and sold on its . . . website" and "is either unable or unwilling to allocate the necessary resources to monitor, police, maintain and properly supervise the goods and services sold on its . . . website." (Am. Compl. P 1, 20; *see also* Pl. Opp'n at 5.) It is clear that Plaintiff's claims are **[\*12]** directed toward Craigslist as a "publisher" of third party content and "Section 230 specifically proscribes liability in such circumstances." Green, 318 F.3d at 471 (internal quotations and citation omitted) *see* Myspace, 474 F. Supp. 2d at 849 ("Plaintiffs argue this suit is based on MySpace's negligent failure to take reasonable safety measures to keep young children off of its site and not based on MySpace's editorial acts . . . . No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities."); Green, 318 F.3d at 470-71 (affirming dismissal of claim that AOL "negligent[ly] fail[ed] to properly police its network for content transmitted by its users" because Section 230 bars "attempts to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network -- actions quintessentially related to a publisher's role"); *see also* Stoner v. eBay, Inc., No. 305666, 2000 WL 1705637, at *3 (Cal. Super. Nov. 1, 2000) (rejecting plaintiff's "contention . . . that eBay should be held responsible for failing to monitor the products auctioned **[\*13]** over its service" because "Congress intended to remove

[through Section 230] any legal obligation of interactive computer service providers to attempt to identify or monitor the sale of such products").

## Fed. R. Civ. P. 11

Defendant having prevailed on its motion, it is apparent that it violated no stricture of Fed. R. Civ. P. 11. *See* Beyah v. Scully, No. 91 Civ. 2720, 1996 U.S. Dist. LEXIS 2753, 1996 WL 103829, at *4 (S.D.N.Y. Mar. 11, 1996). Even assuming, *arguendo*, that Plaintiff's claims were not barred by Section 230 of the CDA, Defendant's motion cannot be called frivolous and Defendant "has every right to move for dismissal" at this time. Koch v. CGM Group, Inc., No. TH 00-216--C M/H, 2001 U.S. Dist. LEXIS 5558, 2001 WL 392523, at *4 (S.D. Ind. Apr. 3, 2001). Plaintiff's application for sanctions is, accordingly, denied. *See* Murawski, 514 F. Supp. 2d at 590.

## IV. Conclusion and Order

For the foregoing reasons, Defendant's motion to dismiss [# 6] is granted and Plaintiff's application for sanctions is denied. The Clerk of Court is respectfully requested to close this case.

## SO ORDERED.

Dated: New York, New York

June 15, 2009

/s/ Richard M. Berman

**RICHARD M. BERMAN, U.S.D.J.**

**End of Document**



Caution
As of: June 8, 2020 10:15 PM Z

# *Gregerson v. Vilana Fin., Inc.*

United States District Court for the District of Minnesota

February 15, 2008, Decided; February 15, 2008, Filed

Civil No. 06-1164 ADM/AJB

**Reporter**
2008 U.S. Dist. LEXIS 11727 *; 2008 WL 451060

Chris Gregerson, Plaintiff, v. Vilana Financial, Inc., a Minnesota Corporation and Vilana Realty, Inc., a Minnesota Corporation, Defendants.

**Subsequent History:** Related proceeding at *Gregerson v. Vilana Fin., Inc., 2010 Minn. App. Unpub. LEXIS 1100 (Minn. Ct. App., Nov. 9, 2010)*

**Prior History:** *Gregerson v. Vilana Fin., Inc., 2007 U.S. Dist. LEXIS 64960 (D. Minn., Aug. 31, 2007)*

## Core Terms

website, Skyline, infringement, advertisement, photograph, watermark, digital, comments, fair market value, damages, statutory damages, posted, attorney's fees, appropriation, embedded, provider, counterclaims, printed, willful, contractual relationship, actual damage, estimates, entitles, license, picture, profits, copies, deceptive trade practices, Minneapolis, photography

**Counsel:** [*1] Chris Gregerson, pro se.

Boris Parker, Esq., Bassford Remele, Minneapolis, MN, on behalf of Defendants.

**Judges:** ANN D. MONTGOMERY, U.S. DISTRICT JUDGE.

**Opinion by:** ANN D. MONTGOMERY

## Opinion

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT**

### I. INTRODUCTION

The above-titled matter was tried by consent of the parties as a court trial before the undersigned United States District Judge beginning on November 5, 2007. At issue were Plaintiff Chris Gregerson's ("Plaintiff") claim of copyright infringement against Vilana Financial, Inc., and Vilana Realty, Inc. ("Defendants") and Defendants' counterclaims of deceptive trade practices, intentional interference with prospective contractual relation, and appropriation against Plaintiff. Having previously determined in a prior order [Docket No. 108] that Defendants are liable to Plaintiff for copyright infringement, the only issues for trial on Plaintiff's claim related to damages. After two days of trial and hearing the testimony of eight witnesses, the Court finds in favor of Plaintiff and dismisses Defendants' counterclaims with prejudice.

### II. FINDINGS OF FACT

1. Plaintiff is a photographer of stock images that he licenses on a single-use basis and that can be purchased [*2] as prints.

2. Defendants are Minnesota corporations offering

mortgage, financial, and real estate services. Andrew Vilenchik ("Vilenchik") is the principal shareholder of both corporations.

3. Two photographs taken by Plaintiff, image 2981, hereinafter referred to as the "Skyline" photograph, and image 2258, hereinafter referred to as the "Kenwood" photograph are the basis of the infringement claim. The Skyline photograph is a picture of the Minneapolis skyline taken by Plaintiff on January 8, 2004. The Kenwood photograph is a picture of a home taken by Plaintiff on August 20, 2002.

4. Plaintiff maintains a website where he publishes his photography, including the Skyline and Kenwood photos. The website, cgstock.com: Phototour of Minneapolis, can be accessed at two web addresses: (1) http://www.phototour.minneapolis.mn.us; and (2) www.cgstock.com. Plaintiff uses the website to publish his photographs and as a medium for his stock photography business. Persons interested in using Plaintiff's photographs may license them according to the terms and prices set forth on the website.

5. On January 14, 2004, Plaintiff published the Skyline photo on his website. Plaintiff published the Kenwood [*3] photo on his website on November 23, 2002. The website, the exclusive source for both photos, included the following notice: "Copyright © 2004 Chris Gregerson" underneath the Skyline photo. Pl.'s Ex. 1. Plaintiff published the following notice underneath the Kenwood photograph: "Copyright © 2002 Chris Gregerson." Pl.'s Ex. 2.

6. The posted photos had been edited by Plaintiff to include a visible watermark with the following website: www.phototour.minneapolis.mn.us and a digital watermark. Pl.'s Exs. 1-4.

7. A digital watermark is a digital code that is imperceptible to the eye but is readable by computers and software. Plaintiff used the software utility "exiftool" to extract the digital files embedded in his images. For each image, the embedded data included the copyright notice. Pl.'s Exs. 3, 4.

8. In May 2005, Plaintiff discovered the unauthorized use of his Skyline photo by Defendants in a Vilana Financial advertisement printed on the inside cover of the 2005-06 Qwest Dex phone book. Pl.'s Ex. 5. Plaintiff testified that Qwest printed approximately 500,000 copies of the phone book containing Defendants' advertisement. The image in the Qwest advertisement is cropped so that the watermark [*4] with Plaintiff's web

address does not appear on the photo.

9. After discovering the Qwest advertisement, Plaintiff sent a letter to Defendants on June 6, 2005, demanding payment for the unauthorized use. Pl.'s Ex. 21. In Plaintiff's letter he estimated that the fair market value for use of the Skyline photo in the Qwest advertisement was $ 1,816. Id. Plaintiff explained that his policy was to triple the charge for unauthorized use of his photographs and that Defendants had until June 20, 2005, to pay him treble damages of $ 5,448. Id. Plaintiff further stated his policy would be to increase his fee to ten times the normal fair market value bringing the fee to $ 18,160 if Defendants failed to pay him by June 20, 2005. Id.

10. Plaintiff later discovered Defendants had used his photo on additional print and web advertisements. In each case the Skyline photo had been edited to remove the watermark with Plaintiff's web address. Plaintiff discovered that Defendants used his Skyline photo in an advertisement published in Zerkalo, a Russian-language newspaper with a press run of 5,000 copies of each issue, and in the Zerkalo website. Pl.'s Exs. 12, 13. Defendants used the Skyline photo in a [*5] one-fourth page advertisement that appeared in six different issues of the newspaper. Defendants used the Skyline photo in two advertisements that appeared on the Zerkalo website. One advertisement was a one-fourth page advertisement that appeared on the website's homepage for six months. The other advertisement was a one-eighth page advertisement that also appeared on the website's homepage for six months. Plaintiff also discovered that Defendants used his Skyline photo in a one-eighth page online advertisement appearing on the website www.bestredyp.com. Pl.'s Ex. 15. This was a non-homepage advertisement that ran for one year.

11. In the course of discovery of the original infringement claims, Plaintiff discovered that Defendants used his Kenwood photo in a tri-fold brochure that also includes the Skyline photo. Pl.'s Ex. 17. Plaintiff estimates that Defendants printed 30,000 copies of the brochure displaying the Kenwood photo while Defendants contend that they printed only 1,000 copies.

12. Defendants contend there was no willful infringement of Plaintiff's copyright, because they believed they validly licensed the Skyline and Kenwood photos from an individual named "Michael Zubitskiy" [*6] ("Zubitskiy"). Vilenchik testified he met Zubitskiy in the sauna at the gym in early March 2004 and in that initial meeting commissioned Zubitskiy to take

photographs of buildings in Minneapolis. Vilenchik claims he did not speak with or hear from Zubitskiy until Zubitskiy called to tell him that he was ready to present the pictures he had taken. Vilenchik testified that after Zubitskiy called him, Zubitskiy came to his office and produced a CD containing digital images of the Skyline and Kenwood photos. Vilenchik says he agreed to pay Zubitskiy for the photos and memorialized the agreement in writing. Under the terms of the written agreement dated March 19, 2004 (hereinafter, the 3/19/04 Agreement), Zubitskiy agreed to sell Defendants the photos for $ 850. Pl.'s Ex. 28. According to the agreement, "[a]ll photos and images will become an intellectual property of Vilana Financial and cannot be resold." Id. The agreement is signed by Zubitskiy and notarized by Vladimir Kazaryan ("Kazaryan"). Id.

13. The Court finds there is no credible evidence to support a belief that "Zubitskiy" [1] exists or was the source of the controverted photos. It is highly implausible that after a brief meeting [*7] in the sauna at the gym at which Zubitskiy did not provide contact information, references, or examples of his work, Defendants commissioned Zubitskiy to perform the photography service. Defendants ask the Court to believe that Zubitskiy arrived at Defendants' office with the exact type of photos Defendants needed in the correct format and image resolution without so much as a phone call in the interim. Further undermining Defendants' story is the fact no contact information for Zubitskiy was included on the 3/19/04 Agreement presented by Defendants and, despite Plaintiff's discovery requests, Defendants have failed to provide any information regarding the whereabouts or existence of Zubitskiy. Despite Vilenchik's contention that the CD Zubitskiy provided contained several photos in addition to the Skyline and Kenwood photos, Vilenchik did not remember what images the other photographs contained, nor the specific number of photographs on the CD.

14. Vilenchik's testimony [*8] was inconsistent and full of contradictions. Vilenchik explained that although he was in the sauna, he was able to give Zubitskiy his contact information without the benefit of paper and pen because his cell phone number was easy to recall. However, Vilenchik's deposition testimony was that Zubitskiy called him at the following number: 612-963-

2900. Dep. Tr. at 24. What would make this phone number particularly easy to recall eludes the Court. In another contradiction, Vilenchik stated in his deposition that at Zubitskiy's request he paid cash, Dep. Tr. 28, but at trial he testified that he paid cash because Defendants did not have a company checkbook at the time of payment. Additionally, Vilenchik testified at trial that Zubitskiy took the photos in March, yet the conditions depicted in the Kenwood photograph show it was taken during the late spring or summer.

15. Vilenchik's credibility was further undermined through the character testimony of several witnesses during trial. Michael Walker, who worked for Defendants and had both business and personal contacts with Vilenchik, testified that Vilenchik has a reputation of being honest only when it serves him. Similarly, Vladimir Sivriver, [*9] who has worked and socialized with Vilenchik, testified that Vilenchik has a reputation for being highly deceptive and saying one thing and then doing another. Kazaryan also testified to Vilenchik's reputation for being dishonest. Kazaryan, who has both a professional and personal relationship with Vilenchik, echoed Sivriver's testimony stating that Vilenchik has a bad reputation and is known for saying one thing and then doing something different. Kazaryan believes Vilenchik exaggerates the truth.

16. The testimony of Kazaryan is additional evidence that Zubitsky is fictional and the 3/19/04 Agreement is fraudulent. Kazaryan initially testified that he did not remember notarizing the 3/19/04 Agreement but later testified that he remembered some portion of it. When Kazaryan was asked whether Zubitskiy was present when he notarized his signature on the 3/19/04 Agreement, Kazaryan replied "apparently, yeah." Further, when notified that the Commissioner of Commerce was prepared to formally investigate whether Kazaryan fraudulently notarized the 3/19/04 Agreement, Kazaryan voluntarily agreed to surrender his notary seal. Although both Kazaryan and Vilenchik testified to the existence of [*10] Zubitskiy, the Court finds their testimony lacking credibility.

17. Defendants did not procure the Skyline and Kenwood photos from Zubitskiy, rather, they unlawfully procured them from Plaintiff's website.

18. After Defendants refused to pay Plaintiff the amount requested in his June 6, 2005, letter, Plaintiff posted on his website an essay about the dispute and a picture of Vilenchik. Plaintiff has continued to use his website as a forum for discussing his dispute with Defendants. In

---

[1] Whether the change in spelling of "Zubitskiy" in the 3/19/04 Agreement to "Zubitsky" in Defendants' Proposed Findings of Fact is intentional or a typographical error will not be resolved here, but it is curious nonetheless.

addition to posting essays regarding the dispute, Plaintiff has maintained a comment section in which visitors to his website may post commentary. The comments posted on Plaintiff's website included criticism of Defendants by Plaintiff, comments posted by visitors to the website, and comments by Vilenchik.

19. Plaintiff's website comments include a detailed description and chronology of all the events relating to this litigation in an essay originally titled "Vilana Financial/Andrew Vilenchik Sued for Copyright Violation, Suspected of Fraud and Forgery." Plaintiff requests: "If you have any information to share, you can email me at chris@cgstock.com. You can also post a comment on this page, keeping in mind **[*11]** profanity and libel are not allowed." Defs.' Ex. 5(A). Plaintiff also made the following comment:

> If you are currently considering obtaining a mortgage through Vilana Financial, Inc. I would encourage you to consider finding a mortgage elsewhere. If you are a customer of Vilana Financial and believe you have been a victim of illegal, fraudulent, or predatory loan practices, you can file a complaint with the **Minnesota Department of Commerce,** market assurance division . . . .
>
> Id.

20. Visitors to Plaintiff's website posted numerous comments in response to Plaintiff's essay. Id. While many of the comments related to the legal issues involved in the litigation, many comments expressed personal opinions about Vilenchik and his businesses. Id. These comments included accusations that Vilenchik was affiliated with the Russian mafia, that his secretary was his girlfriend and a prostitute, and that Vilenchik is a thief. Id.

21. Vilenchik also posted a comment on Plaintiff's website. Id. In his comment, he denies intentionally using Plaintiff's photo without authorization, offers his opinion regarding the litigation, and denies any wrongdoing. Id.

## III. CONCLUSIONS OF LAW

### A. Plaintiff's Damages

Plaintiff **[*12]** seeks actual damages for Defendants' use of his Skyline photo under *17 U.S.C. § 504(b)*. Pl.'s

2d Am. Compl [Docket No. 119]. Plaintiff asserts Defendants' willful infringement of his copyright for the Kenwood photo entitles him to statutory damages up to $ 150,000 under *17 U.S.C. § 504(c)(2)*. Plaintiff asserts that Defendants' willful removal of the electronic and visible watermarks from his photos is a violation of *17 U.S.C. § 1202*, thus entitling him to damages under *17 U.S.C. § 1203*. Plaintiff also seeks his costs and attorney's fees under *17 U.S.C. § 505*.

### 1. Actual Damages for the Skyline Photo

Plaintiff claims the fair market value for all uses of his Skyline photo by Defendants is $ 4,462. Plaintiff, however, seeks ten times that amount because he published a policy of charging ten times the fair market value for unauthorized uses not paid for within ten days. Pl.'s Proposed Findings and Conclusions P 47 [Docket No. 149].

*17 U.S.C. § 504(b)*, however, does not provide for a tenfold increase of punitive damages on the basis Plaintiff seeks. *Section 504(b)* entitles the injured party to actual damages to compensate for the injury resulting from the infringement but also entitles the **[*13]** injured party to the infringer's profits deriving from the infringement. "By stripping the infringer not only of the licensing fee but also of the profit generated as a result of the use of the infringed item, the law makes clear that there is no gain to be made from taking someone else's intellectual property without their consent." *Walker v. Forbes, Inc., 28 F.3d 409, 412 (4th Cir. 1994)*. The Supreme Court has made very clear that the purpose behind the measure of damages set forth in *§ 504(b)* is "to provide just compensation for the wrong, not to impose a penalty by giving to the copyright proprietor profits which are not attributable to the infringement." *Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 399, 60 S. Ct. 681, 84 L. Ed. 825 (1940)*.

Plaintiff could have sought the profits Defendants derived from the infringement as damages but chose not to do so. Although Plaintiff included a request for this type of damage award in his First Amended Complaint [Docket No. 76], he abandoned his claim for profits in his Second Amended Complaint and did not pursue this theory of relief at trial. Accordingly, Plaintiff's damages are limited to actual damages--that is, the fair market value of Defendants' uses of **[*14]** the Skyline photo. To award Plaintiff ten times the fair market value of his pricing policy, would be to "impose a penalty by giving to the copyright proprietor profits which are not

attributable to the infringement." *Sheldon, 309 U.S. at 399*.

Plaintiff estimates the fair market value of all of Defendants' uses of his Skyline photo to be $ 4,462; Defendants estimate the fair market value to be $ 1,756. At trial, Plaintiff testified regarding his calculation of the fair market value of Defendants' uses of the Skyline photo. Pl.'s Ex. 24. Plaintiff obtained price quotes from four other stock photography websites based on a license for "rights-managed photos (usage fees calculated on a case-by-case basis) for nonexclusive use of a photo similar to [the Skyline photo]." Id. In obtaining the price quotes, Plaintiff took into account the various factors that impact the licensing fee such as the size of the image relative to the publication, the placement of the advertisement, and the number of copies printed or the amount of time the advertisement ran. Plaintiff determined the total fair market value each stock photography website would charge for all of Defendants' uses and determined that **[*15]** fair market value was the average of those estimates: $ 4,462. Id.

Defendants do not explain their calculation of the fair market value of their uses of the Skyline photo; however, they assert that their $ 1,756 estimate is consistent with the $ 1,816 demanded by Plaintiff in his June 6, 2005, letter. Plaintiff's letter, however, sought payment for Defendants' use of the Skyline photo in only the Qwest advertisement and does not reflect the fair market value of Defendants' additional uses of the Skyline Photo.

The Court awards Plaintiff $ 4,462 in actual damages under *17 U.S.C. § 504* for Defendants' infringing uses of the Skyline photo.

## 2. Statutory Damages for the Kenwood Photo

Plaintiff seeks damages for Defendants' use of the Kenwood photo under *17 U.S.C. § 504(c)(2)*. *Section 504(c)(2)* provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $ 150,000." In determining the proper measure of statutory damages, the Court considers what is just in a particular case, the nature of the copyright, and the **[*16]** circumstances of the infringement. *Peer Int'l Corp. v. Pausa Records, Inc., 909 F.2d 1332, 1336 (9th Cir. 1990)*. "Because awards of statutory damages serve both compensatory and

punitive purposes, a plaintiff may recover statutory damages whether or not there is adequate evidence of the actual damages suffered by plaintiff or of the profits reaped by defendant . . . in order to sanction and vindicate the statutory policy of discouraging infringement." *Los Angeles News Serv. v. Reuters TV Int'l, 149 F.3d 987, 996 (9th Cir. 1998)* (internal quotations and citations omitted).

The standard for determining whether the infringer's conduct was willful is "whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded that possibility." *Hamil Am., Inc. v. GFI, 193 F.3d 92, 97 (2d Cir. 1999)*. "[E]ven in the absence of evidence establishing the infringer's actual knowledge of infringement, a plaintiff can still prove willfulness by proffering circumstantial evidence that gives rise to an inference of willful conduct." *Island Software & Computer Serv. v. Microsoft Corp., 413 F.3d 257, 264 (2d Cir. 2005)*.

By March 2004, when Defendants contend **[*17]** they procured the photos from Zubitskiy, Plaintiff had obtained a copyright for both photos and Plaintiff's website contained content informing visitors that the photos were copyright protected. Having found that Defendants did not purchase Plaintiff's photos from Zubitskiy and that Plaintiff's website was the sole source for the Skyline and Kenwood photos, the Court concludes that Defendants obtained the photos from Plaintiff's website and thus, willfully infringed Plaintiff's copyright. In so finding, the Court awards Plaintiff $ 10,000 in statutory damages. This amount serves the interests of justice in acknowledging both the need to compensate Plaintiff and deter Defendants from future infringement. By unlawfully obtaining Plaintiff's photos from his website, where it was clear both that use of Plaintiff's photos was only available for a fee and that the photos were copyright protected, Defendants flagrantly disregarded Plaintiff's rights as a copyright owner.

## 3. Damages for Removal of Copyright Management Information

Plaintiff asserts that Defendants' willful removal of the digital and visible watermarks from his photos is a violation of *17 U.S.C. § 1202*, thus entitling him to damages **[*18]** under *17 U.S.C. § 1203*. *17 U.S.C. § 1202(b)(1)*, provides that "[n]o person shall, without the authority of the copyright owner or the law intentionally remove or alter any copyright management information."

17 U.S.C. § 1202(c) defines copyright management information as "information conveyed in connection with copies . . . , including in digital form" and provides a list of such information including "the name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright," § 1202(c)(3), and "[i]dentifying numbers or symbols referring to such information or links to such information," § 1202(c)(7).

