# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ERIN BAUER in her individual capacity and as
administratrix of the ESTATE OF PAUL BAUER

                Plaintiff,

      v.

Case No. 2:20-cv-00215-PP

ARMSLIST, LLC and JONATHAN GIBBON

                Defendants.

---

## PLAINTIFF ERIN BAUER'S OPPOSITION TO

## DEFENDANT ARMSLIST'S MOTION TO DISMISS

---

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

II.   Motion to Dismiss Standard ................................................................................... 2

III.  Summary of Factual Allegations ............................................................................ 3

IV.   Section 230 of the CDA Does Not Support Dismissal ........................................... 6

  A.   The Plain Language of the Statute Permits All of Plaintiff's Claims ............................ 6

    1.   The Language and Purpose of Section 230 ...................................................... 6

    2.   The Language and Purpose of the CDA Do Not Support Dismissal. ............................. 9

    3.   Principles of Federalism and the Presumption Against Preemption Require Reading the CDA to Allow Plaintiff's Claims ................................................................. 12

    4.   The Content and Design Code Created by Armslist Are Not "Information Provided by Another Information Content Provider" ......................................................... 18

    5.   Because Armslist Is Responsible in Part for the Gun Sales Advertisements, They Are Not "Information Provided by Another Information Content Provider" ...................... 19

    6.   Armslist is Entitled to No Protection Under Section 230(c)(2) Because it Did Not Act in "Good Faith" ................................................................................ 21

  B.   The Seventh Circuit Agrees That the Protection Provided By the CDA Should Be Construed Narrowly ............................................................................... 22

  C.   The "Neutral Tools" Test Has No Foundation in the Text of the CDA and Would Provide Armslist With No Protection If It Applied ................................................. 25

Case 2:20-cv-00215-PP   Filed 07/29/20   Page 2 of 35   Document 14

    D.  Armslist's Other Authorities and Counterarguments Are

        Unpersuasive/Distinguishable .......................................................................... 27

V.   Plaintiff States Valid Claims Under the Common Law ...................................... 28

VI.  Conclusion .............................................................................................................. 28

## TABLE OF AUTHORITES

**Cases**

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .............................................................. 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 2

*Astoria Fed. Sav. & Loan Ass'n. v. Solimino,* 501 U.S. 104 (1991) ......................... 6, 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 2

*Bond v. United States*, 134 S. Ct. 2077 (2014) ...................................................... 12, 13

*Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d

   681 (N.D. Ill. 2006) .................................................................................................. 17

*Chicago. Lawyer Comm. For Civil Rights Law, Inc. v. Craigslist Inc.*, 519 F. 3d. 666

   7th Circ. 2008) ................................................................................................. passim

*Cipollone v. Liggett Group*, 505 U.S. 504 (1992); ................................................. 13, 14

*City of Chicago, Ill. v. StubHub!, Inc.*, 624 F.3d 363 (7th Cir. 2010) ......................... 22

*Conroy v. Aniskoff*, 507 U.S. 511 (1993) ................................................................. 7, 11

*Cunningham v. Montes,* 378 F. Supp. 3d 741 (W.D. Wis. 2019) ................................. 23

*Daniel v. Armslist, LLC,* 382 Wis. 2d 241 (Wis. Ct. App. 2018) ("*Daniel I*") ........... 15

*Daniel v. Armslist, LLC*, 386 Wis. 2d 449, 466 (2019) ("*Daniel II*") *cert denied,* 140 S.Ct. 562 (2019) ................................................................................................................ 15, 18, 23

*Dart v. Craigslist,* 665 F. Supp. 2d , 967-969 (N.D. IL 2009). ................................... 25

*Doe v. GTE Corp.,* 347 F.3d 655 (7th Cir. 2003) ................................................. 22, 23

*Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ...................... passim

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008) .................................. 6

*Gibson v. Craigslist, Inc*. 2009 U.S. Dist. LEXIS 53246 (S.D.N.Y. 2009) ................................ 27

*Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016) ................................................... passim

*J.S. v. Vill. Voice Media Holdings, LLC*, 184 Wn. 2d. 95 (Wash. 2015) .................................. 15

*Martinez v. California*, 444 U.S. 277 (1980) ..................................................... 14

*Maynard v. Snapchat, Inc.*, 346 Ga. App. 131 (2018) .......................................... 19, 21

*Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996) ................................................ 13, 14

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2020) ..................................... 6, 14

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041,(7th Cir. 2013) ..................................... 12

*Reno v. ACLU,* 521 U.S. 844 (1997) .............................................................. 7

*Rodgers v. United States,* 185 U.S. 83 (1902). ................................................ 6, 11

*Stayart v. Yahoo! Inc.,* 623 F.3d 436 (7th Cir. 2010) .............................................. 11

*Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 886 (E.D. Wis. 2009) .................................... 11

*Stokinger v. Armslist.com,* No. 1884CV03236-F (Sup. Ct. Mass. Mar. 13, 2020) ....................... 15

*Stratton-Oakmont v. Prodigy*, 1995 N.Y Misc. LEXIS 229 (N.Y. Sup. Ct. 1995) ..................... 7, 9

*Swanson v. Citibank, N.A*., 614 F.3d 400 (7th Cir. 2010) ............................................. 2

*United States v. Carver*, 260 U.S. 482 (1923) .................................................... 15

*United States v. Wilson*, 503 U.S. 329 (1992) .................................................... 11

*United States v. Wilson*, 503 U.S. 329 (1992). ................................................................. 7

*Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, (7th Cir. 2020) ..................................... 2

*Zeran v. America Online, Inc.* 129 F.3d 327 (4th Cir. 1997) ............................................ 22

**Statutes**

18 U.S.C. § 921 ................................................................................................................ 24

18 U.S.C. § 922 .................................................................................................................. 3

18 U.S.C. § 923 .................................................................................................................. 3

U.S.C. § 230 ..................................................................................................................... 20

**Other Authorities**

*Antonin Scalia & Bryan A. Gardner, Reading The Law: The Interpretation*

*of Legal Texts* (2012) ................................................................................................ 6

Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad*

*Samaritans § 230 Immunity*, 86 FORDHAM L. REV. 401, 403 (2017) ........................ 8

H.R. Conf. Rep. No. 104-458 ............................................................................................ 8

H.R. Conf. Rep. No. 104-458 (1996) ................................................................................. 7

H.R. Rep. No. 104-223 (1995) .......................................................................................... 7

# I.    <u>Introduction</u>

Defendants Armslist, LLC and Gibbon ("Armslist") intentionally, recklessly and negligently designed a firearms marketplace in order to facilitate, encourage and assist in the illegal buying and selling of guns so that it could profit from the criminal gun market.  While other online gun sellers require background checks and other measures to prevent illegal gun sales, Armslist crafted design features intended to circumvent state and federal gun laws, and to create a safe haven for gun criminals.  Armslist knew that its actions would cause innocent people to be shot and killed – and they have learned that with a certainty, as mass killers and other criminals are obtaining their guns from Armslist.com.  Armslist's response was to double down on its recklessness.  This case involves yet another criminal gun trafficker that Armslist helped to illegally sell guns, another dangerous criminal who obtained a gun via the Armslist marketplace, and another innocent person – Commander Paul Bauer of the Chicago Police Department – who was killed as a result.  Plaintiff, Commander Bauer's widow, Erin Bauer, brings this case to hold Armslist accountable for its negligence.

