UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

-----------------------------------------------------------------

ERIN BAUER, et al,                    )
                                      )
                    Plaintiff,        )   Case No. 20-CV-215
                                      )   Milwaukee, Wisconsin
        vs.                           )
                                      )   October 29, 2020
ARMSLIST LLC, et al,                  )   9:33 A.M.
                                      )
                    Defendant.        )
                                      )
-----------------------------------------------------------------

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES CHIEF DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs
ERIN BAUER, et al:              Blank Rome LLP
                                By: John D Kimball
                                1271 Ave of the Americas
                                New York, NY 10017
                                Ph: 212-885-5259
                                jkimball@blankrome.com

                                By: Jonathan E Lowy
                                Brady Center to Prevent Gun
                                Violence
                                840 1st St - Ste 400
                                Washington, DC 20002
                                Ph: 202-370-8101
                                Jlowy@bradyunited.org

CONTINUED APPEARANCES:

For the Defendants
ARMSLIST LLC, et al:          FisherBroyles LLP
                              By: Timothy L Moore
                              811 Mason St
                              San Franscisco, CA 94108
                              Ph: 619-6787-1588
                              timothy.moore@fisherbroyles.com

 U.S. Official Transcriber:   SUSAN M. ARMBRUSTER, RMR
 Transcript Orders:           Susan_armbruster@wied.uscourt.com

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

Case 2:20-cv-00215-PP   Filed 11/10/20   Page 2 of 45   Document 25

1              TRANSCRIPT OF PROCEEDINGS

2            Transcribed From Audio Recording

3                    *    *    *

4         THE CLERK:  Court calls civil case Case No. 20-CV-215,

5    Erin Bauer, et al v. Armslist LLC, et al.  Please state your

6    appearances starting with the attorney for the plaintiffs.

7         MR. KIMBALL:  Your Honor, this is John Kimball for the

8    plaintiffs and John Lowy.

9         THE CLERK:  And for the defendants.

10        MR. MOORE:  Your Honor, it's Timothy Moore on behalf

11   of defendants Armslist LLC and Jonathan Gibbon.

12        THE COURT:  Good morning to everyone.  Sorry, one

13   moment.  I was making a note, and I got my own self districted.

14        Part of the reason I got my own self distracted was

15   just before this call, I saw an e-mail from someone saying that

16   delight savings ends this weekend, and I got all flabbergasted

17   and confused, which I guess is just another indication of how

18   bizarre this year has been.  And we made it to this point, and I

19   don't understand how that happened.

20        I mean, aren't there days when it feels like this year

21   lasted for 30 years, and there are other days when it feels like

22   it's flown by because not one day of it has been different than

23   any other day.

24        MR. KIMBALL:  My home office is starting to look

25   familiar.

1          THE COURT:  Familiar?  I'm about ready to see if I can

2    order on line some different color paint and do something to

3    this room because if I look at it one more time, I'm going to

4    scream.

5          So good morning to all of you.  Sorry to be a little

6    bit punchy today.  It has been a long week.

7          We are here today with regards to the two motions to

8    dismiss, and I have kind of a dual purpose in getting us

9    together today.  I'm prepared to rule on one of the motions, but

10   I'd like to hear argument on the other.  And so what I'd propose

11   to do is to give you the oral ruling on the portion that I'm

12   prepared to rule on today, and then if I could give you kind of

13   a sense of what I'm interested in hearing about with regard to

14   the portion that I'd like to hear argument on and then give each

15   of you an opportunity to make your arguments.

16         Did someone just join the call or did we lose someone?

17   I hope we didn't lose anybody.  Mr. Kimball, Mr. Lowy, are you

18   still here?

19         MR. KIMBALL:  We're still here.

20         THE COURT:  Mr. Moore, are you still here?

21         MR. MOORE:  I'm still here.

22         THE COURT:  Okay.  We may have just had someone join

23   to listen.  Okay.  So we have the motion from Mr. Gibbon, and

24   his motion has two bases.  He's moving for lack of personal

25   jurisdiction under 12(b)2 as well as failure to state a claim

1    under 12(b)(6).

2         And then Armslist is moving only for failure to state

3    a claim.  Mr. Gibbon's motion is at our Docket No. 5, and

4    Armslist's motion is at Docket No. 7.

5         Just briefly, I think --  I think I got my arms around

6    the facts.  The genesis of the plaintiffs' claims is --  is the

7    unfortunate and tragic death of Police Commander Paul Bauer in

8    February of 2018.

9         Commander Bauer was killed by a non-party to this

10   case, an individual named Shomari Legghette in Chicago, and the

11   plaintiffs allege that Mr. Legghette was a convicted felon and

12   therefore a prohibited person and so should --  couldn't at

13   least or shouldn't have been able to legally purchase a firearm.

14        What he did do apparently was get a gun from somebody

15   on the street in Chicago.  And the gun had found its way to the

16   street in Chicago apparently, according to the complaint, by an

17   individual named Ron Jones.

18        Mr. Jones is alleged to be a firearm's trafficker from

19   the Milwaukee area.  And somehow or another, and it's not

20   entirely clear from the complaint, how Mr. Jones got rid of a

21   gun that ended up in the illegal firearm's market in Chicago,

22   and that's how Mr. Legghette got hold of it.

23        The plaintiffs allege though, more particularly to

24   this case, that Mr. Jones obtained the handgun from a virtual

25   gun store run by a guy name Caldwell, Thomas Caldwell, on

1   Armslist --  on Armslist.com, the website.

2           And so the argument is that the creation, maintenance

3   and set up of Armslist enabled Mr. Caldwell to run his store,

4   enabled Mr. Jones to purchase the handgun from Mr. Caldwell's

5   store, enabled Mr. Jones then to put that handgun into the

6   illegal stream of commerce in Chicago, and then allowed it to

7   make its way to Mr. Legghette, who then used it to kill

8   Commander Bauer.

9           Ms. Bauer is a resident of Illinois and so she and the

10  estate, both plaintiffs, are Illinois residents.  Mr. Gibbon,

11  who is the member and co-owner of Armslist, is a resident of

12  Pennsylvania.  And then Armslist is an Oklahoma Limited

13  Liability Company with its principal place of business in

14  Pennsylvania, so this is a diversity suit.

15          And there's an extensive description in the complaint

16  of how Armslist works, how one can conduct a search on Armslist,

17  particularly how one can search for a category of sellers called

18  "private sellers".  And the complaint alleges that the way that

19  Armslist is set up is that it creates pretty much a default

20  option sending users to private sellers.

21          It talks about how one can go on the website and

22  search by location, by type of firearm, other search factors.

23  The complaint also spends a significant amount of time, and I'm

24  talking I should say, by the way, about the second amended

25  complaint, Docket No. 4, which is the focus of these motions.

6

1    The complaint also spends a significant amount of time

2    talking about what Armslist does not do.  Armslist emphasizes in

3    numerous places, including its terms of use, that it is not a

4    participant in transactions, buying and selling firearms, that

5    it doesn't investigate the firearms, doesn't certify them,

6    doesn't guarantee whether or not the owner -- the seller I

7    should say or the buyer have the legal capacity to sell or buy,

8    and it doesn't -- According to the plaintiffs, Armslist doesn't

9    do anything or engage in any activity to kind of stop or

10   suppress sales if there's indication that the sales have taken

11   place in violation of the law.

