UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ERIN BAUER,
and ESTATE OF PAUL BAUER,

                    Plaintiffs,

                                                    Case No. 20-cv-215-pp

          v.

ARMSLIST, LLC,

                    Defendant.

**ORDER GRANTING DEFENDANT ARMSLIST'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (DKT. NO. 7), DENYING AS MOOT PARTIES' JOINT MOTION FOR RULE 16(A) STATUS CONFERENCE (DKT. NO. 28) AND DISMISSING COMPLAINT**

Plaintiffs Erin Bauer and the Estate of Paul Bauer have sued defendants Jonathan Gibbon and Armslist, LLC for torts arising out of the death of Paul Bauer. Dkt. No. 4. The plaintiffs raise claims of negligence, negligence *per se*, public nuisance, aiding and abetting tortious conduct, civil conspiracy, wrongful death, loss of consortium and survivorship; they also seek to pierce the corporate veil. Id. at 32-45. The court previously dismissed Gibbon for lack of personal jurisdiction. Dkt. No. 24. Armslist, LLC seeks dismissal for failure to state a claim on which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 5.

Because the plaintiffs have failed to state a claim, the court will grant the motion and dismiss the case.

1

# I.    Facts Alleged in the Second Amended Complaint

In 2017, Ron Jones—whom the plaintiffs describe as "a gun trafficker from the Milwaukee area"—purchased Glock 9mm handgun. Dkt. No. 4 at ¶¶15-16. Jones allegedly purchased the gun from Wisconsin resident Thomas Caldwell through Caldwell's "illicit, virtual gun 'store' . . . ." Id. at ¶¶13, 16. Jones resold the gun "into the broader criminal market" in the Chicago area; it ended up in the hands of Shomari Legghette, who previously had been convicted of offenses carrying penalties of more than one year and thus was prohibited from possessing firearms. Id. at ¶¶16, 134-35. On February 13, 2018, police commander Paul Bauer was chasing Legghette as Legghette fled police. Id. at ¶¶12, 140. Legghette pulled out the Glock and shot Commander Bauer six to seven times in the head, neck, chest and wrist. Id. at ¶141. Commander Bauer was pronounced dead on arrival at the hospital. Id. at ¶142.

The amended complaint does not identify the police department that employed Commander Bauer or the location of the shooting. It *does* state that plaintiff Erin Bauer, Commander Bauer's widow, is a resident of Illinois. Dkt. No. 4 at ¶24. It states that "[f]ormer Chicago police First Deputy Superintendent John Escalante said, in relation to Commander Bauer's shooting, that 'I'm not surprised that gun changed hands and came from out of state.'" Id. at ¶137. It states that Ron Jones sold the Glock "into the Chicago criminal market," and that Jones potentially had a "contact linked to the Chicago area." Id. at ¶¶133-36. Defendant Gibbon stated in the brief in support

2

of his motion to dismiss that Legghette shot Commander Bauer in Chicago, asserting that it was "the only available inference to be drawn" from the amended complaint. Dkt. No. 6 at 20 n.3.

The plaintiffs allege that in 2017, Wisconsin resident Thomas Caldwell was "illicitly 'engag[ing] in the business' of selling firearms via a virtual online 'store' on Armslist.com." Dkt. No. 4 at ¶112. They assert that Caldwell "operated an illicit, unlicensed virtual firearms 'store' via Armslist.com from at least 2015 through 2017," id. at ¶116, and that between 2004 and 2017, police traced eleven firearms recovered in police investigations back to Caldwell, id. at ¶120. The plaintiffs claim that Caldwell posted at least 202 listings for firearms on Armslist.com, "often emphasizing that the weapons were new and unfired;" they allege that the reason Caldwell included these details was because prohibited persons and gun traffickers "prefer to use new guns not linked to previous crimes." Id. at ¶¶117-118. The plaintiffs contend that Caldwell could have used other online gun sale sites—"ShootersXchange.com, GunAuction.com, GunBroker.com and GunRunnerAuctions.com"—to sell his firearms, but that he chose Armslist.com because of "safeguards and precautions" used by the competitor websites. Id. at ¶¶113, 115. The plaintiffs assert that Caldwell has been convicted of violating 18 U.S.C. §923(a), which prohibits dealing firearms without a license. Id. at ¶119.

As for Ron Jones—the alleged gun trafficker who purchased the Glock from Caldwell—the plaintiffs allege that he previously had been convicted on felony drug charges. Id. at ¶131. They speculate that he may have "feared that

3

he was unable to pass a background check." <u>Id.</u> at ¶132. The plaintiffs allege that Jones was "not a one-time customer of Caldwell." <u>Id.</u> at ¶124. They assert that Jones "was a bulk purchaser buying weapons at a rate inconsistent with any lawful purpose and clearly telegraphing to anyone paying attention that he was trafficking firearms to criminal third-parties." <u>Id.</u> The plaintiffs say that the Bureau of Alcohol, Tobacco and Firearms learned from Caldwell that Jones had purchased at least fifteen firearms from Caldwell over a five-year period and that Jones would call Caldwell to discuss gun sales "around three times a month." <u>Id.</u> at ¶125. They contend that when police raided Jones's home (the plaintiffs do not say when), they "uncovered a cache of at least 30 firearms, 2,500 rounds of ammunition, magazines, body armor and a ballistic helmet," <u>id.</u> at ¶126, which the plaintiffs claim "represented the stock-in-trade Jones needed to supply his customers on the criminal firearms market," <u>id.</u> at ¶127. The plaintiffs allege that Jones took advantage of features on Armlist.com to conceal his identity. <u>Id.</u> at ¶¶128-130. The plaintiffs also assert that the search of Jones's home "uncovered indications that Jones potentially had a contact linked to the Chicago area who may have been connected to [Shomari] Legghette," the person who killed Commander Bauer. <u>Id.</u> at ¶134.

The plaintiffs allege that Legghette was a prohibited purchaser who could not buy guns legally because of his prior felony convictions, and that he "foreseeably acquired the Handgun via the criminal market as a result of the trafficking operation assisted and encouraged by the Armslist Defendants via their website." <u>Id.</u> at ¶138. They claim that it is "particularly foreseeable that

4

violent criminals like Legghette who illicitly acquire firearms will utilize them against law enforcement officers like Commander Bauer because such criminals are much more likely than law-abiding citizens to encounter the police in confrontational situations." Id. at ¶139.

The plaintiffs have not sued Caldwell, Jones or Legghette. The defendants are Armslist and John Gibbon. The plaintiffs allege that Armslist is an Oklahoma limited liability company with its principal place of business in Jeannette, Pennsylvania. Id. at ¶25. The plaintiffs assert that Armslist owns and operates the Armslist.com website and that it "derives its primary revenue from selling advertising space on its website." Id. Defendant John Gibbon is a Pennsylvania resident and, according to the plaintiffs, "a member of Armslist and an individual who played a role in the design, architecture, and administration of Armslist.com." Id. at ¶26.

The plaintiffs explain that holders of federal firearms licenses are required to conduct background checks to prevent sales to prohibited persons. Id. at ¶27. License holders also must keep records of firearms transactions to assist law enforcement in tracing firearms linked to criminal activity. Id. The plaintiffs describe how prohibited persons usually cannot buy guns from license holders because they cannot pass these background checks; they also state that "[i]ndividuals are . . . less likely to use weapons purchased from [license holders] in a crime or to resell firearms purchased from [license holders] to dangerous third-parties such as Prohibited Purchasers because

they know that law enforcement can quickly consult transaction records to link their names to these weapons." Id. at ¶28.

In contrast, "private sellers"—people for whom selling firearms is not their business—are not subject to the same requirements, id. at ¶30; while nineteen states and the District of Columbia require background checks "on at least some private sales," "in most jurisdictions, no such background checks are required." Id. at ¶34. The plaintiffs allege that "[m]any illegal gun sellers unlawfully engage in the business of selling a large volume of firearms as a commercial enterprise without a license while falsely pretending to be 'private sellers'—often without detection or prosecution." Id. at ¶31. They contend that buying guns through private sales "from such illegal gun dealers" is an attractive proposition to anyone who fears failing a background check. Id. at ¶32. The plaintiffs say that these private sales, "which take place on the internet at an ever-increasing rate, account for around one-fifth of all United States sales, and are key source for the black market in firearms." Id. They contend that these kinds of private internet sales "have repeatedly been linked to illegal gun trafficking and direct or indirect sales to Prohibited Purchasers," and assert that internet gun sales have been "connected to several well-documented mass shootings—including the 2007 shooting at Virginia Tech (which killed 32 people and left over a dozen wounded) and the 2008 shooting at Northern Illinois University (where 5 were killed and 17 more were wounded)." Id. at ¶34.

6

The plaintiffs maintain that the defendants "were well aware of these facts when they created and/or were maintaining and operating Armslist.com prior to and during 2017." Id. at ¶36. They describe Armslist.com as a "for-profit online firearms marketplace" that "assists and encourages individuals in purchasing and selling firearms and firearm-related items without regulation, detection or compliance with firearms laws." Id. at ¶¶37, 38. The plaintiffs state that Armslist—the owner of Armslist.com—is not a federal firearms license holder. Id. at ¶39.

The plaintiffs contend that the defendants "chose to create Armslist.com after several prominent online marketplaces chose to stop facilitating online private sales of firearms due to a recognition that it was too likely that such transactions would contribute to America's gun violence epidemic by channeling weapons to the criminal market." Id. at ¶40. They cite eBay's 2002 announcement that it was prohibiting gun sales on its website, id. at ¶41; Cragislist's 2007 ban of firearms sales, id. at ¶42; and Amazon.com's third-party seller program and Google's "AdWords" ad platforms' prohibition of the listing of firearms for sale, id. at ¶43. The plaintiffs assert that "[t]he decisions of these online providers sent an unequivocal message to other businesses that online gun marketplaces should either be avoided entirely or should only be operated with the greatest care and strong precautions designed to prevent dangerous people from using such sites to illegally acquire weapons." Id. at ¶44.

7

The plaintiffs allege that, in contrast to these other entities, the defendants "saw an opportunity to design and operate a website that flouted reasonable care and the law in order to dominate the online firearms marketplace business and profit off the criminal gun market." Id. at ¶45. They say that Gibbon—the alleged co-founder of Armslist.com—admitted that in 2007, when he heard that Craiglist.com had decided to ban gun-related ads, he was inspired to create "a place for law abiding gun owners to buy and sell online without all of the hassles of auctions and shipping." Id. at ¶46. The plaintiffs assert that Armslist.com now primarily serves private sellers and that its revenue is almost entirely dependent on the "sales traffic" of the private sellers. Id. at ¶¶47-48. The plaintiffs say that "[i]n 2018 alone, Armslist.com had almost 1.2 million advertisements for firearms transactions from 'private sellers' where no background check was required," and they allege that "[m]any or all of these transactions were also exempt from any record keeping requirements." Id. at ¶49.