The text of § 1202 defines copyright management information broadly and specifically includes information conveyed in digital form. Accordingly, while it is uncertain whether the visible watermark providing Plaintiff's website qualifies under § 1202(c)(7), Plaintiff's digitally embedded watermark does meet the definition set forth in § 1202(c)(3). The digitally embedded watermark, "(c) Chris Gregerson 2003" on the Skyline photo and "(c) Chris Gregerson 2002" on the Kenwood photo, includes Plaintiff's name and [*19] notice of copyright. The plain text of § 1202(c)(3) unambiguously defines copyright management information to include protection for a digitally embedded watermark. However, even if the Court were to conclude that § 1202(c)'s definition of copyright management information was ambiguous and were to look to the legislative history and intent underlying § 1202(c), there is further support that a digitally embedded watermark constitutes copyright management information. In IQ Group, Limited. v. Wiesner Publishing, LLC, 409 F. Supp. 2d 587, 596 (D.N.J. 2006), Judge Joseph A. Greenaway, Jr., of the United States District Court for the District of New Jersey, engages in a lengthy evaluation of legislative history and intent and concludes that "Congress viewed a digital watermark as an example of copyright management information."

Defendants failed to produce the original Skyline photo used in the Qwest advertisement as requested in Plaintiff's first request for production. Plaintiff submitted his first request for production before discovering that Defendants had also used his Kenwood photo and it does not appear that he submitted a request that Defendants produce the original Kenwood photo [*20] used in the tri-fold brochure. [2] By failing to

_____

[2] Plaintiff testified at trial that he included in his Second Interrogatories, Second Request for Production, and Second Request for Admissions, a request that Defendants produce the copies of his photos used by Defendants and the advertisements including the Kenwood photo in digital form. A review [*21] of Defendants' Answers to Plaintiff's Second

produce the original version of the Skyline photo used by Defendants in their various advertisements, Plaintiff was unable to determine whether Defendants removed the digitally embedded watermark. Defendants, however, cannot benefit from this failure to produce. "Where relevant evidence is within the control of a party to whose interest it would naturally be to produce it and he fails so to do, without satisfactory explanation, and produces no evidence or weaker evidence, an inference is justifiable that it would be unfavorable to him." Goldie v. Cox, 130 F.2d 695, 719 (8th Cir. 1942). The Court infers from Defendants' failure to produce the original electronic image used in its advertisements that the original image would have demonstrated that Defendants removed or altered Plaintiff's digitally embedded watermark in violation of § 1202(b)(1).

17 U.S.C. § 1203 provides that this Court may award Plaintiff damages upon finding that Defendants violated § 1202. Plaintiff elected to recover statutory damages for Defendants' violation of § 1202 under § 1203(c)(3)(B). Pl.'s 2d Am. Compl. Under § 1203(c)(3)(B), Plaintiff may recover "statutory damages for each violation of section 1202 in the sum of not less than $ 2,500 or more than $ 25,000." The Court awards Plaintiff $ 5,000 for Defendants' willful removal of the digitally embedded watermark in the Skyline photo.

## 4. Attorney's Fees

Finally, Plaintiff seeks reasonable attorney's fees, costs, and disbursements under 17 U.S.C. § 505. No court has specifically addressed [*22] whether a pro se litigant may recover attorney's fees and costs under § 505; however, there is a general principle that pro se litigants are not entitled to attorney's fees otherwise authorized by fee-shifting statutes. See, e.g., Bond v. Blum, 317 F.3d 385, 398-99 (4th Cir. 2003); Gonzalez v. Kangas, 814 F.2d 1411 (9th Cir. 1987); Smith v. De Bartoli, 769 F.2d 451 (7th Cir. 1985); Owens-El v. Robinson, 694 F.2d 941 (3d Cir. 1982); see also McDermott v. Royal, 123 Fed. Appx. 241, 242 (8th Cir. 2004) (stating that "a pro se litigant is not entitled to attorneys fees under

_____

Interrogatories, Second Request for Production of Documents and Request for Admissions, Plaintiff's Exhibit 32, does not reveal such a request and Plaintiff did not offer into evidence the Second Interrogatories, Second Request for Production of Documents and Request for Admissions he submitted to Defendants. Accordingly, there is no evidence of record that Plaintiff requested the digital copy of the Kenwood photo as possessed by Defendants and used in Defendants' brochure.

section 1988"); White v. Armontrout, 29 F.3d 357, 361-362 (8th Cir. 1994) (stating that a litigant was not entitled to attorney's fees because of his pro se status); McMillan v. Chief Judge, Circuit Court of Greene County, 711 F.2d 108, 109 (8th Cir. 1983) (stating "Because the plaintiffs brought this action pro se and in forma pauperis, however, they did not incur any [costs and attorney's fees]"). Accordingly, Plaintiff's request for attorney's fees is denied.

## B. Defendants' Counterclaims

Defendants assert counterclaims of deceptive trade practices, interference with contractual and business relationships, and invasion **[*23]** of privacy by appropriation of Defendants' name and Vilenchik's likeness. All of Defendants' claims arise from the comments made by Plaintiff on his website, the comments made by visitors to his website, and Plaintiff's use of Defendants' name and Vilenchik's picture on his website.

As it relates to all of the individual counterclaims, Plaintiff contends that he is not liable for the comments made by third parties under the Communications Decency Act ("CDA"). 47 U.S.C. § 230(c). Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," § 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," § 230(e)(3). Although the Eighth Circuit has yet to address the application of § 230, "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006) **[*24]** (quoting Zeran v. Am. Online, Inc., 129 F.3d 327, 331 (4th Cir. 1997)); see also Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102 (9th Cir. 2007); Universal Commun. Sys. v. Lycos, Inc., 478 F.3d 413 (1st Cir. 2007).

Plaintiff, as an operator of a website where users can post comments, is a provider of an interactive computer service. See Universal Commun. Sys., 478 F.3d at 419; Carafano v. Metrosplash.com Inc., 339 F.3d 1119, 1123 (9th Cir. 2003); Faegre & Benson, LLP v. Purdy, 367 F. Supp. 2d 1238, 1249 (D. Minn. 2005). The third-party comments posted on Plaintiff's website are "information

provided by another information content provider." § 230(c)(1). Section 230 defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." § 230(f)(3). Accordingly, Plaintiff is not liable for the third-party comments posted on his website. [3]

Plaintiff is liable for only his own comments on his website. See Universal Commun. Sys., 478 F.3d at 419 (stating "immunity only applies when the information that forms the basis for the state law claims has been provided by '*another* information content provider.' Thus an interactive computer service provider remains liable for its own speech") (internal citations omitted); see also Faegre & Benson, 367 F. Supp. 2d at 1249 (stating that § 230 "immunizes web site operators from liability unless they themselves post the defamatory comments"). Defendants' counterclaims will be analyzed by a review of Plaintiff's comments.

### 1. Deceptive Trade Practices

Minn. Stat. § 325D.44, subd. 1, states in relevant part:

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: (8) disparages the goods, services, or business of another by false or misleading representation of fact; . . . or (13) engages in any **[*26]** other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Defendants assert that by entitling Defendants' essay with the words "Suspected of Fraud and Forgery" and by making the following comment, Plaintiff suggested that Defendants engaged in fraud, illegal activity, and predatory lending practices:

If you are currently considering obtaining a mortgage through Vilana Financial, Inc. I would encourage you to consider finding a mortgage

---

[3] Section 230 immunity extends even after Plaintiff was made aware of Defendants' objections to the comments posted by third parties. Universal Commun. Sys., 478 F.3d at 420 ("It is, by now, well established **[*25]** that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech. . . . Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content.").

elsewhere. If you are a customer of Vilana Financial and believe you have been a victim of illegal, fraudulent, or predatory loan practices, you can file a complaint with the **Minnesota Department of Commerce,** market assurance division . . . .

Defs.' Ex. 5(A). Because this statement is not a false or misleading representation of fact, but rather a statement of opinion, the question is whether Plaintiff's comment created a likelihood of confusion or misunderstanding regarding Defendants' goods or services. The Court finds that because this statement is so clearly a statement regarding Plaintiff's opinion, and Plaintiff does not represent to have any knowledge regarding Defendants' goods or services, Plaintiff's statement did [*27] not create any confusion or misunderstanding regarding Defendants' goods or services. Similarly, the statement that Defendants were suspected of fraud and forgery was a true statement of fact reflecting Plaintiff's belief that Defendants fabricated Zubitskiy and forged his signature on the 3/19/04 Agreement, which was also fraudulently notarized. Accordingly, Plaintiff did not engage in deceptive trade practices in violation of *Minn. Stat. § 325D.44, subd. 1*.

## 2. Interference with Contractual Relationship

One is not liable for intentionally interfering with an existing or prospective contractual relationship where that person has made a truthful representation. *Sorenson v. Chevrolet Motor Co., 171 Minn. 260, 214 N.W. 754, 757 (Minn. 1927)* (finding that a salesman who made a truthful representation did not tortiously interfere with a contractual relation); *Glass Serv. Co., Inc. v. State Farm Mut. Auto. Ins. Co., 530 N.W.2d 867, 871 (Minn. Ct. App. 1995)* (stating that there is no liability for tortious interference with prospective contractual relation "on the part of one who merely gives truthful information to another").

Defendants did not identify any specific comments by Plaintiff that were false. [*28] Accordingly, Defendants have not shown that Plaintiff is liable for interference with existing or prospective contractual relationships.

## 3. Appropriation

Defendants contend that Plaintiff is liable for invasion of privacy by appropriation of Defendants' name and Vilenchik's photograph on his website. "Appropriation protects an individual's identity and is committed when

one 'appropriates to his own use or benefit the name or likeness of another.'" *Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 233 (Minn. 1998)*. The Restatement describes the ways in which an individual can invade another's privacy:

> The common form of invasion of privacy under the rule here stated is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose. Apart from statute, however, the rule stated is not limited to commercial appropriation. It applies also when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one.

*Restatement (Second) of Torts § 652C cmt. b*. Defendants [*29] contend that Plaintiff's postings regarding the dispute caused the website to experience increased traffic constituting a benefit to Plaintiff. Defendants, however, failed to prove that Plaintiff's website experienced any increase in traffic whatsoever. Even assuming they had, Defendants presented no evidence demonstrating a causal connection between Plaintiff's use of Defendants' name and Vilenchik's picture and an increase in traffic to Plaintiff's website. Accordingly, Defendants failed to prove that Plaintiff appropriated their name and likeness for his benefit.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The Court finds in favor of Plaintiff Chris Gregerson and awards him $ 4,462 in actual damages for Defendants' infringement of the Skyline photograph, $ 10,000 in statutory damages for Defendants' infringement of the Kenwood photograph, and $ 5,000 for Defendants' removal of Plaintiff's copyright management information.

2. Plaintiff's claim for attorney's fees and costs is **DENIED.**

3. Defendants' counterclaims against Plaintiff are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

s/ **[*30]** Ann D. Montgomery

ANN D. MONTGOMERY

U.S. DISTRICT JUDGE

Dated: February 15, 2008.

---

**End of Document**

 Caution
As of: June 8, 2020 10:16 PM Z

# *Lemmon v. Snap, Inc.*

United States District Court for the Central District of California

February 25, 2020, Decided; February 25, 2020, Filed

Case No. CV 19-4504-MWF (KSx)

**Reporter**
2020 U.S. Dist. LEXIS 34671 *; __ F. Supp. 3d __; 2020 WL 913643

Carly Lemmon, et al. v. Snap, Inc.

## Core Terms

users, Speed, website, Roommate, driving, subscribers, capture, rewards, notice, notification, mobile, recommendation, passengers, crash, video

**Counsel:** **[\*1]** For Carly Lemmon, as surviving parents of Hunter Morby (deceased), Michael Morby, as surviving parents of Hunter Morby (deceased), Samantha Brown, as surviving parents of Landen Brown (deceased), Marlo Brown, as surviving parents of Landen Brown (deceased), Plaintiffs: Thomas Michael Dempsey, LEAD ATTORNEY, Law Offices of Thomas M Dempsey, Beverly Hills, CA USA; Darryl Dwayne Adams, Michael L Neff, PRO HAC VICE, Law Office of Michael L Neff PC, Atlanta, GA USA; Naveen Ramachandrappa, PRO HAC VICE, Bondurant Mixson and Elmore LLP, Atlanta, GA USA.

For Snap, Inc., doing busniess in California as Snapchat, Inc., Defendant: Jonathan H Blavin, Rosemarie T Ring, LEAD ATTORNEYS, John B Major, Munger Tolles and Olson LLP, San Francisco, CA USA.

**Judges:** Honorable MICHAEL W. FITZGERALD, United States District Judge.

**Opinion by:** MICHAEL W. FITZGERALD

# Opinion

**Proceedings (In Chambers):** ORDER RE: MOTION TO DISMISS FIRST AMENDED COMPLAINT [50]

Before the Court is Defendant Snap Inc.'s ("Snap") Motion to Dismiss the First Amended Complaint (the "Motion"), filed on December 16, 2019. (Docket No. 50). On January 13, 2020, Plaintiffs Carly Lemmon, et al. filed an Opposition. (Docket No. 56). On January 27, 2020, Defendant filed a Reply. **[\*2]** (Docket No. 57).

The Court has read and considered the papers filed in connection with the Motion, and held a hearing on February 10, 2020.

For the reasons discussed below, the Motion is **GRANTED** *without leave to amend*. Plaintiff's claim is barred under the Communications Decency Act because the Speed Filter is a content neutral tool.

## I. BACKGROUND

Plaintiffs commenced this action on May 23, 2019. (Complaint (Docket No. 1)). Plaintiffs filed a First Amended Complaint ("FAC") on November 18, 2019. (Docket No. 47).

The FAC alleges the following facts, which the Court takes as true and construes in the light most favorable to Plaintiffs. *See, e.g., Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 704 (9th Cir. 2016)* (restating generally-accepted principle that "[o]rdinarily, when we review a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, we accept a plaintiff's allegations as true 'and construe them in the light most favorable' to the plaintiff") (quoting *Zucco Partners, LLC v. Digimarc*

*Corp., 552 F.3d 981, 989 (9th Cir. 2009))*.

On May 28, 2017, seventeen-year-old Jason Davis was driving on Cranberry Road in Walworth County, Wisconsin. (*Id.* ¶ 63). Seventeen-year-old Hunter Morby and twenty-year-old Landen Brown were passengers in the vehicle. (*Id.* ¶¶ 6, 64). The car crashed into a tree, and all three boys were killed. (*Id.* ¶¶ 6, 70). Plaintiffs allege [*3] that Defendant's Speed Filter prompted the boys to drive at such dangerous speed. (*Id.* ¶¶ 7, 8).

Prior to the accident at issue, one or more of the boys had downloaded Snapchat to their mobile phones. (*Id.* ¶ 65). At some point before the accident, twenty-year-old Brown opened his Snapchat app. (*Id.* ¶ 66). Shortly before 7:00 p.m., the car began accelerating to a speed significantly above the speed limit, and one "Snap" captured the boys' speed at 123 miles per hour. (*Id.* ¶ 69). "[W]ithin minutes" of the 123-MPH-Snap, the car ran off the road and crashed into a tree. (*Id.* ¶ 70). Walworth County Sheriff investigators estimated the speed of the vehicle to be 113 miles per hour at the time of the crash. (*Id.* ¶ 72). Plaintiffs allege that Snapchat was a critical cause of the accident. (*Id.* ¶ 19).

Carly Lemmon and Michael Morby are residents of Wisconsin and the parents of Hunter Morby. (*Id.* ¶ 17). They assert claims for wrongful death as the surviving parents of Hunter Morby. (*Id.*). Michael Morby also asserts, as administrator of the estate, claims for his son's personal injuries. (*Id.*).

Samantha Brown and Marlo Brown are residents of Wisconsin and the parents of Landen Brown. (*Id.* ¶ 18). [*4] They assert claims for wrongful death as the surviving parents of Landen Brown. (*Id.*). Marlo Brown also asserts, as administrator of the estate, claims for his son's personal injuries. (*Id.*).

Snap is a corporation headquartered in California. (*Id.* ¶ 20). It is a social media company that supplies consumers with products focused on mobile photos and videos. (*Id.* ¶ 24). Snap's products allow users to create, upload, post, send, receive, share, and store digital content. (*Id.*). Snap's primary social media product is its mobile application, Snapchat, which in turn has numerous products and features contained within it. (*Id.*).

For some time before May 28, 2017, Snap created and distributed, within the Snapchat app, a feature that allows users to record their real-life speed, including as a driver or passenger, and overlay that speed onto a mobile photo or video. (*Id.* ¶ 25). This feature is known

as the Speed Filter. (*Id.*). Snapchat users can then share, on social media, that mobile photo or video with their real-life speed as a "Snap," which is Snapchat's messaging product. (*Id.* ¶ 26).

Snap rewards, in unknown, variable, and changing ways, users who consume Snapchat in excessive and dangerous [*5] ways. (*Id.* ¶ 27). Such rewards include trophies, streaks, and social recognition. (*Id.*). Snap knows or should know that its design has created extreme and addictive behaviors by its largely teenage and young-adult users, and indeed, has purposefully designed its products to encourage such behavior. (*Id.*). All of the achievements and trophies in Snapchat are unknown to users, and users do not even know about the achievement until they unlock it. (*Id.* ¶ 28). The fun of figuring out what you might win is Snapchat's appeal. (*Id.* ¶ 29). In other words, even if Snap does not actually reward its teenage and young-adult users any prizes or rewards or trophies for recording a 100-MPH-Snap, Snap's users do not know that. (*Id.* ¶ 31). Many of them believe that they will be rewarded by recording a 100-MPH or faster Snap, or at the very least, they want to find out if they will be so rewarded. (*Id.*).

Snap knew or should have known that, prior to May 28, 2017, many of its users were drivers of, or passengers in, cars driven at speeds of 100 m.p.h. or more because they wanted to use Snapchat to capture a mobile photo or video showing them hitting 100 m.p.h. and then share the Snap with their friends. [*6] (*Id.* ¶ 33). Plaintiffs allege that this is a game for Snap and many of its users, the vast majority of whom are teenagers and young adults. (*Id.* ¶ 34). Specifically, Plaintiffs provide the following explanation of the game: "Go as fast as you can until you hit 100 m.p.h., Snap a photo or video, and then share the 100-MPH-Snap on Snapchat." (*Id.*).

Regardless of whether Snap intended to encourage dangerous speeding, Snap knew or should have known that it was, in fact, encouraging dangerous speeding, either by users while drivers or passengers. (*Id.* ¶ 39). Even if Snap may not have intended for its product to tell users to "go faster," Plaintiffs allege that this is nonetheless the exact message its users receive (*Id.* ¶ 40). Plaintiffs provide four illustrative examples of why Snap did realize or should have realized that it was affecting the driving behavior of its users. (*Id.* ¶ 41).

First, before September 2015, a petition on www.change.org called on Snapchat to address its role in encouraging dangerous speeding. (*Id.* ¶ 44).

Second, on September 10, 2015, Wentworth Maynard

was catastrophically injured in Clayton County, Georgia, in a motor vehicle collision involving Snapchat. (*Id.* ¶ [*7] 20). On that day, Christal McGee was driving in Georgia with three other passengers. (*Id.* ¶ 46). McGee was going approximately 107 m.p.h. when she impacted Maynard's car. (*Id.* ¶ 54). Maynard claims Snapchat facilitated McGee's excessive speeding because McGee was motivated to drive at an excessive speed to obtain recognition and to share her experience through Snapchat. (*Id.* ¶ 53).

Third, in December 2015, a news report documented that three young women near Philadelphia, Pennsylvania, were encouraged by Snapchat to drive at excessive speeds, and as a result, they crashed into a parked tractor-trailer. (*Id.* ¶ 57). All three died. (*Id.*). According to the news report, the victims' families say that Snapchat was used on the night of the car crash. (*Id.* ¶ 58).

Fourth, in October 2016, a news report documented that two young people were driving near Tampa, Florida, and using Snapchat. (*Id.* ¶ 60). The couple tracked their speed to over 115 m.p.h. (*Id.*). The couple lost control of their car and hit a minivan. (*Id.*). Five people died as a result of that car crash. (*Id.*).

Despite its knowledge of the danger of its product in encouraging driving at excessive speeds, Snap did not remove or restrict [*8] access to Snapchat while traveling at dangerous speeds or otherwise properly address the danger it created. (*Id.* ¶ 75).

Furthermore, Snap's warnings disclaimers are inadequate, unreasonable, and ineffective. (*Id.* ¶¶ 77-79).

Based on the following allegations, Plaintiffs bring a claim for negligence and seeks punitive damages. (*Id.* ¶¶ 80-87).

## II. LEGAL STANDARD

"Dismissal under *Rule 12(b)(6)* is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013)*.

In ruling on the Motion under *Rule 12(b)(6)*, the Court follows *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*, and *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d*

*868 (2009)*. "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 570*). The Court must disregard allegations that are legal conclusions, even when disguised as facts. *See id. at 681* ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 996 (9th Cir. 2014)*. "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the [*9] line between possibility and plausibility.'" *Eclectic Properties, 751 F.3d at 995* (quoting *Twombly, 550 U.S. at 556-57*) (internal citations omitted).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the Complaint alleges a plausible claim for relief. *See Iqbal, 556 U.S. at 679*; *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1054 (9th Cir. 2011)*. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc., 838 F.3d 958, 2016 WL 5389307, at *2 (9th Cir., 2016)* (as amended) (quoting *Iqbal, 556 U.S. at 679*). Where the facts as pleaded in the Complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Id. at 996-97*; *see also Somers, 729 F.3d at 960*.

## III. DISCUSSION

### A. Request for Judicial Notice

Along with its Motion, Defendant filed a Request for Judicial Notice ("RJN") on December 16, 2019. (Docket No. 51). On January 13, 2020, Plaintiffs [*10] filed an Opposition. (Docket No. 56). On January 27, 2020, Defendant filed a Reply. (Docket No. 58).

Under *Rule 12(d) of the Federal Rules of Civil Procedure*, if the Court considers matters outside the pleadings in ruling on a motion to dismiss that motion must be converted into one for summary judgment. *Fed. R. Civ. P. 12(d)*. As a general rule, "a district court may not consider any material beyond the pleadings in ruling on a *Rule 12(b)(6)* motion." *Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)*. An exception to this general rule exists for (1) materials that are attached to or necessarily relied upon in the complaint, and (2) matters of public record. *Id. at 688-89*.

In the RJN, Defendant requests that the Court take judicial notice of six documents. (*See* RJN at 1).