In its motion to dismiss, Armslist claims that Congress provided sweeping immunity that bars courts from allowing victims of its negligence a chance for civil justice.  Indeed, under Armslist's view, it would be immune even if it intentionally created "guncriminals.com" for the sole purpose of arming and profiting from the criminal gun market.  Armslist claims this sweeping immunity is required by the "Good Samaritan" provision of Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. §230.  Armslist is wrong.

The CDA §230(c)(1), on which Armslist primarily relies, only bars courts from "treat[ing]" websites as publishers or speakers of third-party content, such as preventing defamation liability from Internet posts.  But Plaintiff does not seek to treat Armslist as a

publisher or speaker of third-party posts; she seeks to impose liability for Armslist's own content and own computer coding that negligently designed and created a marketplace that facilitates and encourages illegal gun sales. Section (c)(2) only bars liability for good faith actions to restrict access to objectionable material. This is the opposite of what Armslist did in affirmatively designing the website to facilitate unlawful firearms transactions and otherwise helping unlicensed gun dealers.

Tellingly, Armslist does not meaningfully consider or analyze the language of Section 230, Congress's purpose in enacting it, or applicable principles of statutory construction. Instead, it relies on inapposite case law which misconstrues the CDA, is unsupported by the statutory language, undermines Congressional intent, and defies the Seventh Circuit's more narrow reading of CDA protection. Armslist's motion to dismiss should be denied.

## II. <u>Motion to Dismiss Standard</u>

Armslist is not entitled to dismissal unless it establishes that the Second Amended Complaint ("SAC") does not state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This Court is bound to "constru[e] the complaint in the light most favorable to the plaintiff, accept[] as true all well-pleaded facts alleged, and draw[] all possible inferences in [the plaintiff's] favor." *Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 454 (7th Cir. 2020). "[T]he court will ask itself *could* these things have happened, not *did* they happen . . . " *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404-05 (7th Cir. 2010) (emphasis in original). If a complaint plausibly alleges that a defendant authored or co-authored content implicated in tortious or unlawful activity, CDA protection does not apply. *See Huon v. Denton*, 841 F.3d 733, 742-43 (7th Cir. 2016).

III.     **Summary of Factual Allegations**[1]

Armslist intentionally designed and operated Armslist.com to actively encourage and assist dangerous individuals in unlawfully transferring firearms, either directly or through intermediary gun traffickers, to parties prohibited from possessing such weapons ("Prohibited Possessors") and otherwise dangerous individuals. SAC at 1 ¶¶ 2-3, 5 ¶ 19-21. It created a number of design features (*i.e.,* pieces of content) on Armslist.com which enabled, encouraged and assisted individuals unlawfully "engage[d] in the business" of selling firearms without a license (in violation of 18 U.S.C. § 923(a)) to operate and market illicit virtual "stores" on Armslist.com. SAC at 1 ¶¶ 2-3, 5 ¶ 19-21, 2 ¶¶ 5-7, 12-18 ¶ 57.[2] Such unlicensed online sellers enable bad actors to evade background checks, transaction records and other legal safeguards that are required of legitimate Federal Firearms Licensees ("FFLs"). SAC at 2 ¶¶ 5-7, 28 ¶ 128; *see also, e.g.,* 18 U.S.C. § 922(t). Unlicensed online dealerships channel a huge amount of weapons to the criminal market. *See id.* at 2 ¶ 6.

Armslist created numerous design features that contribute to making Armslist.com a haven for dangerous, unlicensed dealerships and their disproportionately criminal customer base, including drafting text and computer code that:

- explicitly assures users that it will make no efforts to identify or curtail unlawful transactions, providing "ARMSLIST DOES NOT become involved in transactions between parties and does not certify, investigate, or in any way guarantee the legal capacity of any party to transact" (*see, e.g., id.* at 16 ¶ 57(o));

---

[1] While Armslist invites the Court to reject the truth of these allegations (*see* MTD Br. at 8 n. 5) this Court must accept the allegations as true. *Viamedia,* 951 F.3d at 454.
[2] Armslist suggests that Plaintiff alleges that there was a defined "store" feature on Armslist.com, MTD Br. at 2, 13, but "store" designates a term of art referring to illicit online firearms dealerships like Caldwell's. *See* SAC at 2 ¶ 5.

- enables unlicensed dealers to market themselves by labelling themselves as "Private Parties," and making "Private Party" the default tag applied to advertisements posted by users who do not have an account (s*ee id*. at 14-15 ¶ 57(e-i));

- constructs a filtering function which allows unlawful users to limit searches to "Private Parties" – thus targeting sellers that do not require background checks and/or other restrictions (*see id*. at 12-13 ¶ 57(a-b));

- allows illegal gun sellers and illegal gun buyers to transact on the site without requiring any sort of registration or verification of a user's identity (*see id*. at 17 ¶57(s, t, u));

- does not restrict anyone from using the site to buy and sell guns even though federal and state laws restrict who can legally buy or sell guns (*see id.* at 2 ¶ 8; 18 ¶57(y, z); 33-34 ¶154);

- imposes no limit on the number of sales of firearms that nominal "Private Parties" advertise or sell, even though significant or repeated sales by "private parties" would indicate an illegal dealer  (*see id.* at 15 ¶ 57(j));

- signals to individuals engaged in illegal firearms transactions, through its design and policy choices, that they may operate with impunity and anonymity because Armslist will take no action to discover, deter, or report criminal activity on the website (*see id.* at 15-18 ¶¶ 57(k)-(n); (v)-(z));

- prevents the identification and deterrence of unlawful transactions by not enabling users to flag activity as potentially illegal (though it allows users to flag posts for other reasons, including if the post is over-priced or if the seller is unresponsive); not including measures to monitor, remove or report to law enforcement high volume sellers, or any mechanism to prevent persons from engaging in high volume or repeated sales without a federal firearms license (*see id.* at 30 ¶ 144 and 33 ¶ 154).

These and other of Armslist's features create an anything-goes, anonymous gun market that is a haven for criminals. Armslist is the sole author of this text and design content, and a co-author responsible for creating and/or developing the ultimate advertisements for unlawful firearms transactions in collaboration with its unlawful users. *See id*. at 5 *¶¶* 19-21.

Studies made clear to Armslist, prior to 2017, that criminals were attracted to Armslist.com to acquire guns as a result of its design content, that unlicensed dealers were supplying such criminals with guns through illicit virtual "stores" on Armslist.com and that these guns were likely to be misused to kill or seriously injure third-parties. *See id*. at ¶¶ 74-111. Armslist, rather than respond appropriately to this alarming trend, chose to continue business-as-usual – reaping profits from arming criminals and inflicting untold harm. *Id*. at 3 ¶¶ 9-10.

Criminal traffickers who illicitly acquire guns through unlicensed sellers often transfer them to criminals residing in jurisdictions like Illinois with stricter gun violence prevention laws. *See id*. at 19 ¶ 62, 28-29 ¶¶ 124-138, 35 ¶¶ 160-161, 37 ¶ 176, 38 ¶ 183. Police officers are likely to be injured when guns acquired through unlawful transactions brokered on Armslist.com end up in the hands of criminals. *See id*. at 29-30 ¶ 139, 35 ¶ 162.