12   There are some flags that users can post, things like

13   scams, things like opinions about the pricing of firearms such

14   as "over priced", opinions about the sellers themselves such as

15   "unresponsive", but nothing about whether or not the --  the

16   firearms transactions are legal or illegal, anything of that

17   nature.

18   There's also a good deal of information in terms of

19   sort of scholarly research or studies, information in the

20   complaint about the frequency with which folks who can't buy

21   firearms legally turn to the Internet to try to purchase them

22   illegally and role that, perhaps, the Internet allegedly plays

23   in enabling firearms to get into the hands of folks who aren't

24   supposed to have them, folks who do not have federal firearms

25   licenses and who can't buy from a federally licensed firearms

7

1    dealer for various reasons.

2           So that's kind of the broad outline of --  of what I

3    understand is --  is being alleged in the complaint.  And the

4    issues that --  that I wanted to hear from the parties about

5    I'll get to in a moment.  But I started out by indicating

6    Mr. Gibbon's motion is based both on lack of personal

7    jurisdiction under 12(b)2 and on failure to state a claim.  And

8    I want to give you a ruling today on the motion to dismiss for

9    lack of personal jurisdiction.

10          So if you'll just bear with me for a minute.  You all

11   are familiar with the personal jurisdiction concept and the fact

12   that it's really a due process issue that for a federal court to

13   have personal jurisdiction over a defendant, the plaintiff has

14   to show that the defendant purposefully established minimum

15   contact with the forum.  That's *Central States, Southeast and*

16   *Southwest Areas Pension Fund v. Reimer*, 230 F.3d 934 at 942 and

17   43, 7th Cir 2000.  It cites to *Burger King*, which is one of the

18   seminal cases on personal jurisdiction.  *Burger King* cite 471 US

19   462 at 474 through 476, 1985.

20          And the question the Court's always focused on is

21   whether the defendant's conduct in connection with the forum,

22   which in this case is Wisconsin, or such that it should be

23   reasonably anticipated that the defendant could be hailed into

24   court there.  Again, *Central States* citing *Burger King*.

25          In a 12(b)2 motion, it's the plaintiff's burden to

8

1   establish personal jurisdiction.  That's *Curry v. Revolution*

2   *Laboratories*, 949 F.3rd 385 at 392, 7th Cir case from this year,

3   2020, and it cites *Purdue Search Foundation v.*

4   *Sanofi-Synthelabo*, 338 F.3d 773 at 782, 7th Cir case from 2003.

5           "The plaintiffs bears only the burden of making a

6   prima facia case for personal jurisdiction if there is not an

7   evidentiary hearing."  That's *uBIB Inc., v. GoDaddy Group*, 623

8   F.3d 421 at 423, Seventh Circuit case from 2010.

9           Of course, I have to take the plaintiff's facts as

10  asserted in the complaint as true for the purposes of the motion

11  and resolve any factual disputes in favor of the plaintiff.

12  Again, *uBIB v. GoDaddy*.

13          So I have to look at the law of Wisconsin to determine

14  whether I have personal jurisdiction and what the limits of that

15  personal jurisdiction are.  That's the Seventh Circuit decision

16  in *Advanced Tactical Ordinance System v. Real Action Paintball*,

17  751 F.3d 796 at 800, 7th Cir decision from 2014.

18          And courts in Wisconsin use a two-step inquiry to

19  decide whether personal jurisdiction exists over a non-resident

20  defendant.  First, I have to look at Wisconsin's long-arm

21  statute and determine whether any of the criteria for personal

22  jurisdiction under that statute are satisfied.  That's *United*

23  *States Venture Inc., v. McCormick Transportation*, a case from

24  our district.  2015 Westlaw 669 4031, pages 2 and 3, Eastern

25  District from 2015.

1    That's a pretty simple analysis, quite frankly,

2    because under Section 801.05 of the Wisconsin Statutes, the

3    courts in Seventh Circuit and in Wisconsin have interpreted the

4    personal jurisdiction statute in Wisconsin "to confer

5    jurisdiction to the fullest extent allowed under the due process

6    clause."  That's *Felland v. Clifton*, 682 F.3rd 665 at 678, 7th

7    Cir case from 2012, so it's the requirements of 801.05 are

8    satisfied.

9    And the next step is whether or not for this Court to

10   exercise jurisdiction over the defendant would be consistent

11   with what the tenants of due process.  That's *US Venture* again,

12   2015 669 4031 at pages 2 and 3.  Because Wisconsin presumes that

13   it's long-arm statute is a codification of the due process

14   requirements.  Once a court has determined that the long-arm

15   statute is satisfied, the burden shifts to the defendant to show

16   the jurisdiction would nevertheless violate due process.  That's

17   *Total Administrative Services Corp v. Pipe Fitters Union Local*

18   *No. 120 Insurance Fund*, 131 F.Supp.3rd 841 at 844 from the

19   Western District, and it's quoting a Seventh Circuit case from

20   1986, *Logan Productions, Inc., v. Optibase Inc.*, 103 F.3d 49 at

21   52.

22   So again, I turn to the relationship that the

23   defendant has, that Mr. Gibbon has to the forum state as the

24   supreme court said I must, *Bristol-Myers Squibb v. Superior*

25   *Court of California, San Fransisco County*, 137 S.Ct. 1773 at

10

1  1779 from 2017.

2           And as we know, there are two types of personal

3  jurisdiction that you can look at in terms of the defendant's

4  relationship to the forum.  General jurisdiction or all purpose

5  jurisdiction and then specific jurisdiction.  Again,

6  *Bristol-Myers Squibb* at page 1780.

7           When you're talking about an individual, as we are

8  with Mr. Gibbon, the issue for general jurisdiction is where

9  does he live?  That's at page 1780 of *Bristol-Myers Squibb*.

10          "Personal jurisdiction, however, looks more to the

11 kinds of contacts that the defendant has had with the forum

12 state as those contacts relate to the conduct that's challenged

13 in the complaint."  That's found at 682 F.3d at 673.  So there's

14 got to be some kind of connection between the forum and the

15 underlying controversy.  And principally, and I'm quoting

16 *Bristol-Myers* here.  "Activity or an occurrence that takes place

17 in the forum state and is therefore subject to the State's

18 regulation."  That's page 1780 of *Bristol-Myers Squibb*.

19          "The relevant contacts are those that center on the

20 relations among the defendant, the forum and the litigation."

21 That's the Seventh Circuit decision in *Advanced Tactical*, 751

22 F.3d at 801.  "Not just any contacts will do.  The suit-related

23 contact has to make a substantial connection with the forum

24 state".  That's again *Advanced Tactical* citing *Walden v. Fiore*

25 at 571 US 277 at 284 from 2014 S.Ct..

1          So the simple fact that the defendant's conduct may

2   somehow have affected plaintiffs who have connections to the

3   forum state is not enough, and the relationship between the

4   defendant and forum has to arise out of contacts that the

5   defendant himself creates with the forum.  That's again *Advanced*

6   *Tactical* this time citing *Burger King* at page 475.