The plaintiffs claim that the defendants "implemented policies, features and content on Armslist.com that were designed to motivate and assist in the creation and operation of illicit, unlicensed virtual firearms 'stores' as well as the completion of the illicit gun sales and purchases these 'stores' enable." Id. at ¶53. These alleged policies, features and content included the following:

> (a)    Armslist.com enables any party to identify him or herself as a "Private Party" and enables any party to search for only "Private Party" in his or her state via filtering functions. This enables unlicensed dealers like Caldwell, who are selling large quantities of firearms in violation of § 923(a), to effectively market the fact that they will be selling firearms without background checks, transaction

8

records or compliance with other legal restrictions. It also enables Prohibited Purchaser and/or gun traffickers like Jones to easily locate unlawful sellers like Caldwell while seeking to avoid such restrictions.

. . . .

(c)    Armslist.com, upon information and belief, pre-labels both "For Sale" and "Want to Buy" postings as being posted by or being directed to "Private Part[ies]" if the user does not have an established account when using the "Create a Listing" function, as evidenced in the following interface page that occurs during the process of developing an advertisement.

. . . .

(e)    Because of this feature of the website design and content created by Armslist, when any user who does not have an account attempts to create a post on Armslist.com using the "Create a Listing" function, the user must select various pieces of information—such as the location of the desired transaction and the category o[f] firearm being offered for sale/sought to be purchased (*e.g.*, "Handguns")—from a series of introductory menus; these initial selections are then reflected on the interface page . . . . Upon information and belief, the information on the interface page . . . is ultimately translated into tags displayed on the advertisements produced when the user completes the process of developing the advertisement. . . . .

(f)    The "Private Party" tag that later appears on advertisements . . . is, thus, not produced as a result of the user selecting an option on any menus. Rather, the words "Private Party" occurring on the interface page and later reflected on advertisements are authored entirely by Armslist.com and exist as a pre-populated, default option.

(g)    By automatically applying the words "Private Party" to all advertisements created by users without an account, the Armslist Defendants have chosen to make functioning as or seeking out a "private seller" the default for most of its users.

(h)    As a result, the Armslist Defendants encourage and assist Armslist.com users in engaging in sales/purchases without background checks, transaction records and other restrictions.

<u>Id.</u> at ¶57.

9

The plaintiffs also allege that the defendants act as "co-authors" of advertisements for illegal gun sales, id. at ¶57(i); that the website does not limit the number of firearms ads a "private seller" may post and that it does not take any steps to identify, report or remove people who are, in effect, acting as unlicensed gun dealers, id. at ¶¶57(j)-(k); that the site does not allow users to flag posts that reflect, encourage or solicit unlawful conduct, which sends a message that the defendants will not investigate to see if private sellers are acting as unlicensed dealers and will not exercise any oversight over illegal conduct, id. at ¶¶57(l)-(n); that the site does not require users to open an account—an act which would require a user to identify him or herself—thus enabling users to use the site anonymously, id. at ¶¶57(s)-(x); and that the defendants have taken no measures to prevent prohibited persons from using the website to illegally buy and sell guns or to prevent unlicensed persons from using the site to deal firearms, id. at ¶¶57(y)-(z).

The plaintiffs allege that the defendants knew or should have known that unlicensed individuals were using sites like Armslist.com to enable them to run firearms businesses without licenses and that guns sold by those dealers were making their way into the hands of prohibited persons who would use them to hurt people—including law enforcement officers. Id. at ¶¶61-64. They allege that the policies, features and content the defendants chose to use helped make these illegal firearms sales successful. Id. at ¶¶58-60, 65. The plaintiffs assert that *The Verge* (a technology blog) and *The Trace* (a media source covering gun-related news) analyzed Armslist posts over a period of just under

two and a half years "in an effort to identify unlicensed dealers like Caldwell." Id. at ¶66. The plaintiffs assert that this analysis determined that over 700 phone numbers were listed by sellers in ten or more posts, but that only fourteen of the numbers belonged to legitimate federal firearms license holders. Id. They speculate that "[e]ach one of the other phone numbers is highly likely to belong to a seller who, like Caldwell, has violated and/or is continuing to violate § 923(a) . . . ." Id. They assert that as a part of the *Verge/Trace* investigation, "[m]ultiple unlicensed sellers" were contacted and "freely admitted that they were unlawfully utilizing Armslist.com to turn a profit on the sale of firearms as opposed to simply offloading private collections." Id. at ¶67.

The plaintiffs assert that prior to 2017, the defendants had information demonstrating that their "design, policy and content choices on Armslist.com were encouraging and assisting individuals who, like Caldwell, wanted to unlawfully 'engage in the business' of selling firearms as a commercial enterprise without a license by operating virtual weapons 'stores' on their site." Id. at ¶74. They cite a 2013 report from Mayors Against Illegal Guns that received national media coverage. Id. at ¶¶75-80. They cite a 2011 undercover investigation of online gun sales conducted by the City of New York that was widely reported in the press. Id. at ¶¶81-83. They cite a 2013 study by Third Way and Americans for Responsible Solutions indicating that "Wisconsin had the fifth-highest number of 'Want to Buy' ads seeking out 'private sellers.'" Id. at ¶85. For these reasons, the plaintiffs assert that the defendants had reason

11

to know, before 2017, that prohibited persons—including prohibited persons in Wisconsin—were "seeking to use Armslist.com to acquire firearms at more than quadruple the rate at which they were trying to buy guns at [federally licensed dealers]." Id. at ¶87.

The plaintiffs claim that the defendants had reason to know that guns acquired through transactions brokered on Armlist.com were being used by prohibited persons "to commit horrific murders—including in both Wisconsin and Illinois." Id. at ¶92. They assert that a gun and ammunition used in in a 2012 mass shooting at a spa in Brookfield, Wisconsin were purchased through Armslist.com by a prohibited person. Id. at ¶¶93-97. They assert that a gun used in the 2011 murder of an individual in Oak Brook, Illinois was "initially advertised on Armslist.com—where it caught the eye of" the murderer. Id. at ¶¶98-102. The plaintiffs argue that the defendants were sued in connection with both shootings. Id. at ¶¶97, 103.

The plaintiffs assert that there are simple steps the defendants could have taken to avoid "encouraging and assisting in illegal firearms transactions," and they list them in the second amended complaint. Id. at ¶¶104-109.

## II.     Procedural History

The plaintiffs filed their complaint on February 12, 2020. Dkt. No. 1. The original complaint named four defendants—Armslist and three individuals: Brian Mancini, Jonathan Gibbon and Broc Elmore, all three of whom were alleged to be members of Armlist and individuals "who played a role in the

design, architecture, and administration of Armslist.com." Id. at ¶¶25-28. Sixteen days later, on February 28, 2020, the plaintiffs amended the complaint for the first time. Dkt. No. 3. The amended complaint did not name Broc Elmore, one of the three individual defendants named in the original complaint. The plaintiffs filed a second amended complaint—the operative complaint—on May 12, 2020, excluding defendant Brian Mancini. Dkt. No. 4.

On June 8, 2020, defendant Gibbon filed a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), or alternatively, failure to state a claim under Fed. R. Civ. P. 12(b)(6). Dkt. No. 5. The same day, Armslist, LLC filed its own motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Dkt. No. 7. The plaintiffs filed briefs in opposition on July 29, 2020. Dkt Nos. 14, 15. Gibbon filed a reply brief in support of his motion on September 2, 2020. Dkt. No. 20. Arguing in support of his motion to dismiss for failure to state a claim, Gibbon said, "For the reasons stated in Armslist's Reply Brief, which Mr. Gibbon joins, the claims against him must be dismissed under § 230 [of the Communications Decency Act] . . . ." Id. at 8. Armslist also filed its reply brief on September 2, and stated in a footnote, "Armslist, LLC, joins Mr. Gibbon's reply in support of Mr. Gibbon's own Motion. The non-jurisdictional arguments stated therein support dismissing Armlist, LLC, as well as Mr. Gibbon, because Plaintiff has not stated a claim against Armslist under controlling state law." Dkt. No. 21 at 6 n.1.

The court held a hearing on October 29, 2020. Dkt. No. 24. The court noted at the hearing that defendant Gibbon had moved to dismiss on two

grounds—lack of personal jurisdiction and failure to state a claim. Dkt. No. 25, p. 4 at lines 23-25 through p. 5 at line 1. It noted that Armslist, on the other hand, had sought dismissal only for failure to state a claim. Id., p. 5 at lines 2-3. After providing a brief factual background, id., p. 5, line 9 through p. 8, line 1, the court delivered an oral ruling granting Gibbon's motion to dismiss for lack of personal jurisdiction, id., p. 8 at line 10 through p. 25, line 13.[1] The court concluded, reviewing every paragraph from the second amended complaint that the plaintiffs had cited in their response to Gibbon's motion to dismiss, that there was nothing in the second amended complaint, "extensive as it is, detailed as it is, that would show that there was an attempt to target Wisconsin for purposes of personal jurisdiction." Id. at p. 22, lines 4-7. The court cited Seventh Circuit cases, including Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796 (7th Cir. 2014) and Curry v. Revolution Labs., LLC, 949 F.3d 385 (7th Cir. 2020), in support of its conclusion. Id. at p. 22, lines 7-11.

The court then turned to Armslist's motion to dismiss for failure to state a claim and asked the parties to address the Wisconsin Supreme Court's decision in Daniel v. Armslist, LLC, 386 Wis. 2d 449 (Wis. 2019). Id. at p. 22, line 19 through p. 23, line 22. The court also asked the parties for their

---

[1] On November 9, 2021, one of this court's colleagues dismissed a suit against Gibbon and Armslist that made allegations similar, if not identical, to the allegations the plaintiffs make against Gibbon and Armslist in this case. Richard Webber v. Armslist LLC and Jonathan Gibbon, No. 20-cv-1526, 2021 WL 5206580, at *11. That court concluded that it had personal jurisdiction over Gibbon. Id. at *4.

14

arguments as to whether, if the plaintiffs' state-law claims were not preempted by the Communications Decency Act, Illinois or Wisconsin law should apply. Id. at p. 23, line 23 through p. 24, line 9.

At the end of the hearing, the court told the parties that it wanted to get the parties an answer as soon as it could. Id. at p. 42, lines 4-11. It stated that once it reviewed the parties' arguments and "g[o]t a little bit [its] arms around it a little bit more," it would either schedule a date for an oral ruling or issue a written one. Id. at p. 43, lines 10-15.  The plaintiffs' counsel asked whether the court would allow the plaintiffs to file an amended complaint to try to cure the jurisdictional deficiencies as to defendant Gibbon. Id. at lines 19-25. The court responded that it would be willing to allow the plaintiffs to file an amended complaint, but it encouraged them to wait to do so until the court issued its ruling on "the other issues." Id. at p. 44, lines 1-6.

On October 22, 2021, the parties filed a joint motion asking the court to schedule a status conference to address the situation with the pending motion, reminding the court that it had advised the plaintiffs that it would allow them to amend to address personal jurisdiction as to Gibbon but that it had advised them to wait until the court ruled on Armslist's motion before doing so. Id. at 1-2.

## III.    Jurisdiction

The second amended complaint alleges that the court has diversity jurisdiction under 28 U.S.C. §1332. Dkt. No. 4 at ¶22. There is complete

15

diversity between the parties and the second amended complaint asserts, on information and belief, that the amount in controversy exceeds $75,000. Id.