The first three documents relate to warnings and terms of service: (1) Snapchat's pop-up warning that appeared on or before May 28, 2017, when a user first opened the Speed Filter (Docket No. 33-1); (2) Snapchat's pop-up warning that appeared on or before May 28, 2017, when a user exceeded 15 m.p.h. while using the Speed Filter (Docket No. 33-2); and (3) Snap's Terms of Service in effect on or before May 28, 2017 (Docket No. 33-3). The Court has previously taken judicial notice of the three documents because they were incorporated by reference in Plaintiff's Complaint. [*11] (*See* Docket No. 44 at 6-8). For the reasons stated in the Court's prior order, the Court determines that the three documents are incorporated by reference in Plaintiff's FAC.

The next three documents are several articles that are quoted or referenced in the FAC. (Docket Nos. 53-1, 53-2, 53-3). Defendant asserts that Plaintiffs repeatedly refer to these articles and rely on them to support their argument that Defendant is liable for the accident here. (RJN at 4). Therefore, Defendant argues that the three articles are subject to judicial notice. (*Id.*).

In response, Plaintiffs do not dispute that they cited to the three articles. (Opp. to RJN at 1). Instead, they assert that there is no basis or reason for taking judicial notice of the articles because the Court is not deciding facts on a motion to dismiss. (*Id.*). The Court agrees with Plaintiffs with respect to these three articles; because the Court need not rely on the three articles in ruling on this Motion, the request for judicial notice with respect to the three articles is denied as moot.

Therefore, the RJN is **GRANTED** *in part* with respect to the terms of use and warnings and **DENIED** *in part* with respect to the three articles.

**B. Communications Decency Act [*12]**

Defendant argues that Plaintiffs' claim fails because it is barred by the Communications Decency Act ("CDA"). (Mot. at 19-25).

CDA provides that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *47 U.S.C. § 230(c)(1)* (emphasis added). "The prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Kimzey v. Yelp! Inc., 836 F.3d 1263, 1266 (9th Cir. 2016)* (internal quotations omitted).

The Ninth Circuit provides a three-prong test for *Section 230* immunity. *Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100 (9th Cir. 2009)*. Immunity from liability exists for "(1) provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id. at 1100-01*. "When a plaintiff cannot allege enough facts to overcome *Section 230* immunity, a plaintiff's claims should be dismissed." *Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097 (9th Cir. 2019)*.

As before, Plaintiffs appear to concede that the first two prongs apply and only challenge the third prong. They argue that they are not seeking to hold Defendant liable for another's content, but rather Defendant's [*13] own content, namely the Speed Filter. (Opp. at 22). Therefore, Plaintiffs argue that the Court need not look at whether the Speed Filter is a "neutral tool." (*Id.* at 23). In response, Defendant argues that Speed Filter is not "content in and of [itself]," but is a content-neutral tool that facilitates the communication and content of others. (Reply at 19).

As a preliminary matter, the Court rejects Plaintiffs' argument that the Court need not examine whether the Speed Filter is a neutral tool in light of the Ninth Circuit's decision in *Dyroff*. There, the plaintiff similarly argued that the CDA did not apply to her claims because she was trying to hold the defendant website liable for its own "content" — namely, the recommendation and notification functions. *934 F.3d at 1096*. The Ninth Circuit rejected the plaintiff's argument because it determined that the defendant "did not create **content** on [the website], in whole or in part." *Id.* (emphasis added). Instead, the court held that the defendant's "functions, including recommendations and notifications,

were *content-neutral tools* used to facilitate communications." *Id.* (emphasis added). In other words, the Court cannot simply presume that the Speed Filter *is* "content" because Plaintiffs **[*14]** allege that it is; rather, the Court must determine whether the Speed Filter is a "content-neutral tool" or "content."

In *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC* (*Roommates*), the Ninth Circuit explained that a website operator does not become liable as an "information content provider" merely by "augmenting the content [of online material] generally." *521 F.3d 1157, 1167-68 (9th Cir. 2008)* (en banc). Rather, the website must contribute "**materially . . . to its alleged unlawfulness**." *Id. at 1167-68* (emphasis added). A website does not so "contribute" when it merely provides third parties with "**neutral tools**" to create web content, even if the website knows that the third parties are using such tools to create illegal content. *See, e.g., id. at 1169; id. at 1169, n. 24* (noting that where a plaintiff brings a claim "based on a website operator's passive acquiescence in the misconduct of its users," the website operator generally will be immune "even if the users committed their misconduct using tools of general availability provided by the website operator").

With this backdrop, the Ninth Circuit examined whether CDA immunity applied to three "functions" performed by the defendant Roommate, which operated a website designed to match people **[*15]** renting out spare rooms with people looking for a place to stay. *Id. at 1161, 1164-74*. **First**, Roommate posed questions about sex, family status, and sexual orientation to prospective subscribers, and the subscribers were required to answer these questions as a condition of using Roommate's service. *Id. at 1164*. The Ninth Circuit held that CDA immunity did not apply to this function because Roommate created the questions and choice of answers and forced subscribers to answer them. *Id.* **Second**, Roommate developed and displayed the subscribers' discriminatory preferences. *Id. at 1165*. Although Roommate's subscribers provided the information at issue, Roommate developed, in part, the information because it required subscribers to provide the information as a condition of accessing its services and provided a limited set of pre-populated answers through drop-down menus. *Id. at 1166*. The Ninth Circuit therefore concluded that CDA immunity also did not apply to this function. *Id.* **Third**, Roommate published the subscribers' discriminatory statements displayed in the "Additional Comments" section. *Id. at 1173*. Because Roommate presented "a blank text box," did not provide any specific guidance as to what the comments should contain, and did not urge subscribers **[*16]** to input discriminatory preferences, the Ninth Circuit determined that Roommate was not responsible, in whole or in part, for the development of this function. *Id. at 1173-74*.

In *Dyroff*, the Ninth Circuit further elaborated on this standard. There, the plaintiff brought an action against an operator of the "Experience Project" website after her son died from a heroin overdose. *934 F.3d at 1094*. The website allowed users to register anonymously, recommended users to join certain groups based on the content of their posts and other attributes, and sent email notifications when a user posted content to a group. *Id.* The plaintiff's son posted in a "heroin-related group" regarding where to purchase heroin, received an email notification regarding his post, and ultimately connected off the site to purchase heroin from a contact he made on the site. *Id. at 1095*.

The plaintiff argued that the CDA did not apply because she was trying to hold the website operator liable for its own "content" — namely, the recommendation and notification functions. *Id. at 1096*. Specifically, the plaintiff alleged that these features:

> (1) allowed users to traffic anonymously in illegal, deadly narcotics and to create groups dedicated to their sale and use; (2) steered **[*17]** users to additional groups dedicated to the sale and use of narcotics; (3) sent users alerts to posts within groups that were dedicated to the sale and use of narcotics; (4) permitted users to remain active accountholders despite evidence that they openly engaged in drug trafficking and that law enforcement had undertaken related investigations; and (5) demonstrated antipathy toward law enforcement efforts to stop illegal activity on Experience Project.

*Id. at 1095*.

The Ninth Circuit disagreed with the plaintiff. It held that the website operator was "immune from liability under the CDA because its functions, including recommendations and notifications, were content-neutral tools used to facilitate communications." *Id. at 1096*. In reaching this determination, the Circuit reasoned that the functions "most resemble the 'Additional Comments' features in Roommates.com in that Experience Project users . . . were not required to disclose that they were looking for heroin or other illegal

drugs." *Id. at 1099*. "The recommendation and notification functions helped facilitate this user-to-user communication, but it did not materially contribute, as Plaintiff argues, to the alleged unlawfulness of the content." *Id.* In other words, **[*18]** because the "[p]laintiff cannot and does not plead that Ultimate Software *required* users to post specific content, *made* *suggestions* regarding the content of potential user posts, or *contributed to making* *unlawful or objectionable user posts*[,] Ultimate Software [was] entitled to immunity under the plain terms of *Section 230* and case law as a publisher of third-party content." *Id.* (emphasis added).

Applying this standard, district courts have held that the CDA does not protect website operators when "*it* created the tortious content." *Anthony v. Yahoo! Inc., 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006)* (emphasis in original) (no CDA immunity where the defendant allegedly created false dating profiles to retain customers); *Fraley v. Facebook, Inc., 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011)* (no CDA immunity where the "[p]laintiffs allege[d] that Facebook create[d] content by deceptively mistranslating members' actions, such as clicking on a 'Like' button on a company's page, into the words 'Plaintiff likes [Brand],' and further combining that text with Plaintiff's photograph, the company's logo, and the label 'Sponsored Story.'"); *Opperman v. Path, Inc., 87 F. Supp. 3d 1018, 1044 (N.D. Cal. 2014)* (no CDA immunity where Plaintiffs alleged that Apple's iOS Human Interface Guidelines encouraged data theft and where the guidelines contained "several suggestions that do, on their face, appear to encourage **[*19]** the practices Plaintiffs complain of in this case").

In contrast, other courts have determined that CDA immunity applies where the website merely provides a framework that could be utilized for proper or improper purposes by the user. *See, e.g.,* *Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1125 (9th Cir. 2003)* (CDA immunity applies to a dating website even though some of the content was formulated in response to the website's questionnaire because "the *selection of the content was left exclusively to the user*") (emphasis added); *Goddard v. Google, Inc., 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009)* (CDA immunity applies where the plaintiff alleged that Google's suggestion tool, which used an algorithm to suggest specific keywords to advertisers, caused advertisers to post unlawful advertisements more frequently); *Marshall's Locksmith Serv. Inc. v. Google, LLC, 925 F.3d 1263, 1269 (D.C. Cir. 2019)* ("the defendants'

translation of information that comes from the scam locksmiths' webpages — in particular, street addresses — into map pinpoints" does not take the defendants beyond the scope of *section 230* immunity; "[t]he underlying information is entirely provided by the third party, and the choice of presentation does not itself convert the search engine into an information content provider").

The Court concludes that the Speed Filter is a neutral tool, which can be utilized for both proper and improper purposes. **[*20]** The Speed Filter is essentially a speedometer tool, which allows Defendant's users to capture and share their speeds with others. The Speed Filter can be used at low or high speeds, and Defendant does not require any user to Snap a high speed. While Plaintiffs allege that some users believe that they will be rewarded by recording a 100-MPH or faster Snap, they do not allege that Snap actually rewards its users for doing so. In fact, when a user first opens the Speed Filter, a warning appears on the app stating "Please, DO NOT Snap and drive." (RJN, Ex. A). When a user's speed exceeds 15 m.p.h., another similar warning appears on the app. (RJN, Ex. B). While a user might use the Speed Filter to Snap a high number, the selection of this content (or number) appears to be entirely left to the user, and based on the warnings, capturing the speed while driving is in fact discouraged by Defendant.

Plaintiffs argue that this case can be distinguished from other cases where CDA immunity applied because Plaintiffs are not seeking to hold Defendant liable for "any user content." (Opp. at 22). Plaintiffs reiterated this argument at the hearing. However, central to Plaintiffs' claim is that the users are **[*21]** using the Speed Filter to *capture and share* a 100-MPH or higher number Snap, *i.e.*, to create user content. (*See, e.g.*, FAC ¶ 33 ("Snap knew or should have known that, prior to May 28, 2017, that many of its users have been driving, or were passengers in, cars at speeds of 100 MPH or more because they want to use the Snapchat to *capture* a mobile photo or video showing them hitting 100 MPH and then *share* the Snap with their friends.); *id.* ¶ 35 ("'[L]ooking at the speedometer in your car isn't as much fun' as '*capturing* the car accelerating on camera and then *sharing* with all your friends.'")). The Court cannot ignore the fact that the content itself, the 100-MPH-Snap (or other high-speed Snaps) is at the crux of Plaintiffs' claims. In other words, despite Plaintiffs' assertions to the contrary, it appears that Plaintiffs are seeking to hold Defendant responsible for failing to regulate what the users post through the

Speed Filter; if the users were not motivated to capture their high speeds for content, they would not speed.

Moreover, the Court cannot meaningfully distinguish the situation here from other cases, which have similarly rejected the plaintiff's efforts to plead around the **[*22]** CDA requirement by alleging that the website's features promoted the users to engage in illegal conduct. *See, e.g.,* _Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 22 (1st Cir. 2016)_ ("We hold that claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by _section 230(c)(1)_."); *see also* _Roommates, 521 F.3d at 1169_ ("If an individual uses an ordinary search engine to query for a 'white roommate,' the search engine has not contributed to any alleged unlawfulness in the individual's conduct; providing *neutral* tools to carry out what may be unlawful or illicit searches does not amount to 'development' for purposes of the immunity exception.") (emphasis in original).

Plaintiffs also argued that the harm here was not caused by any user content. (Opp. at 24). However, as Defendant notes, this fact is not determinative. For example, in *Doe II v. MySpace Inc.*, the California Court of Appeal held that the "CDA applies even when the alleged harm actually resulted from conduct that occurred outside of the information exchanged, whether that information was actionable or not." _175 Cal. App. 4th 561, 573, 96 Cal. Rptr. 3d 148 (2009)_. Therefore, even though the plaintiffs there were harmed offline when they were sexually assaulted by **[*23]** people they met through the website, the court held that CDA immunity applied. Similarly, the Court concludes that CDA immunity applies even if Plaintiffs here were harmed by the users' conduct of speeding.

The Court is also guided by the Ninth Circuit, which has instructed courts to apply CDA broadly. "Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that **something** the website operator did encouraged the illegality." _Roommates, 521 F.3d at 1174_ (emphasis in original). "Such close cases . . . must be resolved in favor of immunity, lest we cut the heart out of _section 230_ by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Id.* In other words, "[w]here it is **very clear** that the website directly participates in developing the alleged illegality—as it is clear here with

respect to Roommate's questions, answers and the resulting profile pages—immunity will be lost." *Id.* (emphasis added). "But in cases of **enhancement by implication or**development by inference—such as with respect to the 'Additional Comments' here—_section 230_ must be interpreted to protect **[*24]** websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." _Id. at 1174-75_ (emphasis added).

Based on Plaintiffs' allegations, the Court cannot conclude that "it is very clear" that the Defendant "directly participated" in developing the alleged illegality. For example, Plaintiffs do not allege that Defendant asked its users to capture a Snap with a high speed or even suggested that they should do so. Instead, Plaintiffs' allegations appear to amount to "enhancement by implication or development by inference" — that the Speed Filter impliedly suggested to users that they should Snap a 100-MPH-Snap. However, in such a close scenario, the Ninth Circuit has held that _section 230_ immunity applies.

The Court recognizes this outcome is inconsistent with the Georgia Court of Appeal's decision, which held that CDA immunity does not apply to the Speed Filter. *See* _Maynard v. Snapchat, Inc., 346 Ga. App. 131, 816 S.E.2d 77, 346 Ga. App. 131, 816 S.E. 2d 77 (Ga. Ct. App. 2018)_. However, because the *Maynard* court did not examine or apply any of the Ninth Circuit case law relating to the application of CDA immunity to "neutral tools," the Court does not find the holding in *Maynard* to be persuasive.

Because the Court concludes that CDA immunity applies, **[*25]** the Court need not examine whether Plaintiffs' claim should be dismissed on additional grounds.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion is **GRANTED**. Ordinarily, the Court would grant leave to amend, but here the facts relating to CDA immunity are undisputed and any amendment would be futile. Accordingly, the Motion is **GRANTED** **without leave to amend**, and the action is **DISMISSED**.

This Order shall constitute notice of entry of judgment pursuant to _Federal Rule of Civil Procedure 58_. The Court **ORDERS** the Clerk to treat this Order, and its entry on the docket, as an entry of judgment. *Local Rule 58-6.*

IT IS SO ORDERED.

---

**End of Document**

 Positive

As of: June 8, 2020 9:56 PM Z

## *Nieman v. Versuslaw, Inc.*

United States District Court for the Central District of Illinois, Urbana Division

June 13, 2012, Decided; June 13, 2012, Filed

Case No. 12-3104

**Reporter**

2012 U.S. Dist. LEXIS 109066 *; 2012 WL 3201935

JASON NIEMAN, Plaintiff, v. VERSUSLAW, INC., JOSEPH W. ACTON, YAHOO, INC., GOOGLE INC., and MICROSOFT, INC., Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Motion granted by, Complaint dismissed at *Nieman v. Versuslaw, Inc., 2012 U.S. Dist. LEXIS 109069 (C.D. Ill., Aug. 2, 2012)*

## Core Terms

allegations, provider, interactive, Versuslaw, computer service, immunity, publisher, motion to dismiss, plaintiff's claim, brings, civil conspiracy, public record, third party, Recommendation, documents, internet, Rights, user, prospective economic advantage, internet service provider, unjust enrichment, search engine, websites, links

**Counsel:** **[*1]** Jason Lee Nieman, Plaintiff, Pro se, Springfield, IL.

For Microsoft Corporation, Defendant: Steven P Mandell, MANDELL MENKES LLC, Chicago, IL; Lynn U Thorpe, GONZALES SAGGIO & HARLAN LLP, Chicago, IL.

For Versuslaw, Inc., Joseph W. Acton, Defendants: Steven P Mandell, LEAD ATTORNEY, Elizabeth Anne Ferrari Morris, MANDELL MENKES LLC, Chicago, IL.

For Yahoo, Inc., Defendant: Lynn U Thorpe, LEAD ATTORNEY, GONZALES SAGGIO & HARLAN LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

For Google, Inc., Defendant: Jade R Lambert, LEAD ATTORNEY, PERKINS COIE LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

**Judges:** DAVID G. BERNTHAL, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** DAVID G. BERNTHAL

## Opinion

### REPORT AND RECOMMENDATION

In April 2012, Defendants filed a Notice of Removal (#1), bringing this case to this Court from the Circuit Court of Sangamon County. Plaintiff Jason Nieman, acting pro se, brings suit against the following defendants: Microsoft Corp., Versuslaw, Inc., Joseph W. Acton, Yahoo! Inc., and Google, Inc. Plaintiff brings suit for an alleged violation of his civil rights pursuant to *§ 1981*, in addition to other federal and state law claims. The operative complaint in this litigation **[*2]** is Plaintiff's Second Amended Complaint at Law (#1-5).

The Court now has pending before it several motions to dismiss. In this Report and Recommendation, the Court addresses the following motions: Defendant Google Inc.'s 12(b)(6) Motion to Dismiss Plaintiff's Second Amended Complaint (#16), Defendants' Microsoft

Corporation and Yahoo!, Inc.'s *Rule 12(b)(6)* Motion to Dismiss Counts III, VI, VII, VIII, IX and X of the Second Amended Complaint (#18), Defendants Microsoft Corporation's and Yahoo!, Inc.'s *Rule 12(c)* Motion for Judgment on the Pleadings on Counts III, IV, VIII, IX and X of the Second Amended Complaint (#22), and Defendants Versuslaw, Inc.'s and Joseph W. Acton's Motion to Dismiss Plaintiff's Second Amended Complaint at Law (#27). [1] Plaintiff has responded to each of these motions. [2] After reviewing the parties' pleadings and memoranda, this Court recommends, pursuant to its authority under *28 U.S.C. § 636(b)(1)(B)*, that all of these motions **(#16, 18, 22, and 27)** be **GRANTED**, and that Plaintiff's complaint be dismissed in its entirety with respect to all Defendants.

## I. Background

The following background is taken from Plaintiff's Second Amended Complaint at Law (#1-5). Plaintiff is an insurance claims industry professional. From November 2009 through March 2011, Plaintiff pursued litigation against his former employer, Nationwide Mutual Insurance Company (hereinafter "Nationwide"), and several related defendants. In approximately January 2009, Plaintiff discovered that certain Internet websites were linking copies of information related to the litigation to his name, such that an internet browser search for his name would provide results that referenced the filings or rulings in his litigation against Nationwide. Plaintiff alleges that these references were occurring by way of paid legal search websites such as Lexis/Nexis.com, Justia.com, Leagle.com, and Versuslaw.com. Plaintiff alleges these entities "secure the case information and related documents by way of sites such [*4] as PACER and then 'mirror' it on to the internet by way of their sites and servers." (#1-5, p. 10, ¶ 15).

From January 2009 to present, Plaintiff has applied to various positions of employment. Plaintiff alleges that these potential employers have completed internet browser searches of his name using search engines operated by Defendants, such as Google.com, Yahoo.com, and Bing.com. Plaintiff alleges that prospective employers have found documents related to his litigation against Nationwide through conducting these searches, and have consequently disqualified him from candidacy for the positions to which he has applied. In summary, Plaintiff alleges that "Plaintiff has been effectively 'blacklisted' as to employment opportunities due to the ease at which these references appear pursuant to a simple name search, and due to the unlawful acts of third parties who then use such information to unlawfully disqualify the Plaintiff's candidacy." (#1-5, p. 10).

## II. Standard

Defendants' motions to dismiss seek dismissal under *Fed. R. Civ. P. 12(b)(6)*. The purpose of a motion to dismiss for failure to state a claim is to test the sufficiency of the complaint, not to decide the merits of the case. [*5] *Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990)*. Dismissal is appropriate only if Plaintiff cannot demonstrate that he is plausibly entitled to relief under the facts he has alleged. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 546, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. *Federal Rule of Civil Procedure 8(a)(2)* requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The complaint must give fair notice of what the claim is and the grounds upon which it rests. *E.E.O.C. v. Concentra Health Servs., Inc., 496 F.3d 773, 776-77 (7th Cir. 2007)*. However, fair notice is not enough by itself; the allegations must show that it is plausible, rather than merely speculative, that the plaintiff is entitled to relief. *Tamayo v. Blagojevich, 526 F.3d 1074, 1083 (7th Cir. 2008)*.

When considering a motion to dismiss for failure to state a claim, the Court is limited to the allegations contained in the pleadings. *Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)*. The Court must treat all well-pleaded allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *McMillan v. Collection Prof'ls, Inc., 455 F.3d 754, 758 (7th Cir. 2006)*; [*6] *see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929* (requiring plausible grounds for inferences if those inferences are to sustain a complaint). In considering the plaintiff's factual allegations, the Court should not accept as adequate

---

[1] With respect to (#22), Defendants moved to amend this motion, in Microsoft Corporation's and Yahoo!, Inc.'s Motion [*3] to Correct Their Motion for Judgment on the Pleadings to Add Count VI. (#35).