The content Armslist installed on Armslist.com worked exactly as intended in channeling a Glock 26 9mm handgun (the "Armslist Handgun") into the hands of Shomari Legghette – Commander Bauer's killer. *See id.* at 4 ¶ 16. A Wisconsin resident named Thomas Caldwell operated an illicit virtual "store" on Armslist.com and sold guns with the encouragement and assistance of the design content Armslist created. *See id*. at 3 ¶ 13, 27 ¶ 114. Caldwell has, since, been convicted for illegally engaging in the business of selling guns without a license in violation of 18 U.S.C. § 923(a) – but not before marketing hundreds of firearms for sale on Armslist.com and selling at least 11 firearms later connected to criminal investigations. *Id.* at 27 at ¶¶ 117-120.

A Milwaukee gun trafficker named Ron Jones, utilizing the design content implemented on Armslist.com, purchased the Armslist Handgun from Caldwell in 2017. *Id.* at 3-4 ¶ 15, 28 ¶ 122. Jones resold the Armslist Handgun to criminals in Illinois. *Id*. at 29 at ¶¶ 133-137. Legghette was a convicted felon, hence prohibited from acquiring or possessing guns; he, thus, predictably sought out a firearm through the criminal market fed by gun traffickers like Jones. *Id.* at 4 ¶ 16, 19 ¶ 62, 28-29 ¶¶ 124-138, 35 ¶¶ 160-161, 37 ¶ 176, 38 ¶ 183. Legghette used the Armslist Handgun to kill Commander Bauer on February 13, 2018. *Id.* at 30 ¶¶ 140-143. But for the misconduct of Armslist in designing and operating Armslist.com, the Armslist Handgun would never have been obtained and used by Legghette.

### IV.    Section 230 of the CDA Does Not Support Dismissal

A. The Plain Language of the Statute Permits All of Plaintiff's Claims

1. The Language and Purpose of Section 230 Only Protects Websites That Remove Objectionable Content

Statutory construction begins with an examination of the words Congress chose in the context in which they are used. *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc*., 138 S. Ct. 883, 893-94 (2020) ("[o]ur analysis begins with the text" including "the specific context in which th[e] language is used"). "The primary rule of statutory construction is . . . to give effect to the intention of the legislature." *Rodgers v. United States,* 185 U.S. 83, 86 (1902). The title and heading of a statute may indicate legislative intent when a statute is ambiguous. *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *see* Antonin Scalia & Bryan A. Gardner, *Reading The Law: The Interpretation of Legal Texts at* 217-225 (2012). Courts should not treat any word as superfluous. *See Astoria Fed. Sav. & Loan Ass'n. v. Solimino ,* 501 U.S. 104, 112 (1991). A statute must "be read as a whole." *Conroy v. Aniskoff ,* 507 U.S. 511, 515-16

(1993) (internal quotation omitted).  In construing statutes, "absurd results are to be avoided."

*United States v. Wilson*, 503 U.S. 329, 334 (1992).

Although Armslist argues that Section 230(c) of the CDA requires dismissal, precious

little of its brief discusses that statutory language or Congress's intent.  Further, it never

discusses the core principles of statutory interpretation that must govern its construction of the

CDA.  For good reason: the statutory language and legislative history of the CDA, as well as

rules of statutory interpretation, doom its argument.

The CDA was enacted, in large part, with the "goal of protecting children from harmful

materials" – particularly, sexually explicit content.  *Reno v. ACLU,* 521 U.S. 844, 849 (1997)

(striking down parts of the act a violative of the First Amendment).  Congress later added

Section 230 after a controversial decision in *Stratton-Oakmont v. Prodigy*, 1995 N.Y Misc.

LEXIS 229 (N.Y. Sup. Ct. 1995), which held that a provider of an online financial bulletin board

– which would ordinarily have been treated as a "distributor" (like a library) such that it could

not be liable for comments posted on its website – was treated as a "publisher" when it curated

comments on its website to remove offensive or improper comments.  *See id*. at *6-7, *10-11.

To prevent similar rulings in which no good deed goes unpunished, Congress sought to protect,

and thereby incentivize, "Good Samaritans" who take socially positive actions to screen

offensive content from the Internet.

Section 230's legislative history states Congress's intent to:

provide[] 'Good Samaritan' protections from civil liability for providers or users
of an interactive computer service  for  actions  to  restrict  or  to enable
restriction  of  access  to  objectionable online material. One of the specific
purposes of this section is to overrule *Stratton-Oakmont v. Prodigy* [1995 N.Y
Misc. LEXIS 229 (N.Y. Sup. Ct. 1995)] and any other similar decisions which
have treated such providers and users as publishers or speakers of  content that  is
not their own because they have restricted access to objectionable material.

H.R. Conf. Rep. No. 104-458 at 194 (1996); *see also* H.R. Rep. No. 104-223 at 3 (1995)

(the purpose of Section 230 was to "protect from liability those providers and users

seeking to clean up the internet").

Reflecting this purpose, Congress titled Section 230, "Protection for private

blocking and screening of offensive material."  Section 230(c), on which Armslist relies,

is, similarly, titled: "Protection for 'Good Samaritan' Blocking and Screening of

Offensive Material," and states in full:

> **(c) PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**
>
> **(1) TREATMENT OF PUBLISHER OR SPEAKER**
>
> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> **(2) CIVIL LIABILITY**
>
> No provider or user of an interactive computer service shall be held liable on account of—
>
> **(A)**
>
> any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> **(B)**
>
> any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

The language of the (c)(1) "shall not be treated as" provision, the (c)(2) liability bar and

§230's headings, reflect Congress's intent to protect website operators who take active steps to

limit objectionable content and remove fear that such actions will render them "publisher[s]"

subject to liability.  *See also* H.R. Conf. Rep. No. 104-458 at 194 (likening the idea of being a

"publisher" to active steps to "restrict[] access to objectionable  material").  The Seventh Circuit

has recognized that the title of § 230(c) conflicts with an overbroad interpretation of CDA

protections that would disincentive website operators like Armslist from taking active steps to curtail misconduct by users:

> []§ 230(c) – which is, recall, part of the 'Communications Decency Act'--bears the title 'Protection for 'Good Samaritan' blocking and screening of offensive material', hardly an apt description if its principal effect is to induce ISPs to do nothing about the distribution of indecent and offensive materials via their services.

*Chicago. Lawyers' Comm. For Civil Rights Law, Inc. v. Craigslist Inc.,* 519 F. 3d. 666 (7th Circ. 2008) (internal quotation omitted). *See also* Benjamin Edelman and Abbey Stemler, *From the Digital to the Physical: Federal Limitations on Regulating Online Marketplaces*, 56 HARV. J. ON LEG. 141, 179 (2019) (when an ICS "rejects any easy solution that would increase compliance with applicable law, its status as a 'good Samaritan' seems particularly far-fetched"); Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 FORDHAM L. REV. 401, 403 (2017) ("Something is out of whack—and requires rethinking— [if Bad Samaritans] are categorically immunized from liability").

2. The Language and Purpose of the CDA Do Not Support Dismissal.

Armslist primarily claims that Section 230(c)(1) bars imposing liability, but its language does no such thing. While §230(c)(2) expressly bars "civil liability" for certain actions to restrict access to objectionable content (which are not applicable here), in (c)(1) Congress chose not to expressly bar – or even mention – "civil liability" at all. Rather, (c)(1) simply states how websites are not to be "treated" – focusing solely on the problem arising from *Stratton Oakmont*'s treatment of an internet service provider ("ISP") as a publisher of third-party content. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Jesner v. Arab Bank, PLC*, 138 S.Ct. 1386, 1426 (2018). Hence, §230(c)(1) may not be read like (c)(2)'s liability bar. Yet that is what Armslist suggests.