7          "It's the activity of the defendant that makes the

8   defendant amenable to jurisdiction not the activity of the

9   plaintiff and not the activity of some other entity."  And that

10  is from *Purdue*, and I think I left out the full cite of *Purdue*,

11  338 F.3d at 780.

12         So the whole idea is that the defendant has to have

13  fair warning that he could be sued in the forum state, and he

14  has to purposefully direct his activities at residents of the

15  forum state.  That's *Burger King* at page 472.

16         So if I look at Mr. Gibbon and I look at the

17  allegations in the complaint, the basic allegations against

18  Mr. Gibbon is that he's a creator or co-creator or I think the

19  word architect is used several times in the complaint of the

20  website of Armslist.

21         General jurisdiction is pretty straightforward.

22  Mr. Gibbon lives in Pennsylvania, so I do not have general

23  jurisdiction -- general personal jurisdiction over Mr. Gibbon,

24  so the only way that I can exercise personal jurisdiction over

25  him is if I have specific personal jurisdiction.

1    The argument I think, as I understand it from the

2    plaintiffs or the crux of their argument, is that in creating

3    this website and in designing it and setting it up the way he

4    did, Mr. Gibbon enabled contact with the State of Wisconsin and

5    directed contacts to the State of Wisconsin.

6    I got to first note that there's a mass of case law

7    that indicates that number one, the simple fact of maintaining a

8    website, even if it's an interactive website that people in

9    different states could use, is not sufficient to subject a

10   defendant to the personal jurisdiction of every state in which

11   that website could be used.  And there's also case law that

12   indicates that the creator of such a website does not get

13   differentiated from the website itself it terms of determining

14   personal jurisdiction.

15   For example, B2 or *Be2 LLC v. Ivanov*, 642 F.3d 555,

16   7th Cir case from 2011.  The Court stated, I think it was Judge

17   Hamilton writing, "the Court should be careful in resolving

18   questions about personal jurisdiction involving online contacts

19   to ensure that a defendant is not hailed into court simply

20   because the defendant owns or operates a website that is

21   accessible in the forum state even if that cite is

22   "interactive".  That's *Be2*, 642 F.3d at 558, quoting *Illinois v.*

23   *Hemi Group LLC*, 622 F.3d 754 at 760, 7th Cir case from 2010.

24   Judge Hamilton went on to say, "beyond simply

25   operating an interactive website that's accessible from the

13

1  forum state, the defendant must in some way target the forum

2  state's market.  Same page, 760.

3          "If the defendant merely operates a website, even a

4  "highly interactive" website that is accessible from but does

5  not target the forum state, then the defendant may not be hailed

6  into court in that state without defending the constitution."

7  Same page, 760.

8          Similar discussion in *Advanced Tactical*, which I've

9  already stated, 751 F.3d 796.  There, the Seventh Circuit said,

10  "there's no material difference between a company and its

11  president for the purposes of considering jurisdiction."

12          The Seventh Circuit has not agreed to create some sort

13  of special jurisdictional test for Internet based cases, and it

14  said as much in *Curry v. Revolution Labs* this year, 949 F.3d at

15  page 398.  It uses the same old due process inquiry that it uses

16  in other cases for that person.  But again, it emphasizes that

17  courts have to "ensure a defendant is not hailed into court

18  simply because the defendant owns or operates a website that's

19  accessible in a forum state."  That's *Hemi*, 622 F.3d 756.

20          The Court said this year in *Curry* "that significant

21  caution is certainly appropriate when assessing a defendant's

22  online contacts with a forum state."  That's at page 400.  So

23  what I did in this regard, I cannot find that there's personal

24  jurisdiction simply because Mr. Gibbon owned or created Armslist

25  or was an owner or a comember of Armslist or helped to design

14

1     it.  What I have to do under *Ivanov*, under *Curry*, under *Advanced*
2     *Tactical*, what I have to do is look at whether there are any
3     allegations in the complaint that support a claim that either
4     Mr. Gibbon or Armslist did something to specifically target
5     Wisconsin.

6           And to do that, I went through and I looked at every
7     paragraph that the plaintiff cited in their response to the
8     motion to dismiss, which they indicated showed that Wisconsin
9     was targeted.  And I'll tell you right now after talking for
10    however many minutes I have been talking, that none of these
11    paragraphs show that Wisconsin was directly targeted.

12          The first paragraph the plaintiff cites is
13    paragraph 13 of the second amended complaint.  Paragraph 13
14    simply says, "Upon information and belief, the Armslist
15    defendant's design, policy and content choices actively
16    encouraged and assisted Wisconsin resident, Thomas Caldwell, you
17    remember the on-line arms store, in creating and operating an
18    illicit virtual gun store on the site."

19          That paragraph doesn't say anything about how the
20    defendants may have "targeted" Wisconsin.  In fact, that
21    language that I just cited the "design, policy and content
22    choices" shows up over and over again in the complaint, but it's
23    never particularly clear what those design, policy and content
24    choices are that focused on Wisconsin.

25          Now, the complaint talks about certain design, policy

1    and content choices, and I'll get to some of those in a minute.

2    For example, this allegation that there's kind of a default

3    mechanism that shifts a willing buyer to "private sellers".  But

4    --  But nothing about that indicates how the design, how the

5    policy or how the content choices focused on Wisconsin or

6    targeted Wisconsin.

7            The next paragraph the plaintiff cites is

8    paragraph 15, which says, "Predictably the Armslist defendant's

9    design, policy and content choices also, upon information and

10   belief, motivated and assisted a gun trafficker from the

11   Milwaukee area, Ron Jones, in locating Caldwell's virtual gun

12   store and using it to acquire weapons without a background check

13   or any report of his transactions."

14           This is even if I accept as true the fact that

15   something about this website motivated Mr. Jones to go to

16   Mr. Caldwell's gun store, there's nothing in this paragraph that

17   tells me what it was about the site that particularly targeted

18   Wisconsin residents, like Mr. Jones, as opposed to any other

19   residents of any other state.

20           The next paragraph that the plaintiffs cite is

21   paragraph 33 of the second amended complaint which says, "that

22   Armslist defendants knew or should have known firearms sold

23   online in private sales, including on their site, often cost

24   more money than the same firearms purchased from a licensed

25   dealer because prohibited purchasers and gun traffickers are

1  willing to pay a premium to avoid background checks, transaction

2  records and other restrictions applicable at a federal firearms

3  licensee."

4          This paragraph, even less than the others, doesn't

5  even reference Wisconsin.  It doesn't say what it is about that

6  knowledge would have any affect in targeting deliberately

7  customers in Wisconsin or contacts in Wisconsin.

8          The next paragraph is paragraph 47.  Paragraph 47 of

9  the second amended complaint says, "As intended, Armslist.com

10  now primarily serves so-called private sellers.  A 2013

11  examination of Armslist.com postings by the *New York Times*

12  revealed that 94 percent of the advertisements on the site were

13  posted by self-identified "private sellers"." Again, even

14  accepting the allegation as true, no indication of how that

15  targets Wisconsin.

16          The next paragraph that they cite is paragraph 57.

17  And 57 is -- purports to provide a list of ways in which

18  Armslist policies and features and contents encourage unlawful

19  buyers and sellers to identify, attract, interact and transact

20  with one another, and there are several ways that are listed

21  there.