The second amended complaint asserts that venue in the Eastern District of Wisconsin is proper under 28 U.S.C. §1391(b)(2) because, on the plaintiffs' information and belief, a substantial part of the events giving rise to the claim occurred here. Id. at ¶23. The plaintiffs allege that, on information and belief, "Jones was motivated and assisted by the Armslist Defendants' design, policy, and content choices on Armslist.com in using the site to locate Caldwell's illicit, unlicensed 'store' while operating in the Milwaukee area, first acquired the Handgun from Caldwell in the Milwaukee area, and possessed the Handgun for some period of time in the Milwaukee area." Id.

## IV. The Parties' Arguments

The court granted Gibbon's motion to dismiss the second amended complaint for lack of personal jurisdiction, dkt. no. 24, but he also moved to dismiss for failure to state a claim, dkt. no. 5, and Armslist adopted his arguments, dkt. no. 8 at 26-27. He first argued that the Communications Decency Act barred the plaintiffs' claims. Dkt. No. 6 at 17. He next argued that the court should apply Illinois law in considering the plaintiffs' substantive claims, id. at 19, asserting that under Illinois law, the plaintiffs' claims must be dismissed, id. at 22. Gibbon argued that if the court concluded that Wisconsin law applied, the plaintiffs' claims still must be dismissed. Id. at 24.

Armslist moved to dismiss the second amended complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). Dkt. No. 7. Most of its brief was

16

devoted to the argument that 47 U.S.C. §230 generally immunized it from liability for any conduct by the users of the Armslist.com website. Dkt. No. 8 at 14-23. Armslist briefly argued that §230(c)(2) provided it with immunity as to certain of the plaintiffs' allegations. Id. at 23-25. Armslist briefly argued that even if the court disagreed that the CDA required dismissal of the second amended complaint, the plaintiffs had not alleged sufficient facts to state a claim under Illinois law—which Armslist argued controls—or Wisconsin law. Id. at 25.

In opposing Armslist's motion, the plaintiffs argued that the plain language of §230(c) does not bar liability. Dkt. No. 14 at 14. They asserted that while §230(c)(2) expressly bars civil liability for certain actions, that section is not applicable in this case. Id. They argued that they were not seeking to treat Armslist as a publisher or speaker of third-party content but were seeking to hold Armslist liable for its own content and negligent conduct in the design of the Armslist.com website. Id. at 15. They argued that for the claims they had alleged, "Armslist could be liable even if it never published the relevant gun sales ads," speculating that if Armslist had sold Armslist.com to a third party who had published the ads, "Armslist could be liable for its negligent design . . . ." Id. at 15. The plaintiffs asserted that §230 did not protect Armslist from liability as an "information content provider" to the Armslist.com website. Id. Contending that §230 "does not protect websites from liability arising from content they produce," the plaintiffs argued that the second amended complaint had identified "specific pieces of content Armslist implemented on

17

Armslist.com with zero third-party involvement which encourage and assist illegal gun transactions." Id. at 23 (citing Dkt. No. 4 at ¶57).

In response to Armslist's reference to §230(c)(2), the plaintiffs asserted that their theory of liability was not that Armslist took good-faith actions to restrict access to objectionable material, but that it took bad-faith actions to encourage and facilitate unlawful conduct. Id. at 26. The plaintiffs concluded by asserting that their substantive arguments in opposition to dismissal of their state-law tort claims were contained in their brief in opposition to Gibbon's motion to dismiss. Id. at 33.

In response to Gibbon's motion to dismiss, the plaintiffs asserted that Wisconsin law, not Illinois law, applied to their substantive claims. Dkt. No. 15 at 18. They argued that under Wisconsin law, they had asserted a valid claim for negligence. Id. at 20. They also asserted that because they had stated a claim for negligence, their other claims were not subject to dismissal. Id. at 27-32. Finally, the argued that in the "unlikely event that the Court finds Illinois, and not Wisconsin, law applies," they had stated claims under Illinois law. Id. at 32.

Armslist replied that the plaintiffs' arguments regarding the legislative history and purpose of §230 ignored the actual text of the statute, as well as congressional intent and decades of case law. Dkt. No. 21 at 7. Armslist urged the court to begin with the language of §230. Id. at 8. It argued that the plain meaning of the statute required the court to find that §230 preempted the plaintiffs' state tort claims. Id. at 4-5. Armslist also argued that contrary to the

18

plaintiffs' assertions, there is no "good faith" exception to the protection provided by §230(c)(2). Id. at 13.

## V.    Analysis

Before beginning its analysis of the arguments, the court notes that only Gibbon sought dismissal for lack of personal jurisdiction; Armslist did not seek dismissal on that ground and has adopted Gibbon's arguments only to the extent that they relate to issues other than jurisdiction. Because the court has resolved the personal jurisdiction issue as to Gibbon, this decision does not address personal jurisdiction.

### A.    Legal Standard

Armlist seeks dismissal under Fed. R. Civ. P. 12(b)(6), arguing that §230 prevents the plaintiffs from being able to state a claim upon which this court may grant relief. A motion to dismiss tests the sufficiency of the complaint—not its merits. Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990). When evaluating a motion to dismiss under Rule 12(b)(6), the court must "accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party." United States *ex rel.* Prose v. Molina Healthcare of Ill., Inc., 10 F.4th 765, 771-72 (7th Cir. Aug. 19, 2021) (citing O'Brien v. Vill. of Lincolnshire, 955 F.3d 616, 621 (7th Cir. 2020)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

19

"Rule 12(b)(6) tests whether the complaint states a claim for relief, and a plaintiff may state a claim even though there is a defense to that claim." Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 690 (7th Cir. 2012). "Courts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses." Id. (citing United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005)).

Both Armslist and Gibbon argued in their opening briefs that §230 provided *immunity* for interactive service providers and thus that the statute barred the plaintiffs' claims. They did not use the word "preemption." In their brief opposing Armslist's motion, the plaintiffs included a section titled "Principles of Federalism and the Presumption Against Preemption Require Reading the CDA to Allow Plaintiff's Claims." Dkt. No. 14 at 17. The plaintiffs asserted that "even where a statute's 'express language' mandates some degree of preemption of state law, the 'presumption [against preemption] reinforces the appropriateness of a narrow reading' of the 'scope' of preemption." Id. at 18 (citing Cipollone v. Liggett Group, 505 U.S. 516-18 (1992); Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)). They argued that "[a]ny ambiguity as to whether Plaintiff's claims are to be allowed must be resolved in her favor by narrowly construing the degree to which the CDA preempts state tort law." Id. at 19.

Armslist responded that §230 "preempts state-law causes of action because it provides '[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.'"

20

Dkt. No. 21 at 10 (quoting 47 U.S.C. §230(e)(3)). Armslist argued that the presumption against preemption applied only in cases where the language of a statute did not explicitly preempt state law, and it asserted that the preemption language of §230 is explicit. Id.

The Seventh Circuit has held that "[p]reemption . . . is 'an affirmative defense upon which the defendants bear the burden of proof.'" Benson v. Fannie May Confections Brands, Inc., 944 F.3d 639, 645 (7th Cir. 2019) (quoting Fifth Third Bank ex rel. Tr. Officer v. CSX Corp., 415 F.3d 741, 745 (7th Cir. 2005)).

> "Affirmative defenses do not justify dismissal under Rule 12(b)(6)." *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003). Moving for judgment on the pleadings under Rule 12(c) is the more appropriate way to address an affirmative defense. *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010).

Id. In Benson, the Seventh Circuit held that the district court erred in "penalizing Benson for failing to anticipate an affirmative defense in her complaint and dismissing the action based on . . . preemption." Id.

Armslist asserts, however, that "[t]he Court may dismiss pursuant to 47 U.S.C. § 230 under Rule 12(b)(6)." Dkt. No. 8 at 15. It cites three cases in support of this assertion. First, a decision from the Southern District of New York, Gibson v. Craigslist, Inc., No. 08 Civ. 7735(RMB), 2009 WL 1704355 (S.D.N.Y. June 15, 2009). The Gibson court granted a motion to dismiss on the ground that §230 barred the plaintiff's claims, but stated in a footnote:

> An Affirmative defense, such as Section 230 immunity, is generally addressed on a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment, *see Novak v. Overture*

21

> *Servs., Inc.*, 309 F. Supp. 2d 446, 452 (E.D.N.Y. Mar. 25, 2004), but
> some courts have held that it is proper to evaluate a Section 230
> immunity defense "in the context of a 12(b)(6) motion" where the
> necessary facts are apparent on the face of the complaint and the
> immunity available under the CDA precludes a plaintiff from stating
> a claim. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F.
> Supp. 2d 544, 550 (E.D. Va. 2008); *see also Doe v. Bates*, No. 05
> Civ. 91, 2006 WL 3813758, at *9-10 (E.D. Tex. Dec. 27, 2006). As
> reflected below, that is the position taken here.

Id. at *1, n.1. The court held that

> [e]ven if the Court were to conclude that Defendant should not have
> moved pursuant to Rule 12(c), the Court could properly treat the
> instant Rule 12(b)(6) motion as Rule 12(c) motion for judgment on
> the pleadings, with the same result. *See Bates*, 2006 WL 3813758,
> at *9; *see also Doe v. M[y]Space, Inc.*, 474 F. Supp. 2d 843, 850 n.5
> (W.D. Tex. 2007), *aff'd*, 528 F.3d 413 (5th Cir. 2008), *cert. denied*,
> 129 S. Ct. 60 (2008).

Id. at *2, n.2.

Second, Armslist cites Nieman v. Versuslaw, Inc., No. 12-3104, 2012 WL 3201935 (C.D. Ill. June 13, 2012). The particular Nieman case upon which Armslist relies is a report from a magistrate judge, recommending that the district court grant a Rule 12(b)(6) motion to dismiss the plaintiff's defamation and privacy tort claims against legal search websites and search engines. Id. at *6. But while the district court agreed that §230 barred "many of Plaintiff's claims in the Second Amended Complaint," it concluded that it need not resolve whether to dismiss based on §230 because the First Amendment barred all the plaintiff's claims and the plaintiff had not stated a claim under any count. Nieman v. Versuslaw, Inc., No. 12-3104, 2012 WL 3201931, at *8-9 (C.D. Ill. Aug. 3, 2012). On appeal, the Seventh Circuit did not address the

22

applicability of §230. <u>Nieman v. Versuslaw, Inc.</u>, 512 F. App'x 635 (7th Cir. 2013).

Finally, Armslist relies on <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250 (4th Cir. 2009). But the <u>Nemet</u> court did not discuss the 12(b)(6)/12(c) question because of a difference between the law of the Fourth Circuit and that of the Seventh Circuit. In a footnote, the Fourth Circuit observed:

> There is some disagreement as to whether the statutory bar under § 230 is an immunity or some less particular form of defense for an interactive computer service provider. The Seventh Circuit, for example, prefers to read "§ 230(c)(1) as a definitional clause rather than as an immunity from liability." *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003); *see also* [*Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v.*] *Craigslist, Inc.*, 519 F.3d [666,] at 669 [[7th Cir. 2008)]. Of whatever academic interest that distinction may be, our Circuit clearly views the § 230 provision as an immunity: "By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran* [*v. America Online, Inc.*], 129 F.3d [327,] at 330 [[4th Cir. 1997)].

<u>Id.</u> at 254 n.4.