[2] Plaintiff's responses to the various motions are in the record as follows: Plaintiff responds to (#16) in (#26), Plaintiff responds to (#18 and #22) in (#31), and Plaintiff responds to (#27) in (#33).

abstract recitations of the elements of a cause of action or conclusory legal statements. *Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009)*. District courts, however, are required to liberally construe complaints filed by pro se litigants. *Marshall v. Knight, 445 F.3d 965 (7th Cir. 2006)* (citing *Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972))*.

## III. Discussion

Plaintiff brings the following claims against all Defendants: claims under the Illinois Human Rights Act, commercial misappropriation, violation of *§ 1981* of the Civil Rights Act, violation of the Lanham Act, intentional interference with current and prospective economic advantage, unjust enrichment / civil conspiracy, and violations of the RICO Act. All of the Defendants argue that Plaintiff's claims are barred by *Section 230* of the Communications Decency Act (hereinafter "the CDA"). Additionally, all the Defendants argue that, even apart from the question of immunity presented by the CDA, Plaintiff has [*7] failed to state a claim for which relief can be granted.

The Court will begin by addressing a basic point: reproducing information obtained from judicial records maintained in connection with a public court proceeding cannot give rise to liability. Second, the Court will address the issue of Defendants' immunity under the CDA and whether Plaintiff otherwise fails to state a claim.

## A. Privilege to Publish Matters Contained in the Public Record

As the Court has already noted, Plaintiff's complaint is based on the harm caused to him as a result of documents related to his litigation against Nationwide being readily accessible on the internet. The Court notes that Plaintiff's previous litigation against Nationwide is a matter of public record. The *First Amendment* creates a privilege to publish matters contained in the public record, even in cases where publication would offend the sensibilities of a reasonable person. *Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1231-32 (7th Cir. 1993)*. The Seventh Circuit has further noted that "the *First Amendment* greatly circumscribes the right of even a private figure to obtain damages for the publication of newsworthy facts about him, even when they [*8] are facts of a kind that people want very much to conceal." *Id. at 1232*. This Court therefore

concludes that Plaintiff has not stated a claim for which he is plausibly entitled to relief, given the *First Amendment* protections applicable to this case.

## B. *Section 230* of the Communications Decency Act

*Section 230 of the CDA* directs that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *47 U.S.C. § 230(c)(1)*. The statute provides broad immunity to internet service providers as to any cause of action that would make service providers liable for information originating with a third-party user of the service. *Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321 (11th Cir. 2006)*. In discussing the statute, the Fourth Circuit has noted:

> Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran v. AOL, 129 F.3d 327, 331 (4th Cir. 1997)*. [*9] However, the Seventh Circuit has noted that the statute itself does not refer specifically to "immunity," and that this statute does not operate as a general prohibition of civil liability for web-site operators and other online content hosts. *Chi. Lawyer's Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669 (7th Cir. 2008)*.

*Section 230* applies whenever three elements are satisfied: (1) the defendant is a provider of an interactive computer service; (2) the plaintiff's claims seek to treat the defendant as a "publisher or speaker" of allegedly harmful or unlawful information, and (3) the information at issue was "provided by another information content provider." See *47 U.S.C. § 230(c)(1)*.

In the following analysis, the Court will consider whether Plaintiff's claims are barred by *§ 230* or are otherwise implausible claims. In so doing, the Court will distinguish between groups of Defendants, as Plaintiff has done in his complaint. Plaintiff indicates that Defendant Versuslaw, Inc., and its owner, Defendant Joseph W. Acton are more responsible for Plaintiff's injuries than the "search engine defendants," Defendants Google, Microsoft, and Yahoo. (#1-5, p. 3). Plaintiff [*10] alleges that paid legal search websites, such as

Lexis/Nexis.com, Justia.com, and Versuslaw.com secured the documents related to his litigation against Nationwide and posted it online. At Plaintiff's request, some entities removed the references that caused the litigation documents to turn up as results when querying Plaintiff's name. However, Plaintiff alleges that Defendant Versuslaw, Inc. and Defendant Acton did not comply with the request, and that "the only remaining offending links," found when Plaintiff's name is used as a query in a search engine, are attributable to these Defendants. (#1-5, p. 14, ¶ 23). Plaintiff further alleges that "Defendant Versuslaw, Inc. has paid the search Defendants (Google, Yahoo, and Microsoft) to increase and/or maintain the prominence of the links as to the Plaintiff's protected conduct in association with a simple search of his name." (#1-5, p. 11, ¶ 18). The Court is mindful of these additional factual allegations against Defendant Versuslaw, Inc. and Defendant Acton.

To begin an assessment of whether Plaintiff's claims are barred by the CDA: The CDA defines an "interactive computer service" to include "any information service, system, or access **[*11]** software provider that provides or enables computer access by multiple users to a computer server." *47 U.S.C. § 230(f)(2)*. This definition clearly encompasses search engines. *See, e.g., Jurin v. Google Inc., 695 F.Supp.2d 1117, 1122-23 (E.D. Cal. 2010)*. In this case, the allegations against Defendants Google, Yahoo, and Microsoft are based solely on Plaintiff's factual allegations concerning search results obtained when querying Plaintiff's name using search engines operated by these defendants. Therefore, these defendants are "interactive computer service" providers under the statute. Additionally, a typical example of an "interactive computer service" is a website, such as Defendant Versuslaw, which operates versuslaw.com. *See Batzel v. Smith, 333 F.3d 1018, 1030-31 (9th Cir. 2003)* (noting that *Section 230* immunity may apply to providers and users of interactive computer services). The Court concludes that all of defendants are internet service providers or users to whom *Section 230* may apply.

Second, the Eight Circuit has succinctly summarized how the CDA operates to ensure that internet service providers are not held liable for content developed primarily by third parties:

The CDA **[*12]** states that '[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider,' *47 U.S.C. § 230(c)(1)*, and expressly preempts any

state law to the contrary, id. *§ 230(e)(3)*. The CDA defines an 'information content provider' as 'any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the internet or any other interactive computer service.' *Id.* at *§ 230(f)(3)*. Read together, these provision bar plaintiffs from holding ISPs legally responsible for information that third parties created and developed [citation omitted]. 'Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them.' *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir. 2009)*.

*Johnson v. Arden, 614 F.3d 785, 790-91 (8th Cir. 2010)*.

Stated another way, an internet service provider qualifies for immunity so long as it does not also function as an "information content provider" for the portion of the statement or publication at issue. *Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003)*. **[*13]** *Section 230* provides broad immunity to internet service providers that publish content provided primarily by third parties. *Id.*

In this case, Plaintiff has specifically alleged that the offensive search results giving rise to his claim against Defendants Google, Yahoo, and Microsoft are links to copies of information related to his litigation against Nationwide. Plaintiff indicates that the links include attachments to rulings on general court matters. It is indisputable that Defendants Google, Yahoo, and Microsoft were not involved in the creation or development of these court rulings. Additionally, though Plaintiff argues Defendant Versuslaw has greater liability because it secured the documents related to his litigation against Nationwide and posted them online, this would still be considered content provided primarily by third parties. *See Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003)* (stating "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process"). The Court concludes that the information at issue was "provided by another **[*14]** information content provider." *47 U.S.C. § 230(c)(1)*.

The only remaining issue is whether Plaintiff's specific claims seek to treat defendants as publishers. Plaintiff brings claims federal claims under *§ 1981 of the Civil Rights Act*, the Lanham Act, and the RICO Act. Plaintiff

also brings state law claims under the Illinois Human Rights Act, and he brings state law tort claims of commercial misappropriation, intentional interference with current and prospective economic advantage, unjust enrichment, and civil conspiracy.

The Court will first address the federal claims. To begin, the claims brought under *§ 1981* and RICO are, quite simply, not applicable to the facts as Plaintiff has pled. *See Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996)* (setting forth elements of a § 1981 claim); *see also Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir. 1992)* (setting forth elements of a RICO claim). Plaintiff's civil rights claim is implausible, as Plaintiff is not a member of a racial minority. Plaintiff's RICO claim is also implausible, as Plaintiff's complaint is devoid of allegations that could support a finding of an enterprise or a pattern of racketeering activity. **[*15]** Next, considering Plaintiff's claim under the Lanham Act, the Seventh Circuit considered an analogous case in *Stayart v. Yahoo! Inc., 623 F.3d 436 (7th Cir. 2010)*, in which a plaintiff brought suit against Yahoo! Inc. based on search results obtained when using her name as a search query. In that case, the Seventh Circuit did not reach the issues concerning the CDA. Instead, the court held that the plaintiff lacked standing to bring suit under the Lanham Act because she lacked a commercial interest in her name. Plaintiff's case here is no different, as the Seventh Circuit's reasoning reflects that one's interest in their professional reputation does not amount to a commercial interest in their name.

Second, Defendants argue that Plaintiff's state claims are barred by the CDA. Though Plaintiff nominally brings a variety of types of claims, ranging from claims under IHRA to civil conspiracy, the Court notes that the factual essence of Plaintiff's claims is actually more akin to defamation and various privacy torts. Many circuit courts have held that the CDA bars claims under any state law theory to persons harmed by allegedly defamatory material, where the defendant is not a "publisher **[*16]** or speaker" as defined by the act. *Johnson v. Arden, 614 F.3d 785, 791 (8th Cir. 2010)* (summarizing holdings in five other circuit courts). While the Seventh Circuit has not directly addressed the issue of the scope of the CDA with respect to state claims for defamation, the Court is persuaded by the authority from other circuits that such immunity for defendants is appropriate in this case. Furthermore, with respect to Plaintiff's claim for commercial misappropriation, such a claim is pre-empted by the Illinois Right of Publicity Act. *765 ILCS 1075/30(a)*. Under the statute, there can be

no liability where a person's identity is used for a non-commercial purpose, including in any news or public affairs account. *765 ILCS 1075/35(b)(2)*. This exemption is applicable to this case, as Plaintiff's prior litigation is a matter of public interest and public record. The Court concludes that any claim Plaintiff may have for defamation is barred by the CDA, and any privacy tort he may claim against Defendants is similarly not actionable.

Additionally, several of the state claims that Plaintiff has brought are not supported by his factual allegations. Specifically, Plaintiff brings a claim under **[*17]** the Illinois Human Rights Act, and also brings counts for intentional interference with current and prospective economic advantage, for unjust enrichment, and for civil conspiracy. To establish a prima facie case of retaliation under IHRA, a plaintiff must show that he engaged in a protected activity, and that as a result his employer committed an adverse act against him. *Carter Coal Co. v. Human Rights Comm'n, 261 Ill.App.3d 1, 7, 633 N.E.2d 202, 198 Ill. Dec. 740 (Ill. App. Ct. 1994)*. In this case, Defendants have no employment relationship with Plaintiff. Similarly, Plaintiff's claim for interference with prospective economic advantage must fail because the facts, as Plaintiff has alleged them, indicate Plaintiff did not have any valid business relationship or expectancy. *See Small v. Sussman, 306 Ill.App.3d 639, 648, 713 N.E.2d 1216, 239 Ill. Dec. 366 (Ill. App. Ct. 1999)* (stating elements of tortious interference with prospective economic advantage). Plaintiff's Count IX for unjust enrichment and civil conspiracy is also factually unsupported. These specific claims are most simply addressed by noting, as this Court has already discussed above, that providing online access to judicial public records implicates *First Amendment* privileges, and so these **[*18]** activities cannot form the basis of a tort for civil conspiracy or unjust enrichment.

As such, this Court concludes that the facts, as Plaintiff has alleged them, indicate he does not have any viable claim against Defendants. Defendants enjoy a *First Amendment* privilege to publish matters of public record, any state law defamation or privacy claim would be barred by CDA, and the facts, as Plaintiff has alleged them, do not support his other various statutory and common law claims.

## IV. Summary

For these reasons, the Court recommends that Defendants' various motions to dismiss (**#16, 18, 22,**

and **27**) be **GRANTED**, and that Plaintiff's complaint be dismissed in its entirety with respect to all Defendants.

The parties are advised that any objection to this recommendation must be filed in writing with the clerk within 14 days after being served with a copy of this Report and Recommendation. See *28 U.S.C. § 636(b)(1)*. Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986)*.

ENTERED this 13th day of June, 2012.

/s/ DAVID G. BERNTHAL

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

 Caution
As of: June 8, 2020 9:57 PM Z

# *Nieman v. Versuslaw, Inc.*

United States District Court for the Central District of Illinois, Springfield Division

August 2, 2012, Decided; August 3, 2012, Filed

No. 12-3104

**Reporter**
2012 U.S. Dist. LEXIS 109069 *; 40 Media L. Rep. 2191

JASON LEE NIEMAN, Plaintiff, v. VERSUSLAW, INC., JOSEPH W. ACTON, YAHOO!, INC., GOOGLE INC., and MICROSOFT, CORP., Defendants.

**Subsequent History:** Affirmed by *Nieman v. Versuslaw, Inc., 2013 U.S. App. LEXIS 5549 (7th Cir. Ill., Mar. 19, 2013)*

**Prior History:** *Nieman v. Versuslaw, Inc., 2012 U.S. Dist. LEXIS 109066 (C.D. Ill., June 13, 2012)*

## Core Terms

allegations, Recommendation, Pleadings, Lanham Act, Publicity Act, expectancy, documents, motion for judgment, public record, unjust enrichment, interactive, links, intellectual property, civil conspiracy, computer service, former employer, provider, websites, prospective economic advantage, intentional interference, commercial interest, potential employer, motion to dismiss, cause of action, third party, misappropriation, immunity, notice

**Counsel:** [*1] Jason Lee Nieman, Plaintiff, Pro se, Springfield, IL.

For Microsoft Corporation, Defendant: Steven P Mandell, MANDELL MENKES LLC, Chicago, IL; Lynn U Thorpe, GONZALES SAGGIO & HARLAN LLP, Chicago, IL.

For Versuslaw, Inc., Joseph W. Acton, Defendants: Steven P Mandell, LEAD ATTORNEY, Elizabeth Anne Ferrari Morris, MANDELL MENKES LLC, Chicago, IL.

For Yahoo, Inc., Defendant: Lynn U Thorpe, LEAD ATTORNEY, GONZALES SAGGIO & HARLAN LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

For Google, Inc., Defendant: Jade R Lambert, LEAD ATTORNEY, PERKINS COIE LLP, Chicago, IL; Steven P Mandell, MANDELL MENKES LLC, Chicago, IL.

**Judges:** SUE E. MYERSCOUGH, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SUE E. MYERSCOUGH

## Opinion

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on the Report and Recommendation (d/e 39) entered by Magistrate Judge David G. Bernthal on June 13, 2012. Plaintiff filed "Plaintiff's Objections to the Magistrate's Report and Recommendation (In Favor of Dismissal of All Causes In This Action)" (Objections) (d/e 40) on June 14, 2012. See *28 U.S.C. § 636(b)(1)*; *Fed.R.Civ.P. 72(b)*.

The Report and Recommendation recommends granting Defendants' various motions to dismiss (see

d/e **[*2]** 16, d/e 18, d/e 22, and d/e 27) and dismissing Plaintiff's Second Amended Complaint in its entirety with respect to all Defendants. This Court reviews de novo any part of the Report and Recommendation that has been properly objected to. 28 U.S.C. § 636(b)(1)(C). For the reasons set forth below, the Court overrules Plaintiff's Objections and adopts Judge Bernthal's Report and Recommendation.

## BACKGROUND

A. Plaintiff's Second Amended Complaint

The operative complaint in this matter is Plaintiff's Second Amended Complaint at Law (Second Amended Complaint). The Second Amended Complaint brings claims against the following Defendants: Microsoft Corp. (Microsoft); Versuslaw, Inc. (Versuslaw); Yahoo!, Inc. (Yahoo); Google, Inc. (Google); and Joseph W. Acton (Acton). In the Second Amended Complaint Plaintiff brings suit for an alleged violation of 42 U.S.C. § 1981, in addition to several other federal and state law claims. The claims arise from the following facts that Plaintiff has alleged in his Second Amended Complaint.

Plaintiff is an insurance claims industry professional with over 20 years of experience. Between November 2009 and March 2011, Plaintiff was involved in litigation against his **[*3]** former employer, Nationwide Mutual Insurance Company (Nationwide) and several related defendants.

In approximately January 2009, Plaintiff discovered that certain Internet websites were linking copies of information related to the litigation to Plaintiff's name, such that a simple Internet browser search for his name would provide immediate results that referenced one or more of the filings or rulings in the active litigation. According to Plaintiff, rather than linking his name to significant rulings, such as appellate decisions or even trial court summary judgment rulings, the links included attachments to rulings on matters as common as a stipulated motion to quash a subpoena. Plaintiff has alleged that these references were occurring by way of paid legal search websites such as Lexis/Nexis.com, Justia.com, Leagle.com, and Versuslaw.com (and/or its related site, Findacase.com). These entities secure the case information and related documents by way of sites such as PACER and then "mirror" them onto the Internet by way of their sites and servers.

Between January 2009 and the date of filing this action,

Plaintiff applied for one or more positions of employment. Plaintiff believes that **[*4]** the potential employers have performed Internet browser searches by way of Google.com, Yahoo.com, or Bing.com, and found documents related to litigation against his former employer Nationwide. Plaintiff also believes that the potential employers have used this information to disqualify him from candidacy for the applied position or have shared this information with others who have done so. In other words, Plaintiff alleges he "has been effectively 'blacklisted' as to employment opportunities due to the ease at which these references appear pursuant to a simple name search, and due to the unlawful acts of third parties who then use such information to unlawfully disqualify" his candidacy.

Plaintiff filed the Second Amended Complaint which brings the following claims against Defendants: (1) claims under the Illinois Human Rights Act; (2) commercial misappropriation; (3) violation of § 1981 of the Civil Rights Act (42 U.S.C. § 1981); (4) violation of the Lanham Act; (5) intentional interference with current and prospective economic advantage; (6) unjust enrichment /civil conspiracy; and (7) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).

B. Defendants' Motions

Defendants **[*5]** have all brought Motions to Dismiss. See d/e 16, d/e 18, and d/e 27. Additionally, Defendants Microsoft and Yahoo have brought a Motion for Judgment on the Pleadings on Counts III, IV, VIII, IX, and X of the Second Amended Complaint. [1] See d/e 22. All of the Defendants argue that Plaintiff's claims are barred by Section 230 of the Communications Decency Act (CDA). All Defendants also argue that, even apart from the question of whether the CDA bars Plaintiff's claims, Plaintiff has failed to state a claim for which relief can be granted.

C. Judge Bernthal's Report and Recommendation and Plaintiff's Objections Thereto

As stated, Judge Bernthal has recommended that Defendants' Motions d/e 16,18, 22, and 27 be granted for several reasons. First, Plaintiff's litigation against Nationwide is a matter of public record and the *First*

---

[1] On June 13, 2008, the same day Judge Bernthal issued the Report and Recommendation, Microsoft and Yahoo filed a Corrected Motion for Judgment on the Pleadings (d/e 38) which included Count VI, which had been left out of the original Motion for Judgment on the Pleadings.

*Amendment* creates a privilege to public matters contained in the public record. Second, Plaintiff's **[*6]** claims are barred by *§ 230 of the CDA* (*47 U.S.C. § 230(c)(1)*). Finally, the facts as Plaintiff has alleged them do not support Plaintiff's various statutory and common law claims.

On June 14, 2012, Plaintiff filed his Objections to the Report and Recommendation. Plaintiff argues that: (1) the *First Amendment* does not protect Defendants, (2) *Section 230 of the CDA* does not bar Plaintiff's claims, and (3) Judge Bernthal erred in concluding that Plaintiff failed to state any federal or state claims.

## ANALYSIS

Under *Rule 12(b)(6)*, dismissal is proper where a complaint fails to state a claim upon which relief can be granted. *Fed.R.Civ.P. 12(b)(6)*. To state a claim upon which relief can be granted, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Fed.R.Civ.P. 8(a)(2)*. That statement must be sufficient to provide the defendant with "fair notice" of the claim and its basis. *Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008)*; *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, 940 (2007)*. This means that (1) "the complaint must describe the claim in sufficient detail to give the defendant **[*7]** 'fair notice of what the ... claim is and the grounds upon which it rests'" and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level." *EEOC v. Concentra Health Services, Inc., 496 F.3d 773, 776 (7th Cir.2007)*. While detailed factual allegations are not needed, a "formulaic recitation of a cause of action's elements will not do." *Twombly, 550 U.S. at 555, 127 S.Ct. at 1965, 167 L.Ed.2d at 940*. Conclusory allegations are "not entitled to be assumed true." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868, 885 (2009)* (citing *Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "In ruling on *Rule 12(b)(6)* motions, the court must treat all well-pleaded allegations as true and draw all inferences in favor of the non-moving party." *In re marchFIRST Inc., 589 F.3d 901, 904 (7th Cir. 2009)* (citing *Tamayo, 526 F.3d at 1081*).

A motion for judgment on the pleadings is "designed to provide a means of disposing of cases when the material facts are not in dispute and a judgment on the merits can be achieved by focusing on the content of the pleadings and any facts of which the court will take judicial notice." *All Amer. Inc. Co. v. Broeren Russo Const., Inc., 112 F. Supp. 2d 723, 728 (C.D. Ill. 2000)* **[*8]** (internal quotations omitted). *Rule 12(c)* permits judgment based on the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir. 1998)*. The court may also "take judicial notice of documents that are part of the public record, including pleadings, orders, and transcripts from the prior proceedings." *Hernandez ex rel. Gonzalez v. Tapia, 2010 U.S. Dist. LEXIS 132984, 2010 WL 5232942, at *3 (N.D. Ill. 2010)*. "A motion for judgment on the pleadings is subject to the same standard as a *Rule 12(b)(6)* motion to dismiss." *Medeiros v. Client Services, Inc., 2010 U.S. Dist. LEXIS 84976, 2010 WL 3283050, at *1 (N.D. Ill. 2010)*, citing *Pisciotta v. Old Nat'l Bancorp, 499 F.3d 629, 633 (7th Cir. 2007)*.

### 1. Defendants' Motions to Dismiss Are Granted Because Plaintiff Has Not Stated a Claim

#### a. Counts I and III - Illinois Human Rights Act

Counts I and III are brought against Defendants and purport to allege violations of the Illinois Human Rights Act (IHRA), specifically, *775 ILCS 5/6-101(A)* and/or *(B)*. In these Counts, Plaintiff alleges that he has given Defendants notice that their actions, *i.e.*, "publicizing the Plaintiff's **[*9]** protected conduct without justification[,] acts to aid and/or aid those who would seek to retaliate or discriminate against the Plaintiff for taking part in protected employment activities, and that their continuing refusal to remove such references or links constitute retaliation as to his prior protected conduct."