The CDA's text and legislative history demonstrate that Plaintiff's claims are not barred. For one, Plaintiff does not seek to treat Armslist as the "publisher or speaker" of third-party information, such as in a defamation claim. Rather, the SAC alleges that Armslist is liable for its own content and negligent conduct in designing an inherently dangerous platform in a manner whose design features encourage and assist illegal gun sales. *See id*. at 1 ¶¶ 2-3, 5 ¶¶ 19-21. The fact that Armslist also published an ad to sell the gun does not provide it immunity. Nor does the CDA purport to shield websites from liability for its own conduct or content just because it also published some content produced in collaboration with a third party.

Indeed, Armslist could be liable even if it never published the relevant gun sales ads. Imagine that Armslist designed Armslist.com, but sold it, or partnered with a third party who published the ads. Armslist could be liable for its negligent design, and there could be no credible argument that Plaintiff sought to "treat" Armslist as a publisher of third-party content, because Armslist did not publish third-party content. Armslist does not obtain immunity because it did worse and ***also*** published the ads.

Further, the CDA does not prevent Armslist from being liable for information for which it is an "information content provider" to its website. *See Huon v. Denton,* 841 F.3d 733, 742-43 (9th Cir.2016) (an interactive computer service ("ICS") may "be liable for creating and posting . . .[ content] in a forum that the [ICS] maintains"); *Chi. Lawyers' Comm.,* 519 F.3d at 671 ("What § 230(c)(1) says is that an online information system must not 'be treated as the publisher or speaker of any information provided by' someone else."). The CDA defines "information content provider" as "any person or entity that is responsible, *in whole or in part*, for the creation or development of information provided through the Internet or any other interactive computer service." *Id*. at § 230(f)(3) (emphasis added). A defendant that

contributes in part to content on its online platform is not protected, even if the content is attributable to *both* the defendant and a third party. *See Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 886 (E.D. Wis. 2009), *aff'd,* 623 F.3d 436 (7th Cir. 2010). As the 9th Circuit stated:

> the fact that users are information content providers does not preclude [the platform] from also being an information content provider by helping 'develop' at least 'in part' the information in the profiles . . . and the party responsible for putting information online may be subject to liability, even if the information originated with a user.

*Fair Hous. Council v. Roommates.com*, *LLC*, 521 F.3d 1157, 1165 (9th Cir. 2008) (*en banc*).

Armslist does not address the fact that the SAC seeks to hold it responsible for its own misconduct in authoring or co-authoring information – both in designing Armslist.com, creating text and computer code, and co-developing ads with its unlawful users – rather than as a result of solely "information provided by another information content provider." In so doing, it renders the "in whole or in part" language from § 230(f) meaningless, fails to read the CDA "as a whole," and undermines Congress's stated purpose in enacting the CDA. *See Astoria,* 501 U.S. at 112; *Conroy,* 507 U.S. at 515-16 (internal quotation omitted); *Rodgers,* 185 U.S. at 86.

The CDA provides no basis to find that Congress intended to preclude all liability against bad actors like Armslist for their own misconduct merely because one cause of harm was a third party's contribution to a post. Indeed, reading the CDA as protecting Bad Samaritans, discouraging self-policing of websites, and facilitating circumvention of federal and states gun laws would result in be the sort of absurd result that courts should seek to avoid in construing statutes. *See United States v. Wilson*, 503 U.S. 329, 334 (1992). Both the Seventh and Ninth Circuits have rejected the absurdity that would result from allowing the CDA to shield parties from any liability for their own misconduct in developing or helping to develop dangerous content. *See Huon,* 841 F.3d at 742-43; *Chi. Lawyers' Comm.*, 519 F.3d at 669 ("§ 230(c) as a

11

whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts"); *Fair Hous. Council v, Roommates*, 521 F.3d 1157, 1164 (9th Cir.2008) (Congress's goal was not to create a "lawless no-man's-land on the Internet").

3. Principles of Federalism and the Presumption Against Preemption Require Reading the CDA to Allow Plaintiff's Claims

Federalism precedent also requires reading the CDA to allow Plaintiff's claims. The Supreme Court has held that federalism principles require construing federal statutes to avoid infringing on state authority (such as barring application of state common law), unless Congress has made its intent to so infringe on state authority explicit. *See Bond v. United States*, 134 S. Ct. 2077 (2014); *Gregory v. Ashcroft*, 501 U.S. 452 (1991). This Court should "not [be] looking for a plain statement that [common law claims like Plaintiff's] are excluded" from the coverage of the CDA, but instead, should "not read [the CDA] to [bar common law claims like Plaintiff's] unless Congress has made it clear that [they] are *included.*" *Gregory*, 501 U.S. at 467 (emphasis in original); *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013) ("a court must assume that Congress did not intend to supersede . . . ['the historic police powers of the states'] unless the language of the statute expresses a clear and manifest purpose otherwise").

This constitutional requirement may compel courts to adopt a strained interpretation of a statute to avoid infringing on state sovereignty. In *Gregory*, for example, a provision of the Missouri Constitution requiring judges to retire at age 70 appeared to violate the federal Age Discrimination in Employment Act of 1967 ("ADEA"). 501 U.S. at 455-56. To avoid preempting Missouri law, the Court read the ADEA to exempt judges under an exception for "'appointee[s] on the policymaking level.'" *Id.* at 465. The Court recognized that its interpretation was "an odd way for Congress to exclude judges," "particularly in the context of the other exceptions that surround [the exclusion applicable to judges]." *Id.* at 467. However,

the Court would not construe federal law as displacing Missouri's law because it could not be "absolutely certain" about Congress' intent. *Id*. at 464.

In *Bond,* the Supreme Court refused to allow a prosecution under a federal law that broadly criminalized the use of chemical weapons, even though, as Justice Scalia stated, "it [wa]s clear beyond doubt that [the act] cover[ed] what *Bond* did . . ." 34 S. Ct. at 2094 (Scalia J., concurring). Nonetheless, because a plain reading would lead to the federal government "'dramatically intrud[ing] upon traditional state criminal jurisdiction . . .'", the Court read ambiguity into unambiguous statutory language, finding that the "ambiguity derives from the improbably broad reach of the key statutory definition . . .". *Id*. at 2088 (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)). The Court held that the law could not constitutionally be applied to Bond because "[t]he Government's reading of [a federal statute] would 'alter sensitive federal-state relationships,' [and] convert an astonishing amount of 'traditionally local criminal conduct' into a 'matter for federal enforcement.'" *Id*. at 2091-92 (quoting an earlier decision in *Bond*).

The federalism principles outlined in *Bond* and *Gregory* parallel another critical doctrine: the presumption against preemption. *See, e.g., Bansemer v. Smith Laboratories*, 1988 U.S. Dist. LEXIS 16208 at *9 (E.D. WI. 1988) (noting "strong presumption against preemption that arises when Congress chooses not to provide a federal remedy for injured persons"). Under this doctrine, even where a statute's "express language" mandates some degree of preemption of state law, the "presumption [against preemption] reinforces the appropriateness of a narrow reading" of the "scope" of the preemption. *See Cipollone v. Liggett Group*, 505 U.S. 504, 516-18 (1992); *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996) (discussing *Cipollone*). Moreover, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily

13

accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation omitted); *Patriotic Veterans*, 736 F.3d at 1048 (7th Cir. 2013).