22          The plaintiffs mentioned in their opposition to the

23  motion to dismiss three of those subparagraphs.  First, they

24  mention (b), which is a screen shot of an add that somebody

25  posted advertising a Glock 26-generation IV for $500 for sale in

1  Milwaukee, and there's a photo of the screen shot in the

2  complaint.  And the plaintiffs say, "the above search for a

3  Glock 26 in Wisconsin, for example, located a gun identical or

4  nearly identical to the handgun sold in this case and offered by

5  another private seller in the same city where Jones was based

6  within a matter of minutes."

7          That may very well be.  That shows that somebody

8  placed an add on Armslist.  And that when one ran a search in

9  Wisconsin, one was able to produce a result, but that doesn't

10 show anything about the Armslist creators or Armslist itself

11 targeting Wisconsin other than the fact that it is a site where

12 sellers can post adds and where buyers can access those adds in

13 Wisconsin.  But presumably, the sellers can post adds and buyers

14 can access those adds in any other state in which Armslist is

15 available or maybe internationally as well.

16          So nothing about this paragraph seems to specifically

17 point to a target to Wisconsin.  (E), which the plaintiffs also

18 cite in their opposition says, that the feature -- there is a

19 feature of the website that defaults, as I indicated, to private

20 seller.  And the information on the website is kind of converted

21 into some tags that --  that create a private seller or private

22 party I guess is what it's called here circumstance.  And the

23 screen shot again is of an add that focuses on the sale of a

24 handgun in Milwaukee.

25          There --  I'm sure there is no dispute that -- that

1 sellers can post adds on Armslist for items for sale in
2 Milwaukee or in Wisconsin, and that people can access the site
3 and try to purchase those firearms from sellers in Wisconsin,
4 but that doesn't indicate, that doesn't show, that doesn't even
5 assert that the target is Wisconsin, that's the target of the
6 website is Wisconsin. The target of the website appears to be
7 anybody who is interested in selling guns online or buying guns
8 online.

9        Now, the final subsection that the plaintiffs refer to
10 in paragraph 57 is that --  (f) which says, that the private
11 party tag isn't something that the user selects. It occurs on
12 the page as a pre-populated, default option. And again, that
13 may be. But presumably, that's true in any state in which the
14 website operates.

15        The next paragraph that the plaintiffs cite in their
16 opposition is paragraph 82, which cites to an undercover
17 investigation in 2011 that the City of New York conducted
18 regarding online gun sales. And the results of that
19 investigation, according to the plaintiffs, were that 62 percent
20 of private sellers agreed to sell a gun to a buyer who admitted
21 or affirmatively stated that he or she probably wouldn't be able
22 to pass a background check. 54 percent of Armslist.com private
23 sellers were willing to make a sale to a person that they
24 thought couldn't pass a background check. And finally,
25 67 percent of private sellers in Wisconsin were willing to make

19

1    a sale to a person that it believed couldn't pass a background

2    check, and I think there's some sense that the plaintiffs argue

3    that Armslist ought to have known this.  In other words either

4    did know or should have known that lots of private sellers in

5    Wisconsin were willing to make a sale to people that they

6    believed couldn't pass a background check.

7            Again, even accepting that as true, that is not an

8    indication that Armslist targeted -- specifically targeted

9    Wisconsin.  It may be an indication that there may be a bigger

10   market in Wisconsin for Armslist in certain types of sales, but

11   it doesn't indicate that Armslist targeted Wisconsin.

12           And several of the cases that I cited earlier from the

13   Seventh Circuit indicated that the users' activity is not what

14   generates the personal jurisdiction contacts.  It's the

15   defendant's activity not, the activity of the users.

16           The next paragraph that the plaintiffs cite is

17   paragraph 86, which says the Armslist defendants upon

18   information and belief were also aware of the prevalence of want

19   to buy adds seeking private sellers --  including in Wisconsin

20   --  on their site.

21           This paragraph I think almost illustrates my point.

22   Perhaps, they were aware of the prevalence of want to buy adds

23   that were seeking private sellers.  But the phrase including in

24   Wisconsin is almost an admission that this was happening in

25   other states as well.  It was not simply targeted at Wisconsin,

20

1  and Armslist's knowledge doesn't indicate that it was happening

2  in Wisconsin wouldn't indicate that it was targeting Wisconsin.

3          The plaintiffs also cite paragraph 85, sorry I skipped

4  over it, a 2013 study by Third Way and Americans Responsible for

5  Solutions revealed that Wisconsin had the fifth highest number

6  of want to buy adds seeking out private sellers.  Again, perhaps

7  showing that there's a larger market, but not showing that

8  Armslist targeted Wisconsin.

9          And then the final paragraph that the plaintiffs cited

10  was paragraph 114, which says, that upon information and belief,

11  design, policy and content choices implemented by the Armslist

12  defendant on Armslist.com encourage Caldwell to use Armslist.com

13  for his illicit purposes and assisted in the success of his

14  scheme.

15          Accepting all the allegations in the second amended

16  complaint as true, there is all sorts of evidence that --  that

17  are in the allegation I should say that Armslist wanted to

18  create a market for these private sellers.  There are all sorts

19  of allegations that private sellers are far more likely to sell

20  to people who oughtn't be possessing firearms.  There's

21  certainly allegations that Armslist didn't do anything about --

22  to prevent these private sellers from selling to people who

23  oughtn't be able to purchase firearms.  And in point of fact,

24  maybe one might even conclude that Armslist was encouraging

25  that, but none of this indicates that Armslist or Mr. Gibbon

 1    targeted Wisconsin in particular for that activity.  In fact, it

 2    seems that that activity was targeting anywhere that the

 3    activity could reach.

 4         There's just --  There's just not anything in this

 5    complaint, extensive as it is, detailed as it is, that would

 6    show that there was an attempt to target Wisconsin for purposes

 7    of personal jurisdiction.  And when I look at the Seventh

 8    Circuit cases that I've cited *Be2* and Armslist -- I'm sorry --

 9    *Advanced Tactical* and *Curry* and the others and look at the

10    allegations in the complaint, I can't find that there's personal

11    jurisdiction over Mr. Gibbon, and so I am granting Mr. Gibbon's

12    motion, which is at Docket No. 5, to dismiss the complaint

13    against him for lack of personal jurisdiction.

14         And where that takes us then is to Armslist's argument

15    with regard to the failure of the complaint to state a claim,

16    and that's where I had some questions for you all, and I was

17    hoping to hear further from you in terms of argument, and I'll

18    tell you specifically the issues that I'm interested in.

19         The first basis for Armslist's motion to dismiss for

20    failure to state a claim is preemption under 47 U.S.C. §

21    230(c)1, the Communications Decency Statute.  And as I think the

22    parties have all noted although the defendant has argued more

23    heavily than the plaintiff did, we have a decision not from the

24    federal court here in our circuit but from the Wisconsin Supreme

25    Court that deals directly with this issue, and that's *Daniel v.*

1   *Armslist LLC*, 386 Wis.2d 449, 2019 decision that plaintiffs

2   refer to it as *Daniel-2* because it overrules the Wisconsin Court

3   of Appeals decision or reverses the Wisconsin Court of Appeals

4   decision going in the opposite direction.