Because the Fourth Circuit considered §230 to be an immunity provision, it

> recognized the "obvious chilling effect" the "specter of tort liability" would otherwise pose to interactive computer service providers given the "prolific" nature of speech on the Internet. *Zeran* 129 F.3d at 331. Section 230 immunity, like other forms of immunity, is generally accorded effect at the first logical point in the litigation process. As we have often explained in the qualified immunity context, "immunity is an *immunity from suit* rather than a mere defense to liability" and "it is effectively lost if a case is erroneously permitted to go to trial." *Brown v. Gilmore*, 278 F.3d 362, 366 n.2 (4th Cir. 2002) (quotations omitted) (emphasis in original). We thus aim to resolve the question of § 230 immunity at the earliest possible

23

stage of the case because that immunity protects websites not only from "ultimate liability," but also from "having to fight costly and protracted legal battles." [*Fair Housing Council of San Fernando Valley v.*] *Roommates.com* [*LLC*], 521 F.3d[1157,] at 1175 [(9th Cir. 2008)].

Id. at 254-55.

As the Fourth Circuit observed, over sixteen years before the plaintiffs filed this lawsuit, the Seventh Circuit characterized §230(c) as "an affirmative defense." Doe v. GTE Corp., 347 F.3d 655, 657 (7th Cir. 2003). See also Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 669-670 (7th Cir. 2008). The Seventh Circuit has "repeatedly cautioned that the proper heading" for motions to dismiss based on affirmative defenses "is Rule 12(c), since an affirmative defense is external to the complaint." Brownmark Films, 682 F.3d at 690 n.1. Armslist should have raised the affirmative defense of §230 under Rule 12(c), not under Rule 12(b)(6).

That said, "when all relevant facts are presented, the court may properly dismiss a case before discovery—typically through a Rule 12(c) Motion for Judgment on the Pleadings—on the basis of an affirmative defense." Id. at 690 (citing United States v. Lewis, 411 F.3d 838, 842 (7th Cir. 2005); Brooks v. Ross, 578 F.3d 574, 579 (7th Cir. 2009)). To determine whether it would be proper to dismiss this case based on the affirmative defense of a §230 bar, the court would be required to analyze whether "all relevant facts" have been presented. The court need not wade into those waters, because it concludes that under Seventh Circuit law, the CDA is not a bar to the plaintiffs' claims.

24

B.    <u>Section 230(c) Does Not Immunize the Defendant from Suit</u>

Enacted in 1996, Section 230(c) of Title 47 states:

**(c)** **PROTECTION FOR "GOOD SAMARITAN" BLOCKING AND SCREENING OF OFFENSIVE MATERIAL**

    **(1)** **TREATMENT OF PUBLISHER OR SPEAKER**

    No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

    **(2)** **CIVIL LIABILITY**

    No provider or user of an interactive computer service shall be held liable on account of—

        **(A)**    any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

        **(B)**    any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

The statute defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. §230(f)(2). It defines an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47

25

U.S.C. §230(f)(3). Section 230(e)(3) provides that the statute must not be construed "to prevent any State from enforcing any State law that is consistent" with the statute but says that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent" with the statute.

The text of the statute explains the policy behind it. Section 230(b) states:

**(b)** **POLICY**

It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

Section (c)(1) of the statute, then, states that interactive computer service users or providers cannot be treated as "publishers" or "speakers" of information from another information content provider. In its brief in support

26

of the motion to dismiss, Armlist argued that state and federal courts have agreed that §230 "immunizes websites from claims like the plaintiff's," dkt. no. 8 at 10, and that "[t]he CDA immunizes interactive computer services like Armslist from liability for materials posted by third parties," dkt. no. 8 at 14. But the Seventh Circuit is not one of the "agreeing" courts and it has expressly held that §230 does not create immunity.

In 2003, the Seventh Circuit decided GTE. After someone hid video cameras in the locker rooms, bathrooms and showers of several sports teams and the resulting tapes showing undressed players were sold without the players' consent, the players sued the organizations that sold the tapes (collectively "Franco"), college officials and "three corporations that provided Internet access and web hosting services to the sellers." GTE, 347 F.3d at 656. Relying on §230(c), the district court dismissed the claims against GTE, and the players appealed. Id.

Writing for the panel, Judge Easterbrook began by noting that while GTE had asked for dismissal under Rule 12(b)(6), and the district court had dismissed under that rule, "the reason behind the district court's ruling is not failure to state a claim, but an affirmative defense provided by § 230(c)." Id. at 657. Judge Easterbrook reiterated that "[a]ffirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses." Id. (citing Gomez v. Toledo, 445 U.S. 635 (1980)). Because the plaintiffs had not "protest[ed] the district court's use of Rule 12(b)(6)," however (possibly, Judge Easterbrook speculated, "because the decision could have been recast as a

judgment on the pleadings under Rule 12(c)") the court addressed the §230(c) argument "without fussing over procedural niceties to which the parties are indifferent." Id.

The court recounted that GTE "did not create or distribute the tapes;" although the complaint was not clear, the court assumed that GTE had "provided the usual package of services that enables someone to publish a web site over the Internet." Id. It observed that the company that sold the tapes, Franco—not GTE—"determined the contents of the site, thought the complaint raises the possibility that GTE's staff gave Franco technical or artistic assistance in the creation and maintenance of its web site." Id. The court recounted that GTE was not part of the sales process and that it did not earn revenue from the sales, and that Franco had signed contracts with GTE "promising not to use the web site to conduct illegal activities, infringe on the rights of others, or distribute obscenity (a promise Franco broke)." Id. Although GTE had the right to "inspect each site and cut off any customer engaged in improper activity," the court assumed that GTE did not exercise that right. Id. at 658. "Managers were passive, and the complaint alleges that GTE has a policy of not censoring any hosted web site (that is, that GTE does not enforce the contractual commitments that Franco and others make)." Id.

The court explained that the provisions of §230(c) "preempt contrary state law." Id. It noted, however, that §230(c) does not limit the application of the Electronic Communications Privacy Act of 1986 or its amendments (or any similar state law), citing §230(e)(4). Id. So, the court first analyzed whether the

28

plaintiffs had a claim under the Electronic Communications Privacy Act. Id. It concluded that the plaintiffs had not stated such a claim against GTE as the web host; while it observed that "Congress is free to oblige web hosts to withhold services from criminals (to the extent legally required screening for content may be consistent with the first amendment)," the court concluded that the Electronic Communications Privacy Act could "not be understood as such a statute." Id.

The court then explained that

Section 230(c)(2) tackles this problem not with a sword but with a safety net. A web host that *does* filter out offensive material is not liable to the censored customer. Removing the risk of civil liability may induce web hosts and other informational intermediaries to take more care to protect the privacy and sensibilities of third parties. The district court held that subsection (c)(1), though phrased as a definition rather than as an immunity, also blocks civil liability when web hosts and other Internet service providers (ISPs) *refrain* from filtering or censoring the information on their sites. Franco provided the offensive material; GTE is not a "publisher or speaker" as § 230(c)(1) uses those terms; therefore, the district court held, GTE cannot be liable under any state-law theory to the persons harmed by Franco's material. This approach has the support of four circuits. *See Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980 (10th Cir. 2000); *Green v. America Online*, 318 F.3d 465 (3d Cir. 2003); *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003). No appellate decision is to the contrary.

Id. at 659-660.

The Seventh Circuit observed, however, that if the district court's reasoning (and that of the Fourth, Tenth, Third and Ninth Circuits) was sound, §230(c) "as a whole makes ISPs indifferent to the content of information they host or transmit: whether they do (subsection (c)(2)) or do not (subsection (c)(1))

29

take precautions, there is no liability under either state or federal law." <u>Id.</u> at 660. Noting that the title of §230(c) is "Protection for 'Good Samaritan' blocking and screening of offensive material," the court opined that that title was "hardly an apt description if its principal effect is to induce ISPs to do nothing about the distribution of indecent and offensive materials via their services." <u>Id.</u> Given the conflict between the statute's text and its title, Judge Easterbrook asked, "[w]hy not read § 230(c)(1) as a definitional clause rather than as an immunity from liability, and thus harmonize the text with the caption?" <u>Id.</u> He explained:

> On this reading, an entity would remain a "provider or user"—and thus be eligible for immunity under § 230(c)(2)—as long as the information came from someone else; but it would become a "publisher or speaker" and lose the benefit of § 230(c)(2) if it created the objectionable information. The difference between this reading and the district court's is that § 230(c)(2) never requires ISPs to filter offensive content, and thus § 230(e)(3) would not preempt state laws or common-law doctrines that induce or require ISPs to protect the interests of third parties, such as the spied-upon plaintiffs, for such laws would not be "inconsistent with" this understanding of § 230(c)(1). There is yet another possibility: perhaps § 230(c)(1) forecloses any liability that depends on deeming the ISP a "publisher"—defamation law would be a good example of such liability—while permitting the states to regulate ISPs in their capacity as intermediaries.

<u>Id.</u>

In the end, the court concluded that it did not need to decide which understanding of §230 was correct because the plaintiffs had not stated a claim that GTE was liable for the state-law tort of "negligent entrustment of a chattel;" the court found that GTE had furnished Franco with a service, not a chattel. <u>Id.</u> at 660-61.

Five years later, the court decided <u>Chi. Lawyers' Comm.</u>, 519 F.3d 666. The Committee, suing on behalf of its members, alleged that Craigslist, "which provides an electronic meeting place for those who want to buy, sell, or rent housing (and many other goods and services)," had violated §804 of the Fair Housing Act—42 U.S.C. §3604(a). <u>Id.</u> at 668. Specifically, the plaintiff had alleged that housing notices posted on Craigslist were blatantly discriminatory. <u>Id.</u> Craiglist responded that §230(c)(1) "provides 'broad immunity from liability for unlawful third-party content.'" <u>Id.</u> at 669. Observing, as it had in <u>GTE</u>, that other circuits (by that time, the First Circuit had joined the Third, Tenth, Fourth and Ninth) shared that view, the Seventh Circuit recounted that it had "questioned whether § 230(c)(1) creates any form of 'immunity' . . . ." <u>Id.</u> (citing <u>GTE</u>, 347 F.3d 655).

The Seventh Circuit found little support for the defendant's immunity argument in the language of the statute, noting that §230(c) does not include the word "immunity" and reiterating its explanation from <u>GTE</u> about "why § 230(c) as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts." <u>Id.</u> Reminding the reader that under <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913 (2005) "'information content providers' may be liable for contributory infringement if their system is designed to help people steal music or other material in copyright," the court found that "<i>Grokster</i> is incompatible with treating § 230(c)(1) as a grant of comprehensive immunity from civil liability for content provided by a third party." <u>Id.</u> at 670.

31

In City of Chi., Ill. v. StubHub!, Inc., 624 F.3d 363 (7th Cir. 2010), the court tersely disposed of an Internet auction site's argument that §230(c)(1) immunized it from liability for failing to collect municipal amusement taxes:

> As earlier decisions in this circuit establish, subsection (c)(1) does not create an "immunity" of any kind. *See Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003); *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 669-71 (7th Cir. 2008). It limits who may be called the publisher of information that appears online. That might matter to liability for defamation, obscenity, or copyright infringement. But Chicago's amusement tax does not depend on who "publishes" any information or is a "speaker". Section 230(c) is irrelevant.