*Section 6-101 of the IHRA* provides that it is a civil rights violation for a person, or two or more people to, conspire to "retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination." *775 ILCS 5/6-101(A)*). It is also a violation of the IHRA to "[a]id, abet, compel or coerce a person to commit any violation of [the IHRA]." *775 ILCS 5/6-101(B)*).

The elements of a claim for retaliation under the IHRA are that (1) the employee was engaged in a protected activity; (2) the employer committed a material adverse act against him; and (3) a causal nexus existed between the protected activity and the adverse act. *Hoffelt v. Ill.*

*Dep't of Human Rights, 367 Ill. App. 3d 628, 634, 867 N.E.2d 14, 310 Ill. Dec. 701 (Ill. App. Ct. 2006)*. Plaintiff has not stated a claim for any violation of the IHRA where the allegations against Defendants [*10] are that they provided links to public court documents involving litigation between Plaintiff and his former employer and refused to remove the documents when requested by Plaintiff. Here, the Second Amended Complaint does not allege that any of the Defendants are an employer or potential employer of Plaintiff, nor does it allege that any of the Defendants have committed a material adverse act against Plaintiff. The allegations, which are assumed to be true for purposes of Defendants' Motions, only establish that Defendants provided access to public information that potential employers used to deny Plaintiff employment. This is not sufficient to state a claim under the IHRA.

### b. Counts II and IV - Commercial Misappropriation

Counts II and IV are state law claims for commercial misappropriation. These Counts allege that when Plaintiff's name is entered into one of the various Defendants' (Google, Yahoo, or Microsoft) search engines, a link appears to one of Defendant Versuslaw's websites. When the link is "triggered", the searching party is steered to a page where the searching party can buy a copy of the document for $4.95. The Plaintiff alleges this is "misappropriating his identity [*11] for commercial purposes."

First, the Court notes that the Right of Publicity Act, effective January 1, 1999, replaced the common-law tort of appropriation of likeness. *Maremont v. Susan Fredman Design Group, Ltd., 772 F. Supp. 2d 967, 972 (N.D. Ill. 2011)*; see also *765 ILCS 1075/60*. *Section 30* of the Right of Publicity Act provides, "A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent . . . ." *765 ILCS 1075/30(a)*. The Right of Publicity Act defines "commercial purpose" as "public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." *765 ILCS 1075/5*. Moreover, *section 35* of the Right of Publicity Act states that the Act does not apply to the use of an individual's identity for non-commercial purposes, including any news, public affairs, or sports broadcast or account, or any political campaign."

Here, Plaintiff has not stated a claim under the Right of Publicity [*12] Act. First, the exemption from liability for using a person's identity for a non-commercial purpose, including in a news or public affairs account is applicable here. Plaintiff's prior litigation is a matter of public record and public interest. Moreover, Plaintiff's identity is not being used for a "commercial purpose" as defined by the Right of Publicity Act because his name is used only to find documents related to his case, which are part of the public record. His name is not being held out or used to entice anyone to buy a product. Under Plaintiff's theory, every person who is involved in litigation who has public court documents that can be accessed for a fee on the Internet by doing a browser search or found by using Westlaw, Lexis, Versuslaw, or any other legal research site can state a claim under the Right of Publicity Act. This cannot be the case.

### c. Counts V and VI - *42 U.S.C. § 1981*

In Counts V and VI, Plaintiff attempts to allege a claim under *42 U.S.C. § 1981*. In order to state a claim of discrimination under *§ 1981*, Plaintiff must allege that (1) he is a member of a racial minority; (2) the defendants had the intent to discriminate on the basis of race; and (3) the discrimination [*13] concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 756 (7th Cir. 2006)*. Here, Plaintiff has failed to allege any of these elements. Plaintiff's allegations have nothing to do with discrimination based on race. Nor do the allegations relate to the making or enforcing of a contract. Therefore, Plaintiff has not stated a claim under *§ 1981*.

### d. Count VII - Lanham Act

Count VII is a claim under the Lanham Act against all Defendants. Plaintiff alleges that he has a "substantial property interest in his name" and "the commercial use of his name is only expected to grow in the future." Plaintiff further alleges Defendants Versuslaw and Acton are attempting to associate Plaintiff with their for-profit website. Plaintiff accuses Defendants Google, Yahoo, and Microsoft of actively participating in "these unlawful acts . . . by way of their paid search ranking and/or AdWords mechanisms." While Plaintiff never actually states what violation of the Lanham Act he is attempting to plead, the allegations and his filings in this matter make clear he is alleging a claim under *section 43(a)* (*15 U.S.C. § 1125(a)*) of the Lanham Act. "*Section 43(a)* of the Lanham [*14] Act provides two general theories

of liability: (1) false representations regarding the origin, endorsement, or association of goods or services through the wrongful use of another's distinctive mark, name, trade dress, or other device ("false endorsement" or "false association"); and (2) false representations in advertising concerning the quality of services or goods ("false advertising"). *Stayart v. Yahoo! Inc., 651 F. Supp. 2d 873, 880 (E.D. Wis. 2009)*. Plaintiff's claims are consistent with the first theory of liability.

As an initial matter, the Court notes that Plaintiff must establish he has standing under the Lanham Act. *Stayart v. Yahoo! Inc., 623 F.3d 436, 438 (7th Cir. 2010)*. Judge Bernthal, in his Report and Recommendation, concluded that Plaintiff does not have a commercial interest in his name, and therefore lacks standing. This Court agrees with Judge Bernthal and his Report and Recommendation.

"[S]tanding to assert a § 43 claim is limited to a 'purely commercial class of plaintiffs.'" *Id. at 439* (quoting *Berni v. Int. Gourmet Rest. of Am., 838 F.2d 642, 648 (2d Cir. 1988)*). Plaintiff has simply made conclusory allegations that he has a commercial interest in his professional **[*15]** reputation. In *Stayart*, the Seventh Circuit Court of Appeals rejected the plaintiff's argument that she had a commercial interest in her name because of her extensive activities, including humanitarian efforts. *Stayart, 623 F.3d at 439*. In doing so, the court stated that "the good name that a person garners in such altruistic feats is not what § 43 of the Lanham Act protects: it 'is a private remedy for a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor.'" *Id.* (citation omitted). Similarly, Plaintiff's individual reputation in the insurance industry is not the commercial interest the Lanham Act seeks to protect. Therefore, Plaintiff lacks standing to bring a claim under the Lanham Act.

*e. Count VIII - Intentional Interference with Current and Prospective Economic Advantage*

Count VIII is a claim against all Defendants for intentional interference with current and prospective economic advantage. Plaintiff attached a report to the Second Amended Complaint which indicates that 75% of hiring managers or recruiters use the Internet as part of their review of candidates/applicants. According to Plaintiff, the most common method **[*16]** of research is using a search engine, like Yahoo, Google, or Microsoft's Bing. Plaintiff again alleges he has been "blacklisted" based upon the online availability of the documents related to his litigation against his former employer. Plaintiff claims that Defendants should reasonably have been able to anticipate "these adverse employment actions."

Under Illinois law, the elements of a claim for tortious interference with prospective economic advantage or business relationship are: (1) the existence of a valid business relationship or expectancy; (2) the defendant's knowledge of plaintiff's relationship or expectancy; (3) an intentional and unjustified interference by the defendant inducing or causing a breach or termination of the expectancy; and (4) damages to plaintiff resulting from such interference. *Anderson v. Vanden Dorpel, 172 Ill.2d 399, 406-07, 667 N.E.2d 1296, 217 Ill. Dec. 720 (Ill. 1996)*. "A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *Associated Underwriters of America Agency, Inc. v. McCarthy, 356 Ill. App. 3d 1010, 1020, 826 N.E.2d 1160, 292 Ill. Dec. 724 (Ill. App. Ct. 2005)*.

Here, Plaintiff's Second Amended **[*17]** Complaint does not state a claim for this tort. First, Plaintiff has not alleged the existence of a valid business relationship or expectancy. See *Buchanan v. Serbin Fashions, Inc., 698 F. Supp. 731, 734 (N.D. Ill 1988)* (rejecting claim that prospect of receiving job offer constitutes a sufficient expectancy); *Werblood v. Columbia College, 180 Ill. App. 3d 967, 536 N.E.2d 750, 129 Ill. Dec. 700 (Ill. App. Ct. 1989)* (the plaintiff's expectation of a renewal of her current college employment contract was not sufficient to support a cause of action for intentional interference, even though officials of her college had assured her that her employment there was secure). Moreover, Plaintiff has not alleged that Defendants had knowledge of Plaintiff's alleged business relationship or expectancy. Nor has he alleged an intentional and unjustified interference by Defendants which induced or caused a breach or termination of the business relationship or expectancy. Finally, Plaintiff has not met the requirement, as stated in *McCarthy*, that he allege a business expectancy with a specific third party as well as action by the Defendants directed towards that third party. Therefore, Plaintiff has not stated a claim for intentional **[*18]** interference with current and prospective economic advantage in Count VIII.

*f. Count IX - Unjust Enrichment/Civil Conspiracy*

In Count IX, Plaintiff alleges unjust enrichment and civil conspiracy against all Defendants. In Count IX, Plaintiff repeats the allegations he has set forth in his other claims. Additionally, he alleges Defendants "have acted individually, and/or in concert, by the actions of two or more persons in conspiracy as to their actions."

"To establish an unjust enrichment claim under Illinois common law, a plaintiff must show: (1) the defendant has 'unjustly retained a benefit to the plaintiff's detriment' and (2) the defendant's 'retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" *Siegel v. Shell Oil Co., 656 F. Supp. 2d 825, 834 (N.D. Ill. 2009)* (citation omitted). "For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty." *Martis v. Grinnell Mut. Reinsurance Co., 388 Ill. App. 3d 1017, 1025, 905 N.E.2d 920, 329 Ill. Dec. 82 (Ill. App. Ct. 2009)*. Plaintiff cannot state a claim because **[*19]** there was no independent basis that established a duty on Defendants to act. Moreover, Plaintiff's unjust enrichment claim cannot stand on allegations that Defendants were unjustly enriched by providing electronic access to public case information. Defendants are not "retaining a benefit" to Plaintiff's detriment just because they are selling electronic access to public information and Plaintiff does not like the information contained in those public documents.

"Under Illinois law, the 'elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Id. at 836*. Civil conspiracy is not an independent tort, rather there must be an independent cause of action underlying a civil conspiracy claim. Id. Plaintiff's allegations fall short of establishing the last two elements of this claim. Plaintiff's allegations do not establish that Defendants worked together to accomplish an action that had an unlawful purpose or a lawful purpose by unlawful means in **[*20]** the furtherance of which one of the conspirators committed an overt tortious or unlawful act.

### g. Count X - RICO

Count X of the Second Amended Complaint purports to allege a RICO violation. This Count fails to state a RICO claim as there are no allegations that any of the Defendants were involved in a "racketeering activity" as defined in *18 U.S.C. § 1961* or that they engaged in any of the prohibited activities enumerated in *18 U.S.C. § 1962*.

### 2. Defendants Microsoft's and Yahoo! Inc.'s Motion for Judgment on the Pleadings is Granted

Judge Bernthal recommended that Microsoft's and Yahoo! Inc.'s Motion for Judgment on the Pleadings [2] on Counts III, IV, VIII, IX, and X of the Second Amended Complaint be granted. Judge Bernthal concluded that Plaintiff's claims are barred by the *First Amendment* because reproducing and selling public information obtained in the form of judicial opinions issued in connection with a public court proceeding cannot give rise to liability. See *Rubin v. City of Berwyn, 553 F. Supp. 476, 479 (N.D. Ill. 1982)* (stating "the right to sell and disseminate public information is protected by the *First Amendment*"). Judge Bernthal also concluded that Plaintiff's state law **[*21]** claims, which Judge Bernthal found are more akin to defamation and various privacy torts, are barred by *§ 230 of the CDA*.

#### a. The *First Amendment* Bars Plaintiff's Claims

All of Plaintiff's claims are based upon the following core allegations. Plaintiff was involved in litigation against his former employer. A search of Plaintiff's name on Defendants' websites results in links to copies of filings and court rulings in the Plaintiff's case against his former employer. Potential employers are doing searches of Plaintiff's name and have seen this information. Plaintiff has been "blacklisted" and has lost out on several potential job opportunities because of this.

However, "the *First Amendment* creates a privilege to publish matters contained in public records even if publication would offend the sensibilities of a reasonable person." *Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1231-32 (7th Cir. 1993)*. Moreover, "the *First Amendment* greatly circumscribes the right even of a private figure to obtain damages for the publication of newsworthy facts about him, even when they are facts of a kind that people **[*22]** want very much to conceal." *Id. at 1232*. As stated, all of Plaintiff's allegations rest on

---

[2] A Corrected Motion for Judgment on the Pleadings that included Count VI was filed later.

the premise that Defendants' websites provide links to information that is in the public record. Plaintiff cannot show he is plausibly entitled to relief. Therefore, judgment on the pleadings is appropriate.

### b. Section 230 of the Communications Decency Act

Judge Bernthal, in his Report and Recommendation, also concludes that Plaintiff's state law claims are really variations of defamation and invasion of privacy claims that are barred by § 230 of the CDA. In enacting the CDA, Congress sought to "promote the continued development of the Internet and other interactive computer services and other interactive media," and to "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b).

Section 230 of the CDA provides, in part, that (1) "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" and (2) "[n]o cause of action may be brought and no liability may be [*23] imposed under any State or local rule that is inconsistent with this section." 47 U.S.C. §§ 230(c)(1) & (e)(3).

The language of § 230 sets three limits on the "immunity" [3] provided. First, the "immunity" is available only to a "provider or user of an interactive computer service." 47 U.S.C. § 230(c)(1). The CDA defines the term "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Second, "immunity" is only available for liability based on the defendant having acted as a "publisher or speaker." 47 U.S.C. § 230(c)(1). Finally, "immunity" can be claimed only with respect to "information provided by another information content provider." 47 U.S.C. § 230(c)(1). An "information content provider" is "any person or entity

that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

The Court has reviewed the Report and Recommendation closely and agrees with the conclusions therein that § 230 bars many of Plaintiff's claims in the Second Amended Complaint. However, the Court notes that nothing in § 230 shall be construed to (1) impair the enforcement of any Federal criminal statute or (2) limit or expand any law pertaining to intellectual property. 47 U.S.C. § 230(e)(1) & (2). Therefore, the Court questions whether § 230 would serve to bar Plaintiff's Lanham Act, Right of Publicity Act, and RICO claims.

First, the Lanham Act claim would most certainly be considered an intellectual property claim. See Stayart, 651 F. Supp. 2d at 885 (stating if the Plaintiff has stated a claim for false endorsement under the Lanham Act, the defendant would not be immune from liability for those claims because such a claim would probably be considered an intellectual property claim). Moreover, [*25] Plaintiff's commercial misappropriation claims, which this Court has treated as claims under the Right of Publicity Act, would also likely be considered intellectual property claims and would therefore not be barred by the § 230 of the CDA. See id. at 887-88 (stating that a right-to-publicity claim is generally considered an intellectual property claim and recognizing the disagreement among various federal courts regarding the scope of the intellectual property exception in § 230(e)(2)).

Finally, it is unclear whether § 230 would bar a RICO claim. This Court has found no caselaw on the issue. As stated, "[n]othing in [§ 230] shall be construed to impair the enforcement of . . . any other Federal criminal statute." 47 U.S.C. § 230(e)(1). RICO provides for both civil and criminal enforcement. See 18 U.S.C. § 1963 (setting forth RICO's criminal penalties) and 18 U.S.C. § 1964 (setting forth RICO's civil remedies). However, even claims brought pursuant to the civil enforcement provision of RICO may only be brought by the Attorney General or a person injured in his business or property by reason of a violation of 18 U.S.C. § 1962. See 18 U.S.C. § 1964(b), (c). Section 1962 sets forth the [*26] activities prohibited by RICO, all of which are "unlawful." See 18 U.S.C. § 1962. Also of note, the RICO statute located in Title 18 of the United States Code, which is entitled "Crimes and Criminal Procedure." Therefore, arguably, § 230 of the CDA may

---

[3] The Seventh Circuit has noted that the statutory text of § 230(c)(1) does not mention "immunity" or any synonym, and explained "why § 230(c) as [*24] a whole cannot be understood as a prohibition of civil liability for web-site operators and other online contents." Chicago Laywers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669-70 (7th Cir. 2008) (citing Doe v. GTE Corp., 347 F.3d 655, 659-60 (7th Cir. 2003)

not be used to bar a civil RICO claim because that would impair the enforcement of a Federal criminal statute.

However, the Court need not resolve these issues as the Court has already determined that Plaintiff has not stated a claim under any of the Counts he alleged in his Second Amended Complaint. More importantly, the Court concluded the *First Amendment* bars all of Plaintiff's claims.

IT IS THEREFORE ORDERED that Plaintiff's Objections to the Report and Recommendation are OVERRULED and Judge Bernthal's Report and Recommendation (d/e 39) is ADOPTED. Defendants' Motions to Dismiss (d/e 16, d/e 18, and d/e 27) are GRANTED. Additionally, Defendants Microsoft's and Yahoo! Inc.'s Motion for Judgment on the Pleadings (d/e 22) is GRANTED. Because all of Plaintiff's claims are based on providing information that is in the public record, Plaintiff's claims are barred by the *First Amendment* and any amendment of the Second Amended Complaint would **[*27]** be fruitless. Therefore, the Second Amended Complaint is DISMISSED WITH PREJUDICE. This ruling renders moot both (1) Plaintiff's Motion for Preliminary Injunction against Acton and Versuslaw (d/e 10) because there is no likelihood of success on the merits, and (2) Microsoft's and Yahoo's Corrected Motion for Judgment on the Pleadings (d/e 38) because Count VI has been dismissed with prejudice and the *First Amendment* bars such a claim. Therefore, Plaintiff's Motion for Preliminary Injunction (d/e 10) and Defendants Microsoft's and Yahoo's Corrected Motion for Judgment on the Pleadings (d/e 38) are DENIED AS MOOT. This case is CLOSED.

IT IS THEREFORE SO ORDERED.

ENTERED: August 2, 2012.

FOR THE COURT:

/s/ Sue E. Myerscough

SUE E. MYERSCOUGH

UNITED STATE DISTRICT JUDGE

## JUDGMENT IN A CIVIL CASE

**JURY VERDICT**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**DECISION BY THE COURT**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED** pursuant to an order entered by the Honorable Sue E. Myerscough: judgment is entered in favor of the **[*28]** defendants and against the plaintiff. This case is closed with prejudice.

**Dated:** August 3, 2012

End of Document

No *Shepard's* Signal™
As of: June 8, 2020 8:46 PM Z

# *Stokinger v. Armslist, LLC*

Superior Court of Massachusetts, At Suffolk

March 13, 2020, Decided; April 28, 2020, Filed

Opinion No.: 144647, Docket Number: 1884CV03236-F

**Reporter**
2020 Mass. Super. LEXIS 69 *

Kurt Stokinger et al.[1] v. Armslist, LLC et al.[2]

## Core Terms

firearms, website, sellers, provider, sales, trafficking, gun, third-party, publisher, immunity, licensed, computer service, advertisements, interactive, dealers, posted, third party, users, sex, motion to dismiss, facilitates, purchaser, internet, buyers, background check, design feature, transactions, editorial, shooting, alleges

## Case Summary

### Overview

HOLDINGS: [1]-An online firearm marketplace's motion to dismiss was allowed since the claims against it since the martketplace's conduct fell within the scope of immunity set out in the Communications Decency Act (CDA), *47 U.S.C.S. § 230*, similarly to the challenges raised in the Backpage.com. LLC decision, plaintiffs' challenges related to the design and structure of the website, which were editorial decisions, so their claims were precluded under the CDA, their claim that the marketplace created the content at issue was reviewed and rejected in the Daniel decision, a similar case; the marketplace was not an information content provider, and plaintiffs' claims were based on complaints about posted content created or developed by a third party.

### Outcome

Motion to dismiss allowed.

## LexisNexis® Headnotes

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

***HN1***[⬇] **Content Regulation, Communications Decency Act**

In enacting the Communications Decency Act, *47 U.S.C.S. § 230*, Congress recognized that the internet was an extraordinary advancement in the availability of education and informational resources as well as a forum for free speech and cultural development. *47 U.S.C.S. § 230(a)*.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

***HN2***[⬇] **Content Regulation, Communications Decency Act**

To achieve its goals, the Communications Decency Act (CDA), *47 U.S.C.S. § 230*, provides broad immunity to web-based service providers for all claims arising from their publication of information from third parties. *47 U.S.C.S. § 230(c)(1)*. In fact, the CDA was enacted partially in response to cases in which internet

---

[1] Janella Stokinger.

[2] Grant Headley and Sara Johnson.

publishers were held liable for defamatory statements posted by third parties on their message boards. In reaction, Congress recognized the threat and obvious chilling effect that tort-based lawsuits could pose to the free exchange of information over the internet. The CDA addresses the chill by immunizing interactive computer service providers from claims or theories of liability that would treat it as the publisher or speaker of information provided by a third party.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN3*[ ] **Content Regulation, Communications Decency Act**

The Communications Decency Act , 3*47 U.S.C.S. § 230*, states, in part that no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. *47 U.S.C.S. § 230(c)(1)*. An interactive computer service is as any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions. *47 U.S.C.S. § 230(f)(2)*.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN4*[ ] **Content Regulation, Communications Decency Act**

In the context of the Communications Decency Act , *47 U.S.C.S. § 230*, it is well-established that notice of the unlawful nature or the information provided is not enough to make it the service provider's own speech. Immunity applies even after notice of the potentially unlawful nature of the third-party content.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > Preemption

*HN5*[ ] **Content Regulation, Communications Decency Act**

The Communications Decency Act, *47 U.S.C.S. § 230*, expressly preempts all state claims that are inconsistent with this section. *Section 230(e)(3)* provides that no cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > Communications Decency Act

*HN6*[ ] **Content Regulation, Communications Decency Act**

In the context of the Communications Decency Act, *47 U.S.C.S. § 230*, whether a website's design features employ neutral tools is helpful in determining whether those features materially contribute to the unlawfulness of the content. A neutral tool is a feature provided by an interactive computer service provider that can be utilized for proper or improper purposes. A defendant who provides a neutral tool that is subsequently used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness, even if the interactive computer service provider knew, or should have known, that its neutral tools were being used for illegal purposes. Material contribution does not mean merely taking action that is necessary to the display of allegedly illegal content, such as providing a forum for third-party posts. 'Rather, it means being responsible for what makes the displayed content allegedly unlawful.