It is evident, at minimum, that Congress did not "ma[k]e it clear that [Plaintiff's claims] are *included*" within the CDA's bar. *See Gregory*, 501 U.S. at 467 (emphasis in original). Section (c)(1)'s "shall-not-be-treated-as" provision is far from an explicit statement barring liability for Armslist's negligent design or conduct. It never states that ISPs may not be held liable for any negligent or intentional conduct involving in some way the publication of a post involving some input from a third party. This is especially clear since Congress declined to use language similar to §230(c)(2) that no ISP "shall be held liable" in such cases, but chose instead to simply restrict "treatment" as a "publisher." *See Merit,* 138 S. Ct. at 893-94 (rejection of obvious broader language implies narrow scope).

Any ambiguity as to whether Plaintiff's claims are to be allowed must be resolved in her favor by narrowly construing the degree to which the CDA preempts state tort law. *See Cipollone*, 505 U.S at, 516-18; *Medtronic,* 518 U.S. at 485; *Altria*, 555 U.S. at 77. Construing the CDA to allow Plaintiff's claims is especially necessary because, like the local criminal laws at issue in *Bond*, the tort law that Wisconsin would be prevented from enforcing falls squarely within the police powers that lie at the core of state sovereignty. *See Martinez v. California*, 444 U.S. 277, 282 (1980) ("the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational").

The Wisconsin Court of Appeals decision in *Daniel v. Armslist* appropriately recognized that the presumption against preemption creates an "exacting standard" that necessitates narrowly construing CDA protection to allow claims against Armslist. *Daniel v. Armslist, LLC,*

382 Wis. 2d 241, 259-263 (Wis. Ct. App. 2018) ("*Daniel I*"), *rev'd by Daniel v. Armslist, LLC*, 386 Wis. 2d 449, 466 (2019) ("*Daniel II*") *cert denied,* 140 S.Ct. 562 (2019). In contrast, *Daniel II* failed to address the presumption against preemption, despite it being a central holding of the *Daniel I* opinion it reversed. As *Daniel I* observed,

> If the goal of Congress [had been] to establish the sort of broad immunity urged by Armslist, that is, immunity for all actions of websites that could be characterized as publishing activities or editorial functions, Congress could have used any number of formulations to that end. Instead, Congress limited immunity to a single circumstance: when a theory of liability treats the website creator or operator 'as the publisher or speaker of any information provided by another information content provider.' ***Nothing in this language speaks more generally to website design and operation***.

*Id.* at 263 (emphasis added).

While *Daniel II* reversed *Daniel I*, neither is controlling and this Court may follow whichever construction of this federal statute it finds better reasoned (or neither). And, contrary to Armslist's claims, the fact that the Supreme Court denied certiorari in *Daniel II* does not imply anything (MTD Br. at 1-2, 21). "The denial of a writ of certiorari imports no expression of opinion upon the merits of the case." *United States v. Carver*, 260 U.S. 482, 490 (1923). *Daniel II* should be disregarded.[3]

The Supreme Court of Washington, like the Court of Appeals in *Daniel I*, properly narrowly construed the CDA to allow claims against a website that facilitated sex trafficking through ads on its site. *J.S. v. Vill. Voice Media Holdings, LLC,* 184 Wn. 2d 95 (Wash. 2015). The Court in *J.S.* correctly recognized that a website operator enjoys no protection under the

---

[3] Armslist also cites to a Massachusetts trial court decision in *Stokinger v. Armslist.com,* No. 1884CV03236-F (Sup. Ct. Mass. Mar. 13, 2020). MTD Br. at 1 n. 1. *Stokinger* is unpersuasive because it expressly relied upon the incorrect *Daniel II*. *See Stokinger*, 1884-cv-03236-F at 13-14. *Stokinger* is in the process of being appealed.

CDA if it plays an active role in helping to develop articles of content (like advertisements) that also involve some input from third parties. *See id.* at 101-02. As Justice Wiggins concurred:

> The main purpose of subsection 230(c) is not to insulate providers from civil liability for objectionable content on their websites, but to protect providers from civil liability for limiting access to objectionable content. Ironically, the dissent would turn section 230 upside down, insulating [websites for[4]] expanding access to objectionable content.

184 Wn.2d at 107 (Wiggins, J. concurring). The Court held that Backpage was not entitled to any protection under the CDA because it designed its website to incorporate features that "encourage[d]" advertisements for illegal and socially pernicious commerce (there, sex trafficking). *See id.* at 102-103 (internal quotation omitted). These allegations match those in the SAC – and the concept of "inducement" endorsed by the Seventh Circuit –as a basis for denying CDA protection. *Compare* 184 Wn.2d at 104 (Wiggins, J., concurring) ("plaintiff's claim that Backpage.com designed its posting rules to induce sex trafficking and to help pimps and prostitutes evade law enforcement"), *id.* at 114 n. 12 (citing, *inter alia, Chi. Lawyers' Comm.*, 519 F3d.) *with Huon,* 841 F.3d at 742. Justice Wiggins explained that "an inducement theory does not require the defendant to act as a publisher." *J.S.*, 184 Wn.2d at 112.

Armslist reiterates *Daniel II*'s attempt to distinguish *J.S.* as being decided under a "more permissive" pleading standard. *See* MTD Br. at 5 n. 4. But the court in *J.S.* made clear that the CDA did not shield the defendant even without consideration of additional "hypothetical facts" allowed in Washington. *Id.* at 98; *see also Daniel II*, 386 Wis. 2d 449, 491 n. 4 (Walsh Bradley, J., dissenting) (criticizing the *Daniel II* majority's attempt to distinguish *J.S.* as "unpersuasive" and noting that "the *J.S.* court did not base its determination on any 'hypothetical facts'").

---

[4] The opinion states "plaintiffs from".

Justice Wiggins's statement that the "actual language of the statute . . . does not include the term or any synonym of 'immunity,'" 184 Wn.2d at 104 (Wiggins, J. concurring), is akin to the district court decision later affirmed by the Seventh Circuit in *Chi. Lawyers' Comm.* that Section 230(c)(1) "does not mention immunity or any similar term or phrase." *Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d 681, 695 (N.D. Ill. 2006), *aff'd by Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.,* 519 F. 3d. 666 (7th Cir. 2008).

Multiple commentators have echoed Plaintiff's contention that the overbroad interpretation of CDA protection advanced by some courts – and Armslist – is fatally flawed and contrary to Congress's intent. Stanford Law professor Gregory Dickinson explained that the "broad interpretation" of CDA protection adopted by a number of courts "ignores several serious textual difficulties and mistakenly extends protection too far by immunizing even direct participants in tortious conduct." Gregory M. Dickinson, *An Interpretative Framework for Narrower Immunity Under Section 230 of the Communications Decency Act,* 33 HARV. J. L. & PUB. POL'Y 863, 863-864 (2010). *See also* Ryan Gerdes, *Scaling back § 230 Immunity: Why The Communications Decency Act Should Take a Page From the Digital Millennium Copyright Act's Service Provider Immunity Playbook*, 60 DRAKE L. REV. 653, 672-673 (2012) ("The [Communications Decency] Act was originally intended to allow websites to edit or remove material without fear of liability for "providing" the information, but the result has been a complete lack of policing by websites due to the broad immunity granted by courts."); Patricia Spiccia, *The Best Things in Life Are Not Free: Why Immunity Under Section 230 of the Communications Decency Act Should Be Earned and Not Freely Given*, 48 VAL. U. L. REV. 369,

404 (2013) ("...*Zeran* and its progeny ultimately expanded the scope of section 230 far beyond what Congress actually intended").