5           And the question that I'm interested in hearing from

6   each of you or the arguments that I'd be interested in hearing

7   from each of you is from the --  from the defendants' side.

8   Justice Ann Walsh Bradley dissented from the *Daniel* decision and

9   went into some detail about why it was that she was dissenting.

10  But really in particular what she argued is that the statute is

11  designed to apply to websites in which the creator of the

12  website is acting as a mouthpiece for a third party.

13          And Justice Bradley couldn't see how Armslist was

14  acting as a mouthpiece for buyers and sellers for the third

15  parties.  So for the defendants, I'm curious about their

16  response to that.

17          And then for the plaintiffs, I'm curious about what

18  their response is to the majority opinion, of course, because

19  the majority opinion is pretty thorough.  And if I were to adopt

20  the majority opinion, I would find preemption.  So that's issue

21  number one, and I'll come back to you all in a minute for your

22  argument about that.

23          And issue number two is that if I don't find the

24  preemption and I get to the actual allegations in the complaint,

25  the defendant has argued that Illinois law should apply, and I'm

1    interested in hearing from the defendants about why that is.

2    And from the plaintiff about whether Wisconsin law should apply.

3    So let me turn back and give you all an opportunity to address

4    those issues.  And if you would, I ask you to start with the

5    preemption argument, and I'm going to turn to Mr. Moore first

6    because, obviously, this is the defendants' motion, so I'll give

7    him an opportunity to address the preemption issue first and

8    particularly Justice Bradley's dissenting opinion in *Daniel*.

9         MR. MOORE:  Thank you, Your Honor, and thank you for

10   the detailed ruling and recitation of the allegations in the

11   complaint regarding personal jurisdiction.

12        Turning to your first question, the dissent in the

13   *Daniel* case.  My understanding of the dissent is that it relies

14   on this Washington state court case, *JS v. Village Voice Media*,

15   which I think is widely regarded as mis-applying the law that

16   pertains to Section 230 and also applies the law of Section 230

17   under a state pleading standard that is vastly more favorable to

18   a plaintiff than the federal pleading standards.

19        And the reason that's important is that the Washington

20   State Court and the dissent that *Daniel* relies on is essentially

21   obligated to make a searching inquiry that is beyond a

22   reasonable doubt that the plaintiff could not state a claim.

23   And that inquiry included going and looking at hypothetical

24   facts and really kind of extending even more leeway than a

25   federal court or other state courts would to a plaintiff to

1    avoid dismissal, so that's kind of the first point and

2    procedural point about the dissent.

3           The second point, this notion that Armslist may not be

4    a mouthpiece for the website users I think is misplaced.  Even

5    taking the allegations of the second amended complaint as true,

6    it's clear the website has essentially no content unless users

7    use the website.

8           I think a better way of framing the question for the

9    dissent or in terms of the inquiry here is whether the features

10   of Armslist identified in the complaint constitute developing

11   content that would abrogate Section 230s bar to liability for

12   websites.

13          And looking at the features identified in the

14   compliant, such as the alleged default private seller tag, the

15   alleged I'll call them community features like the flag

16   features, whether those are content.  And if they are content,

17   whether it's sufficient to abrogate Section 230s bar to

18   liability.

19          And that question is answered by whether Armslist

20   materially contributed to the alleged unlawful conduct or to use

21   the phrase that seems to be prevailing in the Seventh Circuit,

22   whether those features induced the unlawful content.

23          And I think the answer to both questions has to be no.

24   Because one, private sellers are not inherently unlawful.  I

25   think as Your Honor noted at some point in deciding the

1   allegations of the complaint, private sellers are just one

2   category of firearm transferors.  Federal law and various state

3   laws allow private sellers to transact, so there's nothing

4   inherently wrong in a default tag that says private seller.

5          Likewise, I'm not sure that even the plaintiffs would

6   argue the various moderation features like the sliding features

7   alleged in the complaint, constitute content for purposes of

8   their plan.

9          And the upshot in terms of your question is that the

10  dissent in the *Daniel* case, *Daniel-2* is simply not correct.  You

11  know, taking the allegation of the complaint here as true, the

12  website is a mouthpiece for its users because there are no adds

13  for the guns.  There is no want to buy postings without the

14  users.

15         THE COURT:  Thank you.  Thank you, Mr. Moore.  Okay

16  Mr. Kimball, Mr. Lowy, let me hear from you all on the other

17  side of the fence.

18         MR. LOWY:  Your Honor, this is John Lowy.  I'll be

19  responding on this issue.  I think there are two approaches or

20  two arguments as to why the majority in *Daniel-2* was wrong.

21  There's a little bit of overlap, but one was set forth in the

22  dissent.  And the other was in *Daniel-1*, the Court of Appeals

23  decision, and I want to start with the Court of Appeals

24  decision.  Because I mean the way the Court in our view should

25  interpret Section 230 and the way that the Court of Appeals did,

1   is, first, the Court's reading the plain language of the text

2   and also applying the presumptions against preemption and also

3   principles of federalism stated in the US Supreme Court

4   decisions in *Bond* and *Gregory* and *Cipollone* and *Medtronic*.

5          And there's a little bit of difference between the two

6   of them, but they all essentially recognize that a federal law,

7   like the CDA, should not be construed as depriving state

8   authority to apply in this case its tort law unless there is a

9   clear unmistakable statement of intent from Congress that that

10  is an intended purpose of the act.

11         And here, the major basis of Armslist's argument, they

12  rely on 230(c)1 as well as (c)2, but the major focus is (c)1.

13  And they're, of course, while Congress in (c)2 stated that that

14  related to civil liability and that no provider of interactive

15  computer service shall be held liable on account of, and then it

16  explains why.  Congress could have written (c)1 like that.

17         And, in fact, Armslist's argument, and I think the

18  majority in *Daniel*, sort of reads 230(c)1 as if it reads

19  something like no provider of an interactive computer service

20  shall be held liable on account of it publishing a third-party

21  post or where one thing it did was publish a third-party post or

22  something like that.

23         Of course, Congress chose to do something very, very

24  different in (c)1.  It didn't say anything about liability.  All

25  it says is treatment of a publisher, and that no provider of

27

1    interactive computer service shall be treated as a publisher.
2    And the legislative history is perfectly clear as to why it
3    talks about this sort of strange phrasing of treatment, and that
4    was because the CDA was seeking to overturn the ruling in
5    *Stratton Oakmont* where the Court held that a website that did a
6    good deed that was a good samaritan that was curating its post
7    was therefore transformed from a mere distributor of content to
8    a publisher of content and therefore subject to liability that
9    it otherwise would not be subjected to.

10        And I mean, Your Honor, I point to Justice Thomas'
11   statement in the *Malwarebytes* case that we just recently
12   submitted as supplemental authority, which explains this in some
13   detail, and so that's all (c)1 does.  And it says, and there's
14   Seventh Circuit language that supports this as well as what
15   Justice Thomas stated, but it prevents that sort of treatment.
16   It does not prevent civil liability for other actions or content
17   provided by Armslist and to find that really rewrites (c)1 in a
18   way that Congress clearly chose not to do.