Id. at 366.

And in 2016, the Seventh Circuit held that Gawker Media, the owner of a website called Jezebel that published an article the plaintiff claimed was defamatory, could not be considered a "publisher" under §230(c)(1) "for purposes of defamation and other related theories of liability . . . simply because the company hosts an online forum for third-party users to submit comments." Huon v. Denton, 841 F.3d 733, 741 (7th Cir. 2016) (citing Chi. Lawyers' Comm., 519 F.3d at 671-72; GTE, 347 F.3d at 658-59).[2]

In sum, the Seventh Circuit repeatedly has stated that §230(c)(1) does not create "immunity." In its opening brief in support of its motion to dismiss, Armslist cited only two of the Seventh Circuit's decisions—Chi. Lawyers'

---

[2] The court concluded that such a company *could* be liable "for creating and posting, inducing another to post, or otherwise actively participating in the posting of a defamatory statement in a forum that that company maintains." Huon, 841 F.3d at 742 (citing Chi. Lawyers' Comm. 519 F.3d at 671; Roommates.com, 521 F.3d at 1166-67; FTC v. Accusearch Inc., 570 F.3d 1187, 1199-1200 (10th Cir. 2009)).

32

Comm. and Huon. Despite citing Chi. Lawyers' Comm. multiple times, Armslist did not mention the court's holding that §230(c)(1) does *not* create immunity. Armslist asserted that "[c]ourts that failed to apply Section 230 immunity analyzed claims under more permissive state court pleading standards, dealt with clear content development by an interactive computer service, criminal prosecutions, or other factors taking the alleged misconduct out of 230's ambit," dkt. no. 8 at 11 n.4, listing Huon as one of those courts. But the Seventh Circuit's rulings—including the ruling in Huon—were not narrow or fact-bound; the court consistently has interpreted the plain language of §230(c)(1) as a definitional provision, regardless of the factual context. (The Seventh Circuit has done what Armslist urged this court to do in its reply brief—look at the plain language of the statute—yet it does not address the Seventh Circuit's point that the plain language of §230(c)(1) does nothing more than define "publishers" and "speakers" for the purposes of the statute.)

Armslist also relied heavily on Daniel v. Armslist, LLC, 386 Wis. 2d 449 (Wis. 2019), in which the Wisconsin Supreme Court concluded that §230(c)(1) required dismissal of the plaintiff's tort claims against Armslist. The plaintiff's mother and others were killed in a mass shooting committed by someone who illegally had purchased the murder weapon from a "private seller" who had offered it for sale on Armslist.com. Id. at 457. The complaint contained allegations similar to those alleged in the second amended complaint in this case. Id. at 459-62. In contrast to the Seventh Circuit, the Wisconsin Supreme Court stated that §230(c)(1) "immuniz[ed] interactive computer service

33

providers from liability for publishing third-party content." Id. at 464. Daniel is not binding authority on this court; the Seventh Circuit's decisions are.[3]

The court does not mean to imply that §230(c) never can provide protection from liability for entities like Armslist. But that protection is not, as Armslist has argued, a broad grant of immunity. It is a fact-based inquiry. For example, the Seventh Circuit affirmed the district court's grant of Craigslist's motion for judgment on the pleadings in Chi. Lawyers' Comm. The court recounted that "[a]lmost in passing," the plaintiff had alleged that Craiglist was liable for violations of the Fair Housing Act because although it had not created the discriminatory posts, it had "caused" the discriminatory third-party posts to be made. Chi. Lawyers' Comm., 519 F.3d at 671. Emphasizing that Craigslist was not the author of the discriminatory posts, the Seventh Circuit found that the only causal connection between Craigslist and the discriminatory posts was the fact that "no one could post a discriminatory ad if craiglist did not offer a forum." Id. The court stated that "[n]othing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination; for example, craigslist does not offer a lower price to people who include discriminatory statements in their postings." Id. at 671-72. For that reason, the court concluded that "given § 230(c)(1) [the plaintiff] cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful discrimination." Id. at 672.

---

[3] Although it was decided in 2019, Daniel cited only one Seventh Circuit decision interpreting §230(c)(1), Chi. Lawyers' Comm., and it did not mention the holding in that case that §230(c)(1) does not create immunity.

34

The plaintiffs in this case have not raised claims of defamation or obscenity or copyright infringement—the types of claims that would require the court to determine whether Armslist is a "publisher" or "speaker" of content, rather than a provider of an interactive computer service that hosts content created by third parties. None of the nine claims in the second amended complaint challenge the *content* of ads posted on the Armslist.com website—not even Caldwell's ad. The plaintiffs have alleged that Armslist should have structured the website differently—should have included safeguards and screening/monitoring provisions, should have been aware of the activity of individuals like Caldwell, should have implemented measures that would prevent illegal firearms dealers from using the website to sell guns without a license.

In declining to dismiss the complaint on §230(c) grounds, the court in Webber v. Armslist recently stated that because the plaintiff in that case had alleged "negligence and public nuisance based on Defendants' affirmative conduct," it appeared that "§ 230 is not even relevant to this case." Webber v. Armslist, No. 20-cv-1526, 2021 WL 5206580, at *6 (E.D. Wis. Nov. 9, 2021). This court agrees. Section 230 does not immunize Armslist from suit and the court will not dismiss the complaint on that basis.

Finally, the court could not follow the defendant's argument that §230(c)(2) immunized it from some of the plaintiff's allegations. The defendant says that "[i]n effect, Plaintiff alleges Defendants have developed content, precluding Section 230 immunity, for 'action[s] voluntarily taken in good faith

35

to restrict access . . . material' they consider 'otherwise objectionable' and actions 'taken to . . . restrict access to material descried in paragraph 1' of the Section 230(c)." Dkt. No. 8 at 23-24. It referenced the plaintiffs' claims that Armslist does not allow users to flag illegal posts, that it defaults to "private seller" mode when a user does not create an account and that it permits searches by "private seller." Id. at 24. It also noted the second amended complaint's references to Armslist.com's terms of use and FAQ page and the plaintiffs' allegation that Armslist provided assurances to give unlawful users confidence that they would face little risk of identification. Id. The defendant concluded that the plaintiffs' allegations were a "misguided attempt to generate liability for 'content' that is not content for purposes of Section 230(c)(1), *i.e.*, Armslist's terms of use, FAQ, etc. . . . ." Id. at 25.

Section 230(c)(2) protects interactive computer users from being sued for restricting access to or availability of certain objectionable material. The second amended complaint does not allege that Armslist took actions to *restrict* access; it alleges that Armslist did not structure the website to prevent certain users from using the site to illegally traffic in firearms. The plaintiffs agree that they have not alleged that the defendant took any action to restrict access to or availability of material. Section 230(c) does not apply, but if it did, it would not warrant dismissal.

C.    Substantive State-Law Claims

Because §230 does not bar the plaintiffs' claims, the court turns to the substance of those claims. The primary claim in the second amended

36

complaint is negligence—the plaintiffs allege that the defendant had a general duty to the public to exercise care in creating and administering the firearms website, that that duty included implementing safeguards and screening procedures, that the defendant breached that duty in several ways and that those breaches ultimately caused Commander Bauer's death by the firearm Legghette obtained via Jones and Caldwell. Dkt. No. 4 at ¶¶150-166. The remaining claims—negligence *per se,* public nuisance, aiding and abetting tortious conduct, civil conspiracy, wrongful death, loss of consortium, survivorship and piercing of the corporate veil—all flow from the allegations of negligence.

The parties disagree about which state's law the court should apply in determining whether the plaintiffs have alleged sufficient facts to state claims for these causes of action. The defendant asserts that "Wisconsin's choice of law analysis requires applying ***Illinois*** law to [the plaintiff's] claims because Illinois has greater contacts with the alleged tort." Dkt. No. 6 at 19 (emphasis by the defendant). The plaintiffs argue that Wisconsin's choice of law rules mandate that Wisconsin law applies. Dkt. No. 15 at 12.

1. *Choice of Law*

"A federal court sitting in diversity applies state 'substantive' law and federal 'procedural' law." Mathis v. Metro. Life Ins. Co., 12 F.4th 658, 661 (7th Cir. 2021) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Horne v. Elec. Eel Mfg. Co., Inc., 987 F.3d 704, 713 (2021)). The court looks "'to the choice-of-law rules of the forum state to determine which state's law applies' to

37

the issues before it." <u>Sosa v. Onfido, Inc.</u>, 8 F.4th 631, 637 (7th Cir. 2021) (quoting <u>Heiman v. Bimbo Foods Bakeries Distrib. Co.</u>, 902 F.3d 715, 718 (7th Cir. 2018)). "In tort cases, [Wisconsin] courts begin with the presumption that the law of the forum applies unless non-forum contacts are of greater significance." <u>Thomas Middlesex Ins. Co. v. Brinks. Co.</u>, No. 19-CV-1223-JPS, 2020 WL 433886, at *2 (E.D. Wis. Jan. 28, 2020) (citing <u>Glaseske v. Shaw</u>, 661 N.W.2d 420, 427 (Wis. Ct. App. 2003)). "If neither potential forum has clearly more significant contacts, the Court moves on to analyze five 'choice influencing factors,' including predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law." <u>Id.</u>

The court begins by determining whether Illinois has "clearly more significant contacts" than Wisconsin. Armslist concedes that the plaintiffs allege that Jones purchased the gun from Caldwell in Wisconsin, but it says that "[e]very other event that Plaintiff alleges occurred in Illinois: (a) shooting, (b) subsequent sales of the gun; (c) Jones' alleged supply of the criminal market in Chicago; (d) even the criminal marketplace in Chicago of which Armslist's [sic] was purportedly aware." Dkt. No. 6 at 20. It argues that the only contact with Wisconsin "is that, at some point, however many transactions removed, Jones allegedly first purchased the gun from Caldwell in Wisconsin after Caldwell posted on Armslist." <u>Id.</u> Armslist contends that "[v]irtually ***no*** alleged facts demonstrate a connection with Wisconsin." <u>Id.</u> (emphasis by the

38

defendant). Armslist also points to the fact that Commander Bauer and plaintiff Erin Bauer are citizens of Illinois and infers from the amended complaint that Legghette also was an Illinois citizen. Id. at 21.

The plaintiffs respond that "the gun trafficking activity that delivered the gun to the hands of Commander Bauer's killer occurred in Wisconsin because [the defendant] designed Armslist.com so as to facilitate private (background check free) gun sales in Wisconsin." Dkt. No. 15 at 18. The plaintiffs assert that Wisconsin's relationship with the events that gave rise to the claims is not mere "happenstance." Id.

Two major factual events give rise to the plaintiffs' claims: (1) the sale of the gun from Caldwell to Jones through the advertisement on Armslist.com, and (2) the shooting of Commander Bauer. The second amended complaint alleges that Caldwell—a Wisconsin resident—placed an ad on Armslist.com which caused Jones—a Milwaukee-area gun trafficker—to buy a gun. Those are *Wisconsin* contacts. They allege that Jones re-sold the gun into the "broader criminal market" in the Chicago area—an *Illinois* contact. Eventually, the gun ended up in the hands of Shomari Legghette. Armslist infers that whatever transfers happened between the time Jones re-sold the gun and the time Legghette obtained it occurred in Illinois, but the second amended complaint is silent on that issue. The second amended complaint also is silent regarding Legghette's state of citizenship. Legghette used the gun to kill Bauer, an *Illinois* citizen. It appears likely that the shooting occurred in Illinois, but the second amended complaint does not say so.