**Judges:** [*1] Heidi E. Breiger, Justice of the Superior Court.

**Opinion by:** Heidi E. Breiger

# Opinion

*MEMORANDUM OF DECISION AND ORDER ON ARMSLIST, LLC'S MOTION TO DISMISS*

This action arises from the shooting of Boston Police Officer Kurt Stokinger ("Officer Stokinger") during a police investigation. Officer Stokinger and his wife, Janella Stokinger ("Mrs. Stokinger") (collectively, "the Stokingers"), assert various claims against the shooter, Grant Headley ("Headley"), the gun's seller, Sara Johnson ("Johnson"), and Armslist, LLC ("Armslist"), an online marketplace facilitating the purchase and sale of firearms. The Stokingers allege that Johnson used Armlist to purchase firearms—including the gun used to shoot Stokinger—and then illegally sold or transferred those firearms to individuals who were legally prohibited from possessing firearms. Before the court is Armslist's motion to dismiss the Stokingers' claims against it (Counts Three, Four, Five, Six, and Seven) on the ground that each claim is barred by the *Communications Decency Act, 47 U.S.C. §230 (2018)*. For the following reasons, Armslist's motion to dismiss is *ALLOWED*.[3]

BACKGROUND

Following is a summary of the well-pleaded factual allegations of the First Amended Complaint (the [*2] "complaint").[4] See *Sisson v. Lhowe, 460 Mass. 705, 707, 954 N.E.2d 1115 (2011)*.

A. Relevant Federal and State Regulation of Firearm Sales

Federal law requires that only federally licensed firearms dealers may engage in the firearms business. To obtain a federal firearms license, a person or entity must apply for—and be granted—a license from the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). Federally licensed firearms dealers are subject to duly promulgated regulations. For example, licensed dealers are required to conduct background checks of potential buyers to ensure that guns are not sold to individuals who are prohibited from possessing firearms, such as felons, the mentally ill, domestic abusers, and minors (collectively, "prohibited purchasers"). In addition, licensed dealers must keep records of firearms sales to assist law enforcement with criminal investigations. Licensed dealers also must inform law enforcement whenever a purchaser engages in a "multiple sale," which is when a purchaser buys more than one firearm within five business days as it may indicate firearms trafficking. Licensed dealers also have a duty to screen for suspicious sales and may refuse a sale when the dealer believes that the sale is dangerous [*3] or risky.

Under federal law, unlicensed "private sellers"—persons not engaged in the firearms business—are permitted to sell a maximum of four firearms per year. Such private sellers are not required to conduct background checks of potential buyers or keep a record of their transactions.

In Massachusetts, all firearm purchasers—licensed or not—must obtain a permit prior to buying a firearm, and the issuance of such a permit requires the individual to undergo a background check. *G.L.c. 140, §§129B-129C*.

B. Armslist.com

Armslist.com is a for-profit online firearms marketplace that facilitates sales of firearms and accessories. Armslist owns and operates Armslist.com, which it developed after several major websites chose to cease online firearm sales.

Armslist.com is not a federally licensed firearms dealer. Instead it functions as an intermediary by providing information to both firearms sellers and buyers so as to facilitate transactions. Prospective firearms customers use the website's internal e-mail system to contact firearms sellers to arrange a transaction. Customers may also contact sellers outside of the website by using the seller's contact information provided on the website.

C. The Firearm Involved in [*4] the Shooting

On January 8, 2016, Headley shot Stokinger in the leg with a .40 caliber Glock Model 27 semi-automatic handgun. Headley, a convicted felon, is a prohibited purchaser of firearms under Massachusetts law. *G.L.c. 140, §129B*. After the shooting, fellow officers recovered Headley's firearm. The post-shooting investigation produced information giving rise to the Stokingers'

---

[3] Armslist also filed a motion to dismiss for lack of personal jurisdiction but in light of the instant ruling, the court need not address the jurisdictional issue.

[4] As additional support for its motion, Armslist submitted a declaration from Jonathan Gibbon, the co-founder and President of Armslist, to which the Stokingers objected. Insofar as the court has resolved the instant motion without the benefit of Mr. Gibbon's declaration, this objection is moot.

allegation that Headley's possession of the firearm was traced to Armslist.com transactions.[5] The Stokingers believe that shortly after Johnson purchased the firearm from McNamara, either Johnson or Sullivan sold the gun to Headley.

D. Instant Action

On October 18, 2018, the Stokingers filed this action against Headley, Johnson, and Armslist. Count One is a claim against Headley for assault and battery. Counts Two and Three are negligence claims against Johnson and Armslist, respectively. Count Four alleges that Armslist aided and abetted in Johnson's negligent sale of the firearm to Headley. Count Five asserts a claim of public nuisance against Armslist. Counts Six and Seven assert claims by Mrs. Stokinger against all defendants for loss of consortium and loss of support. Armslist now moves to dismiss each of the claims against [*5] it (Counts Three, Four, Five, Six, and Seven) on the ground that the Stokingers' claims are barred by the *Communications Decency Act ("CDA" or the "Act"), 47 U.S.C. §230*.

The gravamen of the Stokingers' negligence claim (Count Three) is that Armslist.com's design and operational features facilitate illegal firearms sales and encourage illegal firearms trafficking because Armslist.com makes it easy for prospective buyers to locate private sellers by using a filter feature permitting prospective buyers to browse advertisements by private sellers. Inasfar as most states do not require private firearm sellers to conduct background checks on prospective customers, private sales are more attractive to prohibited purchasers. Additionally, prospective

customers may use the website's "location" filter to narrow their search to sales to specific states, enabling them to weed out sales in states with stricter gun laws.

The Stokingers further allege that Armslist is negligent because it permits users to maintain their anonymity, and takes no action to monitor or prevent illegal sales. The Stokingers also claim that Armslist is aware that its website is a magnet for illegal gun transactions and negligently failed [*6] to institute reasonable safeguards to minimize the risks of such transactions, such as limiting the number of guns that can be sold or purchased by each user or requiring sellers to conduct background checks.[6]

Count Four alleges that in brokering the firearm transaction between Johnson and McNamara, Armslist aided and abetted in the negligent subsequent sale of the firearm to Headley.

Count Five alleges that Armslist created a public nuisance by designing and maintaining an online marketplace tailored to attract and encourage persons who wish to buy or sell firearms in contravention of federal and state gun laws. As a result, the Stokingers claim that Armslist substantially and unreasonably interfered with the public's safety and comfort.

Counts Six and Seven allege that Armslist's aforementioned conduct was the proximate cause of Mrs. Stokinger's loss of consortium and loss of spousal support.

For the following reasons, the court concludes that Armslist is immune from each of these claims pursuant to the *CDA*.

DISCUSSION

A. CDA Generally

*HN1*[↑] In enacting the *CDA*, Congress recognized that the internet was an extraordinary advancement in the availability of education and informational resources as [*7] well as a forum for free speech and cultural development. *47 U.S.C. §230(a)*. It also found that the internet had "flourished, to the benefit of all Americans, with a minimum of government regulation." *47 U.S.C.*

---

[5] In particular, ATV learned that Derek McNamara ("McNamara") purchased the firearm on March 3, 2015, from Black Op Arms, a federally licensed firearms dealer in Claremont, New Hampshire. McNamara informed ATF that he then sold the firearm to Johnson, a New Hampshire woman who contacted him through Armslist.com. McNamara met Johnson in a McDonald's parking lot in Warner, New Hampshire, in July 2015, and sold her the firearm. Her confederate, Daniel Ray Sullivan ("Sullivan"), was a convicted felon. On July 26, 2017, Johnson and Sullivan were indicted in on federal firearms charges in the United States District Court in New Hampshire; each pleaded guilty. Sullivan admitted he contacted Armslist.com to arrange various firearms purchases.

According to ATF's investigation, Johnson purchased and then sold an estimated thirty to sixty-three firearms that she procured from Armslist.com. At least four of the firearms she purchased were recovered on the streets of Greater Boston within seven months of Johnson's purchase.

---

[6] Because the court concludes that Armslist is immune from the negligence claim pursuant to the *CDA*, the court need not determine whether Armslist owed a duty of care to the Stokingers.

§230(a)(4). In light of its findings, Congress sought "to promote the continued development of the Internet" and "to preserve the vibrant and competitive free market that presently exists . . ." *47 U.S.C. §230(b)(1)-(2)*.

*HN2*[↑] To achieve its goals, the *CDA* provides broad immunity to web-based service providers for all claims arising from their publication of information from third parties. *Doe v. MySpace, Inc., 528 F.3d 413, 418 (5th Cir. 2008)*, citing *47 U.S.C. §230(c)(1)*. In fact, the *CDA* was enacted partially in response to cases in which internet publishers were held liable for defamatory statements posted by third parties on their message boards. *Doe v. Backpage.com, LLC, 817 F.3d 12, 18 (1st Cir. 2016)*, citing *Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 N.Y.Misc. LEXIS 229, *12-*14 (N.Y.Sup.Ct. May 24, 1995)*. In reaction, Congress recognized the threat and "obvious chilling effect" that tort-based lawsuits could pose to the free exchange of information over the internet. *Zeran v. America Online, Inc., 129 F.3d 327, 331 (4th Cir. 1997)*. The *CDA* addresses the chill by immunizing interactive computer service providers from claims or theories of liability that "would treat [it] as the publisher or speaker of . . . information" provided by a third party. See *Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007)* (quotations omitted) (interactive computer service providers still liable **[*8]** for their own conduct and their own speech).

B. The Instant Claims

The Stokingers' claims are predicated on Armslist's creation, design, and maintenance of Armslist.com. *HN3*[↑] The *CDA* states, in pertinent part, "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *47 U.S.C. §230(c)(1)*. An interactive computer service is as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." *47 U.S.C. §230(f)(2)*. Here, the Stokingers do not dispute that Armslist.com is an interactive computer service. Rather, the central question before the court is whether the Stokingers' claims treat Armslist as the publisher or speaker of the content provided by the sellers and buyers of firearms who access its site.[7] *Backpage.com,*

*LLC, 817 F.3d at 19*. The Stokingers argue that their claims do not treat Armslist as the publisher or speaker of third-party content; instead, they claim that Armslist's liability is predicated on **[*9]** its role in developing, designing, and maintaining a website that facilitates and encourages illegal gun trafficking.

It appears that this issue is one of first impression in the Commonwealth, although the highest state court in Wisconsin and the Court of Appeals for the First Circuit have already addressed and resolved the same issue. Review of the pleadings and case law in this area leads the court to agree that Armslist's conduct falls within the scope of the immunity set out in the *CDA*, consequently barring the Stokingers' claims.

C. Analysis

There has been "near-universal agreement that *section 230* should be not be construed grudgingly." *Backpage.com, LLC, 817 F.3d at 18*. "This preference for broad construction recognizes that websites displaying third-party content may have an infinite number of users generating an enormous amount of potentially harmful content, and holding website operators liable for that content 'would have an obvious chilling effect' in light of the difficulty of screening posts for potential issues." *Id. at 18-19*, quoting *Zeran, 129 F.3d at 331*. This broad construction has resulted in the recognition by courts across the country that many causes of action are premised on the publication or speaking of third-party content. See *National Ass'n of the Deaf v. Harvard Univ., 377 F.Supp.3d 49, 65 (D.Mass. 2019)*.

For example, **[*10]** in *Backpage.com, LLC, 817 F.3d at 20-21*, the court concluded that "publishing" functions include not only "editorial decision[s] with respect to" the content of a particular posting, but also "the structure and operation of the website." In that case, three young sex trafficking victims filed suit against Backpage, alleging it engaged in a course of conduct that deliberately facilitated sex trafficking, *Id. at 16*. In so doing, Backpage removed postings by victim support organizations as well as law enforcement "sting advertisements" from the "Escorts" section of the website. *Id.* The plaintiffs also alleged that Backpage's rules governing advertising content were designed to encourage and facilitate sex trafficking, particularly where it did not require a content poster to provide

---

[7] An information content provider is "any person or entity that

is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *47 U.S.C. §230(f)(3)*.

identifying information and did not require phone or email verification. *Id. at 16 & n.2*. Although Backpage's filtering system prohibited advertisements containing certain words or phrases associated with sex trafficking, a content poster could bypass that ban by using an abbreviated form of the word or phrase. *Id. at 16*. The plaintiffs also claimed that Backpage charged for advertisements posted in the "Adult Entertainment" section, thus profiting from sex trafficking. **[*11]** *Id. at 17*.

Plaintiffs argued that the *CDA* did not bar their claims because they did not seek to hold Backpage liable as a "publisher or speaker" of third-party content; rather, they sought to hold Backpage liable for designing a website that made it a participant in sex trafficking. *Id. at 20*. The court disagreed, concluding that the complained-of conduct was "part and parcel of the overall design and operation of the website," and consequently such features were editorial choices falling "within the purview of traditional publisher functions." *Id. at 21*. The court also noted that other jurisdictions had rejected similar claims attempting to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others. See *id. at 21*, citing *MySpace, Inc., 528 F.3d at 419-20* (failing to implement basic safety measures was another way of claiming website operator was liable for publishing third-party content).

In response to *Backpage.com, LLC*, Congress enacted *Public Law 115-164*, titled "Allow States and Victims to Fight Online Sex Trafficking Act of 2017" (the "2018 Amendment") to clarify that the *CDA* "was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution **[*12]** . . ." *Id.* The 2018 Amendment did not narrow the broad scope of the CDA's immunity—except in relation to sex trafficking. The court's holding in *Backpage.com, LLC* was superseded by the enactment of the 2018 Amendment, but the broad legal principles immunizing other website operators, like Armslist, remain in effect.[8]

---

[8] The Stokingers refer to various Congressional floor statements, claiming that the *CDA* should be read in light of its purpose, which is to promote decency and to prevent results like *Stratton Oakmont, Inc., 1995 N.Y.Misc. LEXIS at *14*, which held a website operator liable for publishing defamatory third-party posts. Is not the role of this court to rewrite legislation to comport with a perceived or presumed purpose motivating its enactment. The quite legitimate question of whether websites like Armslist.com should operate in the

Here the Stokingers' challenges to Armslist.com, see *supra*, are the same as or similar to those raised in *Backpage.com, LLC*. As was the case in *Backpage.com, LLC*, the challenges relate to the design and structure of the website, which are editorial decisions, so the Stokingers' claims are precluded under the *CDA*. See *Backpage.com, LLC, 817 F.3d at 21* ("Features such as these, which reflect choices about what content can appear on the website and in what form, are editorial choices . . ."). See also *Green v. America Online (AOL), 318 F.3d 465, 471 (3rd Cir. 2003)* cert. denied, *540 U.S. 877, 124 S. Ct. 200, 157 L. Ed. 2d 140 (2003)* ("decisions relating to the monitoring, screening, and deletion of content from its network [are] actions quintessentially related to a publisher's role" and protected by *CDA*).

The Stokingers claim that Armslist could have done more to discourage or delete the offending or unlawful content or changed its policies so as to reduce the harmful content posted on its website is merely **[*13]** another way of stating that Armslist is liable for publishing the third-party content. See *MySpace, Inc., 528 F.3d at 420-21*, cert. denied, *555 U.S. 1031, 129 S. Ct. 600, 172 L. Ed. 2d 456 (2008)* (where sexual assault victim alleged website operator failed to implement measures that would have prevented her from communicating with predator, court dismissed victim's claims because her allegations were another way of claiming website was liable for publishing the communications of another). See also *Universal Commc'n Sys., Inc., 478 F.3d at 422* (website operator's decision not to reduce misinformation by changing its website policies was "as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting"); *Green, 318 F.3d at 470* (failure properly to police its network for content transmitted by users treats website as "publisher or speaker" of that content).

The Stokingers allege that Armslist either knew or should have known that its website facilitates and encourages illegal gun trafficking. *HN4[↑]* It is well-established that "notice of the unlawful nature or the information provided is not enough to make it the service provider's own speech. *Universal Commc'n Sys., Inc., 478 F.3d at 420*. Immunity applies "even after notice of the potentially unlawful nature of the third-party

---

fashion they do must be addressed by Congress. If Congress did not intend to immunize firearms markets like Armslist, then it need only amend *§230* to reflect that intent as it did in response to the court's decision in *Backpage.com, LLC*.

content." *Id.*

The Stokingers suggest their claims are directed **[*14]** not to content-posters, but to Armslist's conduct and to the content that Armslist itself created.[9] While the Stokingers are correct that an interactive computer service provider remains liable for its own conduct and its own speech, see *Universal Commc'n Sys., Inc., 478 F.3d at 419*, the Stokingers' claim that Armslist created the content at issue here was reviewed and rejected in a similar case. See *Daniel v. Armslist, LLC, 2019 WI 47, 386 Wis. 2d 449, 926 N.W.2d 710 (Wis. 2019)*, cert. denied. *140 S. Ct. 562, 205 L. Ed. 2d 356 (2019)*.

*Daniel* involved a mass shooting in Wisconsin, where the shooter purchased the firearm from a private seller on Armslist.com. *Id. at 714*. Daniel, a child of one of the victims, subsequently filed suit against Armslist asserting the same claims alleged in this case—negligence, aiding and abetting tortious conduct, and public nuisance—among others. *Id. at 716*. Armslist moved to dismiss the complaint, arguing there, as here, that the *CDA* barred Daniel's claims. Daniel claimed there, as do the Stokingers here, that through the design and operation of its website, Armslist helped "develop" the content of the advertisement that led to the firearm sale; therefore, it was an "information content provider" within the meaning of *§230(f)(3)*. See *id. at 718*. Daniel also argued that her claims were not based on Armslist's publication of third-party content, but instead **[*15]** were based on Armslist's facilitation and encouragement of illegal firearm sales by third parties. *Id.* The Stokingers advance those same arguments in this case.

Initially, Wisconsin's court of Appeals agreed with Daniel, declaring that the *CDA* did not bar Daniel's claims. See *Daniel v. Armslist, LLC, 2018 WI App 32, 382 Wis. 2d 241, 913 N.W.2d 211, 217-24 (Wis. 2018)*. The Supreme Court of Wisconsin disagreed, reversing,

and holding that Armslist did not develop the content at issue (i.e., the firearm advertisement that led to the sale), and because Daniel's claims treated Armslist as the publisher of that content, her claims were barred. *Daniel v. Armslist, LLC, 926 N.W.2d at 722, 726-27*.

In reaching its conclusion, the court employed the "material contribution" test to determine whether Armslist materially contributed to the illegality of the third-party content or whether it merely published content created by someone else.[10] *Id. at 720*, citing *Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1168 (9th Cir. 2008)*. *HN6*[↑] Whether a website's design features employ "neutral tools" is helpful in determining whether those features materially contribute to the unlawfulness of the content. *Id. at 721*. A "neutral tool" is a feature provided by an interactive computer service provider that can be "utilized for proper or improper purposes" (citations omitted). *Id.* "A defendant who provides a neutral tool that is subsequently **[*16]** used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness," even if the interactive computer service provider knew, or should have known, that its neutral tools were being used for illegal purposes. *Id. at 721, 722*.

Although Daniel claimed that Armslist's design features made it easier for prohibited purchasers to illegally obtain firearms the court held that the complained-of design features were "neutral tools," and therefore, Armslist did not materially contribute to the development of the firearm advertisement. *Id. at 722*. The court also concluded that the other design features that Daniel claimed could have been implemented were merely "precautions" that were permissible but not required under the *CDA*.[11] *Id.* Additionally, the court was not

[9] The Stokingers also argue that the presumption against the preemption of state common-law claims applies in this case. See *Ajemian v. Yahoo!, Inc., 478 Mass. 169, 178, 84 N.E.3d 766 (2017)* ("In interpreting a Federal statute, we presume that Congress did not intend to intrude upon traditional areas of State regulation or State common-law unless it demonstrates a clear intent to do so"). However, this argument fails because *HN5*[↑] the *CDA* expressly preempts all state claims that are "inconsistent with this section." See *47 U.S.C. §230(e)(3)* ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section").

[10] "[M]aterial contribution 'does not mean merely taking action that is necessary to the display of allegedly illegal content,' such as providing a forum for third-party posts. 'Rather, it means being responsible for what makes the displayed content allegedly unlawful.' " *Daniel, 926 N.W.2d at 719*, quoting *Jones v. Dirty World Entm't Recordings, LLC, 755 F.3d 398, 410 (6th Cir. 2014)*.

[11] Congress did not want to discourage interactive computer service providers from voluntarily screening unlawful third-party content. Therefore, under *§230(c)(2)*, an interactive computer service provider is not liable for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent,

persuaded by Daniel's argument that Armslist.com made illegal firearm sales easier, stating that such an argument merely attempted to distinguish the case "from the litany of cases dismissing suits against website operators who failed to screen for unlawful content." *Id. at 723*. The court also noted that Armslist's intent did not affect immunity because the *CDA* does not contain a good faith requirement. *Id.* *[*17]* For those reasons, the court held that Armslist was not a content provider within the meaning of *§230(f)(3)*; rather, the content at issue was provided by a third party. *Id.*[12]

Here, the Stokingers' claims concern both the same design features and the same arguments raised in *Daniel*. The court concludes that Armslist is not an information content provider, and that the Stokingers' claims are based on complaints about posted content created or developed by a third party. Armslist is thus entitled to immunity under the *CDA*, and the Stokingers' claims must be dismissed.

ORDER

For the foregoing reasons, it is hereby *ORDERED* that the defendant Armslist, LLC's motion to dismiss is ALLOWED.

Heidi E. Breiger

Justice of the Superior Court

Dated at Lowell, Massachusetts, this 13th day of March 2020.

---

**End of Document**

---

harassing, or otherwise objectionable . . ."

[12] The court also concluded that with respect to Daniel's claims (negligence, aiding and abetting, and public nuisance), that the duty Armslist allegedly violated derived from its immunized role as a publisher of third-party content. *Daniel, 926 N.W.2d at 725-26*.

No *Shepard's* Signal™
As of: June 8, 2020 10:04 PM Z

# *Thomas v. Brinks, Inc.*

United States District Court for the Eastern District of Wisconsin

January 28, 2020, Decided; January 28, 2020, Filed

Case No. 19-CV-1224-JPS

**Reporter**

2020 U.S. Dist. LEXIS 13638 *; 2020 WL 433886

JAMES THOMAS, Plaintiff, MIDDLESEX INSURANCE CO. and UNITED HEALTHCARE INSURANCE COMPANY, Involuntary Plaintiffs, v. BRINKS, INC. and BALDWIN & LYONS, INC., Defendants.