This Court should follow applicable rules of statutory construction, and the Washington Supreme Court and *Daniel I*'s well-reasoned analysis.

4. <u>The Content and Design Code Created by Armslist Are Not "Information Provided by Another Information Content Provider"</u>

Under the CDA's plain language, Plaintiff's claims fall outside of the scope of the CDA's protection because they do not to treat Armslist as a publisher of third-party content, but seek to hold Armslist responsible for its actions in producing and presenting content on Armslist.com. *See* SAC at 1 ¶¶ 2 – 3, 5 ¶¶ 19-21. The SAC identifies specific pieces of content Armslist implemented on Armslist.com with zero third-party involvement which encourage and assist illegal gun transactions. *See id.* at 12-18 ¶ 57.

The CDA does not protect websites from liability arising from content they produce. *See Huon,* 841 F.3d at 742-43 (an interactive computer service ("ICS") may "be liable for creating and posting . . .[content] in a forum that the [ICS] maintains"); *Chi. Lawyers' Comm.,* 519 F.3d at 671 (CDA protection only applies to content produced by "someone else" rather than operator(s) of a website); *Roommates,* 521 F.3d at 1165 ("Roommate's own acts . . . are entirely its doing and thus section 230 of the CDA does not apply to them").

*Daniel I* appropriately recognized this critical distinction and correctly allowed similar claims because Armslist's website content and code was not "information provided by another information content provider" within the meaning of § 230(c)(1). *See Daniel I*, 382 Wis. 2d at 268 ("claims . . . d[id] not seek to hold Armslist liable for publishing another's information content" but "[sought] to hold Armslist liable for its own alleged actions in designing and operating its website in ways that caused injuries" to plaintiff); *see also Daniel II*, 386 Wis. 2d at

486 (Walsh Bradley, J. dissenting) ("The allegations here, however, assert liability for Armslist not based on content provided by another. Rather, the allegations assert liability based on design content Armslist alone created.").

Similarly, in *Maynard v. Snapchat, Inc.*, 346 Ga. App. 131 (2018), the Court of Appeals of Georgia held that Snapchat could be liable for its role in causing an auto accident due to the driver using Snapchat's "Speed Filter," an application which superimposed the speed at which a mobile phone is traveling on an image it posts. *See id.* at 136, 132-133. The Georgia Court of Appeals reversed the lower court's holding that the CDA blocked the claim, finding that the suit was not trying to treat Snapchat as a "publisher" of third-party content (indeed, there was no image posted), but was, instead, seeking to hold "Snapchat liable for its own conduct, principally for the creation of the Speed Filter and its failure to warn users that the Speed Filter could encourage speeding and unsafe driving practices." *Id*. at 136.

5. Because Armslist Is Responsible in Part for the Gun Sales Advertisements, They Are Not "Information Provided by Another Information Content Provider"

Plaintiff's claims are also permitted because Armslist is "responsible, in *** part, for the creation or development" of Caldwell's gun sales ads.  § 230(f)(3).  Thus, the ads are not "information provided by another information content provider" that could support protection under (c)(1)'s shall-not-be-treated-as provision.

The SAC alleges that Armslist and unlawful users like Caldwell *both* act as "information content provider[s]" who play significant roles in the production of unlawful advertisements like Caldwell's and that these advertisements are co-authored by Armslist and their unlawful users. *See, e.g*., SAC 5 ¶¶ 19-21.   For example, the SAC alleges that "the Armslist Defendants are acting as co-authors of advertisements for illegal sales by unlicensed dealers like Caldwell by contributing a critical piece of content to these advertisements," and describes Armslist's choice

to, as a default, include the important "Private Party" tag on transactions by users without registered accounts order to help unlawful users like Caldwell to generate effective advertisements including this tag which will increase their ability to market unlicensed virtual "stores" to other criminals. *See id*. at 14-15 ¶ 57(e-i); *see also* 3-4 ¶ 15, 28 ¶ 128.

The addition of the "Private Party" tag resembles *Roommates*, in which the text of discriminatory options provided in drop-down menus (which was authored by Roommates.com but ultimately selected by users) was displayed as part of user profiles that involved some third-party input. *See Roommates,* 521 F.3d at 1165. Armslist's filtered search function (as described in SAC 12 ¶ 57(a-b)) also closely approximates Roommates.com's active role in supplying a search system which filtered results based on discriminatory information produced, in part, by Roommates.com – a function for which Roommates.com enjoyed no CDA protection. *See* 521 F.3d at 1167 ("Roommate is not entitled to CDA immunity for the operation of its search system, which filters listings . . . Roommate designed its search system so it would steer users based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose."). Armslist's other features create a culture of anonymity and impunity, which allow illegal gun purchases and sales without basic restrictions, also constitute content – similar to the allegations in *J.S.*, 184 Wn. 2d at 102. *Maynard* similarly recognized that the CDA provides no protection when a website produces a feature which encourages dangerous misconduct by others. *See* 346 Ga. App. at 136, 132-33. Since Armslist.com's features attract criminal buyers like Jones, and enable and encourage misconduct like Caldwell's gun trafficking, they are not entitled to CDA protection. *See Huon,* 841 F.3d at 742-743; *Chi. Lawyers' Comm.,* 519 F.3d at 671-72; *J.S.*, 184 Wn.2d 95 at 103; *Roommates*, 521 F.3d at 1167-68; *Maynard,* 346 Ga. App. at 136, 132-33.

Some cases interpreting the CDA appear to have imposed an additional requirement that that such a contribution must be "material" to the content displayed in order for the operator of the platform to be subject to liability. *See Roommates*, 521 F.3d at 1168. This "material" component is not supported by the statutory language, and runs counter to the federalism principles and the presumption against preemption that demand a narrow reading of CDA protection. However, even if "material contribution" were required, Plaintiffs satisfy that test.

The Seventh Circuit appears to have reframed this test in terms of the question of whether a site "induces" unlawful conduct. *See Huon* 841 F.3d at 742-43; *Chi. Lawyers' Comm.* 519 F.3d at 671-72. By enabling illegal gun sellers and shielding them from detection, Armslist would be "inducing" their ads, even if none of Armslist's words were part of the ads themselves.