19        But particularly when you look at the presumption
20   against preemption and the principles of federalism in *Bond* and
21   *Gregory*, in those cases, they basically instruct courts to in
22   some cases really bend over backwards and actually have very
23   unusual interpretations of statutes to avoid infringing on state
24   authority.

25        The last thing a court should do in light of those

1    principles is to, you know, read a statute like this to provide
2    broader immunity than the plain language or the legislative
3    intent that would suggest.
4            And, you know, as Justice Thomas explained, it is not
5    just Justice Thomas.  Seventh Circuit has spoken about this area
6    of law where there's been this body of case law built up with
7    courts just misconstruing the CDA providing a holding that it
8    provides far, far, broader protection than it was ever intended
9    to do, and that the plain language supports.
10           And you know, in fact while counsel says that the
11   Washington Supreme Court decision in *JS* was widely criticized,
12   I'm not aware of any criticism to be honest with you.  I'm not
13   sure if there's any criticism mentioned in any of the briefs.
14   But actually Justice Thomas criticizes very similar cases that
15   went the opposite way on cases in which other courts have held
16   that *Backpage*, which is the sex trafficking website that was at
17   issue in those cases, Justice Thomas criticized the cases that
18   provided *Backpage* with immunity under the CDA as one of the
19   examples of this misinterpretation.
20           So I think that those are a couple of ways why I think
21   the Supreme Court was wrong in *Daniel-2*.  And by the way, I
22   don't even believe Wisconsin Supreme Court addressed presumption
23   against preemption or principles of federalism which is rather
24   odd given that it was a major focus of the decision that was
25   reversing.

29

1          To me, that suggests that there is no real good answer

2    as to why those principles don't apply.  The arguments that

3    Armslist raises as to why the principles don't apply simply are

4    incorrect.

5          They argue that the federalism principle in *Bond* is

6    apparently limited to a criminal cases.  That's not true at all.

7    *Bond* is applying broad principles of federalism that is applied

8    to civil tort cases.  In *Cipollone*, it's applied to hiring

9    issues.  In *Gregory*, it's certainly not limited to criminal

10   laws.

11         And I believe they also say that the presumption

12   against preemption only applies if the language is ambiguous.

13   That's also not correct.  While there's some principles of

14   statutory interpretation that only applies if there is ambiguous

15   language, the presumption against preemption is not one of

16   those.  It is another principle that's founded in federalism,

17   and there's no language that I believe Armslist cites or that

18   I'm aware of anyone citing saying that the presumption against

19   preemption only applies if the language is ambiguous.

20         But even if that was the case, I think reading (c)1 in

21   a way that Armslist suggests it should be read is I think wrong,

22   but at the very least ambiguous because it's certainly not clear

23   that Congress saying shall be treated as a publisher should be

24   read as something like shall not be held liable when, you know,

25   that's language that was in (c)2 and, you know, Congress refused

1 | or chose not to use.

2 |        And then finally, another reason why the Supreme

3 | Court -- the Wisconsin Supreme Court was incorrect is that even

4 | if you accepted this broad, narrow, incorrect reading of the

5 | CDA, Armslist is an information content provider of these posts.

6 | And by, for example, having -- There's a number of reasons, and

7 | Your Honor's explained a bunch of them.  But one of them is the

8 | private party tag, the private seller tag.  By tagging posts,

9 | they are providing --  Armslist is providing information to that

10 | post, and it's very similar to the menus and questions in the

11 | *Roommates.com* case that the Ninth Circuit found was providing

12 | information and took those postings and that conduct out of CDA

13 | protection.

14 |       So I think for all those reasons and the ones stated

15 | in the brief, the Wisconsin Supreme Court was incorrect in the

16 | dissent, and the Court of Appeals in *Daniel* were correct, and

17 | there should be no CDA protection here.

18 |      THE COURT:  Thank you, Mr. Lowy.  I appreciate it.

19 | And I know you made the arguments in front of the Supreme Court

20 | in *Daniel* as well.  I have one question for you with regard to

21 | one of your last comments, and I know this was in your alls

22 | brief as well.

23 |       The argument that the tags are actually providing

24 | content information or information content.  Is the argument

25 | that --  Is the argument that somehow Armslist is defining who a

 1   poster is or what a poster is, and that's the content?  What's
 2   the argument that the tags provide actual information content?
 3        MR. LOWY:  Well, I mean as we explained, I mean
 4   essentially the private seller tag or at least many Armslist
 5   users is a, and I'm speaking a little bit losely, is sort of a
 6   shorthand for illegal buyer or seller in that --  That's not
 7   always the case, but there's certainly a substantial number of
 8   illegal buyers, gun buyers and illegal gun sellers.  And the way
 9   they operate through Armslist and Armslist welcomes them and
10   assists them in the illegal gun trade is by saying, we're
11   private sellers.

12        It's a very odd thing to want to identify yourself as
13   because, of course, usually if you were buying a car, for
14   example, you would prefer a car that's new, that has a lower
15   price, that has better service and warranty.  You wouldn't be
16   looking for simply a used car if it had worse --  higher price
17   and was in worse condition than everything else.  If you are
18   looking for a used car, you know, you are focused on price, and
19   you assume that a used car is going to be cheaper.

20        What we hear, this is a great example, and we have the
21   allegation that Caldwell posted, at least, 202 guns on Armslist.
22   Perfectly clear that this is someone who is engaged in illegal
23   gun trade.  Armslist knew or should have known it.  And many of
24   those guns were new or --  or not fired.  That's very --  That's
25   just a flag in the way that we know that the criminal gun market

1    works is that when they resell guns, they sell them at a

2    premium.  Because, you know, there are transaction costs along

3    the way.  And so basically that's a flag that if you want to buy

4    more expensive guns, a seller.  That's what it gives you.  It's

5    an indicator these guns are going to be more expensive.  You can

6    assume they're going to be in worse condition.  You can assume

7    you will have less variety.  The one thing that they give you

8    though is no background checks and no record.

9          And so that's the sort of shorthand for illegal buyers

10   and sellers.  And when Armslist puts that tag on, that's what

11   they are communicating essentially to two people like Jones and

12   Caldwell.

13         THE COURT:  Thank you, Mr. Lowy.  So I want to give

14   you, Mr. Moore, an opportunity to respond.

15         MR. MOORE:  Sure.  So taking counsel's last point and

16   the notion that the private seller tag is somehow equivalent to

17   the unlawful conduct in the *Roommates.com* case.

18         First, that's simply not correct.  In *Roommates.com*,

19   the unlawful conduct were categories of personal information

20   that are barred by the FHA in persons seeking housing.  The way

21   the *Roommates.com* website was set up is that users had to supply

22   that information.  It wasn't optional.  There was no way to

23   avoid it.

24         Here, the term private seller is not the same kind of

25   thing.  It is not inherently illegal for someone to be a private

1   seller, to look for a private seller, to prefer to transact with

2   private sellers.  Whether or not the allegations of the

3   complaint are true doesn't change that fact.  The reality is in

4   many states and under federal law, there are ways to transact

5   with private sellers that are perfectly legal.  That's the first

6   point.