39

Wisconsin law presumes that Wisconsin law applies unless the Illinois contacts are clearly more significant. The court cannot conclude that the Illinois contacts—either alleged or inferred—are clearly more significant than the Wisconsin contacts. If Legghette murdered Commander Bauer in Illinois, that would be a significant contact under the circumstances of the case. But the fact that a Wisconsin resident posted the ad that caused a Wisconsin gun trafficker to purchase the firearm that made its way into what appears to have been the illegal gun market that allowed Legghette to obtain it is also a significant fact under the circumstances of the case. Because neither forum has clearly more significant contacts than the other, the court must move on to consider the five factors.

First, the court considers the predictability of results—a factor that "deals with the parties' expectations." State Farm Mut. Auto. Ins. Co. v. Gillette, 251 Wis. 2d 561, 589 (Wis. 2002). The court asks "what legal consequence of the [sale of the gun] comports with the expectations of the parties?" Id. The plaintiffs allege that it was the defendant's negligence in failing to monitor the activities of Wisconsin residents Caldwell and Jones that led to Commander Bauer's death at Legghette's hands. Viewed from that perspective, the parties likely would expect the dispute to be resolved under Wisconsin law. Armslist argues that the underlying tort occurred out of state, apparently referencing the murder of Commander Bauer, and asserts that under Brinks, "it is more predictable that [the defendant] would be subject to Illinois laws rather than Wisconsin laws." Dkt. No. 6 at 21 (citing Brinks, 2020

40

WL 433886, at *3). But this analysis assumes that the underlying tort is the murder of Commander Bauer. While that murder is part of the chain of events, the heart of the plaintiffs' allegations is that the defendant did not take steps to prevent Wisconsin residents Caldwell and Jones from engaging in the unlawful firearms dealing that led to Commander Bauer's murderer having the gun that killed him. And the <u>Brinks</u> court's conclusion that Illinois law applied was based on more than the fact that the tort occurred in Illinois—"[n]ot only did the tort occur in Illinois, but it was allegedly caused by an Illinois citizen with whom the defendants contracted to carry out business in Illinois" and "[t]he defendants [were] being sued over the Illinois citizen's conduct in the course of that business." <u>Brinks</u>, 2020 WL 433886, at *3. This factor weighs in favor of applying Wisconsin law.

Second, the court considers the maintenance of interstate and international order; this factor "requires that the jurisdiction that is minimally concerned defer to the jurisdiction that is substantially concerned." <u>State Farm</u>, 251 Wis. 2d. at 589-90. Here, both states are equally concerned. Wisconsin has an interest: the defendant's website is a starting point for what the plaintiffs allege is the unlawful selling and purchasing of guns in Wisconsin and the allegations in the complaint demonstrate that Wisconsin residents were able to use Armslist.com to engage in unlawful, unlicensed gun trafficking. Illinois has an interest: the plaintiff is a citizen of Illinois. The second amended complaint alleges that the firearm made its way to the "broader criminal market" in the Chicago area, and the gun was used to

41

murder an Illinois resident and law enforcement officer. Illinois has significant interests in the safety of its citizens and public servants, and in preventing illegally-purchased guns from entering the state. Armslist again argued that the alleged tort occurred in Illinois and asserted that none of the parties are citizens of Wisconsin. Dkt. No. 6 at 21. As discussed above, only *part* of the alleged tort occurred in Illinois. And while it is true that none of the *parties* are citizens of Wisconsin, the second amended complaint alleges that some of the *actors* in the chain of events that caused the injury were in Wisconsin and that the sale of the firearm occurred in Wisconsin, because of illegal gun trafficking by Wisconsin residents. This factor is neutral.

Third, the simplification of the judicial task factor states that a "'simple and easily applied rule of substantive or procedural law is to be preferred.'" State Farm, 251 Wis.2d at 591 (quoting Heath v. Zellmer, 35 Wis. 2d 578, 597 (Wis. 1967)). The court can easily and simply apply Wisconsin law, the law of the forum state. See Drinkwater v. Am. Family Mut. Ins. Co., 290 Wis. 2d 642, 662 (Wis. 2006) ("This court has stated a general rule that the judicial task is rarely simplified when lawyers and judges must apply themselves to foreign law."). To state a negligence claim under Illinois law, a plaintiff "must allege: 1) the existence of a duty of care owed by the defendant to the plaintiff; 2) a breach of that duty of care; and 3) an injury proximately caused by that breach." Leslie v. Medline Indus. Inc., No. 20-cv-01654, 2021 WL 4477923, at *7 (N.D. Ill. Sept. 30, 2021) (citing Monson v. City of Danville, 115 N.E.2d 81, 95 (Ill. 2018)). "It is undisputed that Illinois law requires a 'legally cognizable

42

present injury or damage to sustain a negligence claim.'" Id. (quoting Yu v. Int'l Bus. Machs. Corp., 732 N.E.2d 1173, 1177 (Ill. App. Ct. 2000)). These elements are similar to the elements a plaintiff must allege to state a claim for negligence under Wisconsin law: "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury." Hornback v. Archdiocese of Milwaukee, 313 Wis. 2d 294, 305 (Wis. 2008) (quoting Gritzner v. Michael R., 235 Wis. 2d 781, 790-91 (Wis. 2000)).

There *is* a difference between Wisconsin and Illinois negligence law, one that the Webber court explained:

> Wisconsin, unlike Illinois, . . . has abandoned the "no duty-no liability concept of the majority in *Palsgraf* . . . ." *A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 483 . . . (1974) (citing *Palsgraf v. Long Island R.R.Co.*, 248 N.Y. 339 . . . (1928)). The first element, a duty of care, is established under Wisconsin law whenever it was foreseeable to the defendant that his or her act or omission might cause harm to some other person." *Gritzner*, 235 Wis.2d 781, ¶20. In other words, under Wisconsin law, "[a] defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone." *Id.*

Webber, 2021 WL 5206580, at *7. This distinction matters little in applying the simplification of the judicial task; the court could as easily apply either state's law.

Armslist argued that "there is already controlling law in Illinois involving Armslist," and thus that the third factor weighs in its favor. Dkt. No. 6 at 22. The court assumes that the defendant was referring to Vesely v. Armslist, LLC.

43

In Vesely, the Seventh Circuit affirmed the district court's dismissal of the plaintiff's complaint against Armslist, finding that the plaintiff (who had made allegations similar to those made by the plaintiffs in this case) had failed to state a claim for negligence under Illinois law. Vesely v. Armslist, LLC., 762 F.3d 661, 667 (7th Cir. 2014). The decision in Vesely means that the simplification of the judicial task factor weighs slightly in favor of applying Illinois law, but only slightly.

Fourth, the advancement of the forum's governmental interests factor addresses "whether the nonforum rule comports with the standards of fairness and justice that are embodied in the policies of the forum law." State Farm, 251 Wis.2d at 592. "If it appears that the application of forum law will advance the governmental interest of the forum state, this fact becomes a major, though not in itself a determining, factor in the ultimate choice of law." Id. (quoting Heath, 35 Wis.2d at 598). This factor appears to be neutral. As the court noted when analyzing the third factor, the Wisconsin and Illinois negligence laws are similar. This is not a situation whether application of one forum's law would thwart the legitimate governmental interests of either forum. Armslist appears to agree, asserting that "[the plaintiffs'] faulty theories of liability are equally invalid under Illinois or Wisconsin law." Dkt. No. 6 at 22.

The plaintiffs argue that as a "justice-seeking" jurisdiction, Wisconsin has an interest in the parties' conduct because Wisconsin is a government "which seeks safety for persons." Dkt. No. 15 at 19. They assert that Wisconsin's interests would be advanced by holding Armslist accountable "for

44

their forum-related activities." Id. at 19-20. The court does not agree that this factor weighs more heavily in favor of applying Wisconsin law. Presumably the Illinois government also seeks "safety for persons" and presumably its interests would be advanced by holding Armslist accountable (if it is liable) for any activities that resulted in injury in Illinois. The plaintiffs' arguments do not persuade the court that this factor is not neutral.

Finally, the parties do not dispute that the application of the better rule of law factor is neutral. Dkt. No. 6 at 22 ("Here, though the formulation of a tort duty differs slightly between Illinois and Wisconsin . . . neither can be said to "anachronistic" [sic] and as such factor (v) does not favor either forum."); Dkt. No. 15 at 20 ("The fifth factor is thus, neutral.")

The first factor weighs in favor of applying Wisconsin law. The second, fourth and fifth factors are neutral. The third factor weighs slightly in favor of applying Illinois law. The court concludes that Wisconsin law applies. In an abundance of caution, however, it also has considered whether the plaintiffs might have stated claims under Illinois law where they have not stated claims under Wisconsin law.

### 2. *The Substantive Claims*

#### a. Negligence

In Wisconsin, the sufficiency of a negligence claim depends on whether a complaint alleges facts adequately establishing the following four required elements: "(1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury."

45

Hornback, 313 Wis. 2d at 305 (quoting Gritzner, 235 Wis. 2d at 790-91). As the court has discussed, the duty of care is established when it was foreseeable to the defendant that its acts or omissions could cause harm to someone else. Gritzner, 235 Wis. 2d at 791. As for breach,

> [a] person is negligent when [he or she] fails to exercise ordinary care. Ordinary care is the care which a reasonable person would use in similar circumstances. A person is not using ordinary care and is negligent, if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.

Id. at 792 (quoting Wis JI-Civil 1005).

Finally, "ordinary negligence law . . . requires a causal link between a defendant's negligence and the plaintiff's injuries." Burton v. E.I. du Pont de Nemours and Co., Inc., 994 F.3d 791, 821 (7th Cir. 2021) (citing Fondell v. Lucky Stores, Inc. 85 Wis. 2d 220 (Wis. 1978)). "To establish causation, [the plaintiff] has the burden of showing that negligence by [the defendant] was "'a substantial factor in producing'" [the plaintiff's] injuries." Murphy v. Columbus McKinnon Corp., 399 Wis. 2d 18 at ¶77 (Wis. 2021) (citing Morden v. Continental AG, 235 Wis.2d 325, 361 (Wis. 2000)). To constitute cause, "[t]he negligent conduct need not be the sole or primary factor, only a substantial factor." Nieuwendorp v. Am. Family Ins. Co., 191 Wis. 2d 462, 475 (Wis. 1995) (citing Clark v. Leisure Vehicles, Inc., 96 Wis.2d 607, 617 (Wis. 1980)). "Whether negligence was a cause-in-fact of an injury is a factual question for the jury if reasonable people could differ on the issue, and the question only becomes one of law for judicial decision if reasonable people could not

46

disagree." <u>Cefalu v. Cont'l W. Ins. Co.</u>, 285 Wis. 2d 766, 773 (Wis. Ct. App. 2005) (citing <u>Morgan v. Pa. Gen. Ins. Co.</u>, 87 Wis. 2d 723, 737 (Wis. 1979)).