## Core Terms

negligent hiring, weigh, supervision, training, pleadings, insurer, respondeat superior theory, motion for judgment, predictability, allegations, involuntary, parties, cases

**Counsel:** [*1] For James Thomas, Plaintiff: Drew J DeVinney, LEAD ATTORNEY, Martin Law Office SC, Oak Creek, WI.

For Middlesex Insurance Co, Involuntary Plaintiff: Phillip C Theesfeld, Yost & Baill LLP, Milwaukee, WI.

For United Healthcare Insurance Company, doing business as AARP Medicare Supplement Plans, doing business as Medicare Solutions, Involuntary Plaintiff: Matthew S Mayer, Mallery & Zimmerman SC, Wausau, WI.

For Brinks Inc, Baldwin & Lyons Inc, Defendants: Shimon B Kahan, Haynes Strudnicka Kahan & Poulakidas LLC, Chicago, IL; Eugene M LaFlamme, McCoy Leavitt Laskey LLC, Riverwood Corporate Center III, Waukesha, WI.

**Judges:** J.P. Stadtmueller, United States District Judge.

**Opinion by:** J.P. Stadtmueller

## Opinion

### ORDER

On August 23, 2019, this case was removed to federal court pursuant to *28 U.S.C. § 1332* from Milwaukee County Circuit Court. (Docket #1). The case arises from a car accident in Illinois between Plaintiff, a Wisconsin citizen, and Jovani Garcia ("Garcia"), a non-party Illinois citizen. Plaintiff sued Brinks, Inc., ("Brinks"), the security company that employed Garcia, for negligence under a *respondeat superior* theory of liability, as well as for negligent hiring, training or supervision under Wisconsin law. Plaintiff also sued [*2] Baldwin & Lyons, Inc., ("Baldwin"), the company that insures Brinks, under a Wisconsin law allowing direct actions against insurers in negligence cases.

On December 17, 2019, Brinks and Baldwin filed separate, but similar, motions for judgment on the pleadings, which are now fully briefed. Both defendants argue that Illinois law, rather than Wisconsin law, applies to the matter at hand. Under Illinois law, Brinks cannot be sued for negligent hiring, supervising or training when it has conceded responsibility for Garcia's conduct under a theory of *respondeat superior*, as it has in this case. *Gant v. L.U. Transp., Inc., 331 Ill. App. 3d 924, 770 N.E.2d 1155, 1159, 264 Ill. Dec. 459 (Ill. Ct. App. 2002)* (holding that although negligent hiring, retention, or entrustment "may establish independent fault on the part of the employer, it should not impose additional liability on the employer" if *respondeat*

*superior* applies).[1] Similarly, under Illinois law, there is no direct action against insurers in negligence cases—rather, there must be a judgment before Brinks before Plaintiff can sue Baldwin for a recovery. *Direct Auto Ins. Co. v. Bahena, 2019 IL App (1st) 172918, 433 Ill. Dec. 249, 131 N.E.3d 1094, 1107 (Ill. Ct. App. 2019)*.

The overarching issue, then, is whether Wisconsin or Illinois law governs this action. For the reasons explained below, Illinois law **[*3]** applies. The motions for judgment on the pleadings will be granted, the claims against Baldwin will be dismissed, and Baldwin will be dismissed without prejudice from the action. Additionally, Plaintiff's claim for negligent hiring will be dismissed with prejudice. Finally, since Illinois law governs these cases, it is not clear whether the involuntary plaintiffs, who were added pursuant to *Wis. Stat. § 803.03*, should remain in the case. Within twenty-one days of the date of this order, Plaintiff is instructed to file a document with the Court that either explains the basis for including the involuntary plaintiffs under an Illinois corollary to *Wis. Stat. § 803.03*, or dismisses the involuntary plaintiffs and their crossclaims.[2]

─────────────────────────

[1] The tort of negligent hiring or supervision allows an employer to be held liable for "injuries proximately caused by the employee's incompetence or unfitness. . .[but] is not dependent upon a finding that the employee acted within the scope of his or her employment." **Sherrill v. Smart, 181 Wis. 2d 366, 514 N.W.2d 422, 1993 WL 535121, at *3 (Wis. Ct. App. 1993)**. Unlike *respondeat superior*, which holds an employer vicariously liable for the torts of its employees conducted within the scope of employment, negligent hiring or supervision holds employers directly liable for the actions of its employees—regardless of whether the employee's actions were conducted within the scope of employment or were technically negligent—provided that (1) the employee's act caused the plaintiff's injury and (2) the employer caused the employee's wrongful act. *Miller v. Wal-Mart Stores, Inc., 219 Wis. 2d 250, 580 N.W.2d 233, 238-39 (Wis. 1998)*. Because negligent hiring is "predicated on. . .[and] entirely derivative of, the negligence of the employee, [and] cannot exceed the liability of the employee," Illinois courts have found that if *respondeat superior* applies, then a negligent hiring claim is duplicative. *Gant, 770 N.E.2d at 1159*. Wisconsin courts do not have this rule. The Court notes, however, both *respondeat superior* and negligent hiring seek to remedy the same harm, i.e., the plaintiff's injury caused by the employee's conduct. This harm does not grow or shrink depending on the number of theories of liability upon which a plaintiff prevails.

[2] Please note that the document filed under the title "Answer to Complaint AND COUNTERCLAIM against Baldwin & Lyons

## 1. LEGAL STANDARD

*Federal Rule of Civil Procedure Rule 12(c)* permits a party to move for judgment after the complaint and answer have been filed by the parties. *Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)*. A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim under *Rule 12(b)(6)*. *Adams v. City of Indianapolis, 742 F.3d 720, 727-28 (7th Cir. 2014)*. To survive a challenge under *Rule 12(c)* or *12(b)(6)*, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon **[*4]** which it rests." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chi., 810 F.3d 476, 480 (7th Cir. 2016)* (citation omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id. at 480-81*.

## 2. RELEVANT ALLEGATIONS

The allegations in this complaint are relatively straightforward. Plaintiff alleges that he was driving on Route 83 near Vernon Township, Illinois. As he approached the intersection with Route 53, the rear of Plaintiff's car was struck from behind by a pickup truck driven by Garcia, a Brinks employee. Plaintiff alleges that Garcia's negligence caused the accident.

## 3. ANALYSIS

The parties agree that this Court should apply Wisconsin's choice-of-law rules to determine the law governing this case, because a court sitting in diversity must apply the choice-of-law rules of the state in which it sits. *See Assembly Component Sys. v. Platinum Equity, L.L.C., No. 09-CV-778, 2010 U.S. Dist. LEXIS 67228, 2010 WL 2719978, at *6 (E.D. Wis. July 7,*

─────────────────────────

Inc. and Brinks Inc. filed by Middlesex Insurance Co., ANSWER to Complaint AND CROSSCLAIM against Baldwin & Lyons Inc. and Brinks Inc. filed by Middlesex Insurance Co.,"(Docket #9), is not the correct document.

*2010)*. In tort cases, courts begin with the presumption that the law of the forum applies unless nonforum contacts are of greater significance. *Glaeske v. Shaw, 2003 WI App 71, 261 Wis. 2d 549, 661 N.W.2d 420, 427 (Wis. Ct. App. 2003)*. If neither potential forum has clearly more significant contacts, the Court [*5] moves on to analyze five "choice influencing factors," including predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *Id.*

On first impression, the non-forum contacts do appear to be of greater significance to the facts underlying this action. The accident giving rise to this lawsuit occurred in Illinois, while Plaintiff was driving through Illinois, and involved a Brinks employee from Illinois, who was driving an Illinois truck. It is true that Plaintiff is a Wisconsin citizen and the action was filed in Wisconsin, but these are the only facts supporting application of Wisconsin law in this case. In cases involving automobile accidents between citizens of different states, it is sensible to apply the law of the state where the accident occurred, particularly if there is some other connection to that state than merely the accident. *See Conklin v. Horner, 38 Wis. 2d 468, 157 N.W.2d 579, 582 (Wis. 1968)* (applying Wisconsin law when the accident occurred in Wisconsin and the lawsuit was filed in Wisconsin).

Applying Wisconsin's choice-of-law tort factor test confirms this initial impression. "The first [*6] factor, predictability of results, deals with the parties' expectations." *State Farm Mut. Auto. Ins. Co. v. Gillette, 2002 WI 31, 251 Wis. 2d 561, 641 N.W.2d 662, 676 (Wis. 2002)*. Generally, predictability "has little or no relevancy to an automobile accident or other tort that was never intended or planned." *Heath v. Zellmer, 35 Wis. 2d 578, 151 N.W.2d 664, 672 (Wis. 1967)*. However, in assessing this low-weight factor in the context of automobile accidents, Wisconsin courts have noted that it may be "reasonable to assume that a Wisconsin resident who drives in [another state], and then is involved in a collision involving [another state's resident]. . .would have tort damages computed under [that state's] law." *State Farm, 641 N.W.2d at 686* (Wilcox, J., concurring in part and dissenting in part). Thus, although this factor weighs lightly in the analysis, it bears consideration. Here, on the facts of this case, the Court finds that it is more predictable that defendants would be subject to Illinois laws rather than Wisconsin laws. Not only did the tort occur in Illinois, but it was allegedly caused by an Illinois citizen with whom

the defendants contracted to carry out business in Illinois. The defendants are now being sued over the Illinois citizen's conduct in the course of that business. The Court therefore agrees with the defendants that application of Illinois law to the [*7] parties and facts of this case is slightly more predictable than application of Wisconsin law. This case is not about an insurance policy that was issued in Wisconsin, as was the case in *State Farm*. Nor is this a situation in which the car accident occurred in Illinois, but no other facts tether the parties to Illinois. Rather, in this case, the victim is a Wisconsin citizen, but the facts of the case arose in Illinois, and the defendants, who are not citizens of Wisconsin, are being held responsible for an Illinois citizen's actions, which occurred while he was carrying out their business in Illinois. This factor weighs in favor of Illinois law.

The second factor, "maintenance of interstate and international order, requires that the jurisdiction that is minimally concerned defer to the jurisdiction. . .that is substantially concerned." *Id. at 676*. Here, both Wisconsin and Illinois are equally concerned with this action: Wisconsin has an interest in rectifying the harms visited upon its citizens, and Illinois has an interest in deterring negligence on its interstates. Although none of the parties are citizens of Illinois, the defendants do business in Illinois and employ Illinois citizens, including [*8] the one who allegedly caused the accident in question, which occurred in Illinois. Therefore, Illinois is not, as Plaintiff argues, simply "minimally concerned." Rather, Illinois also has an interest in ensuring that the companies that carry out business there are responsible for the actions of their employees. This factor does not clearly weigh in favor of either state's law.

The third factor, "simplification of the judicial task," seeks the state with the more "simple and easily applied rule" of law. *Id.* (citations and quotations omitted). This factor weighs in favor of Illinois law. Brinks has already conceded responsibility under a theory of *respondeat superior, see* (Docket #22 at 2) ("Once the principal has admitted its liability under a respondeat superior theory, as in this case, the cause of action for negligent hiring, training and supervision is duplicative and unnecessary.").[3] Thus, applying Illinois law would avoid a duplicative lawsuit on the issue of negligent hiring,

---

[3] Notwithstanding this confusing language, it seems that Brinks intends to litigate some aspect of the employee's alleged underlying negligence, for which it has conceded it would be liable.

training, or supervision. *Gant, 770 N.E.2d at 1159*. As to Baldwin, applying Illinois law would relieve the insurance company of litigating the case unless and until a judgment is granted in Plaintiff's favor. *Direct Auto Ins., 131 N.E.3d at 1107*. Applying Wisconsin **[*9]** law, on the other hand, would protract and inflate the litigation. This factor weighs in favor of applying Illinois law.

The fourth factor concerns the advancement of the forum's governmental interests. In cases such as automobile accidents, the question presents itself as "whether the proposed non-forum rule comports with the standards of fairness and justice that are embodied in the policies of the forum law." *Heath, 151 N.W.2d at 673*. In other words, does the law adequately serve the policies of the state, be it compensation, remediation, or deterrence? *See State Farm, 641 N.W.2d at 678*. Either Illinois or Wisconsin law would compensate Plaintiff for his harms, as he seeks redress from Brinks for the negligence of its employee. In Wisconsin, he can bring this lawsuit as two causes of action; in Illinois, it is as a single cause of action, but the liability for Garcia's faults does not increase with the number of claims brought. Put another way, Plaintiff may prevail under one or multiple theories of liability against Brinks, but the damages caused by Garcia do not change. Similarly, while Illinois may have a greater interest in applying its tort law to accidents that occur on its interstates, there is no reason why a negligence suit **[*10]** brought under Wisconsin laws would not deter any avoidable negligence on the part of an employer. On balance, this factor does not weigh in favor of either state's law.

The fifth and final factor asks which law is "better." *Id.* Courts typically consider whether a law is "anachronistic" or whether it is founded "on a rational basis and serves a discernable purpose." *Id.* It does not appear that either law is anachronistic or otherwise impracticable. Although Wisconsin law allows Plaintiff to bring a direct action against a defendant's insurer, Plaintiff will be equally able to recoup from the insurer under Illinois law if a judgment is entered in Plaintiff's favor. Moreover, although Wisconsin law allows Plaintiff an additional claim, i.e., negligent hiring, training, or supervision, it seems that Brinks has already conceded that it would be liable under a theory of respondeat superior, (Docket #22 at 2), i.e., that it would be liable for the negligence of its employee. There is no allegation or suggestion in Plaintiff's briefs that this relief would be insufficient to redress his harms. This factor, too, does not weigh in favor of either state's law.

The state of Illinois appears to have **[*11]** a stronger connection to the facts of this case than the Wisconsin forum. Moreover, taken as a whole, the factors weigh in favor of applying Illinois law to the facts at hand. Under Illinois law, the negligent hiring, training, and supervision claim is duplicative, and the claims against the insurer are anticipatory. Therefore, the Court will grant the motions for judgment on the pleadings.

## 4. CONCLUSION

For the reasons explained above, the Court finds that Illinois law applies, and the motions for judgment on the pleadings should be granted. Plaintiff's claims against Baldwin will be dismissed, and Baldwin will be dismissed without prejudice. Plaintiff's second claim will be dismissed with prejudice as duplicative of the first claim.

Accordingly,

**IT IS ORDERED** that the defendants' motions for judgment on the pleadings (Docket #19 and #21) be and the same are hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the second claim for negligent hiring, training, or supervision be and the same is hereby **DISMISSED with prejudice** as to all defendants;

**IT IS FURTHER ORDERED** that Plaintiff's first claim for negligence, as well as any involuntary plaintiffs' counterclaims against Baldwin & Lyons, Inc., **[*12]** be and the same are hereby **DISMISSED without prejudice** as to Baldwin & Lyons, Inc.;

**IT IS FURTHER ORDERED** that Baldwin & Lyons, Inc. be and the same is hereby **DISMISSED without prejudice** from this action; and

**IT IS FURTHER ORDERED** that, within twenty-one (21) days of the date of this order, Plaintiff submit either a document explaining the basis for the involuntary plaintiffs' continued participation in the action under Illinois state law, or a motion to dismiss them from the action.

Dated at Milwaukee, Wisconsin, this 28th day of January, 2020.

BY THE COURT:

/s/ J.P. Stadtmueller

Timothy Moore

J.P. Stadtmueller

U.S. District Judge

---

**End of Document**

 Neutral

As of: June 8, 2020 10:22 PM Z

## *United States v. Lacey*

United States District Court for the District of Arizona

January 7, 2020, Decided; January 8, 2020, Filed

No. CR-18-00422-PHX-SMB

**Reporter**

2020 U.S. Dist. LEXIS 2645 *

United States of America, Plaintiff, v. Michael Lacey, et al., Defendants.

**Prior History:** *United States v. Lacey, 2018 U.S. Dist. LEXIS 175964 (D. Ariz., Oct. 12, 2018)*

## Core Terms

Indictment, Travel, prostitution, unlawful activity, alleges, immunity, state law, criminal statute, violations, interstate, charges, promotion, website, criminal law, Vagueness, offenses, provider, state criminal law, federal law, no effect, advertisements, facilitated, cases

**Counsel:** [*1] For Michael Lacey, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Erin E McCampbell, LEAD ATTORNEY, Liptsitz Green Scime Cambria LLP, Buffalo, NY; Gregory Michael Zamora, LEAD ATTORNEY, Debus Kazan & Westerhausen Limited, Phoenix, AZ; James C Grant, LEAD ATTORNEY, Davis Wright Tremaine LLP - Seattle, WA, Seattle, WA; Lee David Stein, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Paul John Cambria, Jr., LEAD ATTORNEY, Liptsitz Green Scime Cambria LLP, Buffalo, NY; Robert Corn-Revere, Ronald Gary London, LEAD ATTORNEYS, Davis Wright Tremaine LLP - Washington, DC, Washington, DC; Janey Henze Cook, Henze Cook Murphy PLLC, Phoenix, AZ.

For Ronald Gary London, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Anthony Ray Bisconti,

LEAD ATTORNEY, Bienert Miller & Katzman PLC, San Clemente, CA; James C Grant, LEAD ATTORNEY, Davis Wright Tremaine LLP - Seattle, WA, Seattle, WA; John Lewis Littrell, LEAD ATTORNEY, Bienert Miller & Katzman PLC, San Clemente, CA; Kenneth Morley Miller, LEAD ATTORNEY, Bienert Miller & Katzman PLC, San Clemente, CA; Lee David Stein, LEAD ATTORNEY, Mitchell Stein [*2] Carey Chapman PC, Phoenix, AZ; Seetha Ramachandran, LEAD ATTORNEY, Schulte Roth & Zabel LLP, New York, NY; Thomas Henry Bienert, Jr., LEAD ATTORNEY, Bienert Miller & Katzman PLC, San Clemente, CA; Whitney Z Bernstein, Bienert Miller & Katzman PLC, San Clemente, CA.

For Scott Spear, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Bruce S Feder, LEAD ATTORNEY, Feder Law Office PA, Phoenix, AZ; Lee David Stein, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ.

For John Brunst, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Ariel A Neuman, Gary S Lincenberg, Gopi K Panchapakesan, LEAD ATTORNEYS, Bird Marella Boxer Wolpert Nessim Drooks, Lincenberg & Rhow PC. Los Angeles, CA; Lee David Stein, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Michael D Kimerer, Rhonda Elaine Neff, LEAD ATTORNEYS Kimerer & Derrick PC, Phoenix, AZ.

For Dan Hyer, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; K C Maxwell, LEAD ATTORNEY, Maxwell Law PC, San Francisco, CA; Lee David Stein, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ.

[*3] For Andrew Padilla, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Lee David Stein, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Michael L Piccarreta, LEAD ATTORNEY, Piccarreta Davis Keenan Fidel PC, Tucson, AZ.

For Joye Vaught, Defendant: Anne Michelle Chapman, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Lee David Stein, LEAD ATTORNEY, Mitchell Stein Carey Chapman PC, Phoenix, AZ; Stephen M Weiss, LEAD ATTORNEY, Karp & Weiss PC, Tucson, AZ.

For USA, Plaintiff: John Jacob Kucera, LEAD ATTORNEY, US Attorneys Office - Los Angeles, CA, Los Angeles, CA; Kevin M Rapp, Margaret Wu Perlmeter, LEAD ATTORNEYS, US Attorneys Office - Phoenix, AZ, Phoenix, AZ; Reginald E Jones, LEAD ATTORNEY, US Dept of Justice - Child Exploitation & Obscenity Section, Washington, DC; Andrew C Stone, Peter Shawn Kozinets, US Attorneys Office - Phoenix, AZ, Phoenix, AZ.

**Judges:** Honorable Susan M. Brnovich, United States District Judge.

**Opinion by:** Susan M. Brnovich

# Opinion

**WO**

**ORDER**

Pending before the Court is Defendants Motion to Dismiss Indictment Based on *Section 230 of the Communications Decency Act* or, Alternatively, as Void for Vagueness. (Doc. 783, "Motion".) The Government [*4] responded, (Doc. 809, "Resp."), and Defendants replied (Doc. 830, "Reply"). The Court has considered the pleadings and enters the following Order.

## I. BACKGROUND

Defendants are former officers, executives, and employees of Backpage.com, a classified advertisement website specializing in "adult" services largely used as forums for soliciting prostitution.[1] (*See generally* Doc. 230, "SI".) On July 25, 2018, a federal grand jury returned a 100-count Superseding Indictment against Defendants. (*Id.*) The Superseding Indictment alleges Defendants engaged in numerous criminal acts—conspiracy, violations of the Travel Act, and money laundering—while operating the website Backpage.com ("Backpage").[2] Count 1 alleges Defendants "knowingly and intentionally" entered into a conspiracy, *18 U.S.C. § 371*, to commit violations of the *Travel Act*, *18 U.S.C § 1952 (a)(3)(A)*, against all defendants. (SI ¶¶ 195-99.) Counts 2-51 allege Defendants:

> "used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they [*5] are committed and of the United States, including but not limited to [*A.R.S.] Section 13-3214*, and thereafter performed and attempted to perform, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity."

(SI ¶ 201.) The fifty advertisements supporting Counts 2-51 market the sale of women or minors using coded-terms common to prostitution. (*Id.*) The ads specifically depict a range of prostitution-related business activities and transactions. Some of the ads depict specific victims, (Counts 2, 4-5, 12-17, 19-24), whose services were offered in multiple ads. (SI ¶¶ 160-76.) The Superseding Indictment alleges Defendants employed three distinct strategies to attract ads they knew were for prostitution. (SI ¶ 34.) Particularly relevant here, Backpage also *created* prostitution ads by copying content from other prostitution websites and then

---

[1] As this Court previously established, the Superseding Indictment's factual allegations are taken as true at this stage. (*See* Doc. 793, "Order" (citing *United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002)*)).

[2] This Courts prior order outlines the charges in greater detail. (*See generally* Doc. 793.)

soliciting pimps and prostitutes by offering free trials. (SI ¶¶ 35-44.) Defendants created a business relationship with TheExoticReview.com ("TER"), a "prostitution website" where clients, known as "johns", could rate escorts. (SI ¶¶ 45-67.) Further, the Superseding Indictment outlines detailed moderation practices **[*6]** Backpage used to evade detection by law enforcement and create a "veneer of deniability." (SI ¶ 13.) Among other techniques, Defendants stripped known prostitution terms from advertisements but allowed ads to be posted with the underlying message unchanged. Defendants, at various points, assisted known pimps and prostitutes in changing ads to avoid deletion by Backpage moderators. (SI ¶¶ 45-67.)