6. <u>Armslist is Entitled to No Protection Under Section 230(c)(2) Because it Did Not Act in "Good Faith"</u>

Armslist also claims that it is entitled to protection under 47 U.S.C. § 230(c)(2)(A), which bars liability for "*action* voluntarily taken *in good faith* to *restrict access to* or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id*. (emphasis added) (discussed in MTD Br. at 17-19). This claim borders on the frivolous. Armslist did not take any action to restrict access to objectionable material, certainly not in "good faith." And Plaintiff's theory of liability is the opposite – that Armslist took actions in bad faith to encourage, contribute to and facilitate objectionable content and illegal conduct.[5]

---

[5] President Trump recently issued an executive order suggesting that this "good faith" language has teeth and that online platforms should lose CDA protection if they cannot make a showing of "good faith" with regards to how they police content. President Trump, "Executive Order on Preventing Online Censorship" (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

Plaintiff is certainly not seeking to impose liability based on Armslist's nonexistent "Good Samaritan" screening of offensive content.  On the contrary, Armslist is a "Bad Samaritan" that encouraged, facilitated and contributed to content that was dangerous and illegal.  Armslist's view that any operator of a website that posts an article of content involving some third-party input is immune from liability frustrates Congress's purpose.

B.  The Seventh Circuit Agrees That the Protection Provided By the CDA Should Be Construed Narrowly

Armslist relies on a line of authority originating with the Fourth Circuit's opinion in *Zeran v. America Online, Inc.* 129 F.3d 327 (4th Cir. 1997) that improperly construes CDA as providing broad immunity.  *See* MTD Br. at 3 (quoting *Zeran*).  The Seventh Circuit and courts within it have consistently declined to adopt such an overly broad reading of CDA § 230(c)(1) urged by Armslist.

The Seventh Circuit has denied motions to dismiss claims based on the CDA where the claims did not treat a defendant as the publisher or speaker of a third party's content even if the facts involved some publication of a third-party content. *See City of Chicago, Ill. v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010), *certified question answered sub nom.*, 2011 IL 111127, 979 N.E.2d 844 (stating CDA § 230 "might matter to liability for defamation, obscenity, or copyright infringement" but not the imposition of a an amusement tax); *Huon* 841 F.3d at 742-43; *Chi. Lawyers' Comm.,* 519 F.3d at 669–71.  *See also Doe v. GTE Corp.,* 347 F.3d 655, 659 (7th Cir. 2003) (claim of negligent entrustment did not require an interpretation of CDA § 230 where the plaintiff did not contend that the defendant "published" anything).  The Western District of Wisconsin rejected CDA § 230 as a basis to grant summary judgement because a plaintiff's cause of action under the Telephone Consumer Protection Act sought to hold a

defendant liable under a theory of invasion of privacy, rather than as the publisher of objectionable content. *Cunningham v. Montes,* 378 F. Supp. 3d 741, 742 (W.D. Wis. 2019).

The Eastern District of Wisconsin has recognized that: "A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is 'responsible in whole or in part' for creating or developing, the website is also a content provider." *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873 (E.D. Wis. 2009), *aff'd on other grounds*, 623 F.3d 436 (7th Cir. 2010). An ICS may "be liable for creating and posting, inducing another to post, or otherwise actively participating in the posting of [unlawful content] in a forum that the [ICS] maintains." *Huon,* 841 F.3d at 742.

Armslist's assertion that courts have "repeatedly" held that "an interactive computer service's alleged bad faith or knowledge of illegal conduct does not breach Section 230 immunity" relies on *Daniel II's* misreading of *Chi. Lawyers' Comm.,* 519 F.3d at 670. Def's. Mot. to Dismiss at 6. *Daniel II* found, "[t]ogether, §§ 230(c)(1) and (2) allow interactive computer service providers to be 'indifferent to the content of information they host or transmit: whether they do … or do not … take precautions, there is no liability under either state or federal law.'" *Daniel II,* 386 Wis.2d at 466 (citing *Chic. Lawyers' Comm.*, 519 F.3d at 670). But the language quoted by the *Daniel II* court does not support its view. Rather, it was part of Judge Easterbrook's broad ruminations on the scope of CDA § 230, and quoted *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003). Read in its entirety, the Seventh Circuit in *Chicago Lawyers* suggested the opposite conclusion of *Daniel II*. Judge Easterbrook read the "Good Samaritan" caption alongside the text of §§ 230(c)(1) and (2) and questioned whether it is appropriate to read "a law designed to eliminate [ICS] liability to the creators of offensive material [as] defeating

claims by the victims of tortious or criminal conduct." *Chic. Lawyers' Comm.*, 519 F.3d at 670

(citing *GTE Corp.*, 347 F.3d at 659). Ultimately, Judge Easterbrook read §§ 230(c)(1) and (2)

"each to do exactly what it says" and resolved the dispute under § 230(c)(1) without deciding

whether § 230(c)(2) requires an ICS to affirmatively engage in content moderation in order to

invoke protections under that subsection or CDA § 230 more generally. *Id.* at 671. This Court

also should decline Defendant's invitation to conclude that CDA § 230 immunizes "an

interactive computer service's alleged bad faith or knowledge of illegal conduct." MTD Br. At 6.

Contrary to what Armslist claims, it does not "swallow the [CDA] rule" to hold, as the

Seventh Circuit has, that an ICS may "be liable for creating and posing, inducing another to post,

or otherwise actively participating in the posting of [unlawful content] in a forum that the [ICS]

maintains." *Huon,* 841 F.3d at 742. Armslist still cannot be treated as a publisher of third-party

posts to which it did not contribute, but it should be liable for its own design decisions (its own

content and computer code) and for inducing advertisements produced in collaboration with its

unlawful users. In response to the same assertion made by the court's majority in *Daniel*, the

dissent noted that her "conclusion is not at odds with the bulk of CDA jurisprudence … [and

can] peacefully coexist [with *Zeran*] because they deal with different factual allegations –

liability for third party content vs. liability for first party content." *Daniel II*, 386 Wis.2d at 494

n. 6 (Walsh Bradley, J. dissenting).

Defendant's characterization of *Dart v. Craigslist*, 665 F.Supp.2d 961, 968-69 (N.D. Ill

2009) misconstrues Plaintiff's claims. The court in *Dart* acknowledged that the Seventh Circuit

reads CDA § 230 narrowly and that an ICS may lose § 230 protections if it is "designed to

achieve illegal ends … [or] causes or induces its users to post unlawful content." That is what

Plaintiff alleges here. The allegations in *Dart* are distinguishable from Plaintiff's. Unlike in the

instant case, Craigslist's alleged role in the production of the offensive advertisements appears to have been limited to the creation of an "Adult Services" section of its website and provision of a search tool allowing users to try to seek out their sexual preferences without any parameters being inserted into the search by Craigslist.com. *Id.* at 967-969. The SAC alleges that the Armslist played an active and direct role in authoring or co-authoring content associated with the unlawful firearms transactions occurring on Armslist.com.

Defendant's comparison of Armslist.com to Craigslist.com fails to recognize critical differences. Craigslist is a bare-bones online bulletin board that allows users to post advertisements related to a wide array of goods and services that may or may not be subject to federal regulation and it enlists its users in flagging content that violates its terms of service. *Chi. Lawyers' Comm,.* 519 F. 3d at 668-69. While the Seventh Circuit noted that it is "expensive and may well be futile" for Craigslist to vet content, *Chi. Lawyers' Comm.,* 519 F.3d at 669, Armslist was designed exclusively to facilitate and promote sales of guns, which are restricted products that certain people are not allowed to buy or engage in the business of selling and which are subject to a discrete framework of federal regulation (18 U.S.C. § 921 *et. seq*). Armslist could have easily been taken those laws into account when it designed the site, but Armslist welcomes, encourages and assists illegal buyers and sellers to access and use its content for illegal ends.