7          The second point is this notion that -- I just want to

8   quibble with the notion that the private seller tag has no value

9   other than to signal to prohibited purchasers and others who

10  want an illegal gun.  You know, counsel may not prefer a used

11  car, but I drive an 18-year old BMW.

12         Some people are gun enthusiasts.  They are lawful gun

13  enthusiasts.  They are not criminals.  And whether or not

14  counsel is prepared to accept it, that is the target market for

15  Armslist.  The fact that some people have used the website

16  improperly doesn't mean that the private seller tag is somehow

17  inherently an indication of wrongful intent or misuse.

18         Second, the notion that Armslist somehow should be on

19  notice is a red herring.  Whether or not users misuse an

20  otherwise lawful website feature and the website proprietors are

21  aware of it doesn't affect the Section 230 analysis.  There is

22  no question that that's the case under controlling law.

23         So the fact that plaintiffs allege and point to what

24  they claim Armslist should have known or studies show what

25  Armslist should have known is immaterial for the analysis of

1  whether Armslist is an information-content provider.

2  And on that question, I respectfully hope to nudge the
3  Court maybe in a different direction on this notion of a private
4  seller tag.  The question is not whether Armslist as a website
5  creates content.  Obviously, every single website creates
6  content in a plain language sense because there is a website and
7  someone created it.  The question is whether Armslist is the
8  content developer with respect to the alleged unlawful content
9  at issue.

10  And as I understand the complaint, there are sort of
11  two categories of that.  There are the features of the website
12  itself which the plaintiffs allege make it an
13  information-content developer.  And then there's the post by the
14  users.  I don't think there is any question that posts by the
15  users are not developed by Armslist.  So the question is, is the
16  private seller tag a content that Armslist developed for
17  purposes of Section 230?

18  And I point the Court to the material contribution
19  test of *Roommates.com* or the inducement test the Seventh Circuit
20  has used, for example, articulated in Judge Easterbrook's
21  opinion in the *Chicago Lawyer's Association Case*.

22  And under either test, I think it's clear that the
23  private seller tag cannot be considered content that Armslist
24  developed.  Because it is a lawful, you know, because the
25  category of private sellers are a lawful category, there's no

1    way that Armslist could be -- Armslist could be described as

2    inducing people to misuse it under the Seventh Circuit test.  I

3    think it's really a matter as simple as that.

4              THE COURT:  All right.  Thank you all.  I appreciate

5    this.  Between the briefs and this a lot of food for thought and

6    I appreciate the effort and the detail that you've provided.

7    Let me turn you if I may for just a few moments to the choice of

8    law issue.  Assuming without deciding right now that there is no

9    preemption, the defendants argued that Illinois law ought to

10   apply, and I'm interested in hearing about why that is and

11   interested in hearing about the plaintiff's response to that.

12   So again let me pick on you, Mr. Moore.

13             MR. MOORE:  Sure.

14             THE COURT:  Go ahead.

15             MR. MOORE:  I think that the easiest way to understand

16   why Illinois should apply is that virtually every significant

17   fact supporting plaintiff's claims occurred in Illinois.  I

18   appreciate or rather I anticipate the rebuttal that, well, the

19   gun was sold in Wisconsin and taking the complaint as true if we

20   have to accept that.  But the final act of the alleged tort, the

21   tragic shooting of Commander Bauer, happened in Illinois, and

22   the plaintiff can see that.  It's alleged in the complaint.

23   Plaintiff is an Illinois citizen.

24             As far as I can understand the complaint, Shomari

25   Legghette is an Illinois citizen.  Under Wisconsin choice of law

1  factors, there's really no basis to apply Wisconsin law.  And as

2  I read plaintiff's opposition to that aspect of Mr. Gibbon's

3  motion, they really offer no rebuttal to the notion that the

4  locus of the harm has any weight whatsoever in the

5  choice-of-law.  And they don't seem to credit the fact that the

6  Seventh Circuit ruled on substantially identical claims in the

7  *Vesely* case applying Illinois law which again in light of the

8  locus of the harm and the other factors Wisconsin considers

9  support applying Illinois law.

10          MR. KIMBALL:  Your Honor, this is John Kimball.

11          THE COURT:  Yeah, Mr. Kimball.

12          MR. KIMBALL:  If I could just respond briefly to that.

13  What Mr. Moore says is accurate except that we contend the

14  operative facts here Your Honor will have to consider is that

15  the gun trafficking involved took place in Wisconsin.

16          So we contend Wisconsin law should govern because the

17  gun trafficking activity that resulted in Commander Bauer's

18  death originated in Wisconsin with Armslist designed to

19  facilitate private sales to prohibited purchasers.  That was the

20  critical first step which took place in Wisconsin and which we

21  contend Armslist should have foreseen would take place in

22  Wisconsin.

23          So our argument is basically that the operative facts

24  concerning the gun trafficking that we're complaining about took

25  place in Wisconsin not in Illinois.  We acknowledge that the

1  shooting actually occurred, of course, in Illinois.

2         THE COURT:  I'm sorry before --  I know you want to

3  respond, Mr. Moore, but I just want to ask.  You know the

4  choice-of-law factors one of them is the advancement of the

5  forum governmental interest whether the non-forum rule comports

6  with the standards of fairness that are embodied in the policy

7  of the forum law.

8         And so advancement of Wisconsin interest is a factor

9  that I have to take into account, and I'm curious how you

10  analyze that factor and come up with Illinois law as a choice of

11  law?

12         MR. MOORE:  Your Honor, are you addressing that to me?

13         THE COURT:  Did I interrupt you, Mr. Kimball?

14         MR. KIMBALL:  No, Your Honor, I completed that point.

15         THE COURT:  There was a pause so I thought you were

16  finished.  I'm really, really sorry.  I apologize.  Let me let

17  Mr. Moore answer my question, and I'll come back to you,

18  Mr. Kimball.

19         MR. MOORE:  Certainly, Your Honor.  I think it's as

20  simple as every operative fact involving an authority other than

21  the transaction occurred in Illinois.  I appreciate counsel's

22  point that the allegations of the complaint identifies the place

23  of the alleged gun sale as Wisconsin, but that's the only part

24  of the claim that occurred in Wisconsin.

25         There's no tort without the ultimate act of the

1    shooting in Illinois.  Everyone involved in the case, at least

2    factually not necessarily parties, is from Illinois other than

3    Caldwell and Jones.  So really it's difficult for a defendant to

4    see what interest Wisconsin would have in the claim,

5    governmental interest of Wisconsin for those reasons.

6            And as Your Honor noted in discussing personal

7    jurisdiction, I appreciate the somewhat separate analysis, the

8    factors in the complaint that identify Wisconsin are not

9    particular to Wisconsin.  To be somewhat glib, there's nothing

10   special about Wisconsin with respect to Armslist's business.

11   And even though we're not talking about personal jurisdiction,

12   we're contesting personal jurisdiction with respect to Armslist

13   in Wisconsin, I think for all the reasons Your Honor articulated

14   earlier, Wisconsin doesn't have any particular interest in the

15   application of Wisconsin law to these facts.

16           THE COURT:  Mr. Kimball or Mr. Lowy.

17           MR. KIMBALL:  This is John Kimball.  Your Honor, just

18   to briefly reply.  This is an issue that we may need to develop

19   through some pretrial discovery on exactly what happened here.