Just as the plaintiff did in <u>Webber</u>, the plaintiffs here have alleged

that [the defendant] (1) knew criminal gun buyers and sellers frequently exploit a legal loophole allowing "occasional" gun sales by private sellers that skirt state and federal regulations; (2) knew in [the year of the events alleged in the second amended complaint] that Armslist.com was facilitating illegal and reckless sales by unlicensed sellers and purchases by prohibited possessors; and (3) specifically created and designed their website to capitalize on this illegal market opportunity after other companies offering similar services abandoned it.

<u>Webber</u>, 2021 WL 5206580, at *8. <u>See</u> Dkt. No. 4 at ¶¶2-11, 33-36, 38-58.

Given Wisconsin's law on duty—that the duty of care is established when it is foreseeable to the defendant that its acts or omissions could cause harm to someone else—the second amended complaint states facts sufficient to establish that Armslist had a general duty to exercise ordinary care. The second amended complaint alleges facts sufficient to assert breaches of that duty—the failure to implement screening mechanisms to identify or remove or report individuals who are selling or buying large numbers of firearms through the website, the failure to track patterns of users of the website, the defaulting to a "private seller" tag ads created by users who have not created accounts. And the second amended complaint alleges actual loss or injury—the death of Commander Bauer.

The issue here, as it was in <u>Webber</u>, is whether the second amended complaint states sufficient facts to show that those breaches were a "substantial factor" in causing Commander Bauer's death. The Wisconsin

47

Supreme Court has explained that "[t]he phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." Merco Distrib. Corp. v. Commercial Police Alarm Co., Inc., 84 Wis. 2d 455, 458-59 (Wis. 1978) (citations omitted). Would a reasonable person conclude that the way Armslist structured the Armslist.com website, and its alleged failures to monitor how that website was being used, had such an effect in producing Commander Bauer's death that that reasonable person would regard the website as a cause of Commander Bauer's death? The answer must be no.

Shomari Legghette killed Commander Bauer. Although the gun he used to kill Commander Bauer had been advertised on Armslist.com by Caldwell and purchased by Jones, the second amended complaint does not allege that Legghette obtained the gun from Armslist, Caldwell or Jones. The second amended complaint alleges that Jones bought the gun from Caldwell in 2017; Legghette killed Commander Bauer with the gun on February 13, 2018. The second amended complaint sheds no light on how the gun made its way from Jones to Legghette. While the ability of an unlicensed firearms dealer (Caldwell) to advertise the gun on Armslist.com and the ability of a firearms trafficker (Jones) to find that ad on Armslist.com and connect with Caldwell to make the purchase set in motion the series of events that eventually put a gun in the hands of a prohibited person who used it to commit a murder, the line between Armslist's alleged acts and omissions and Legghette's murder of Commander

48

Bauer is too attenuated to constitute a "substantial factor" in Commander Bauer's death.[4]

The second amended complaint alleges that "Legghette would never have had the Handgun on February 13, 2018—and Commander Bauer would still be alive—had the Armslist Defendants been responsible, reasonable and lawful in how they designed and administered Armslist.com." Dkt. No. 4 at ¶143. It alleges that Legghette "would not have been able to acquire the Handgun" had Armslist taken various monitoring and preventive measures. Id. at ¶144. The plaintiffs likely are correct that Legghette would not have killed Commander Bauer with the particular Glock 9mm that made its way from Caldwell to Jones to Legghette if Armlist had flagged the fact that Caldwell was acting as an unlicensed gun dealer on Armslist.com or had barred Caldwell. But the assertion that if Legghette had not had that particular gun Commander Bauer would be alive today is a "legal conclusion couched as a factual assertion," and the court is not required to accept it as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombley, 550 U.S. at 555). As the Webber court noted, "Armslist is hardly the only source of guns in this country . . . ." Webber, 2021 WL 5206580, at *9. Legghette—whom the second amended complaint describes as a violent criminal, a prohibited person who would not have been able to legally purchase a gun because of felony convictions—managed to obtain a

_____

[4] The connection between the defendant's alleged conduct and the death of Commander Bauer is even more attenuated that the connection between Armslist's alleged conduct and the death of Sara Schmidt in Webber; Schmidt's estranged husband purchased the gun he used to murder her from a private seller whose ad he saw on Armslist. Webber, No. 2021 WL 5206580, at *8.

49

firearm despite his felony convictions and his prohibited status. The plaintiffs' assertion that Commander Bauer would still be alive today if Legghette had not obtained that particular gun is implausible; it assumes that there was no other way for Legghette to arm himself, an assumption sadly disproved by the number of felon-in-possession cases pending in state and federal courts and the number of firearms that law enforcement officers recover from prohibited persons. The second amended complaint does not sufficiently allege cause under Wisconsin law, and does not state a claim for negligence.

Even if the second amended complaint properly had pled a claim for negligence under Wisconsin law, it is possible that Wisconsin public policy would have barred the negligence claim.

> When determining whether public policy bars liability for negligence, [courts] must consider whether: (1) the injury is too remote from the negligence; (2) the injury is disproportionate to the negligent tortfeasor's culpability; (3) it appears too highly extraordinary, in retrospect, that the negligence should have brought about the harm; (4) allowing recovery would place an unreasonable burden on the tortfeasor; (5) allowing recovery would tend to open the door to fraudulent claims; and (6) allowing recovery would open a field having no sensible or just stopping point.

Lakeland Commc'n Grp. LLC v. Polk Cty., 383 Wis. 2d 785, 2018 WL 3241405, at *5 (Wis. Ct. App. July 3, 2018) (citing Gritzner, 235 Wis. 2d 781 at 794-95).

In Webber, the court concluded that Wisconsin's public policy barred the suit against Armslist because the injury was too remote from and out of proportion to Armslist's conduct and because allowing recovery would place an unreasonable burden on Armslist. Webber, 2021 WL 5206580, at *10. The court explained that after the firearm was purchased from a private party

50

based on an ad posted on Armslist.com, the user of the gun committed "an abhorrent and tragic crime." Id. Given the Seventh Circuit's holding that "acts that are either criminal or intentionally tortious . . . are more likely to be adjudged superseding causes than merely negligent acts," id. (quoting Scottsdale Ins. Co. v. Subscription Plus, Inc., 299 F.3d 618, 620 (7th Cir. 2002), the Webber court concluded that "the conscious, pre-meditated decisions and actions of Schmidt's killer served as a superseding cause of Plaintiff's injury." Id. While acknowledging that Armslist may have owned and operated the website that the killer used to buy the gun, the court concluded that "lawfully providing a forum for individuals to engage others interested in buying and selling firearms is simply too far removed and out of proportion to the criminal act committed by Schmidt's killer." Id.

That reasoning arguably is more persuasive here, where the killer did not use the website to obtain the gun he used to kill Commander Bauer. But courts should proceed cautiously in finding that public policy factors bar liability. The public policy factors are "judicial policy considerations that function like a proximate cause analysis." Burton, 994 F.3d at 829. "[W]hen a court precludes liability based on public policy factors, it is essentially concluding that despite the existence of cause-in-fact, the cause of the plaintiff's injuries is not legally sufficient to allow recovery." Fandrey ex rel. Connell v. Am. Family Mut. Ins. Co., 272 Wis.2d 46, 61 (Wis. 2004). The public policy factors "operate as a check on liability in rare cases;" for example, "[o]verriding a jury verdict based on public policy considerations is 'infrequent'

51

and requires 'unusual and extreme considerations.'" <u>Burton</u>, 994 F.3d at 829 (quoting <u>Roehl Transp., Inc. v. Liberty Mut. Ins. Co.</u>, 325 Wis. 2d 56, 110 (Wis. 2010)). The Wisconsin Supreme Court has stated that "[a]s a matter of best practice," it will "refrain from a public policy consideration of liability until after a trial of the facts." <u>Hornback</u>, 313 Wis. 2d at 322. Under the facts of this case, the court need not base its decision on the public policy factors; the plaintiffs have failed to state a negligence claim under Wisconsin law.

Nor does it appear that the plaintiffs could have stated a claim for negligence under Illinois law. In <u>Vesely</u>, 762 F.3d at 663-64, a man purchased a gun from an Armslist advertiser and used it to murder a woman who had rejected his romantic overtures. The woman's brother sued for, among other things, negligence under Illinois law. <u>Id.</u> at 664. The Seventh Circuit held that the plaintiff had not stated sufficient facts to show that Armslist had a duty of care, because he could not show a relationship between Armslist and the murder victim (as required by Illinois negligence law). <u>Id.</u> at 665. And the court held that "when a criminal act by a third party is the cause of the injury, a special relationship is required before any further analysis." <u>Id.</u> The Seventh Circuit concluded that no special relationship existed between the parties and that the complaint had alleged no such relationship. <u>Id.</u> at 665-66. In rejecting the plaintiff's argument that Armslist's acts or omissions created a condition conducive to a foreseeable intervening criminal act, the court stated that "simply *enabling* consumers to use a legal service is far removed from encouraging them to commit an illegal act." <u>Id.</u> at 666 (citation omitted).

52

The second amended complaint does not allege a relationship—special or otherwise—between Armslist and Commander Bauer or Erin Bauer. And while the plaintiffs have alleged that the design of the website and Armslist's failure to implement safeguards and conduct monitoring and reporting created a condition conducive to the intervening criminal act, the Seventh Circuit has rejected that argument when applying Illinois law.

### b. Negligence *Per Se*

The second amended complaint alleges that breaching a statutory standard of care constitutes negligence, that Caldwell was convicted of selling firearms without a license on Armslist in violation of 18 U.S.C. §923(a) and that Armslist aided and abetted Caldwell because it was willfully blind to the clear red flags raised by his activities on the website. Dkt. No. 4 at ¶¶168-174.

Under Wisconsin law, "[o]ne who violates a criminal statute must be held negligent *per se* in a civil action for damages based on such violation." Bennett v. Larsen Co., 118 Wis. 2d 681, 692-93 (Wis. 1984) (quoting McAleavy v. Lowe, 259 Wis. 463, 475 (Wis. 1951)). If the plaintiffs had sued Caldwell, they may have had a claim against *him* for negligence *per se*. But *Armslist* has not been convicted of violating 18 U.S.C. §923(a). The plaintiffs assert that the defendant can be held liable as an "accomplice or co-conspirator to a party who directly violates a statute" under 18 U.S.C. §2. Dkt. No. 4 at ¶170. But 18 U.S.C. §2 is a criminal statute. It does not create a private right of civil action. The plaintiffs have not alleged that Armslist was charged with, or convicted of, criminally

53

aiding and abetting Caldwell or anyone else. The plaintiffs have not stated a claim for *per se* negligence under Wisconsin law.

Under Illinois law, "[i]n a common law negligence action, a violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence; the violation does not constitute negligence *per se*." Abbasi *ex rel.* Abbasi v. Paraskevoulakos, 187 Ill. 2d 386, 394 (Ill. 1999) (citing Kalata v. Anheuser-Busch Cos., 144 Ill. 2d 425, 434-35 (Ill. 1991)). In addition to the reasons the plaintiffs have not stated a negligence *per se* claim under Wisconsin law, it appears that the plaintiffs could not have stated a negligence *per se* claim under Illinois law because even if Armslist (and not Caldwell) had been convicted of violating a criminal statute, that violation would have constituted only *prima facie* evidence of negligence, not negligence *per se*.