Defendants previously argued this alleged conduct was consistent with traditional editorial functions protected by the *First Amendment*. (*See generally* Doc. 583.) Applying *Section 230 of the Communications Decency Act* ("CDA" or "*§ 230*"), *47 U.S.C. § 230*, to the Superseding Indictment, Defendants now make a similar argument. That is, because *§ 230* immunizes publishers like Backpage from prosecution under all state criminal law, the Superseding Indictment fails to state an offense and should be dismissed pursuant to *Federal Rule of Criminal Procedure 12(b)(3)(B)(v)*. (Mot. at 4-11.) Alternatively, Defendants claim the Travel Act, as applied by the Superseding Indictment, fails to give adequate notice of criminality, meriting dismissal of all counts as void for vagueness. (*Id.* at 11-13.)

## II. LEGAL STANDARD

"An indictment is sufficient if it, first, contains the essential elements of the offense **[*7]** charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974)*. Since federal crimes are "solely creatures of statute," *Dowling v. United States, 473 U.S. 207, 213, 105 S. Ct. 3127, 87 L.Ed.2d 152 (1985)* (internal quotation marks omitted), a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute. *United States v. Pirro, 212 F.3d 86, 91-92 (2d Cir. 2000)*. Accordingly, *Federal Rule of Criminal Procedure 12* allows a defendant to file a pretrial motion to dismiss for failure to state a defense if the motion "can be determined without a trial on the merits." *Fed. R. Crim. P. 12(b)(3)(B)(v)*. Such a motion "is generally capable of determination before trial if it

involves questions of law rather than fact." *United States v. Kelly, 874 F.3d 1037, 1046 (9th Cir. 2017)* (quoting *United States v. Nukida, 8 F.3d 665, 669 (9th Cir. 1993)*. An indictment must "set forth all the elements necessary to constitute the offense intended to be punished." *Hamling v. United States, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974)* (quoting *United States v. Carll, 105 U.S. 611, 612, 26 L. Ed. 1135 (1882)*). Therefore, when a count charged by an indictment fails to recite an essential element of the offense, that count is facially defective and must be dismissed. *United States v. Pernillo-Fuentes, 252 F.3d 1030, 1032 (9th Cir. 2001)*. In determining whether an indictment charges a cognizable offense, courts are bound by the four corners of the indictment, must accept the truth of the allegations in the indictment, and cannot consider **[*8]** evidence that does not appear on the face of the indictment. *United States v. Lyle, 742 F.3d 434, 436 (9th Cir. 2014)*; *United States v. Boren, 278 F.3d 911, 914 (9th Cir. 2002)*; *United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996)*.

Defendants Motion implicates two federal statutes—the CDA and Travel Act. Statutory construction "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *United States v. Albertini, 472 U.S. 675, 680, 105 S. Ct. 2897, 86 L.Ed.2d 536 (1985)* (quoting *Park 'N Fly, Inc., v. Dollar Park & Fly, Inc., 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985))*. "Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate." *Dowling, 473 U.S. at 213, 105 S.Ct. 3127* (internal quotation marks omitted).

## III. DISCUSSION

Defendants claim immunity from prosecution in the manner charged by the Superseding Indictment. That is, *§ 230 of the CDA* grants publishers of third-party content, like Defendants here, immunity from violations of state criminal laws. (Mot. at 4) Specifically, *§ 230* grants immunity to interactive computer services for liability based on publishing third-party content or for failing to remove any such content, regardless of whether the website knew or should have known that third parties were posting illegal content. (*Id.*) Defendants argument is straightforward: *Section 230* preempts all state criminal laws; the instant Travel Act charge is based on violation of underlying **[*9]** state criminal laws prohibiting prostitution; Thus, *§ 230*

precludes prosecution in the manner charged. (*Id.*) Even if not precluded by *§ 230*, Defendants contend the Travel Act charges are impermissibly vague and merit dismissal on that basis alone. (Mot. at 11.) Both arguments fail.

### a. Does the CDA preclude Travel Act charges?

#### i. *Section 230* of the Communications Decency Act

Congress enacted the CDA as *Title V of the Telecommunications Act of 1996, Pub. L. No. 104-104*, primarily to protect minors from exposure to indecent and obscene material on the internet. *See Batzel v. Smith, 333 F.3d 1018, 1026 (9th Cir. 2003)* (reviewing legislative history of the CDA); *see also* S. Rep. No. 104-23, at 187-193 (1996) (noting that Congress "has been troubled by an increasing published reports of inappropriate uses of telecommunications technologies to transmit pornography, engage children in inappropriate adult contact, terrorize computer network uses through 'electronic stalking' and seize personal information.") To avoid unduly burdening the continued development of the internet, Congress enacted *§ 230*." *47 U.S.C. § 230*. "Whether wisely or not," Congress "made the legislative judgment to effectively immunize providers of computer services from civil liability in tort with respect to materials disseminated by **[*10]** them but created by others." *Blumenthal v. Drudge, 992 F. Supp. 44, 49 (D.D.C. 1998)*.

In relevant part, *§ 230(c)(1)* specifies that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *47 U.S.C. § 230(c)(1)*. Thus, *§ 230* gives interactive service providers[3] "a reasonable way to . . . help them self-regulate themselves without the penalty of law." *See* 141 Cong. Rec. H8460-01, B8470 (1995) (statement of Rep. Barton). Accordingly, *§ 230(e)(2)* provides that "no provider of an interactive computer service shall be liable on account of - (A) any action voluntarily taken in good faith to restrict access to or availability of material

that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *47 U.S.C. § 230 (c)*. But this grant of immunity is not absolute. *Section 230(e)*, entitled, "Effect on other laws," provides:

> (1) No effect on criminal law. Nothing in this section shall be construed to impair the enforcement of *section 223* or *231* of this Act, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, *or any other federal criminal statute.*

> (2) No effect on intellectual property law. **[*11]** Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.
> (3) State law. Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

> (4) No effect on communications privacy law. Nothing in this section shall be construed to limit the application of the *Electronic Communications Privacy Act of 1986* or any of the amendments made by such Act, or any similar State law.

*47 U.S.C. § 230(e)(1)-(4)* (emphasis added). The above state law and federal criminal law carve-outs bear directly on Defendants arguments. *47 U.S.C. § 230(e)(1)*, *(3)*.

#### ii. The Travel Act, *18 U.S.C § 1952*

The Superseding Indictment alleges violations of the Travel Act, Title *18, United States Code, Section 1952*. *Section 1952(a)(3)* criminalizes the "use of mail or . . . facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity." The definition of "unlawful activity" includes a range of activities that violate a state or federal law. Specifically, *§ 1952 (b)* defines "unlawful **[*12]** activity" as follows:

> (b) As used in this section "unlawful activity means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or controlled substances . . . or prostitution offenses in violation of the laws of the State in which they are committed or of the United

---

[3] Defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ." *47 U.S.C. § 230(f)(2)*.

States, (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title."

18 U.S.C. § 1952(b). A violation of § 1952 is thus premised upon another distinct violation of state or federal law. United States v. Polizzi, 500 F.2d 856, 870 (9th Cir. 1974). "Although state law becomes the focus of this inquiry, 'the gravamen of a charge under § 1952 is a violation of federal law.'" Id. (quoting United States v. Karigiannis, 430 F.2d 148, 150 (7th Cir. 1970), cert. denied, 400 U.S. 904, 91 S. Ct. 143, 27 L. Ed. 2d 141 (1970)). "Reference to state law is only necessary to identify the type of unlawful activity in which defendants intended to engage." Id. (internal quotation marks and citation omitted).

### iii. The Superseding Indictment's Viability

This is not the first time the Court has considered the application of the CDA to the Superseding Indictment. (Doc. 793 at 13.) In denying Defendants **[*13]** prior motion to dismiss, (Doc. 561), this Court found Defendants conduct fell outside "traditional, editorial functions" protected by the First Amendment and CDA. (Doc. 793 at 13 (finding the Superseding Indictment alleged conduct "qualitatively different" from the protected activities in the cases Defendants cited both then and reargue now)). The order distinguished cases cited by Defendants precisely because they were premised on the CDA's grant of immunity from civil liability.[4] (Id.) "[T]he CDA," on the other hand, "has no effect on any other Federal criminal statute." (Id. (citing 47 U.S.C. § 230(e)(1))). Defendants would be well served to consult and, at a minimum, address this Court's prior analysis before petitioning the Court to dismiss on similar grounds. Regardless, after consideration of Defendants Motion and Reply, this Court's earlier analysis holds.

Defendants arguments fail for three reasons. First,

Defendants fail to demonstrate the CDA precludes charges under a federal criminal statute like the Travel Act. This, alone, merits denial of Defendants Motion. Second, even assuming the § 230 applies to the instant Travel Act charges, they do not establish § 230's immunity covers the conduct the Superseding **[*14]** Indictment alleges. Third, Defendants misread the Travel Act to require an underlying violation of state criminal law by Defendants themselves.

First, Defendants narrow reading of the CDA to preclude prosecution under a federal criminal statute is unconvincing, particularly given the statutes plain language. At the outset, § 230(e)(1) immediately declares the CDA has "[n]o effect on criminal law." 47 U.S.C. § 230(e)(1). Directly following this disclaimer, Congress clarifies § 230 may not be interpreted to impair enforcement of some specific criminal statutes likely implicated by the CDA or "any other federal criminal statute." Id. Defendants argue that by listing some specific federal criminal statutes § 230 expressly leaves unaffected, the statute's carve-outs only touch substantive federal statutes. They Travel Act, they contend, is not such a statute. That is, because the Travel Act, they believe, depends on violation of underlying substantive state criminal statutes, it falls outside § 230(e)'s scope. They call this a "common sense notion." (Reply at 4.) The Court finds otherwise. Defendants "commonsense" distinction directly contravenes § 230's plain language. Given the straightforward nature of § 230(e)'s disclaimer—"nothing in this section **[*15]** shall be construed to impair enforcement of . . . any other Federal criminal statute"— Defendants battle is uphill.[5] Why the Court should not, "[a]s in all such cases, . . . begin by analyzing the statutory language, 'assum[ing] that the ordinary meaning of that language accurately expresses the legislative purpose,'" Defendants do not explain. Hardt v. Reliance Stand. Life. Ins. Co., 560 U.S. 242, 251, 130 S. Ct. 2149, 176 L. Ed. 2d 998 (2010) (quoting Gross v.

---

[4] Citing nearly identical case-law, Defendants arguments here, largely repeat and expand on those previously made and considered by this Court in a similar, albeit not identical context. Compare Doc. 561 at 21-24 (arguing Defendants activities fell under First Amendment protection) with Doc. 783 at 5-7 (repeating those arguments to seek immunity under § 230).).

---

[5] Defendants reading ignores a ready explanation for § 230's explicit carveouts for federal criminal statutes concerning obscene and harassing phone calls, 47 U.S.C. § 223, providing access of harmful materials to minors, 47 U.S.C. § 231, particular acts relating to obscenity, 18 U.S.C. §§ 1460-1465, and sexual exploitation of children, 18 U.S.C. §§ 1460-1470. The specific federal statutes emphasized by the § 230(e)(1) carve-outs directly correspond to a central concern of the CDA—"to control the exposure of minors to indecent material." See Batzel v. Smith, 333 F.3d 1018, 1026 (9th Cir. 2003).

Timothy Moore

*FBL Financial Services, Inc., 557 U.S. 167, 175, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)).* Nor do Defendants explain why, if Congress desired to limit *§ 230* so, they did not explicitly do so. *See Barnhart v. Sigmon Coal Co., 534 U.S. 438, 452, 122 S. Ct. 941, 151 L.Ed.2d 908 (2002)* ("It is a general principle of statutory construction that when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.").

Instead, *§ 230*'s plain language supports the Government's position. The modifier 'any' in *§ 230(e)(1)*, employed without any limiting language, "amounts to 'expansive language [that] offers no indication whatever that Congress intended [a] limiting construction.*" See Atlantic Recording Co. v. Project Playlist, Inc., 603 F.Supp.2d 690, 704 (S.D.N.Y. 2009)* (citing *Harrison v. PPG Indus., 446 U.S. 578, 589, 100 S. Ct. 1889, 64 L.Ed.2d 525 (1980)*. This conclusion is bolstered by the fact that the 'surrounding statutory language' supports the conclusion that Congress intended the word 'any' to mean all federal criminal laws. **[*16]** *See ACLU v. Dep't of Def., 543 F.3d 59, 69 (2d. Cir. 2008)* (holding that the word "any" in statute "deserves an expansive application where the surrounding statutory language and other relevant legislative context support it."). Defendants reading eschews both "common-sense" and established principles of statutory interpretation. As this Court previously held, the CDA does not preclude the charges under a federal criminal statute like the Travel Act here. (Doc. 793 at 13.)

Second, even if the CDA applied to generally preclude charges under the Travel Act, Defendants do not establish the CDA applies to their conduct as alleged by the Superseding Indictment. Fundamentally, Defendants contend this prosecution seeks to hold them liable for the "exercise of a publisher's traditional editorial functions"—whether to block or allow content—"perforce immune" under *§ 230*.[6] (Mot. at 5; *Fair Housing Council*

*of San Fernando Valley v. Roomates.com, LLC, 521 F.3d 1157, 1170-71 (9th Cir. 2008).* But, as the Government's response correctly identifies, this Court previously considered this argument, holding "the SI does not attack protected editorial functions." (Doc. 793 at 12). As this Court previously explained, "[t]he SI does not allege Defendants are criminally liable because they unknowingly or unintentionally operated a website used by third parties to post **[*17]** prostitution ads. Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage . . . , intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try and secure future business." (Doc. 793 at 15.) The Superseding Indictment alleges conduct far beyond the simple maintenance of neutral policies prohibiting certain content. *Cf. Dart v. Craigslist, Inc., 665 F. Supp. 2d 961, 968-69 (N.D. Ill. 2009).* Again, at this stage, these allegations are accepted as true. *United States v. Buckley, 689 F.2d 893, 897 (9th Cir. 1982), cert denied, 460 U.S. 1086, 103 S. Ct. 1778, 76 L. Ed. 2d 349 (1983).* Challenging the adequacy of the evidence supporting the allegations is improper at the pleading stage. "A motion to dismiss . . . is not a device for summary trial of the evidence." *United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996); see also United States v. Boren, 278 F.3d 911, 914 (2002)* ("The indictment either states the offense or it doesn't. There is no reason to conduct an evidentiary hearing"); *United States v. Nukida, 8 F.3d 665, 670 (9th Cir. 1993)* ("[t]he proper procedure for raising [a] challenge to the sufficiency of the government's evidence [is] . . . not a pretrial motion to dismiss.") (internal quotation marks omitted).

Third, and lastly, the Travel Act does not require the government allege Defendants committed the underlying violation of state law. Defendants argue their conviction **[*18]** for the underlying state prostitution offenses is a legal impossibility. That is, because *§ 230(e)(3)* immunizes Defendants from prosecution under state law for publishing advertisements, regardless of whether those ads were used to commit

---

[6] Defendants overstate *§ 230*'s grant of immunity. Recognizing the scope of *§ 230*'s immunity is far from absolute, courts regularly find conduct, like that alleged by the Superseding Indictment, beyond the reach of *§ 230(c)(1)*, particularly at the pleading stage. *See e.g., Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 670 (7th Cir. 2008)* ("To appreciate the limited role of *§ 230(a)(1)*, remember that 'internet content providers' may be liable for contributory infringement if their system is designed to help

people steal music or other material in copyright."); *Anthony v. Yahoo! Inc., 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006)* (*section 230(a)(1)* did not apply where defendant allegedly created fake user profiles to induce users to renew subscriptions to defendant's online dating service); *Hy Cite Corp. v. badbusinessbureau.com.com, L.L.C., 418 F. Supp. 2d 1142, 1148-49 (D. Ariz. 2005)* (immunity not granted at the pleading stage where defendant allegedly created defamatory content).

actual acts of prostitution or illegal sex trafficking.[7] (Mot. at 8.) Not only does § 230 not immunize Defendants from the instant prosecution, but Defendants misconstrue the Travel Act's requirements.

In the Ninth Circuit, "[a]n indictment under the Travel act requires allegations of each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity." _United States v. Tavelman, 650 F.2d 1133, 1138 (9th Cir. 1981)_. The Superseding Indictment clears each hurdle. It alleges Defendants, with intent to promote or facilitate state law prostitution offenses, performed overt acts in furtherance of that unlawful activity. (_See generally_ SI ¶¶ 1-201.) Given Defendants are charged with facilitating or promoting, rather than directly committing, prostitution offenses in violation of state law, it is unsurprising they could not be convicted for the "underlying state law offense on which the **[\*19]** Travel Act charge is based." (Mot. at 8.) Although the Ninth Circuit has yet to directly address this topic, the case law of other circuits supports the denying the Motion on this ground as well. _United States v. Welch, 327 F.3d 1081, 1092 (10th Cir. 2003)_ ("The Travel Act proscribes not the unlawful activity per se, but the use of interstate facilities with the requisite intent to promote such unlawful activity. An actual violation of [the Utah Commercial Bribery Statute] is not an element of the alleged Travel Act violations in this case and need not have occurred to support the Government's § 1952 prosecution."); _United States v. Montague, 29 F.3d 317, 322 (7th Cir. 1994)_ ("[T]he federal crime to be proved in _Section 1952_ is the use of interstate facilities in furtherance of the unlawful activity . . . _Section 1952_ does not require that the state crime ever be completed."); _United States v. Palfrey, 499 F. Supp. 2d 34, 43 (D.D.C. 2007)_ ("The statute requires only that a defendant 'inten[ded] to . . . promote . . any unlawful activity,' not that the defendant have completed such unlawful activity.'") (internal citation omitted).

Defendants cases are inapt. _See e.g., United States v. Fernandez, 722 F.3d 1 (1st Cir. 2013)_; _United States v. Tonry, 837 F.2d 1281 (5th Cir. 1988)_. Unlike the state prostitution offenses here, the underlying violations in _Fernandez_ were lawful when they occurred; the Travel Act charges in _Tonry_ were based on direct violations of a state bribery statute, not the promotion **[\*20]** or facilitation of unlawful activity Defendants here face. _See United States v. Bertman, 686 F.2d 772, 774 (9th Cir. 1982)_ ("When the unlawful activity charged in the indictment is the violation of state law, the commission of or the intent to commit such a violation is an element of the federal offense.") Defendants remaining cases all involve allegations of direct violations of state criminal statutes, not federal criminal laws like the Travel Act here. _See Backpage.com v. McKenna, 881 F. Supp. 2d 1262, 1273 (W.D. Wash. 2012)_; _Backpage.com, LLC v. Cooper, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013)_; _Backpage.com, LLC v. Hoffman, No. 13-cv-03952, 2013 U.S. Dist. LEXIS 119811, 2013 WL 4502097, at \*7 (D.N.J. Aug. 20, 2013)_.

Defendants misinterpret both the CDA and Travel Act. The CDA's grant of immunity "protects certain internet-based actors from certain kinds of lawsuits," _Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1099 (9th Cir. 2009)_, but has "no effect" on "any other federal criminal statute." _47 U.S.C. § 230(e)(1)_. The Travel Act, in turn, condemns interstate travel or use of interstate facilities in furtherance of any unlawful activity, defined broadly as acts in violation of certain underlying state and federal laws. The Superseding Indictment alleges Defendants promoted and facilitated such violations, not their direct commission. (_See generally_ SI.) While the focus of the inquiry may fall on underlying violations of state laws criminalizing prostitution, the gravamen of a charge under the Travel Act remains a violation of federal **[\*21]** law. _See Polizzi, 500 F.2d at 870_. As this Court held previously, the CDA does not preclude prosecution under federal criminal law.

### a. Void for Vagueness

Defendants argument that the SI is unconstitutionally vague similarly fails. Recycling a previous argument, Defendants argue they lacked fair and reasonable warning that their conduct to assist publication of known prostitution ads could violate the Travel Act. (Mot. at 12 (citing _United States v. Kilbride, 584 F.3d 1240, 1257 (9th Cir. 2009)_). The Court rejected this argument once before and sees little reason to alter its conclusion: "The SI alleges Defendants used a website with the intent to

---

[7] Defendants support their argument with an email from the former President of the National Center for Missing & Exploited Children ("NCMEC"). The Court does not reach the merits of this extrinsic evidence. _United States v. Kelly, 874 F.3d 1037, 1047 (2017)_ ("In determining whether an indictment charges a cognizable offense, we are bound by the four corners of the indictment, must accept the truth of the allegations in the indictment, and cannot consider evidence that does not appear on the face of the indictment.") (citations omitted).

facilitate prostitution (a criminal activity) and executed strategies to further and increase that activity. The Court cannot conclude that such a standard or the allegations of the SI do not give fair warning that facilitating a criminal act is itself a crime." (Doc. 793 at 22.)

Applying the CDA does not change this outcome. The CDA, by its plain language, does not apply to federal criminal prosecutions. *47 U.S.C. § 230(e)(1)*. As mentioned previously, the CDA's grant of immunity is far from absolute. *Barnes, 570 F.3d at 1099* ("Looking at this text, it appears clear that neither *[§ 230(c)]* nor any other declares general immunity from liability deriving from third-party content, as **[*22]** [defendant] argues it does. '*Subsection (c)(1)* does not mention immunity or any synonym.'") (quoting *Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669 (7th Cir. 2008)*). Other courts uneven treatment of Defendants claims of CDA immunity from civil liability also weighs against their argument. *Compare M.A. v. Village Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1051 (E.D. Mo. 2011)* (dismissing civil claims) *with J.S. v. Village Voice Media Holdings, Inc., 184 Wn.2d 95, 359 P.3d 714, 715-16 (Wash. 2015)* (denying motion to dismiss). Additionally, as this Court previously recognized, the Superseding Indictment sufficiently alleges Defendants had notice of the illegal nature of the activities they promoted or facilitated. (*See* Doc. 793 at 6.)

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** Defendants Motion to Dismiss Indictment Based on *Section 230* of the Communications Decency Act or, Alternatively, as Void for Vagueness (Doc. 783) **DENIED**.

Dated this 7th day of January, 2020.

/s/ Susan M. Brnovich

Honorable Susan M. Brnovich

United States District Judge

**End of Document**