The sweeping immunity proposed by Armslist is inconsistent with the narrow reading of the statute adopted by the Seventh Circuit.

C. The "Neutral Tools" Test Has No Foundation in the Text of the CDA and Would Provide Armslist With No Protection If It Applied

Armslist characterizes the design features that it created to facilitate illegal gun sales as "neutral tools" that can be used by visitors to a website for either lawful or unlawful purposes

and claims they entitle Armslist to CDA protection. *See* MTD Br. at 5, 16-17. Armslist is incorrect on the facts and the law.

First, while some courts have held that "neutral tools" cannot support liability under the CDA, the text of the CDA provides *no basis* for such a test. So long as Armslist is not treated as a publisher or speaker of third-party content, it can be liable for negligently creating web tools, even if they are "neutral."

But even assuming that CDA bars liability for "neutral tools," the allegations in the SAC demonstrate that Armslist is entitled to no immunity. Armslist fails to acknowledge that, as *Roommates* observed, "[p]roviding neutral tools for navigating websites is fully protected by CDA immunity, *absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes.*" 521 F.3d at 1174 n. 37 (emphasis added). Thus, even assuming, *arguendo*, that features such as Armslist.com filtering function allowing users to limit their search to "Private Parties" (12 ¶ 57(a)) are "neutral tools", Armslist is entitled to no protection if it actively encourages individuals to misuse features capable of use in unlawful endeavors. This encouragement is precisely what is alleged in the SAC. *See, e.g.,* SAC at 1 at ¶¶ 2-3, 5 ¶¶ 19-21, 16 ¶ 57(o).

Indeed, while the Seventh Circuit held that Craigslist could not be held liable for its "neutral tools," it explained that "[n]othing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination." *Chi. Lawyers' Comm.* 519 F.3d at 671-72. *Huon* confirmed that intent to encourage and assist unlawful conduct, and knowledge that certain website features will be employed to accomplish an unlawful purpose, *are* relevant to the question of whether CDA protections apply. 841 F.3d at 742-43 (an ICS may "be liable for .

. . inducing another to post . . . [unlawful content] in a forum that the [ICS] maintains.").  The

SAC makes those allegations.  *See, e.g.,* SAC at 1 at ¶¶ 2-3, 5 ¶¶ 19-21, 16 ¶ 57(o).

Finally, the features identified in the SAC are not "neutral tools" even if some may be

capable of some lawful uses.  Even if some subset of the transactions enabled by the features of

Armslist.com are lawful, these tools are *disproportionately* useful to unlawful users seeking to

avoid background checks and/or transaction records through private, online sales rather than

buying weapons at FFLs.  *See* SAC 2 ¶¶ 5-7, 28 ¶ 128.  The SAC notes studies that strongly

corroborate the claim that these tools are not "neutral" and are, instead, disproportionately

attractive to criminals.  *See* SAC at 21- 26 ¶¶ 74-111.

D.  Armslist's Other Authorities and Counterarguments Are Unpersuasive/Distinguishable

The other, non-Seventh Circuit authorities to which the Defendants attempt to analogize

this case are factually distinct or legally incorrect.  These non-binding cases do not allege that the

operators of the relevant websites took an active role in authoring or co-authoring the content

challenged in the relevant suit.  *See, e.g., Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C.

Cir. 2014) (dismissing claims where the "complaint charge[d] the defendants only with

'allowing' the pages to exist and 'furthering' them by not 'remov[ing] these postings'"); *Gibson*

*v. Craigslist, Inc*. 2009 U.S. Dist. LEXIS 53246, *11 (S.D.N.Y. 2009) (seeking relief for site's

"alleged failure to block, screen, or otherwise prevent the dissemination of a third party's

content, *i.e*., the gun advertisement in question" without mentioning any active role by the site in

developing content or inducing content); *M.A. v. Vill. Voice Media Holdings,* 809 F. Supp. 2d

1041, 1052 (E.D. Mo. 2011); *Barnes v. Yahoo!,* 570 F.3d 1096 (9th Cir. 2009) *amended by* 2009

U.S. App. LEXIS 21308 (9th Cir. Sept. 28, 2009) (similar); *Gregerson v. Vilana Financial, Inc.,*

2008 U.S. Dist. LEXIS 11727 (D. Minn. Feb. 15, 2008) (similar).   By contrast, the SAC explicitly alleges authorship or co-authorship through contribution or inducement.

Finally, Armslist makes a cursory policy argument that Plaintiff is seeking to impose a crushing and impossible burden on website operators like Armslist.com. *See id*. at 9 n. 6. However, that is not true, and, even if it were, it would not entitle Armslist to continue to encourage, assist, facilitate and profit from illegal gun sales that kill innocent people.   The fact is, Plaintiff does not claim that Armslist is liable because it failed to review postings.   Rather, it chose to implement dangerous designs, to assure unlawful users of impunity, to create default tag sales as involving a "Private Party," to not require users to have registered, verified accounts and to not require that its users be legal buyers or sellers – all which would substantially decrease the amount of unlawful conduct on Armslist.com without any "vetting" of posts.   And these designs would make later monitoring of the site a significantly less time-consuming and expensive. Furthermore, such changes entirely within the technological and financial capabilities of website operators like Armslist.com.   Such changes are in keeping with the spirit of the CDA.

The CDA was designed to encourage website operators like Armslist to create a culture of accountability rather than one of anonymity and lawlessness.   Ruling in Plaintiff's favor will not somehow crash the internet by exposing good faith actors to crushing liability.

## V.      Plaintiff States Valid Claims Under the Common Law

Armslist falsely claims that Plaintiff fails to state claims under Wisconsin and/or Illinois law.   MTD Br. at 19-21.   These arguments are refuted in Plaintiff's Opposition to Defendant Gibbon's motion to dismiss.

## VI.     Conclusion

The words Congress chose in Section 230 matter – a lot. Those words do not provide Armslist with the sweeping immunity it claims, nor does it render this or other courts powerless to grant civil justice to victims of Armslist's negligent, intentional, and deadly conduct – including Commander Paul Bauer's widow. Armslist's motion should be denied.

Dated: July 29, 2020                    By:    **CANNON & DUNUPHY, S.C.**

                                               /s/ Brett A. Eckstein
                                               Patrick O. Dunphy
                                               State Bar No. 1036964
                                               Brett A. Eckstein
                                               State Bar No. 1036964
                                               595 North Barker Road
                                               P.O. Box 1750
                                               Brookfield, WI 53008-1750

                                               **BRADY**

                                               /s/ Jonathan E. Lowy
                                               Jonathan E. Lowy
                                               Chief Counsel and Vice President,
                                               Legal
                                               840 First Street NE
                                               Suite 400
                                               Washington, DC 20002
                                               202-370-8104
                                               jlowy@bradyunited.org

                                               /s/ Christa Y. Nicols*
                                               Christa Y. Nicols *(pro hac vice to
                                               be filed)
                                               Litigation and Constitutional
                                               Counsel
                                               840 First St., NE, Suite 400
                                               Washington, DC, 20002
                                               202-370-8131
                                               cnicols@bradyunited.org

                                               **BLANK ROME, LLP**

                                               /s/ John D. Kimball*

John D. Kimball *(pro hac vice to be filed)
1271 Avenue of the Americas
New York, NY 10020
(212) 885-5000
jkimball@blankrome.com