20   But, you know, our allegation is that Wisconsin governmental

21   interest would be advanced by the curtailment of Armslist

22   facilitated gun trafficking, and that Wisconsin has a clear

23   interest in holding Armslist accountable for its gun

24   trafficking, the gun trafficking activities in the State of

25   Wisconsin.

1    And so that's our argument as to why Wisconsin law

2 should apply here.  I think it can be --  This is an issue that

3 Your Honor may want to defer on and let's see how the evidence

4 evolves through pretrial discovery.  There's a lot --  You know,

5 there's a number of things that we don't know about for sure.

6 We made allegations in the complaint, but we do need to develop

7 the facts more fully.  And I think if Your Honor is not sure at

8 this point, that issue could be decided at a later time in the

9 case.

10    THE COURT:  And you're talking about, Mr. Kimball, the

11 kind of how we got from the sale in Wisconsin to what the steps

12 are between the sale in Wisconsin and how the gun got into the

13 hands of Mr. Legghette?

14    MR. KIMBALL:  Yes, Your Honor, that's exactly --  We

15 don't really have all those facts pinned down at this point.  We

16 will need pretrial discovery in order to do so.

17    MR. LOWY:  Your Honor, this is Jonathan Lowy again.

18 Just very briefly just to address another point that Mr. Moore

19 said about the *Vesely* case I think is substantially identical to

20 this one.  It isn't.  I mean, there's certainly some

21 similarities.  It's another innocent person in Illinois killed

22 as a result of Armslist practices, but that decision was much

23 more limited, and it also recognized that if there's evidence or

24 allegations of assisting or encouraging the sort of conduct that

25 occurred rather than simply enabling it, that there was no

 1   special relationship requirement and there could be liability.

 2   And there are many allegations that are made in this case that

 3   were not made in the *Vesely* case and certainly were not

 4   addressed by the Court including, I believe, the tagging of

 5   private parties, aiding and abetting of criminal violations and

 6   others.

 7        So we think that even if we don't think Illinois

 8   should apply but even if it does, we feel that there's no basis

 9   to dismiss the case on the basis of *Vesely* or other law.

10        THE COURT:  Thank you, Mr. Lowy.  Mr. Moore, I want to

11   give you the last word since it's your motion.

12        MR. MOORE:  Thank you, Your Honor.  I want to reply to

13   the comment that Mr. Lowy just said.  Certainly, the cases are

14   not identical.  But the part I think that is instructive is the

15   claim in *Vesely* that it's "an affirmative conduct case" and that

16   Armslist should be liable for affirmative conduct in designing a

17   website and operating a website.  That was the notion that the

18   Court rejected in dismissing the case.

19        And, of course, some more claims are made here maybe

20   on the basis of somewhat different allegations, but respectfully

21   those are distinctions without a difference when it comes to the

22   application of Illinois law.

23        THE COURT:  All right.  Thank you all.  I'm --  The

24   reason I asked you all for argument on these issues is because

25   I'm not in a position to rule today, and I did want to hear

1    further from you about the questions that I had and get some

2    more development particularly around the differing opinions in

3    *Daniel*.

4              I do, of course, want to get you all an answer as soon

5    as I can, so let me --  I think there are two options.  One

6    option is I get you a written decision.  But another is I reach

7    back out to you all and set a date where I can give you an oral

8    decision.  And just knowing myself, that may be the quicker

9    avenue, but let me --  I'd like to take a look at what you've

10   argued today before I give you a date for that, so if you will

11   give me some time to take a look at what you've argued.

12             With regard to the ruling that I've already made today

13   with regard to dismissal of Mr. Gibbon for lack of personal

14   jurisdiction, I will just tell you all since you are all out of

15   district practitioners, we do record phone hearings and my

16   chambers at any rate posts those recordings on CMECF.  So you'll

17   be able to access the recording on Pacer by clicking the link to

18   the recording, and you can sit in the comfort of your home

19   office if that's still where you want to be and listen.

20             In addition, if you'd like to get a recording for

21   yourself either on a thumb drive or whatever else you want to

22   use, you can contact our clerk's office.  The phone number and

23   the address are on the website, and you can order a thumb drive

24   and have the recording yourself.

25             And then finally, if you'd like to order a transcript

1  of today's hearing, there are instructions on our website about

2  how to do that and a transcript order form, so I encourage you

3  to look there if you want to get a transcript.  So I just wanted

4  to let you know that even though I gave you an oral ruling today

5  and the court minutes of today will not go through and recite

6  all the details of that ruling, there are several different ways

7  that you can access or get a copy of the ruling by either

8  listening or getting yourself a recording on a devise or

9  ordering a transcript.

10          So let me look at what you've argued on the -- on the

11  motion to dismiss the 12(b)(6) motion today.  And then once I

12  get a little bit my arms around it a little bit more, I will get

13  back to you and let you know either whether you can expect an

14  oral or written decision or whether I want to give you a date

15  for an oral ruling.  So with that --

16          MR. KIMBALL:  Your Honor, may I ask a point, a

17  question?

18          THE COURT:  Mr. Kimball?

19          MR. KIMBALL:  Yes.  Thank you very much.  With respect

20  to --  I realize you ruled on the jurisdiction point, but would

21  you allow us to file an amended complaint?

22          THE COURT:  Trying to state personal jurisdiction?

23          MR. KIMBALL:  Yes.  You recited a lot of the

24  deficiencies, and I think they can be, perhaps, corrected

25  through an amended complaint.

43

1        THE COURT:  I'd be willing to allow to you file an

2    amended complaint, but I encourage you not to do it right yet.

3    Let me take a look at the other issues because if I come to a

4    particular conclusion on the other issues, you may wish to amend

5    on those as well so why don't you wait until you get a final

6    decision from me, and then we'll see.

7        MR. KIMBALL:  Okay thank you, Your Honor.  I

8    appreciate that.

9        THE COURT:  Other than that, Mr. Kimball, Mr. Lowy,

10   any questions or comments for today?

11       MR. KIMBALL:  No, Your Honor.

12       MR. LOWY:  No thank.  You very much, Your Honor.

13       THE COURT:  And Mr. Moore, anything else on behalf of

14   Armslist or Mr. Gibbon today?

15       MR. MOORE:  No.  Thank you for your considered

16   opinions and opportunity to argue.

17       THE COURT:  Thank you all.  I appreciate it.  I

18   appreciate your time.  I know you're all in different time

19   zones, so thank you for taking the time today.  And like I said,

20   I hope to contact you soon with how we're going to next proceed.

21   So in the meanwhile, stay safe and healthy.  Thank you.

22       (Whereupon proceeding was concluded.)

23

24

25

C E R T I F I C A T E


        I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.


Signed and Certified November 9, 2020.

/s/Susan Armbruster

Susan Armbruster


                    Susan Armbruster, RPR, RMR
                   United States Official Reporter
                   517 E Wisconsin Ave., Rm 200A,
                        Milwaukee, WI 53202
                Susan_Armbruster@wied.uscourts.gov

Case 2:20-cv-00215-PP   Filed 11/10/20   Page 45 of 45   Document 25