### c. Public Nuisance

The plaintiffs claim that by its alleged acts and omissions, Armslist "intentionally, recklessly and/or negligently participated in creating and maintaining an unreasonable interference with rights held in common by the general public." Dkt. No. 4 at ¶183. They assert that Armslist's actions constitute a public nuisance "under both common and statutory law."[5] Id. at ¶185.

---

[5] The plaintiffs did not identify any "public nuisance" statute, despite alleging that Armslist's actions constituted a public nuisance under "statutory law."

54

Under Wisconsin law, "[t]he tort of nuisance is grounded in a condition or activity that unduly interferes with a public right or with the use and enjoyment of private property." Bostco LLC v. Milwaukee Metro. Sewerage Dist., 350 Wis. 2d 554, 575 (Wis. 2013) (citation omitted). "A public nuisance involves the impingement of public rights, rights that are common to all members of the public." Id. "In order to recover for a public nuisance, an individual must have suffered harm of a kind different from other members of the public who exercised that common right." Id. (citing Restatement (Second) of Torts, §821C). A court first must determine whether a nuisance exists; if it does, the court must determine "whether the complained of conduct was a cause of creating the nuisance." Butler v. Advanced Drainage Systems, Inc., 294 Wis. 2d 397, 417 (Wis. 2006) (citations omitted). "Proof that the underlying conduct was tortious is necessary to liability predicated on nuisance." Id.

Because the court has concluded that the plaintiffs have not stated a negligence claim under Wisconsin law, there is no proof that the underlying conduct of which they complain was tortious. The plaintiffs have not stated a claim for public nuisance under Wisconsin law.

To state a public nuisance claim under Illinois law, "the complaint must allege four distinct elements . . . : the existence of a public right, defendants' substantial and unreasonable interference with that right, proximate cause, and injury." Young v. Bryco Arms, 213 Ill. 2d 433, 441 (Ill. 2004). The court has concluded that the plaintiffs have not pleaded a sufficient causal link between Armslist's alleged acts and omissions and the injury suffered. And the

55

Illinois Supreme Court has held that "legal cause will not be found where the criminal acts of third parties have broken the causal connection and the resulting nuisance "'is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong.'"" Id. at 453 (quoting City of Chi. v. Baretta U.S.A. Corp., 213 Ill. 2d 351, 408 (Ill. 2004). Shomari Legghette's criminal act broke whatever causal connection there may have been and the plaintiffs have not alleged that he was under the control of Armslist. It does not appear that the plaintiffs could have stated a claim for public nuisance under Illinois law.

> d.    Aiding and Abetting Tortious Conduct

Wisconsin recognizes the claim of aiding and abetting a negligent tort. Winslow v. Brown, 125 Wis. 2d 327, 334 (Wis. Ct. App. 1985). "[A] person is liable in a civil action for aiding and abetting if: (1) the person undertakes conduct that as a matter of objective fact aids another in the commission of an unlawful act; and (2) the person consciously desires or intends that his conduct will yield such assistance." Id. at 336. Knowledge of illegal conduct is insufficient to show that a defendant assisted in the unlawful conduct. Id. at 336-37.

The plaintiffs allege that the defendant was on notice "that unlicensed dealers like Caldwell disproportionately engage in" negligent actions such as Caldwell's negligent transfer of the gun to Jones despite allegedly knowing that Jones was likely to resell the gun to violent criminals. Dkt. No. 4 at ¶¶202-204. The second amended complaint does not assert that the defendant

56

"consciously desires" or "intends" to assist these types of sales. It alleges only knowledge, which is insufficient to prove aiding and abetting tortious conduct under Wisconsin law.

Illinois appears to recognize a cause of action for "act[ing] in concert with another tortfeasor, giving substantial assistance or encouragement to another's tortious conduct." Simmons v. Homatas, 236 Ill. 2d 459, 476 (Ill. 2010) (citing Restatement (Second) of Torts §876 (1979)). To determine whether a plaintiff has stated a claim for in-concern liability, a court must consider "(1) the nature of the act encouraged, (2) the amount of assistance given by the defendant, (3) his presence or absence at the time of the tort, (5) his relation to the other, and (5) his state of mind." Id. at 477. Because it requires the court to consider the defendant's relationship to the tortfeasor and the defendant's state of mind, the in-concert cause-of-action is similar to the Wisconsin aiding-and-abetting cause of action. The plaintiffs have not alleged that the defendant intended to assist or encourage the conduct of unlicensed firearms dealers like Caldwell.

Illinois also appears to recognize civil aiding and abetting; to state a claim, the plaintiff must allege that "(1) the party whom the defendant aided performed a wrongful act that caused an injury; (2) the defendant was generally aware of his role as part of the overall wrongful or tortious activity when he provided the assistance; and (3) the defendant knowingly and substantially assisted in the principal violation." Johnson v. Filler, 109 N.E.3d 370, 374 (Ill. App. Ct. 2018) (citation omitted). Again, the second amended complaint does not allege that the defendant knowingly assisted Caldwell. It

57

does not appear that the plaintiffs could have stated an aiding and abetting claim under Illinois law.

e.    Civil Conspiracy

The second amended complaint alleges that Armslist conspired with others to supply firearms to prohibited persons when it decided to "act in concert and with a common purpose to breach various duties imposed by federal and/or state firearms statutes (either directly or as accomplices/co-conspirators) as well as to violate the common law duty of reasonable care." Dkt. No. 4 at ¶209. It asserts that Gibbon and Armslist "and/or other parties known or unknown explicitly or implicitly conspired with one another to participate in a collaboration/combination to accomplish an unlawful purpose—the supply of firearms to Prohibited Purchasers either directly or through gun traffickers like Jones." Id. In their brief in opposition to Gibbon's motion to dismiss, the plaintiffs suggest that "Gibbon and Armslist could have conspired with various unknown third-party web designers, marketing professionals or firearms industry actors who are not employees/agents of Armslist in setting up Armslist.com to function as a haven for illegal firearms transactions." Dkt. No. 15 at 28.

Wisconsin law defines a civil conspiracy as "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means a purpose not in itself unlawful." Thomas *ex rel.* Gramling v. Mallett, 285 Wis. 2d 236, 324 (Wis. 2005) (quoting Onderdonk v. Lamb, 79 Wis. 2d 241, 246 (Wis. 1977)). "To state a cause of action for civil

58

conspiracy, the complaint must allege: (1) The formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting from such acts." Id. (quoting Onderdonk, 79 Wis. 2d at 247).

The defendant argued in support of dismissal that under Wisconsin law, a corporation cannot conspire with its agents; it asserted that the plaintiffs' conspiracy claim "makes this exact allegation—that Mr. Gibbon and Armslist entered into a civil conspiracy." Dkt. No. 6 at 29-30. Neither of the cases the defendant cited state as much, and even if the plaintiffs had cited a case that stood for this proposition, the second amended complaint alleges that Gibbon and Armslist "and/or other parties" conspired.

This claim, however, is especially vague. The second amended complaint alleges that Gibbon and Armslist "and/or other parties" conspired. What other parties? In their brief, the plaintiffs speculate that there could have been all manner of co-conspirators, but the second amended complaint does not make that allegation. While the language of the claim is phrased in terms of intention—conspiring to supply firearms to prohibited persons—the complaint does not allege any other facts indicating that was Armslist's intent. It alleges that Armslist had reason to know that users of its website may have been doing things that resulted in guns ending up in the hands of prohibited persons. But it does not allege in anything other than a conclusory fashion that Armslist intended to help put guns in the hands of prohibited persons. The second amended complaint does not state a civil conspiracy claim under Wisconsin law.

59

Under Illinois law, a civil conspiracy is "a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means." Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 62 (Ill. 1994). The Illinois Supreme Court has held that "[w]hile a civil conspiracy is based upon intentional activity, the element of intent is satisfied when a defendant knowingly and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner." Id. at 64. It does not appear that the plaintiffs could have stated a civil conspiracy claim under Illinois law, because the second amended complaint alleges no facts indicating that Armslist knowingly and voluntarily participated in a scheme to put guns in the hands of prohibited persons.

f.      Wrongful Death, Loss of Consortium and Survivorship

The plaintiffs allege that "as a result of the misconduct discussed in this Complaint," the defendant caused Commander Bauer's wrongful death. Dkt. No. 4 at ¶216. They assert that as a result of the alleged misconduct, Erin Bauer was deprived of her husband's presence, support, affection and companionship. Id. at ¶224. And they allege that Erin Bauer is entitled to bring any claims Commander Bauer could have brought against the defendant. Id. at ¶227. These claims "relat[e] to the death of a tort victim." Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 293 Wis. 2d 38, 58 (Wis. Ct. App. 2006). See also, Christ v. Exxon Mobil Corp., 362 Wis. 2d 668, 681-82 (Wis. 2015) ("Damages for injuries sustained by a *tort victim* prior to his

60

death now survive in what is known as a survival action;" "Certain relatives of *tort victims* are now able to bring actions for wrongful death;" "Wrongful death actions are derivative tort actions.") (emphasis added). Because the plaintiffs have not stated a claim against Armslist for negligence under Wisconsin law, there is no tort from which to derive claims of wrongful death, loss of consortium and survivorship.

It appears the same would have been true under Illinois law, whose Wrongful Death Act provides the survivor with a cause of action if the death was caused "by a wrongful act, neglect or default." Williams v. Manchester, 228 Ill. 2d 404, 419 (Ill. 2008).

g.      Piercing the Corporate Veil

Finally, the second amended complaint asserted that Armslist was not appropriately capitalized, did not follow corporate formalities and operated as the alter ego of Gibbon. Dkt. No. 4 at ¶¶230-231. For these reasons, the plaintiffs asked the court to pierce the corporate veil and "hold Gibbon individually responsible for all liabilities imposed on Armslist in connection with this case." Id. at ¶233.

The court dismissed Gibbon for lack of personal jurisdiction over a year ago. It now concludes that the plaintiffs have not stated claims against Armslist. Even if the plaintiffs' assertions that Armslist was not appropriately capitalized, did not follow corporate formalities and acted as Gibbon's alter ego were more than conclusory assertions, Armslist has no liability for the court to

61

impose on Gibbon personally. The plaintiffs have not stated a claim for piercing the corporate veil.

## VI. Conclusion

The murder of Commander Paul Bauer on February 13, 2018 was horrific and inexcusable. The court cannot imagine the pain Erin Bauer has endured at the loss. She is not alone in her anger and frustration that people who should not have guns—who are prohibited from having guns—appear able to obtain them with little effort and use them to wreak unspeakable damage. But that understandable anger and frustration does not translate into a claim for tortious conduct by the website on which the ad for the gun that made its way to Shomari Legghette appeared.

The court **GRANTS** Armslist, LLC's motion to dismiss for failure to state a claim. Dkt. No. 7.

The court **DENIES AS MOOT** the parties' joint motion for a Rule 16(a) status conference. Dkt. No. 28.

The court **ORDERS** that the case is **DISMISSED** for failure to state a claim. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 19th day of November, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

62